# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Ellen S. Ewald, | Civil No. 11-2116 SRN/SER |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Royal Norwegian Embassy and Gary Gandrud, Esq., | |
| Defendants. | |

Thomas E. Marshall, Esq., Sheila A. Engelmeier, Esq., and Susanne J. Fischer, Esq., Engelmeier & Umanah, P.A., Minneapolis, MN, on behalf of Plaintiff Ellen S. Ewald.

Sean Somermeyer, Esq., and Daniel G. Wilczek, Esq., Faegre Baker Daniels LLP, Minneapolis, MN, on behalf of Defendants Royal Norwegian Embassy and Gary Gandrud.

## I. INTRODUCTION

On December 15, 2011, the undersigned United States District Judge heard oral argument on Defendant Gary Gandrud's ("Gandrud") Motion to Dismiss [Docket No. 4], as well as Plaintiff Ellen S. Ewald's ("Ewald") Motion to Strike [Docket No. 12]. At that hearing the Court requested supplemental memoranda on certain underlying legal issues. Having reviewed all of the submissions and for the reasons set forth below, Defendant Gandrud's Motion to Dismiss is granted and the Plaintiff's Motion to Strike is denied.[1]

---

[1] On December 9, 2011, Ewald moved to strike the Affidavit of Elisabeth Wemberg [Docket No. 11], filed concurrently with Gandrud's Reply Memorandum [Docket No. 10] on December 1, 2011. Ewald argues that the untimely filing of this affidavit violated Minnesota Local Rules 7(b)(1–3), as well as established case law. Ewald also argues that if this material is considered, she should be permitted to undertake discovery. This Court has not considered the Affidavit of Elisabeth Wemberg in coming to its decision, and the Motion to Strike is now denied as moot.

## II.  BACKGROUND[2]

Ewald is a United States citizen currently living in Minnesota.  Gandrud is a Minnesota resident working as Honorary Consul[3] for Norway at the Honorary Norwegian Consulate General in Minneapolis.   Notice of Removal [Docket No. 1] Ex. A ("Complaint") ¶¶ 1, 2, 3.  In 2008, Ewald interviewed for the position of Higher Education and Research Officer with various individuals at the Norwegian Consulate and at the Norwegian Embassy in Washington, D.C. ("Embassy").  Id. ¶ 10.  Ewald alleges that the Embassy told her that the Higher Education and Research Officer position offered the same salary, benefits, and responsibilities as the other contemporaneously posted position, that of Innovation and Business Development Officer.  Id. ¶ 7, 11.  Based on these representations, Ewald accepted the offer of employment as  Higher Education and Research Officer on October 1, 2008, and relocated from Norway in order to begin work for the Embassy at the Consulate in Minnesota.  Id. ¶¶ 12–13.  The Embassy hired Mr. Anders Davidson ("Davidson") as the Innovation and Business Development Officer.  Id. ¶ 15.

Ewald first complains that her domestic partner Mr. Terje Mikalsen and her two daughters were denied health insurance coverage, but that Davidson's wife and children received coverage.  Id. ¶ 18.  Ewald complained on several occasions that Davidson's family was covered under the health insurance plan while hers was not.  Id. ¶ 20.  The Embassy changed its position

---

[2] In considering Gandrud's Motion to Dismiss, the Court takes the facts alleged in Ewald's Complaint to be true.  See Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994).

[3] Gandrud was appointed Honorary Consul for the Kingdom of Norway on August 1, 2008, and became Honorary Consul General on January 15, 2010.  Gandrud Aff. [Docket No. 7] ¶¶ 2, 5.  His position is given as "Honorary Consul" throughout this opinion for ease of reference.

on November 6, 2008, agreeing to offer health insurance to Ewald's partner and youngest daughter. On March 19, 2009, however, the Embassy again changed its position and stated it would be cancelling Ewald's partner's insurance. Id. ¶¶ 22–24.

Ewald next complains that in August 2009, she discovered that Davidson's salary was approximately $110,000, while hers was only $70,000. Id. ¶ 25. She wrote several letters to the Embassy and her supervisors, seeking an explanation of the apparent inequity in salaries. Id. ¶¶ 26–32. An Embassy employee told Ewald that it had been Gandrud's decision to pay Davidson more than Ewald. Id. ¶ 34.

In early January 2010, Gandrud told Ewald that he did not set the salaries for Ewald and Davidson and that Ewald should "nip this in the bud" or there might be "consequences." Id. ¶¶ 33-36. Ewald stated that she thought this was gender discrimination, and she alleges that Gandrud pounded his fist on the table to end the discussion. Id. ¶ 38.

Ewald further alleges that the Embassy did not provide her adequate assistance; for instance, Davidson received an assistant, while Ewald did not. Id. ¶ 41. Moreover, Davidson received travel funding four times in six months, while Ewald had to pay for her own job-related travel. Id. Ewald also alleges that the Embassy interfered with her ability to perform her job by not permitting her to be a part of 2010 Science Week and by not inviting her to the Ceremonial Signing between the University of Minnesota and Oslo held during Science Week, although Science Week is specifically identified in her job duties. Id. ¶¶ 43, 49.

She further alleges that Gandrud did not invite Ewald to accompany him on visits to Concordia College and Luther College, and he allegedly excluded Ewald from participating in the planning meetings for the Norwegian royal visit in the fall of 2011. Id. ¶¶ 45–46. Although

she attended the Torskeklubben luncheon in 2009 and 2010, Ewald was not invited to attend the event with Gandrud. Id. ¶ 57. The Embassy informed Ewald that her position would not be extended beyond its expiration in October 2011, although the Embassy initially offered an extension to Davidson. Id. ¶ 59. Ewald filed her Complaint in Hennepin County District Court on July 1, 2011, and the complaint was removed to federal court on July 27, 2011.

### III.  DISCUSSION

**A.     Motion to Dismiss Standard**

A motion to dismiss a complaint for lack of subject-matter jurisdiction is governed by Rule 12 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(1). In considering a Rule 12(b)(1) motion, the court views the pleadings in the light most favorable to the nonmoving party and treats the alleged facts as true. See Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993). Immunity is a matter of subject-matter jurisdiction. See, e.g., Hagen v. Sisseton-Wahpeton Cmty. Coll., 205 F.3d 1040, 1043 (8th Cir. 2000). Courts are without subject-matter jurisdiction when a plaintiff's alleged causes of action stem from the covered acts of a consular officer immune under the Vienna Convention. See, e.g., Gerritsen v. Consulado Gen. de Mexico, 989 F.2d 340, 345–46 (9th Cir. 1993). "Dismissal for lack of subject matter jurisdiction will not be granted lightly," and it will be found proper only "when a facial attack on a complaint's alleged basis for subject matter jurisdiction shows there is no basis for jurisdiction." Wheeler v. St. Louis Sw. Ry. Co., 90 F.3d 327, 329 (8th Cir. 1996).

**B.     Ewald's Claims Against Gandrud Lack Subject-Matter Jurisdiction**

Ewald's Complaint alleges that Gandrud's actions constituted promissory estoppel, a violation of Minnesota Statutes §§ 181.64 and 181.932, gender discrimination, reprisal, aiding

and abetting, and retaliatory harassment, as well as a violation of the Equal Employment Pay Act. Compl. ¶¶ 60–112. Gandrud contends that he is immune from prosecution for these acts under the doctrine of consular immunity.

### 1. Consular Immunity under the Vienna Convention on Consular Relations

The Vienna Convention on Consular Relations sets forth the doctrine of consular immunity: "[C]onsular officers who are nationals of or permanently resident in the receiving State shall enjoy only immunity from jurisdiction and personal inviolability in respect of official acts performed in the exercise of their functions." Vienna Convention on Consular Relations art. 71, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 (the "Vienna Convention"). Moreover, honorary consuls are not "amenable to the jurisdiction of the judicial or administrative authorities of the receiving State in respect of acts performed in the exercise of consular functions." Id. art 43 (applied to honorary consuls through article 58(1)). Consular officers are defined as "any person, including the head of a consular post, entrusted in that capacity with the exercise of consular functions." Id. art. 1(1)(d). Consular Officers are subdivided into two categories - career consular officers and honorary consular officers. Id. art. 1(2). Both categories of consular officers, however, are covered by consular immunity in the exercise of their official acts.[4] See id. art. 71.

---

[4]Ewald cites Holloway v. Walker, 800 F.2d 479 (5th Cir. 1986), for the proposition that honorary consul's immunity is "significantly more circumscribed than career consuls." Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss [Docket No. 8] ("Pl.'s Opp'n Mem.") 10. Although career consul and honorary consul are subject to different chapters of the Vienna Conventions (chapters 2 and 3, respectively), the general consular immunity provision – Article 71 – applies to both in the exercise of official acts. Holloway is inapposite to the present case, as it pertains to a Bolivian businessman whose consular status "was conferred for the convenience of an acquaintance who was doing business in Bolivia in 1969," who made "no showing that any consular activity ha[d] taken place since Bolivia terminated his honorary relationship in 1973,"

Although Ewald argues that sovereign immunity is analogous to consular immunity, they are in fact markedly different. Consular immunity pertains to consular officials, while sovereign immunity applies to states. The Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602–1611, is the basis for sovereign immunity, but it does not apply to individual immunities – "Congress did not intend the FSIA to address position-based individual immunities such as diplomatic and consular immunity." Samantar v. Yousuf, 130 S. Ct. 2278, 2289, n. 12 (2010). The FSIA has a commercial activity exception, 28 U.S.C. § 1603(d), while the Vienna Convention covers all official acts, Vienna Convention, art. 71. Compare Zveiter v. Brazilian Nat'l. Supt. of Merc. Marine, 833 F. Supp. 1089 (S.D.N.Y. 1993) (finding jurisdiction over Brazilian agencies under the commercial activity exception to FSIA sovereign immunity in an employment discrimination case) with Ford v. Clement, 834 F. Supp. 72 (S.D.N.Y. 1993) (holding an individual consular officer immune from an employment discrimination lawsuit under the Vienna Convention's consular immunity).

Gandrud is a United States citizen serving as an honorary consul, and as such he is entitled to consular immunity under the Vienna Convention for "official acts performed in the exercise of [his] functions." Vienna Convention, art. 71. Given that consular immunity applies to Gandrud's position, the sole remaining question is whether the acts alleged by Ewald constitute official acts covered by this immunity.

---

and who had "actual and constructive notice of the termination of his status as an Honorary Bolivian Consul." Id. at 481.

## 2. Official Acts Performed in the Exercise of Consular Function

Article 71 of the Vienna Convention grants immunity to honorary consuls for "official acts performed in the exercise of their functions." Similarly, Article 43 of the Vienna Convention grants immunity to career consuls for "acts performed in the exercise of consular functions." This immunity is not unbounded, however, and is strictly limited to acts performed in the exercise of consular function. "Without prejudice to their privileges and immunities, it is the duty of all persons enjoying such privileges and immunities to respect the laws and regulations of the receiving state." Id. art. 55(1). The purpose of consular immunity "is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States." Id. Preamble.

### a. Consular Function

The analysis of whether conduct constitutes an official act and whether it was performed in the exercise of consular functions requires a two-part analysis: (1) whether the consular officer's actions implicated a legitimate consular function; and (2) whether the acts were performed in the exercise of that consular function at issue. See, e.g., Ford, 834 F. Supp. at 75; see also Park v. Shin, 313 F.3d 1138, 1141–42 (9th Cir. 2002); and Consulado Gen. de Mexico, 989 F.2d at 346. Consular functions are defined in the Vienna Conventions at Article 5, which includes a general provision defining consular functions as "performing any other functions entrusted to a consular post by the sending State which are not prohibited by the laws and regulations of the receiving State to which no objection is taken by the receiving State . . . ." Vienna Convention, art. 5(m). Courts have held various activities to be legitimate consular functions under Article 5, including protecting the consulate premises, Consulado Gen. de

Mexico, 989 F.2d at 346 ("The functions of protecting the dignity and premises of the Consulate are reasonable functions of a foreign mission in this country, and they are not illegal in and of themselves."), obtaining office space, Berdakin v. Consulado de la Republica de El Salvador, 912 F. Supp. 458, 465 (C.D. Cal. 1995) ("The Consul clearly was entrusted with the function of entering into a lease in order to secure office space . . . since without a lease . . ., there could be no Consulate at all."), and entering into contracts, Heaney v. Government of Spain, 445 F.2d 501, 505 (C.A.N.Y. 1971) ("[plaintiff] points to nothing which would suggest that [contracting] would not be embraced by the catch-all definition [of Article 5(m)], and such a narrow reading of the treaty would be inconsistent with its apparent purpose. . . .").

In Ford, then-Judge Sotomayor analyzed a career consul's actions under Article 43 and found that "the management and supervision of the Vice Consul and other consular staff . . . come[s] within the scope of Article 5(m) since they are fundamental to the efficient execution of all of the other consulate functions enumerated by the Vienna Convention." Ford, 834 F. Supp. at 75–76. In Ford, the career consul defendant allegedly isolated a female employee, worked against her accreditation, harassed her with the intent of forcing her resignation, spread false rumors about her and her husband verbally and in writing, and ultimately caused her to be terminated. Id. at 73–74. The Ford decision, however, held that all of these alleged actions implicated a legitimate consular function protected by Article 5(m).

Ewald's Complaint alleges causes of action all stemming from her hiring, employment, workplace atmosphere, and termination. See Compl. ¶¶ 60–112. All of these alleged actions implicate the consular function of managing and supervising consulate employees, and as such fall within the consular function under Article 5(m) of the Vienna Convention.

### b.     Acts in Exercise of Consular Function

The second prong of the official acts analysis is whether the acts performed were in the exercise of the valid consular function. Where the consular function is legitimate, the intentional or tortious nature of the acts performed in its exercise does not preclude consular immunity. See Berdakin, 912 F. Supp. at 465 ("Article 5(m) requires that the *function* be legal, but Article 43 does not require that the conduct in the exercise of that function also be legal."); and Consulado Gen. de Mexico, 989 F.2d at 346 (holding that verbal warnings, threats, and a citizen's arrest, without physical contact, were performed in the exercise of a valid consular function – protecting the consulate – and thus subject to Article 43 immunity); and Heaney, 445 F.2d at 505 (holding that breaching a contract was performed in the exercise of the consular function of contracting and therefore subject to consular immunity); but see Joseph v. Office of the Consulate Gen. of Nigeria, 830 F.2d 1018, 1027–28 (9th Cir. 1987), cert. denied, 485 U.S. 905 (1988) (holding that destruction and removal of property from a house rented for consular officer's personal use were not performed in the exercise of any consular function and therefore not subject to consular immunity); and Gerritsen v. de la Madrid Hurtado, 819 F.2d 1511, 1515–16 (9th Cir. 1987) (denying consular immunity to officials charged with assault with a deadly weapon and kidnapping, because their offenses violated the penal laws of the United States and were not in exercise of a legitimate consular function).

A mere breach of the law does not preclude consular immunity — "if this were the rule . . . there would be no immunity, . . . [since e]very lawsuit asserted against a consular official accuses him or her of some violation of legal rights." Koeppel & Koeppel v. The Fed. Republic of Nigeria, 704 F.Supp. 521, 523 (S.D.N.Y. 1989) (finding consular immunity where consular

office was damaged by fire caused by a Nigerian citizen living at the consulate with the permission of the consular officer but in violation of the lease). However, the acts must be performed in the "exercise" of a consular function, which "necessarily implies an attempt by an employee to perform his or her consular duties successfully." Joseph, 830 F.2d at 1027.

In a similar case, the Ford court granted consular immunity, determining that alleged employment discrimination, harassment, and wrongful termination were performed in the exercise of the valid consular function of managing and supervising consulate staff. Ford, 834 F.Supp. at 76. Moreover, the Ford court noted that allowing "courts of one nation to sit in judgment about the delicate policy decisions of another nation regarding the supervision and management of its consular personnel" would be "unsound international policy." Id.

The analysis in Ford is germane to Ewald's allegations against Gandrud. Specifically, the acts included in Ewald's Complaint all relate to Gandrud's management and supervision of her as an employee of the Embassy. Accordingly, his acts were performed in the exercise of a valid consular function – managing and supervising the employees of the Embassy – and he is therefore entitled to consular immunity for these acts.

    c.    **Available Remedies**

Although this Court lacks subject-matter jurisdiction over Gandrud as a result of his consular immunity, remedies are potentially available to aggrieved plaintiffs such as Ewald. Here, the Embassy remains as a defendant and has "authorized its counsel to accept service on its behalf and has notified counsel for Ms. Ewald." Def.'s Supp. Mem. in Support of Mot. to Dismiss [Docket No. 17] 4, n. 4. Moreover, as other cases have noted, this "does not leave foreign consuls free to abuse legal rights with impunity," Koeppel & Koeppel, 704 F. Supp. at

253, as the State Department can declare a consular officer a *persona non grata*, thereby requiring the sending state to recall the person or terminate his consular duties at the consulate. See Vienna Convention, art. 23(1).

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

1. Defendant Gary Gandrud's Motion to Dismiss [Docket No. 4] is **GRANTED**; and
2. Plaintiff's Motion to Strike [Docket No. 12] is **DENIED** as moot.

BY THE COURT:

Dated:  January 26, 2012                s/Susan Richard Nelson
                                        SUSAN RICHARD NELSON
                                        UNITED STATES DISTRICT JUDGE