1            UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2
3    ------------------------------------------------------------
                                    )
     Ellen S. Ewald,                )   File No. 11-cv-2116
4                                    )            (SRN/SER)
              Plaintiff,            )
5                                    )
     vs.                             )   Saint Paul, Minnesota
6                                    )   August 24, 2012
     Royal Norwegian Embassy,        )   10:30 a.m.
7                                    )
              Defendant.            )
8    ------------------------------------------------------------
9
           BEFORE THE HONORABLE STEVEN E. RAU
10      UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                    **(MOTIONS HEARING)**
11
     APPEARANCES
12   For the Plaintiff:        ENGELMEIER & UMANAH PA
                               SHEILA A. ENGELMEIER, ESQ.
13                             12 South Sixth Street
                               Suite 1230
14                             Minneapolis, Minnesota 55402

15   For the Defendant:        FAEGRE BAKER DANIELS LLP
                               DANIEL G. WILCZEK, ESQ.
16                             SEAN R. SOMERMEYER, ESQ.
                               90 South Seventh Street
17                             Suite 2200
                               Minneapolis, Minnesota
18                             55402-3901

19   Court Reporter:           CARLA R. BEBAULT, RMR, CRR, FCRR
                               316 North Robert Street
20                             Suite 146 U.S. Courthouse
                               Saint Paul, Minnesota 55101
21

22

23
          Proceedings recorded by mechanical stenography;
24   transcript produced by computer.

25

1                    **I N D E X**

2   ELISABETH WEMBERG                                    PAGE
        Examination by The Court                          5
3       Examination by Mr. Wilczek                        8
        Examination by Ms. Engelmeier                    15
4       Re-examination by Mr. Wilczek                    23

5

6

7   EXHIBITS                                            REC'D

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

1
2
3
4          THE COURT:  We're here this morning on the matter

5     of Ewald versus the Royal Norwegian Embassy, case number

6     11-cv-2116.  Would counsel note their appearances for the

7     record.

8          MR. WILCZEK:  Dan Wilczek and Sean Somermeyer for

9     the Embassy, your Honor.

10          THE COURT:  Thank you, Mr. Wilczek.

11          MS. ENGELMEIER:  And Sheila Engelmeier for

12     Ms. Ewald.

13          THE COURT:  Thank you, Ms. Engelmeier.

14          We're here this morning on an Order to Show Cause.

15     And before we proceed any further, I'm going to lay out what

16     in the Court's view is what has occurred to date in this

17     case, and then ask counsel if I've properly recited what's

18     occurred.

19          I go back to July 1st of 2011 and on July 1st of

20     2011 the Summons and Complaint was served on Mr. Wilczek who

21     is a partner at Faegre Baker and Daniels.  He is here today

22     as counsel for the Royal Norwegian Embassy.  On July 1st,

23     2011, Mr. Wilczek accepted service on behalf of Defendant

24     Gary Gandrud, who is affiliated with the Embassy but also is

25     a former partner at Faegre, Baker and Daniels.  His position

1     is unclear to me at this point and it's immaterial.  The

2     Embassy did not authorize Mr.  Wilczek at that time to

3     accept service of process.

4           Shortly thereafter, Mr. Gandrud made a Motion to

5     Dismiss.  There was a hearing on the Motion to Dismiss in

6     December.

7           On January 9th, 2012, Mr. Wilczek, as

8     Mr. Gandrud's counsel, represents to the Court in a brief

9     that the Embassy has authorized him to accept service of

10    process on its behalf; and he then notified Ms. Engelmeier

11    and perhaps Mr. Marshall.

12          The Court granted Mr. Gandrud's Motion to Dismiss

13    whereupon the Embassy on April 3rd made a second Motion to

14    Dismiss.  At the hearing on that Motion to Dismiss, May

15    15th, Judge Nelson denied the motion from the bench and

16    directed the parties to mediate with me within 90 days.

17          On May 25th a Notice of Settlement Conference was

18    sent out scheduling a settlement conference on July 6th.  On

19    July 6th a hearing was held at the end of the day wherein

20    the Court declared impasse; and on July 13th the Court

21    issued an Order to Show Cause scheduling a hearing on August

22    13th.  That hearing on August 13th was postponed until today

23    to accommodate Ms. Wemberg's vacation schedule because in

24    the Order to Show Cause I directed her to appear here.

25          Ms. Engelmeier, as far as you're concerned, is

1    that a correct recitation?  Is there anything that I have

2    misstated?

3            MS. ENGELMEIER:  No, your Honor.  I think it is

4    correct.

5            THE COURT:  Mr. Wilczek?

6            MR. WILCZEK:  Yes, your Honor, I believe that's

7    correct.  But for clarification, Mr. Gandrud serves as the

8    Honorary Counsel General for the Honorary Consulate in

9    Minneapolis.  He is a former partner at Faegre Baker and

10   Daniels.

11           THE COURT:  And I think I noted for the record

12   that Mr. Gandrud's status with your law firm is unclear.  I

13   don't know when he left Faegre Baker Daniels, and for

14   purposes of this hearing today it's immaterial.

15           Ms. Wemberg, I directed you to appear.  Would you

16   please approach and go to the witness stand.

17           Would you raise your right hand.

18           (Witness Wemberg sworn by the Court)

19           MS. WEMBERG:  I do.

20           THE COURT:  Very good.

21                              EXAMINATION

22   BY THE COURT:

23   Q.  Ms. Wemberg, identify for the record what your position

24   is at the Embassy in Washington, DC?

25   A.  I'm counselor at the Embassy.  I'm head of the

1   administration and counselor affairs.

2   Q.  To whom do you report?

3   A.  I report to the DCM and the Ambassador.

4   Q.  The who?

5   A.  DCM is Deputy Chief of Mission.

6   Q.  Do you report to the Charge d'Affaires?

7   A.  I report to the Ambassador and the Deputy Chief of

8   Mission.

9   Q.  Okay.  Now, in front of you -- and your lawyer has put

10  this document up on the screen -- is a document that you

11  brought with you to the settlement conference on July 6th,

12  2012?

13  A.  Yes.

14  Q.  Before we engaged in settlement discussions I had the

15  parties for a plenary session in this courtroom and I asked

16  you whether you had authority on behalf of the Royal Embassy

17  to settle this case and you represented to me that you did.

18  I then visited with the Plaintiff for about an hour.

19  A.  Yes.

20  Q.  You were in my jury room during that time period.  When

21  I visited with you in my jury room, you handed me that piece

22  of paper.  You advised me that that was your authority but

23  that your authority had been revoked that morning.

24  A.  Yes.

25  Q.  Is that correct?  I didn't ask you anything more than

1    just that.  Is that true?

2    A.  Yes.

3    Q.  And who revoked your authority?

4    A.  The Ambassador.

5    Q.  When did he revoke your authority?

6    A.  The same morning.

7    Q.  Before or after you represented to me that you had

8    authority to settle the case?

9    A.  Before.

10              THE COURT:  Thank you.  That's what the Court

11   needs to hear.

12              Now, this is an Order to Show Cause and it is --

13   unless counsel want to further inquire of Ms. Wemberg, this

14   is a hearing ordering the Embassy to show cause why I should

15   not sanction it both under the Court's inherent power under

16   Rule 16 and Rule 37.  How would counsel propose we proceed

17   at this point?  Ms. Engelmeier?  Plaintiff traditionally

18   goes first, Mr. Wilczek.

19              MS. ENGELMEIER:  Well, your Honor, I frankly think

20   you've heard the issues that are relevant to the questions

21   that I thought the Court had with respect to whether

22   Ms. Wemberg had been honest with the Court.  So I'm

23   inclined -- I wouldn't have any further questions of this

24   witness given her responses thus far, although I'd have to

25   note that I'm having a little bit of trouble hearing her.

1   So I would defer to the Court with respect to how to

2   proceed.

3              THE COURT:  Mr. Wilczek.

4              MR. WILCZEK:  Your Honor, I'd like to ask some

5   questions because I think the questions that you asked need

6   to be more fully flushed out and placed into context

7   regarding what Ms. Wemberg understood and what Ms. Wemberg

8   meant when she gave your answers.

9              THE COURT:  Proceed.

10                       EXAMINATION

11  BY MR. WILCZEK:

12  Q.  All right.  Ms. Wemberg, when you travelled to

13  Minneapolis -- well, let me take a step back.  As head of

14  administration at the Embassy, what are your duties?

15  A.  I'm responsible for --

16             THE REPORTER:  Maybe you need to speak into the

17  microphone a little closer.

18             THE COURT:  And try to, Ms. Wemberg, you speak

19  softly and you do have a bit of an accent and so in light of

20  that, please try to speak a little more slowly so that the

21  court reporter can get what you say down accurately.  Thank

22  you, ma'am.

23             THE WITNESS:  Okay.  My responsibility there is

24  administration and counselor affairs.  That means budgeting.

25  It means responsible for all local employees' housing,

1    properties, everything that is -- everything according to

2    administration.

3    BY MR. WILCZEK:

4    Q.  Are you responsible for personnel matters?

5    A.  Yes.

6    Q.  Do you have authority to enter into contracts on behalf

7    of the Embassy?

8    A.  Yes.

9    Q.  You are not a native of the United States, correct?  You

10   were born in Norway?

11   A.  Yes.

12   Q.  Is English your native language?

13   A.  No.

14   Q.  Have you, prior to the settlement conference, ever been

15   involved in the United States courts system at all?

16   A.  No.

17   Q.  Ever been before a judge or a magistrate?

18   A.  No.

19   Q.  Ever participated in a settlement conference?

20   A.  No.

21   Q.  Now, Magistrate Rau pointed out to you the Power of

22   Attorney which is displayed.  When did you find out that you

23   would have the responsibility for representing Norway at the

24   settlement conference?

25   A.  One and a half week before the settlement conference.

1   Q.  And who told you that?

2   A.  Mr. Johan Vibe, the DCM at the Embassy.

3   Q.  And Mr. Vibe, is he currently the DCM?

4   A.  No.

5   Q.  What is his current position?

6   A.  He is Ambassador, Norwegian Ambassador to Spain.

7   Q.  At the time that you were here at the settlement

8   conference was Mr. Vibe still in the position of DCM at the

9   Embassy?

10  A.  No.  No, he had left.

11  Q.  At the time that you came to Minneapolis for the

12  settlement conference, what was your understanding of what

13  your authority was with regard to the settlement conference?

14  A.  That I could settle the case.

15  Q.  Did you -- were you given any instructions regarding

16  what you had to do at the settlement conference?

17  A.  No.

18  Q.  Was any type of cap placed upon what monetary amount, if

19  any, you could offer?

20  A.  No.

21  Q.  Was there any limit placed upon you regarding what you

22  could or could not do?

23  A.  No.

24  Q.  And when you came out here, you met with me, correct?

25  A.  Yes.

1   Q.  And what was the purpose of meeting with me?

2   A.  The purpose was to go through the case and find out how

3   we should proceed with this.

4   Q.  And do you recall about how long we met, Ms. Wemberg?

5   A.  We had a three-hour meeting the day before.

6   Q.  And at the time that the meeting was concluded, had your

7   view regarding your authority with regard to the settlement

8   conference changed?

9   A.  No.

10  Q.  Did you believe that you had the authority to make

11  decisions in your discretion based upon what you determined

12  to be in the best interests of Norway?

13  A.  Yes.

14  Q.  Now, the Judge asked you whether or not your authority

15  had been revoked.

16  A.  Yes.

17  Q.  Were you told that you were not allowed to settle the

18  case?

19  A.  No.

20  Q.  What were you told?  What -- when you responded to the

21  Magistrate at the settlement conference and said you did not

22  have authority to settle the case, what were you referring

23  to?

24  A.  The Ambassador told me the same morning that if I

25  settled the case I had to contact him before.

1    Q.  He wanted to be consulted?

2    A.  Yes.

3    Q.  And as a result of that instruction --

4    A.  Yes.

5    Q.  -- you felt you didn't have unilateral authority any

6    longer to settle the case?

7    A.  Yes.

8    Q.  Did you feel that you were still expected to exercise

9    your best judgment --

10   A.  Yes.

11   Q.  -- at the settlement conference?

12          Now, as you may recall, Ms. Wemberg, at the

13   settlement conference there became a bit of a concern

14   regarding the extent of your authority?

15   A.  Yes.

16   Q.  Was anything done to clarify that issue?

17   A.  I called the Ambassador.

18   Q.  And this was -- I think it was before lunch, correct?

19   A.  Yes.

20   Q.  And what was your purpose in calling the Ambassador?

21   A.  To make sure I had the proper authority to settle the

22   case.

23   Q.  And did the Ambassador tell you that you had authority

24   to settle the case?

25   A.  Yes.

1   Q.  Did the Ambassador place any limits on your ability to

2   exercise discretion in the settlement of the case?

3   A.  No.

4   Q.  Did he give you any limit on what you could do?

5   A.  No.

6   Q.  Did he tell you what offer, if any, you should make in

7   connection with the settlement conference?

8   A.  No.

9   Q.  Subsequently to this conversation, if you may recall

10  there was an offer made --

11  A.  Yes.

12  Q.  -- to settle the case.  There was an offer of $25,000,

13  correct?

14  A.  Yes.

15  Q.  Who made the decision?

16  A.  I did.

17  Q.  To offer $25,000?

18  A.  I made that decision.

19  Q.  When you made the offer of $25,000, did you believe at

20  that time that was contrary to the opinion of others in the

21  Embassy regarding what should be done or what should not be

22  done to settle the case?

23  A.  Yes.

24  Q.  Why did you decide to do that?

25  A.  Because I considered the information I got from the

1    Magistrate the same day and I considered the facts in this

2    case.  I also considered what they meant at the Embassy but

3    I made my own decision.

4    Q.  Now, when you made the offer of $25,000, was that in

5    your view your final position that you would take on behalf

6    of the Embassy with regard to settlement negotiations?

7    A.  No.

8    Q.  Were you prepared to negotiate further?

9    A.  Yes.

10   Q.  Were you prepared to give additional consideration to

11   any facts or arguments made regarding why or why not

12   settlement would be in the best interests of Norway?

13   A.  Yes.

14   Q.  Did you make another offer?

15   A.  No.

16   Q.  Why not?

17   A.  The Magistrate came back and told me that I had to go

18   for 100,000 or more, and I thought that was not the best

19   interests of Norway.

20   Q.  So at the time that the settlement conference ended

21   because impasse was declared?

22   A.  Yes.

23   Q.  You had the authority that you understood you had when

24   you first got on the plane to come to Minneapolis for the

25   settlement conference, correct?

1   A.  Yes.

2   Q.  Whose decision -- did anybody else make the decision

3   regarding the offer that the Embassy made in connection with

4   the settlement of this case other than you?

5   A.  No.

6           MR. WILCZEK:  I have nothing further, your Honor.

7           MS. ENGELMEIER:  I have a few questions if I may.

8                       EXAMINATION

9   BY MS. ENGELMEIER:

10  Q.  Ms. Wemberg, and I apologize, it may be that I just

11  couldn't hear you fully.  So can you explain to me again why

12  you told Magistrate Judge Rau that your settlement authority

13  had been revoked?

14  A.  The same morning the Ambassador told me that if I settle

15  the case, I need to consult him first.

16  Q.  So when we're looking at the exhibit that's in front of

17  you and on the screen, this document is signed by someone

18  other than the Ambassador, correct?

19  A.  Yes.

20  Q.  Why did you need to have this document signed if you

21  have the authority to make decisions?

22  A.  This document is signed by Lars Petter Henie.  He was

23  Charge d'Affaires.  The Ambassador was in Norway at that

24  time.

25  Q.  Once, again, you've testified today that you were the

1   person who had the authority to make the decisions with

2   respect to settlement?

3   A.  Yes.

4   Q.  What I'm trying to understand is if that was the case,

5   then why would you need a signed document from the

6   Ambassador or from the Charge d'Affaires who is in place of

7   the Ambassador?  Why would you need that if you were the one

8   that had the authority?

9   A.  The Ambassador told me that I should have this document

10  with me when I came up here.

11  Q.  And so the sum total of what the Ambassador -- so you

12  said the Ambassador was out of town?

13  A.  Yes.

14  Q.  And he called you from out of town to tell you that even

15  though you had the authority to make decisions, he wanted to

16  hear from you?

17  A.  Yes.

18  Q.  That's the sum total of that discussion?

19  A.  Yes, he told me that I should consult him.

20  Q.  Anything else that was said in that discussion?

21  A.  No.

22  Q.  Directing your attention to the document in front of

23  you.  This is the order that caused you to appear here today

24  and you'll see in the indented part the document provides --

25  it's quoting from an earlier order that asked the Embassy's

1    representatives to come to the pretrial settlement

2    conference on July 6th.  Did you see that order?

3    A.  Yes.

4    Q.  And did you see the part that's in bold on this document

5    that reads that:  "This means that each party must attend

6    through a person who has the power to change that party's

7    settlement posture during the course of the conference."

8    Did you see that before you came that day?

9    A.  I seen the document before I came.

10   Q.  And did you understand that you were the person who had

11   that power?

12   A.  Yes.

13   Q.  But only if you consulted with the Ambassador first; is

14   that right?

15   A.  I got the message the same morning that I should consult

16   him first, yes.

17   Q.  And when you ultimately did reach out to the Ambassador

18   after Magistrate Judge Rau expressed his concern about your

19   statement that the authority granted in the June 29th

20   document had been revoked, the Ambassador was difficult to

21   reach; isn't that correct?  It took you some time?

22   A.  No, he was easy to reach.

23   Q.  Even though he was out of town?

24   A.  Yes.

25   Q.  Okay.  Now, the other question I have, so the -- my

1   recollection is on the morning when we were all in this

2   courtroom on the 6th, Magistrate Judge Rau asked you, "Do

3   you have full authority to resolve this matter without any

4   caps?"  And you said, "Yes, I do."  Do you remember that?

5   A.  Yes.

6   Q.  I believe he also asked you, "Is it just you?"  Do you

7   recall that question?

8   A.  I don't remember.  Probably.

9   Q.  And do you recall also saying yes, it was just you?

10          MR. WILCZEK:  Objection.  Assumes facts not in

11   evidence.  She didn't recall the question.

12          MS. ENGELMEIER:  I believe she also said, your

13   Honor, that she may --

14          THE COURT:  The objection is overruled.  You may

15   answer.

16   BY MS. ENGELMEIER:

17   Q.  Do you consider yourself as a representative of the

18   Embassy somebody who is obliged to follow this Court's

19   order?

20   A.  Yes.

21   Q.  And would that be true as well should at some point this

22   court order a payment to be made by the Embassy and the

23   Norwegian Foreign Ministry?

24   A.  Yes.

25   Q.  Let me tell you why I ask that question.  Is there a

1    Deputy Minister in the Foreign Ministry -- which you're

2    technically a part of, correct?

3    A.   Yes.

4    Q.   Is there a Deputy in the Foreign Ministry by the name of

5    Forde -- I may be saying it wrong -- Anderson?

6    A.   Forde Andersen.

7    Q.   F-O-R-D-E, O period, Andersen, A-N-D-E-R-S-E-N; a Deputy

8    Minister?

9    A.   Yes.

10   Q.   And that's a person who speaks with authority for the

11   Norwegian Foreign Ministry, correct?

12   A.   Yes.

13   Q.   And do you know that he has publicly said that the

14   Norwegian Foreign Ministry is reserving the right to not pay

15   any ordered amounts due by this court?

16   A.   No.

17   Q.   Did you see an article in the -- can you read that from

18   where you are?

19   A.   Yes.

20   Q.   An article in a newspaper on August 18 in Norway.  I

21   presume you read Norwegian?

22   A.   Yes.

23   Q.   And you see in the second column there that the Deputy

24   Minister of the Norwegian Foreign Ministry is stating -- is

25   talking about sovereign immunity?

1    A.  Yes.

2    Q.  And do you see that he says something to the equivalent

3    of we have agreed to waive our objection to the first kind

4    of sovereign immunity allowing us to be heard in a United

5    States court, but we are reserving our right to assert our

6    sovereign immunity so as not to have any judgment by the

7    court enforced.  Do you read that the same way that I do?

8    It's in the second column there on the bottom and then the

9    top of the third column.

10              MR. WILCZEK:  Is there a date on that article?

11              MS. ENGELMEIER:  August 18th, as I said before.

12              THE COURT:  August 18th, 2012?

13              MS. ENGELMEIER:  Correct.

14              THE WITNESS:  It's difficult to read it from here.

15              MS. ENGELMEIER:  It's difficult to read it?

16              THE WITNESS:  Yes.

17              THE COURT:  Why don't you give her the original.

18              MS. ENGELMEIER:  I certainly can.

19              If I may just briefly address the witness from

20    here?

21              THE COURT:  You may.

22    BY MS. ENGELMEIER:

23    Q.  So where I thought it said what I just said, which is

24    that we reserve the right to assert sovereign immunity to

25    not follow any judgment of the court, was kind of the bottom

1   here and on the top here.

2            (Pause in proceedings)

3            THE COURT:  Ms. Engelmeier, perhaps you should

4   restate the question now that the witness has had a chance

5   to review the document.

6            MS. ENGELMEIER:  Thank you very much, your Honor.

7   BY MS. ENGELMEIER:

8   Q.  Do you think I fairly characterized what he said there?

9   A.  Yes.

10  Q.  Okay.  And so what I'm wondering is have you ever had

11  any discussions with Deputy Minister Andersen or the

12  Ambassador or anyone else regarding the intention of Norway,

13  I'm just saying Norway instead of the Embassy or the

14  Norwegian Foreign Ministry because you've said in Norway's

15  best interest, so using your shorthand term of Norway, did

16  you have any discussions with anyone prior to the settlement

17  conference that suggested Norway would not follow this

18  court's, meaning this court in the United States, judgment

19  with respect to the Ewald case?

20  A.  No.

21  Q.  Has anyone ever told you that Norway had no intention of

22  paying any judgments by this court?

23  A.  No.

24  Q.  Did that -- the issue of whether Norway was going to pay

25  judgments impact your position on settlement at all?

1    A.  Can you repeat that?

2    Q.  Sure.  I'm sorry.  If you're not understanding me, feel

3    free to ask me to rephrase.

4         So you said that on the date of the settlement

5    conference you decided not to make any further offers when

6    the Judge asked you to make an offer of $100,000 or more --

7         THE COURT:  Well, let's -- the Judge does not

8    concede that that's what the Judge asked.

9         MS. ENGELMEIER:  Oh, I apologize.

10        THE COURT:  That's all right.  Simply because

11   Mr. Wilczek states that the Judge said that doesn't mean

12   that the Judge in fact said that or that's what the Judge's

13   notes said.

14        MS. ENGELMEIER:  Okay.  I apologize, your Honor.

15        THE COURT:  That's all right.  I want the record

16   to be clear that the Judge isn't conceding that since it's

17   apparent that Mr. Wilczek's intent in this hearing is to put

18   the Judge on trial rather than his client.

19        Proceed.  Thank you.

20   BY MS. ENGELMEIER:

21   Q.  Ms. Wemberg, what I'm trying to understand is you made a

22   decision not to offer $100,000 at some point during that

23   hearing.  Is that correct?

24   A.  Yes.

25   Q.  And did -- in making that decision, were you considering

1    the fact that perhaps Norway wouldn't have to follow the

2    order of a United States court?

3    A.  No.

4              MS. ENGELMEIER:  I have nothing further.

5              THE COURT:  Thank you.

6              Do you have anything further, Mr. Wilczek?

7              MR. WILCZEK:  I do, your Honor.  Thank you.

8                        RE-EXAMINATION

9    BY MR. WILCZEK:

10   Q.  Ms. Wemberg, when you were here making offers, an offer,

11   I should say, to settle the case, would, based on your

12   understanding, Norway have stood by you in terms of your

13   commitment to offer to pay money to settle the case?

14   A.  Yes.

15   Q.  I want to go back to the statement regarding how the

16   mediation or the settlement conference ended.  What was your

17   understanding of what you were being told regarding what you

18   needed to agree to for the settlement conference to

19   continue?

20   A.  Can you repeat?

21   Q.  Yeah.  What did you understand that you would need to

22   agree to for the settlement conference to continue at the

23   time that impasse was declared?  Do you recall the reference

24   to six figures?

25   A.  Yes.

1    Q.  What was said in that regard?

2    A.  It would not be a settlement unless I give an offer of

3    six figure or more.

4              MR. WILCZEK:  I have nothing further.

5              MS. ENGELMEIER:  I have nothing further, your

6    Honor.

7              THE COURT:  Very good.  Does counsel want to be

8    heard with respect to the legal issues?

9              MS. ENGELMEIER:  Your Honor, I'm happy to repeat

10   what I said previously if the Court is so inclined.  But I

11   think we made our position clear that there was a failure to

12   follow the Court's order and that requires a sanction.

13             THE COURT:  Thank you.

14             Mr. Wilczek.

15             MR. WILCZEK:  Thank you, your Honor.  When

16   Ms. Wemberg came to Minneapolis she understood that she had

17   authority to exercise her judgment regarding what was in the

18   best interests of Norway in the settlement conference.  At

19   the time that she got the message from Mr. -- Ambassador

20   Strommen that she needed to consult with him before she

21   reached a settlement, her authority wasn't revoked.  She was

22   asked to consult with him before she made a decision.

23             Now, thereafter your Honor expressed concern about

24   whether or not in fact she had authority and you suggested

25   that we clarify that issue, and we did.  We called the

1    Ambassador, spoke to the Ambassador.  The Ambassador

2    clarified that she had authority.  He did not place any

3    limits on her authority.  He didn't put any cap on what she

4    could do.  The decision that she made after that point was

5    her decision and her decision alone.  She acted contrary to

6    what she understood some in the Embassy didn't want her to

7    do, but she was willing to make that decision because she

8    thought it was in the best interests of Norway.

9           So at the end of the day -- although there was

10   some confusion, I acknowledge -- at the end of the day she

11   had exactly what the Court ordered.  She had authority to

12   determine Norway's position.  She had authority to determine

13   what she wanted to do without any cap, without any limit.

14   We complied with the order when she came.  There was some

15   confusion regarding how she interpreted the Ambassador's

16   statement that she consult with him, but at the end of the

17   day there was no doubt.  And there is no question she had

18   the authority to determine Norway's position and there

19   weren't any -- there was no limits, there were no limits

20   placed on what she could do in that regard.  Thank you.

21          THE COURT:  Thank you.

22          The Court will be issuing an order shortly in

23   connection with this matter.  I will make the following

24   observation, though, for the benefit of counsel.

25          First, the conduct of this litigation does not

1   comport with the spirit or the requirements of Rule 1 of the

2   Federal Rules of Civil Procedure.  The case is more than a

3   year old and there's been nothing but seriatim motion

4   practice to avoid any substantive discussion of the case on

5   the merits.

6           Second, given what the Court has heard today, I

7   would be hard pressed to believe that Ms. Wemberg had any

8   authority because her authority was a moving target

9   throughout the day.

10          Third, given what has been submitted to the Court

11  in connection with the official position of Norway

12  subsequent to that settlement hearing, a great deal of doubt

13  is cast on Ms. Wemberg's authority also.

14          We are now in recess.

15          (Court adjourned at 11:08 a.m.)

16                          *       *       *

17

18

19          I, Carla R. Bebault, certify that the foregoing is

20  a correct transcript from the record of proceedings in the

21  above-entitled matter.

22

23          Certified by:   s/Carla R. Bebault
                             Carla Bebault, RMR, CRR, FCRR
24

25