## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Ellen S. Ewald,

             Plaintiff,

vs.

Royal Norwegian Embassy,

             Defendant.

Civil No. 11-CV-02116 (SRN/SER)

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL**

### INTRODUCTION

Plaintiff Ellen Ewald's ("Plaintiff's") motion to compel should be denied. In late 2012 and early 2013, Defendant Royal Norwegian Embassy ("the Embassy") bore considerable burden responding to Plaintiff's extensive discovery requests. The breadth of the requests required the Embassy to review over 187,000 pages of documents written in English and Norwegian, and to produce 88,985 pages of documents. The Embassy produced documents in the form *requested by Plaintiff*, using search terms *requested by Plaintiff*. Plaintiff has had these documents for between five-and-one-half and eight months. Plaintiff has taken nine depositions, using 181 documents as exhibits. The twice-extended discovery deadline has passed.

Plaintiff now brings this motion, claiming surprise that some of the documents she requested from the Norwegian Embassy are written in Norwegian, claiming that her well-staffed legal team has not been able to review the documents, raising supposed deficiencies in the manner in which documents were produced that either have been

corrected or are non-substantive, asking this Court to compel the Embassy to respond to yet more discovery requests of little—if any—value, and asking the Court to extend the discovery deadline again to allow her to subpoena private, third-party information.

The Embassy has fulfilled its discovery obligations. Plaintiff's motion untimely, is without basis, and violates the fundamental principle that discovery must be proportionate to the claims at issue.

## BACKGROUND

### I.   The Context for Plaintiff's Claims.

In 2008 the Embassy created two officer positions at its Honorary Consulate in Minneapolis. These positions were unique and did not—and do not—exist anywhere else within Norway's Ministry of Foreign Affairs ("MFA"). One officer position focused on higher education and research (the position held by Plaintiff), and the other focused on innovation, entrepreneurship, promotion of business, and commercialization (the position held by Anders Davidson). Plaintiff and Davidson were two of three employees working at the Honorary Consulate.

Plaintiff asserts eight claims: (1) promissory estoppel, (2) violation of Minn. Stat. § 181.64, (3) gender discrimination under the Minnesota Human Rights Act ("MHRA"), (4) reprisal under the MHRA, (5) "retaliatory harassment," (6) violation of the Equal Employment Pay Act, (7) retaliation in violation of the Minnesota Whistleblower Act, and (8) violation of Norway's Working Environment Act. Doc. No. 104. The Embassy's

2

unrebutted damages expert opines that Plaintiff's economic damages are $90,714. Ex. 1.[1]

As this Court will recall, Plaintiff seeks only "garden variety" emotional-distress

damages.

## II.   Pre-Discovery: The Embassy Preserves Plaintiff's Work Laptop.

Plaintiff sent a demand letter to the Embassy in March 2011, and commenced

litigation in July 2011. Affidavit of Sean Somermeyer ("Somermeyer Aff.") ¶ 2. Upon

receipt of the demand letter, the Embassy issued a legal hold and took steps to preserve

relevant information. Id. On September 30, 2011, Plaintiff's last day of employment at

the Honorary Consulate, Stroz Friedberg (a forensics and e-discovery technical services

firm) took possession of and imaged Plaintiff's laptop, but did not analyze it. Affidavit

of Breandan Gleason ("Gleason Aff.") ¶ 4.[2] Although not requested by Plaintiff (see Pl's

Ex. A), the Embassy preserved but did not image the mobile phone that Plaintiff used

during her employment. Id.

## III.   June 2012 – May 2013: Discovery Proceeds.

### A. The Parties' Rule 26(f) Conference.

At their June 29, 2012, Rule 26(f) conference, the parties discussed the production

of ESI, but did not discuss the specific types of ESI that would be produced.   Pl's Ex. C,

---

[1]   All exhibits not attached to Plaintiff's memorandum are numbered and attached to the Affidavit of Joel P. Schroeder ("Schroeder Aff."), filed herewith and referred to as "Ex." For ease of reference, the Embassy will refer to the lettered exhibits attached to Ms. Engelmeier's affidavit as "Pl's Ex.".

[2]   Plaintiff forwarded hundreds of files to her personal email accounts before her last day of employment. Affidavit of Erin D. Buntain ("Buntain Aff.") ¶ 17.

Doc. No. 32-1; Sommermeyer Aff. ¶ 3.  At no time during the conference did Plaintiff address the production of discrete forms of ESI, such as text messages.  Id.  Nor did Plaintiff ask the Embassy to collect and review mobile phones.  Id.

The parties filed a Joint Rule 26(f) Report that incorporated a Form of Production Agreement ("FOPA") drafted by Plaintiff's counsel and agreed to without modification by the Embassy.  Pl's Ex. C; Sommermeyer Aff. ¶ 4.  The FOPA outlined the technical specifications for the production of ESI, providing in part:

> The Parties are prepared to engage in **reasonable** electronic discovery in response to discovery requests.
>
> According to the document preservation obligations imposed by the Federal Rules of Civil Procedure, the Parties agree to preserve potentially relevant active data and associated metadata in native format.
>
> . . .
>
> OCR or Extracted Text: The Parties also shall provide scanned/paper documents and ESI with optical character recognition ("OCR") text by providing external .TXT text files on a document level basis.  In addition, TIFFs produced from ESI should be accompanied by corresponding external TXT files containing the extracted text….  The receiving party accepts the text-searchable format "as is" and the producing party accepts no liability as to the accuracy of searches conducted on those files.

Pl's Ex. C. at 1 (emphasis added).  The FOPA does not specifically mention text messages nor provide additional restrictions regarding how ESI would be collected or produced.  Id.

### B. The Pretrial Conference.

On July 6, 2012, the Court held a pretrial conference.  During that conference, Plaintiff did not indicate she would seek the production of text messages.  Ex. 2.  With

respect to the collection and production of documents and ESI, the Court counseled the

parties as follows:

- "You can reach an agreement now about how to do [e-discovery], and what needs to be preserved and the like, so that we don't run into preservation problems or accusation of spoliation or other things. . . . [I]f we are going to go forward with this case, you want to go forward on the merits, and not have – have a minimum amount of sideshows."

- "So, it seems to me that the parties, themselves, have an incentive to see if they can at least identify some of these issues ahead of time. And if the[re] are going to be issues, alert me or alert each other to try to resolve them among themselves or bring them to my attention as soon as you can so that the schedule that we have is adhered to."

Id. at 5, 7.

### C. The Parties Respond to Discovery Requests.

On August 2, 2012, Plaintiff served interrogatories and document requests. Pl's

Exs. D, E. Plaintiff's document requests did not specifically request text messages or

voice mails and did not include text messages in the definition of "document." Pl's Ex. E

at 2.[3] "Voice mail" is mentioned only in Plaintiff's boilerplate definition of "document,"

along with other obscure items such as "vouchers" and "photostats." Id.

---

[3]     One of Plaintiff's document requests mentions "cell phone and/or telephone records." Pl's Ex. H at No. 19. The full text of that document request (the majority of which was excised from Plaintiff's brief) states:

REQUEST NO. 19: All documents that relate to, bear upon or provide evidence of any communications, oral or otherwise, Defendant has had at any time with any current or former agents or employees of Defendant relating to the subject matter of this litigation or the allegations contained in Plaintiff's complaint. This Request includes, but is not limited to, notes of any telephone conversations Defendant or its personnel might have had with such individuals, cell phone and/or other telephone records.

The Embassy served responses and objections to Plaintiff's discovery requests on October 5, 2012. Pl's Exs. G, H. Although it objected to some of Plaintiff's interrogatories, the Embassy provided lengthy narrative responses to others. Pl's Ex. G. In response to Plaintiff's document requests, the Embassy agreed to produce a majority of the documents requested by Plaintiff but lodged objections in response to other requests, including one objection relating to the inviolability of the Embassy's archives pursuant to international treaty. See, e.g., Pl's Ex. H at No. 25.[4]

Thus, as far back as October 2012, the Embassy clearly stated what it would and would not produce. Plaintiff did not challenge the limits to discovery that the Embassy had drawn. Schroeder Aff. ¶ 4.

### D. Documents Are Collected from Plaintiff's Work Laptop.

With the advance agreement of Plaintiff, documents from Plaintiff's work laptop were collected and imported by Stroz Friedberg and sent to FaegreBD for processing and review. Ex. 3; Schroeder Aff. ¶ 5; Gleason Aff. ¶ 5. At no time has the Embassy's counsel had access to the physical laptop or its image; it has been maintained by Stroz Friedberg. Gleason Aff. ¶ 4.

---

Id. The Embassy rightfully objected to this overbroad request and interpreted Plaintiff's request for "cell phone and other telephone records" to mean billing statements or other records or logs of calls made; not text messages or voice mails. Id.; Schroeder Aff. ¶ 4.

[4]     The Embassy reiterated its position on December 3, 2012, when it sent to the Court (and Plaintiff) a Diplomatic Note to the U.S. Department of State regarding this matter. Ex. 4. In that Note, the Embassy again outlined the category of documents over which it agreed to waive the inviolability of its archives and documents. Id. at 2.

6

### E. The Parties Agree on Search Terms and Produce Documents.

Having clearly identified its objections, and hearing nothing from Plaintiff, the Embassy began the time-consuming and expensive process of collecting and reviewing documents that were potentially responsive to Plaintiff's document requests. Schroeder Aff. ¶ 6.

The Embassy did not undertake its document collection in a vacuum. The Embassy and Plaintiff agreed to six search terms: (1) Ellen, (2) Ewald, (3) Anders, (4) Davidson, (5) "Higher Education and Research," and (6) "Innovation and Business Development." Ex. 5. Plaintiff did not request any other terms. Schroeder Aff. ¶ 6. The MFA's Oslo-based I.T. administrator ran the search terms on custodians' email accounts and provided the results to the Embassy's counsel so it could be loaded into a database, reviewed, and produced. Schroeder Aff. ¶ 7.[5]

The Embassy engaged one contractor fluent in Norwegian to assist with the review of over 187,000 pages of documents. Id. The Embassy began its document production on December 3, 2012 and produced 62,481 pages of documents that month. The Embassy produced documents on a rolling basis:

---

[5]      Because both sides needed additional time to collect and produce documents, the parties submitted a joint motion requesting that the Scheduling Order be extended an additional three months. Doc. No. 78. The Court granted the parties' request and postponed the discovery deadline from March 1 to June 3, 2013. Doc. No. 82.

| Prod. CD | Date Produced | Bates Range | No. of Pages |
|----------|---------------|-------------|--------------|
| 1 | 12/3/2012 | RNE 00001-05796 | 5,796 |
| 2 | 12/7/2012 | RNE 05797-22402 | 16,606 |
| 3 | 12/14/2012 | RNE 22403 - 41434 | 19,032 |
| 4 | 12/21/2012 | RNE 41435 - 62481 | 21,047 |
| 5 | 1/11/2013 | RNE 62482 - 62534 | 53 |
| 6 | 1/25/2013 | RNE 62535 - 87889 | 25,355 |
| 7 | 2/18/2013 | RNE 87890 - 88985 | 1,096 |
| 8 | 7/8/2013 | RNE 88986-88994 | 9 |
| | | | *88,985 total pages produced* |

In less than two months, the Embassy produced more than 87,000 of the 88,985 pages of responsive documents. Using Axcelerate, a common document review and processing tool, the documents were produced to Plaintiff in accordance with the FOPA. Buntain Aff. ¶¶ 4, 6, 7.

### F. Plaintiff Requests Documents Through Norway's Public Disclosure Act.

Although Plaintiff claims that the Embassy produced too many documents, she retained a law firm in Oslo to request more documents from the Norwegian government under Norway's Public Disclosure Act.   Schroeder Aff. ¶ 17.   Unlike documents produced in discovery, Norway must only disclose to Plaintiff those documents that are required to be disclosed under Norwegian law. As a result, the Embassy was required to produce many documents twice.

### G. Plaintiff Takes Nine Depositions on Two Continents.

As Plaintiff's counsel made clear on December 13, 2012, Plaintiff's "review of the documents is necessary before depositions begin." Ex. 5. Between March 4 and July

11, 2013, Plaintiff took nine depositions on two continents and marked 181 documents as

deposition exhibits[6]:

| Date | Deponent | Location | Number of Exhibits |
|------|----------|----------|--------------------|
| 3/4/2013 | (1) Gary Gandrud | Minneapolis, MN | 56 |
| 3/7/2013 | (2) Christina Carleton | Minneapolis, MN | 8 |
| 4/4/2013 | (3) Walter Mondale | Minneapolis, MN | 18 |
| 4/8/2013 | (4) Anders Davidson | Minneapolis, MN | 21 |
| 6/13/2013 | (5) Liv Morch Finborud | Oslo, Norway | 11 |
| 6/18/2013 | (6) Amb. Johan Vibe | Madrid, Spain | 31 |
| 6/28/2013 | (7) Elisabeth Wemberg | Washington, D.C. | 21 |
| 6/28/2013 | (8) Urd Milbury | Washington, D.C. | 0 |
| 7/11/2013 | (9) Amb. Wegger Strømmen | Washington, D.C. | 15 |
| | | | Total: 181 |

The 181 deposition exhibits selected by Plaintiff's counsel came from across the Bates

range of documents. Pl's Ex. W at 2. Prior to the depositions of the Norwegian

witnesses, Plaintiff's counsel provided courtesy copies of approximately 195 documents

in Norwegian along with Google translations. Schroeder Aff. ¶ 9.[7]

## IV.   May 2013: The Parties Agree to A One-Month Stay in Discovery For The Purposes of Engaging in Settlement Discussions.

In early May, the parties requested a one-month extension to the scheduling order

for the sole purpose of "explor[ing] fully the possibility of settlement." Ex. 6. There

---

[6]   Due to a variety of factors (some of which were discussed with the Court during an informal teleconference), the deposition of Berit Johne is scheduled to take place later this month in Brussels.

[7]   Plaintiff takes umbrage with the fact that the Embassy's counsel refused to find documents for him during a deposition. Pl's Mem. at 10. Mr. Marshall twice asked Mr. Schroeder: "where would this [document] be found in the documents that were produced?" Pl's Ex. II, Gandrud Dep. 101-102. Mr. Schroeder simply stated the obvious: it is not opposing counsel's duty, in the middle of the other party's deposition, to find documents for the examining attorney.

were then no major discovery disputes pending. Schroeder Aff. ¶ 10. The Court amended the scheduling order a second time, extending the discovery deadline to July 3. Doc. No. 102.

## V.    May 31, 2013: On The Friday Evening Before Mediation, Plaintiff Sends A 17-Page Letter Raising Discovery Issues for the First Time.

For nearly a year—from the parties' 26(f) conference on June 29, 2012 until the evening of May 31, 2013—discovery proceeded without significant dispute.   That changed at 8:18 p.m. on Friday, May 31, 2013, when Plaintiff emailed a 17-page letter before a private mediation scheduled for Tuesday, June 4. Pl's Ex. V. In that letter, Plaintiff:

- Claimed technical difficulties related to the Embassy's document production, including  that the production "lacks authenticity and integrity" because the domain name "@utenriksdepartementet.com" appeared on some of the images produced by the Embassy (Ex. V at 2);

- Requested unfettered access to an image of Plaintiff's work laptop and mobile phone (Id. at 3);

- Requested unfettered access to the personal mobile phones of employees of the Embassy and the MFA, and that the Embassy search for and produce text messages (Id. at 13-14);

- Objected to several of the Embassy's interrogatory answers and responses to Plaintiff's document requests (Id. at 10-13); and

- Asked the Embassy to designate documents as responsive and locate documents contained within its document production (Id.).

## VI.    June 2013: The Embassy Responds to Plaintiff's Concerns.

The June 4 mediation was unsuccessful. On June 7, the Embassy responded to Plaintiff's letter. Pl's Ex. W. After noting Plaintiff's delay in raising concerns, the

Embassy explained that the content of the documents produced had not been affected in the process of preparing the electronic data for production, explained why it believed the domain name "@utenriksdepartementet.com" appeared on some of the emails, explained that Plaintiff's difficulty in searching for documents in Norwegian was attributable to Plaintiff's review database, noted that the Embassy was not obligated to designate the documents it produced to specific discovery requests, reasserted a majority of objections made months prior, and explained that it did not intend to produce text messages or voice mails. Pl's Ex. W. The Embassy also invited dialogue, if desired, to further address Plaintiff's concerns. Id. at 10.

## VII.    July 2013: The Parties Attempt To Resolve Plaintiff's Concerns.

After nearly three weeks of silence, Plaintiff raised additional concerns by email on Sunday, June 30, 2013. Pl's Ex. Z. The Embassy and its consultants at Stroz Friedberg investigated the additional concerns raised by Plaintiff. Gleason Aff. ¶ 7.

On July 24, counsel and their e-discovery consultants met for two hours. Ex. 7; Schroeder Aff. ¶ 12; Gleason Aff. ¶ 8. Breandan Gleason of Stroz Friedberg and Erin Buntain of FaegreBD answered most of the questions posed by Plaintiff's consultants. Gleason Aff. ¶ 8; Buntain Aff. ¶ 13. The Embassy's counsel confirmed the outcomes of the meeting in writing the following day:

- Although the documents produced by the Embassy conformed with the parties' FOPA and were searchable, the Embassy agreed to provide new load files to make searching the metadata fields for Norwegian characters easier. Ex. 7 at 1. The new load files were provided on August 2. Schroeder Aff. ¶ 16.

- The Embassy explained that its document processing software automatically selected the encoding (selecting UTF-8 for text containing foreign characters and ANSI for text not containing foreign characters). Ex. 7 at 2.

- After contacting the administrator of Relativity (Plaintiff's document-review database), the Embassy proposed to Plaintiff a fix to resolve any difficulties Plaintiff had because the production of documents written in Norwegian resulted in the document production being in mixed encoding text files (ASNI and UTF-8). Id.

- The Embassy explained that the word "ikke" ("not" in Norwegian) appeared because the MFA's I.T. Department sometimes prepends "ikke" to the email addresses of departed employees to identify those addresses as no longer in use. Id. For example, because Berit Johne left the MFA in August 2010 and her emails were not collected until after her employment ended, the word "ikke" appeared before her email address. Id. The appearance of "ikke" did not impact the integrity of the Embassy's document production or Plaintiff's ability to search for and retrieve documents. Id.

- The Embassy explained that "utenriksdepartementet" (Norwegian for MFA) appeared in the email address of the original native file and was exported by Axcelerate. For example, Liv Finborud's email address is lmf@mfa.no. Id. at 3. In the underlying native file, Ms. Finborud's email address was formatted as "/O=UTENRIKSDEPARTEMENTET/OU=DRIFTSNETT/CN=RECIPIENTS /CN=LMF." Id. When processed by Axcelerate, Ms. Finborud's email address appeared as lmf@utenriksdepartementet.com instead of lmf@mfa.no. The appearance of "utenriksdepartementet" did not impact the integrity of the Embassy's production or Plaintiff's ability to search for documents. Id.[8]

- With respect to larger-than-normal spacing issues in some of the emails produced by the Embassy, the Embassy explained that this occurs on occasion when Axcelerate converts some files to .tiff images. Id. While the images are a bit more cumbersome to use, the content of the emails is not affected. Id.; see also Gleason Aff. ¶ 8. [9]

---

[8]   As is evident from Plaintiff's submissions to the Court, sometimes technical information is displayed when emails are printed or processed. See, e.g., Pl's Ex. A ("To" line displays the following: group/cn=recipients/cn=tomm; group/cn=recipients/cn=sfischer; group/cn=recipients/cn=jmartin). Even so, Plaintiff's counsel represents this to be a "true and correct" copy. Engelmeier Aff. ¶ 2.

[9]   The Embassy had earlier offered to rerun the production to eliminate the extra spacing. Ex. 8. This would have reduced the page count by approximately 32,000 pages

At the July 24 meeting, Plaintiff's counsel did not raise additional concerns and subsequently stated that she does not believe these technical issues impacted the integrity of the Embassy's document production. Schroeder Aff. ¶ 12.[10] On July 26, the Embassy responded to Plaintiff's request for additional discovery. Pl's Ex. DD. On July 29, the parties held a final meet and confer. Schroeder Aff. ¶ 13.[11]

## ARGUMENT

Plaintiff's motion should be denied for three reasons: (1) Plaintiff's lack of diligence, (2) Plaintiff's specific requests are generally overbroad, irrelevant, and unnecessary, and (3) Plaintiff's requests are disproportionate to her claims.

## I.    PLAINTIFF'S LACK OF DILIGENCE.

This Court may deny Plaintiff's motion in its entirety on the sole basis that Plaintiff has waited too long to raise discovery issues.

A party is precluded from manufacturing discovery issues when the party has sat on her hands and waited until the last minute to raise discovery-related issues. See, e.g., Ford Motor Co. v. Edgewood Props., 257 F.R.D. 418, 426 (D.N.J. 2009) ("One may

---

(thereby reducing the page count to 56,000). Buntain Aff. ¶ 9. Plaintiff rejected this offer. Ex. 8.

[10]   Indeed, none of the eleven witnesses deposed in this case, including Plaintiff, have raised any question about the authenticity of documents produced by the Embassy.

[11]   Plaintiff states that July 29 was "the first date Defendant's counsel was available to meet and confer on or after July 16." Pl's Mem. at 2; Engelmeier Aff. ¶ 54. This is not true. Because Plaintiff had sent her most recent correspondence on July 16, the Embassy needed time to investigate the concerns prior to holding a meet and confer. The Embassy responded on July 25 and 26 (Ex. 7 & Pl's Ex. DD), and held the meet and confer on July 29.

reasonably expect that if document production is proceeding on a rolling basis . . . a receiving party will have reviewed the first production for adequacy and compliance issues for a reason as obvious as to ensure that the next production of documents will be in conformity with the first production or need to be altered. It was incumbent on Edgewood to review the adequacy of the first production so as to preserve any objections."); Bredemus v. Int'l Paper Co., 252 F.R.D. 529, 534 (D. Minn. 2008) (motion to compel denied because plaintiff failed to challenge defendant's discovery responses and objections for five months after their receipt); Wakehouse v. Goodyear Tire & Rubber Co., 2007 WL 1340788, at *6 (D. Neb. Apr. 5, 2007) (motion to compel production of documents waived due to plaintiff's several-month delay and absence of any justification); Idahosa v. Creve Coeur Police Dept., 2007 WL 486771 (C.D. Ill. Feb. 9, 2007) (motion to compel denied where plaintiff waited eight months after receiving alleged unsatisfactory answers before bringing motion to compel); Pearce v. E.F. Hutton Group, Inc., 117 F.R.D. 477, 478 (D.D.C. 1986) (motion to compel filed four months after responses received was untimely, as objecting party should have conferred with adversary and filed motion when issue arose).

Here, eight months passed before Plaintiff took any action to address what she now claims are deficiencies in the Embassy's discovery responses and document production. The Embassy responded to Plaintiff's discovery requests in October 2012. In December 2012, the parties agreed on terms to search the emails of certain custodians. The Embassy began its rolling production and produced 62,481 pages of documents by the end of 2012. By February 18, 2013, the Embassy had produced over 80,000 pages of

14

responsive documents. Plaintiff began taking depositions in March 2013 and had completed nine depositions by early July 2013.

Plaintiff raised discovery-related issues for the first time on May 31, 2013. Plaintiff's delay is, by itself, good reason to deny her motion.

## II. PLAINTIFF'S DISCOVERY REQUESTS ARE IRRELEVANT, OVERBROAD, AND UNNECESSARY.

### A. Plaintiff's Discovery Requests for All Communications About Plaintiff.

Ten months after the Embassy served its objections to Plaintiff's interrogatories and document requests, Plaintiff moves to compel responses to Interrogatory Nos. 3 and 13 and Document Request Nos. 8 and 19. The discovery requests are plainly overbroad:

> **INTERROGATORY NO. 3:** State the names, addresses, and employment of all persons with whom you have had conversations or communications regarding any of the matters or issues raised or alleged in your answer to any claim in this action as well as any counterclaims, and describe in detail the dates, places, and substance of all such conversations or communications.

> **INTERROGATORY NO. 13:** Identify all persons with whom Plaintiff's employment was discussed and the content of each conversation or communication. Provide documentation, if any, for all communications.

> **REQUEST NO. 8:** All documents concerning any communication relating to Plaintiff's employment by or between any current or former employee or other current or former representatives of Defendant and Plaintiff from January 2008 to the present.

> **REQUEST NO. 19:** All documents that relate to, bear upon or provide evidence of any communications, oral or otherwise, Defendant has had at any time with any current or former agents or employees of Defendant relating to the subject matter of this litigation or the allegations contained in Plaintiff's complaint. This Request includes, but is not limited to, notes of any telephone conversations Defendant or its personnel might have had with such individuals, cell phone and/or other telephone records.

Pl's Exs. G, H. The Embassy rightfully objected to, and did not answer, Interrogatory No. 3, Request No. 8, and Request No. 19. Id. For Interrogatory No. 13, the Embassy objected and referred Plaintiff to its interrogatory answers and documents that would be produced. Pl's Ex. G. In the intervening eight months, Plaintiff did not challenge the Embassy's objections. Schroeder Aff. ¶ 4.

The Embassy's objections are reasonable. The interrogatories would require the Embassy to cut-and-paste every single written communication about Plaintiff—relevant or not—into a Word document and attempt to recount every single conversation—relevant or not—ever held about Plaintiff. The interrogatories would also require the Embassy to interview every single employee who ever communicated verbally about Plaintiff's employment and attempt to produce a narrative response reflecting those communications. It is for these reasons that courts have rightfully held that such inquiries are overly broad, unduly burdensome, and better suited for depositions. See Stephens v. City of Chicago, 203 F.R.D. 353, 361 (N.D. Ill. 2001) (after plaintiff requested information about "conversations" and "suggestions" by defendant, court stated: "plaintiff can obtain the information through a less onerous medium, to-wit: depositions"). In Hilt v. SFC Inc., for example, the court refused to compel a party to answer interrogatories similar to Plaintiff's because "[t]his would require plaintiff to provide the equivalent of a narrative or otherwise detailed account of her entire case-in-chief, together with identification of virtually all supporting evidence for each fact." 170 F.R.D. 182, 186 (D. Kan. 1997).

16

Plaintiff deposed nine witnesses and has had ample opportunity to explore the information she belatedly seeks. In addition, Plaintiff's last-minute attempt to narrow the overly broad interrogatories does not address the overbreadth defects described above or the fact that Plaintiff had full opportunity to explore this topic in the nine depositions that she took. Pl's Mem. at 7-8; Pl's Ex. V at 10-11. Plaintiff's request to compel responses to Interrogatory Nos. 3 and 13 should be denied.

With respect to Request Nos. 8 and 19, it is simply incorrect for Plaintiff to claim that she has not located documents responsive to these requests. Documents "concerning any communication relating to Plaintiff's employment" (No. 8) constitute a majority of the Embassy's document production and include several depositions exhibits (e.g., Dep. Ex. Nos. 47, 65, 80, 128, 135, 136, 149, 153, 154, and 164 (not attached here)). Indeed, any mention of Plaintiff in a document would be responsive to Request No. 8 and would have been captured by the agreed-upon search terms, one of which was "Ellen" and another of which was "Ewald." Ex. 5. For reasons unknown, Plaintiff's brief truncates the substantive portion of Request No. 19. Compare Pl's Mem. at 7 with supra at 15. The actual request, reproduced in full above, seeks documents relating to communications the Embassy had with any of its current or former employees relating to the subject matter of this litigation or the allegations contained in Plaintiff's complaint. Id. The Embassy rightfully objected to the request's overbroad and burdensome nature,

as well as the potential intrusion on privileged communications.  Id.[12]  Plaintiff's request

to compel responses to Request Nos. 8 and 19 also should be denied.

## B. The Court Should Deny Plaintiff's Request for Past Complaints of Inequitable or Discriminatory Conduct Against Women.

Plaintiff requests documents related to complaints of gender discrimination and

unequal pay. Pl's Mem. at 26-28. Plaintiff's August 2012 discovery requests state:

> **INTERROGATORY NO. 18:**  Identify all other claims of inequitable treatment of females, whether by compensation or otherwise, made to the Norwegian Foreign Service since 2002.

> **REQUEST NO. 24:**  All complaints of inequitable or discriminatory conduct against females by the Norwegian Foreign Service since 2002.

Pl's Exs. G, H.  In October 2012, the Embassy objected to these requests because they

sought irrelevant information not calculated to lead to the discovery of admissible

evidence and infringed on the inviolability of the Embassy's archives pursuant to

international treaty. Id.

Ten months later, Plaintiff challenges the Embassy's objections on the grounds

that the discovery might "show[] that Defendant had knowledge of the applicable gender

discrimination and equal pay laws and it failed to act to ensure compliance with the

laws." Pl's Mem. at 26. The requested discovery, even if provided, would do nothing to

show the Embassy "failed to act to ensure compliance with the laws" with respect to

---

[12]    Plaintiff makes much of the fact that this request includes "notes of any telephone conversations Defendant or its personnel might have had with such individuals, cell phone and/or other telephone records." Pl's Ex. H at No. 9.  As explained above, in addition to handwritten notes, the Embassy interpreted this clarifying sentence to request telephone records or logs; not text messages.  Schroeder Aff. ¶ 4.

Plaintiff. There is nothing in the record to suggest that the Embassy is or was unaware of the obligation to compensate women and men equally for equal work. Ex. 9 at 149-150 (noting Embassy's awareness of obligation).

Plaintiff also claims that "Defendant knew its pay practices were discriminatory, that nothing was done about the unequal pay for women, and it continued to pay women less than men." Pl's Mem. at 26. Despite production of thousands of pages of documents collected from search terms agreed to by Plaintiff and completion of eleven depositions, Plaintiff can point to nothing in the record to suggest that the Embassy believed that its pay practices were discriminatory. Indeed, the documents are replete with statements that Plaintiff and Davidson were compensated differently because they held different jobs.[13]

Plaintiff's request for worldwide discovery of "all...claims of inequitable treatment of females" seeks information that is not calculated to lead to the discovery of admissible evidence regarding a claim involving the comparative treatment of two employees working at the Honorary Consulate in Minneapolis. Lacking from Plaintiff's request is any consideration of whether or not Plaintiff is similarly situated to the employees holding different positions in different cities and countries. Burns v. Hy-Vee, Inc., 2002 WL 31718432, *2 (D. Minn. Nov. 21, 2002) ("Where an individualized claim

---

[13] Plaintiff took the deposition of Urd Milbury, an administrative employee in Washington D.C. Ms. Milbury expressed an unsubstantiated belief that local female employees are paid less than local male employees (Pl's Ex. HH, Milbury Dep. 25:14-15), but that does not open wide the doors to comparative discovery, particularly as Ms. Milbury admittedly has no knowledge regarding Plaintiff's job and compensation, or that of Davidson. Ex. 10 at 107:2-109:12.

of disparate treatment is alleged, the discovery of information concerning other employees should be limited to those employees who are similarly situated."). In fact, the officer positions in Minneapolis were created as a part of a new model honorary consulate and were funded through a unique arrangement in which six stakeholders contributed the money needed for the officers' compensation, benefits, and expenses.

Moreover, as stated in its October 2012 objections and subsequent Diplomatic Note, Norway has rights pursuant to international treaty that conflict with Plaintiff's appetite for more and more information. See VIENNA CONV. ON CONSULAR REL., arts. 33 & 61; VIENNA CONV. ON DIPLOMATIC REL., arts. 24 & 27. The Embassy has not agreed to expand that waiver. Plaintiff's request for past complaints of discrimination and unequal pay should be denied.

## C. Plaintiff's Belated Requests for Additional Documents Are Either Not Responsive or Objectionable.

Plaintiff requests additional documents, many of which are not responsive to Plaintiff's document requests. Pl's Mem. at 28-30. A few days before the expiration of the discovery deadline, Plaintiff took the deposition of Urd Milbury, a cultural and communications officer at the Embassy who has no personal knowledge of Plaintiff or her employment at the Honorary Consulate. After that deposition, Plaintiff asked the Embassy to produce a variety of documents. Pl's Ex. Y. That same evening, the Embassy asked Plaintiff to explain whether she believes the documents requested are responsive to her document requests. Ex. 11. Plaintiff never responded. Schroeder Aff. ¶ 14; Pl's Ex. DD.

### 1. Wage Statistics

Plaintiff requests wage statistics for Norway's U.S. missions. Ex. 11. In August 2012, Plaintiff requested "payroll records" and "documents relating to salary and/or benefits" for employees at Norway's U.S. missions. Pl's Ex. E at Nos. 6, 15. In October 2012, the Embassy objected to these requests primarily because they were overbroad, sought irrelevant information, and infringed on the inviolability of the Embassy's archives. Pl's Ex. H at Nos. 6, 15. In December 2012, the Embassy provided the Court and Plaintiff with the Diplomatic Note referenced above. Ex. 4. In the intervening months, Plaintiff did not object to these limits. Schroeder Aff., ¶ 4.

In addition, for the same reasons discussed in Section II.B, above, this information will not lead to the discovery of admissible evidence because these other employees are not similarly situated to Plaintiff.

### 2. Mercer Study on Wages in New York City

Plaintiff requests "a study done by a group called Mercer which concerned wage disparity issues in the New York mission[.]" Ex. 11. First, this study does not fall within the scope of any of Plaintiff's discovery requests. Plaintiff claims the study is "directly relevant to the issues of unequal pay and Defendant's knowledge of the equal pay laws" and "may show pay differentials between men and women." Pl's Mem. at 28-29. The study, however, examines issues with respect to local employees in New York, has

nothing to do with gender, and does not evaluate pay differentials based on gender. Ex. 11; Ex. 10 at 122:2-6. Plaintiff's request for the study should be denied.[14]

### 3. Urd Milbury's PowerPoint Presentation

Plaintiff also requests "a [P]ower[P]oint presentation presented to Aud Kolberg and other senior officials about wage disparity issues. This presentation included other locally employed personnel describing their personal situations and the unfairness they suffered." Ex. 11. As with the Mercer study, Plaintiff has never stated how this request is responsive to her document requests, and the Embassy does not believe the PowerPoint is responsive. In addition, a presentation about concerns of local employees at the Embassy in Washington is irrelevant to and will not lead to discoverable information regarding Plaintiff's claims. Those employees worked in a different location, had different supervisors, had different jobs, were not part of the new model, were not employed through term contracts, and their salaries were not dependent on the contribution of stakeholders. Ms. Milbury has no personal knowledge about the work and compensation of Plaintiff or Davidson and testified that the focus of the PowerPoint was on allegedly low salaries for all local employees and not gender-based salary differences. Ex. 10 at 107:2-109:2 (no knowledge about Plaintiff's work); 122:7-124:5 (noting that both men and women complained about their compensation). Plaintiff's request for the PowerPoint should be denied.

---

[14]     Plaintiff also claims that the study may lead to admissible evidence because one of the Embassy's defenses to the EPA claim is market differentials between corporate and education positions. Pl's Mem. at 29. A third-party analysis of the salaries of local employees at the New York Consulate would have nothing to do with the market for the positions held by Plaintiff and Davidson in Minneapolis.

22

#### 4. Worldwide Working Environment Survey Results

Last, Plaintiff requests "surveys of foreign service employees internationally in 2011 and 2013 which included inquiries and identification of workplace bullying in the various missions." Ex. 11. Here again, Plaintiff has never stated whether this request is responsive to her document requests, and the survey results are responsive. More troubling, however, is the fact that Plaintiff knew about these surveys as far back as March 2010 but did not bother to tell her lawyers about the surveys so they could attempt to pursue them during discovery. See Ex. 12, RNE 6571.[15] Factually and legally, worldwide survey results of employees working in different environments with different cultures and supervisors have nothing to do with the work environment of a three-employee Honorary Consulate in Minneapolis. Plaintiff's request for worldwide survey results should be denied.

### D. The Documents Plaintiff Claims Are "Missing" Are Contained in the Embassy's Document Production or Will Be Searched For.

Plaintiff also claims that certain documents were not produced. Pl's Mem. at 8. With respect to emails, Plaintiff's complaint rings hollow when she agreed to the six search terms that were applied to the emails of MFA custodians. Ex. 5. In addition, the documents that Plaintiff has inquired about appear to have been produced. Schroeder Aff. ¶ 15 (chart). With respect to responsive documents that might be in the possession

---

[15]     The March 25, 2010 email inviting Plaintiff to participate in the survey was produced by the Embassy on December 7, 2012. It is in both Norwegian and English.

23

of Trond Fevolden, the Embassy has agreed to search for responsive documents. Id.; Pl's Ex. DD at 4.

### E. The Embassy Has Produced Responsive Handwritten Notes.

Plaintiff surmises that the Embassy did not search for and produce enough handwritten notes because she "has not found any notes" in the Embassy's document production. Pl's Mem. at 7-8. But the premise of Plaintiff's claim is wrong. A cursory review of the Embassy's production confirms that the Embassy produced numerous hard-copy documents, including handwritten notes.[16]  See, e.g., RNE 5537, 5620-27, 5629-33, 5636-37, 5639, 5641 (handwritten notes produced in December 2012); RNE 88986 (handwritten notes produced in July 2013) (not attached here).

### F. Any Technical Issues Involving the Embassy's Document Production Have Been Resolved, Are Being Resolved, or Are Inconsequential.

Plaintiff claims that "technical issues" with documents produced by the Embassy made the production unsearchable and "unusable." Pl's Mem. at 10.[17]  Plaintiff lists six issues that made the Embassy's production "challenging," but does not ask the Court to do anything about these issues.[18]  There is good reason for this; either the issues have

---

[16]  Contrary to Plaintiff's view, Ms. Carleton did not serve as the official "note taker" for the Honorary Consulate and does not possess responsive handwritten notes. Somermeyer Aff. ¶ 10.

[17]  The Embassy's production is clearly searchable as Plaintiff's own expert claims to have performed numerous searches on the production. See Doc. No. 111, Carney Decl. ¶¶ 36-38.

[18]  The "technical issues" served as Plaintiff's pretext to pursue additional discovery. Ex. V. According to Plaintiff, the six issues are: (1) mixed data encoding with the text files, (2) bad character encoding within the load file, (3) excessive spacing on the tiff

24

been resolved or they do not need to be resolved. Accordingly, the Embassy will not

address the issues in depth and instead refers the Court to the Embassy's July 25, 2013

letter and the Affidavits of Breandan Gleason and Erin Buntain for additional

explanation. Ex. 7; Gleason Aff.; Buntain Aff.

### G. The Court Should Deny Plaintiff's Request for Unnecessary Post-Discovery Discovery Regarding the Embassy's Document Collection Efforts and the Technical Minutiae of Its Servers and Network.

On June 3, 2013, Plaintiff served the following discovery requests:

**INTERROGATORY NO. 21:** Identify and describe the Defendant's e-mail systems architecture and provide:

     a.     For E-mail Archive Servers used for preservation, identify the server names, geographic locations, software product and versions used.

     b.     For E-mail Backup Servers, identify the server names, geographic locations, software product and versions used.

     c.     For Exchange Servers, identify the server names, geographic locations, software product and versions used.

     d.     For Outlook Clients Ellen Ewald, Gary Gandrud, Walter Mondale, Jan Aage Larsen, Berit Johne, Elin Rognlie, Anders Davidson, Christina Carleton, Johann [sic] Vibe, Liv Morch Finborud, Elizabeth [sic] Wemberg and Wegger Strommen, identify the client names, geographic locations, software product and versions used.

**INTERROGATORY NO. 22:** Identify and describe the tools and methods used by Defendant to preserve, collect, process and produce evidence in this case.

**REQUEST NO. 30:** Provide all documents that identify the Defendant's email systems architecture and include:

---

images and in the text files, (4) an odd domain name printed on the tiffs and within the text and load files, (5) "ikke" email addresses, and (6) inconsistent text between the metadata and the images of the data. Pl's Mem. at 12. Issues 1 and 2 have been resolved. Issues 3, 4, 5, and 6 have been sufficiently explained to Plaintiff (by way of a July 24 in-person meeting with the parties' technical consultants; follow-up correspondence of July 25; and now the Affidavits of Mr. Gleason and Ms. Buntain) and do not impact the content or authenticity of the documents.

a.     For Outlook clients individuals identified in Request No. 29 above, those documents providing the client names, geographic locations, and software versions.

b.     For Exchange Servers, those documents providing the server names, geographic locations, software product and versions.

c.     For E-mail Backup Servers, those documents providing the server names, geographic locations, software product and versions.

d.     For E-mail Archive Servers used for preservation, those documents providing server names, geographic locations, software product and versions.

Pl's Exs. L, M.   The Embassy objected on a variety of grounds, including that the interrogatories and document requests were overbroad, unduly burdensome, and sought irrelevant and protected information. Pl's Ex. L at Nos. 21, 22; Pl's Ex. M at No. 30.  In its objections, the Embassy also reminded Plaintiff of the 26(f) Report, the FOPA, and the parties' coordination with respect to the review, collection, and production of ESI. Pl's Ex. L at No. 22.

Without citation to legal authority, Plaintiff now moves to compel responses to these discovery requests because of "problems with the Defendant's document production." Pl's Mem. at 16. But, Plaintiff fails to identify these problems or recognize that there are no material problems with the Embassy's document production.   The Embassy spent hours investigating and providing explanations regarding these supposed "problems." These "problems" are largely a consequence of the preparation of the data, including foreign language documents, for production using industry-standard software; Plaintiff is not claiming that the Embassy manipulated or altered data. In addition to the fact that any issues regarding the production are now moot because all such "problems" and "concerns" have been resolved or are being resolved, Plaintiff does not explain how

this discovery is relevant or will lead to the discovery of admissible evidence. Fundamentally, these "problems" did not affect the substantive content of the documents produced. In fact, despite knowledge of these so-called "problems" identified as far back as April 2013 (Ewald Decl. ¶ 4) and outlined in Plaintiff's May 31 letter (Pl's Ex. V), Plaintiff proceeded to take the depositions of Liv Finborud, Ambassador Vibe, Elisabeth Wemberg, Urd Milbury, and Ambassador Strømmen between June 13 – July 11, 2013. If the "problems" were material or prejudicial, Plaintiff would not have proceeded with the depositions.[19]

## H. The Court Should Deny Plaintiff's Request for Forensic Images of Laptops, Phones, Memory Cards, and Tablets.

Plaintiff also moves for the production of a plethora of devices used by "key witnesses and decision makers"—including laptops, mobile phones, memory cards, and tablets—based on "technical issues with Defendant's production of documents." Pl's Mem. at 17. Specifically, Plaintiff requests devices so they can be analyzed forensically:

**REQUEST NO. 27:** Plaintiff requests that you present for review, examination, and analysis the laptop computers used by Plaintiff while employed by Defendant.

**REQUEST NO. 28:** Plaintiff requests that Defendant present the computer forensic images and/or backup copies of the laptop computers used by Plaintiff for analysis of the following:
a. E-mail evidence- live/active/nondeleted, deleted, unallocated.
b. Applications - installed and uninstalled.
c. Software agents and/or scripts used for evidence preservation.

---

[19] Plaintiff also claims that she "found the Norwegian documents very difficult to search," but her hired forensic expert had no such difficulty searching Norwegian words such as "beskjed" and "stemmen." Compare Ewald Decl. ¶ 4 with Carney Decl. ¶¶ 36-37 ("The Plaintiff searched the Defendant production using 24 mobile evidence search terms, [including] 9 from the Norwegian language.").

**REQUEST NO. 29:** Plaintiff requests that you present for review, examination, and analysis the cellular/smart or other phones, memory cards and tablets currently in use and those used by the following individuals between November 1, 2008 and November 1, 2011: [Ellen Ewald; Gary Gandrud; Walter Mondale; Jan Aage Larsen; Berit Johne; Elin Rognlie; Anders Davidson; Christina Carleton; Johann [sic] Vibe; Liv Morch Finborud; Elisabeth Wemberg; and Wegger Strommen.]

Pl's Ex. M.

Plaintiff's requests should be denied for several reasons. First, the reason Plaintiff claims this discovery is needed does not exist. The technical problems have been explained, resolved, or are being resolved, with considerable time and expense by the Embassy. Any remaining issues are inconsequential. "Issues" with a document production do not support forensic examination and, indeed, Plaintiff has failed to cite any legal authority in support of her request.

Second, as is discussed below, Plaintiff's requests violate proportionality considerations and other provisions of the Federal Rules. See infra at § V; Fed. R. Civ. P. 1; Fed. R. Civ. P. 26(b)(2)(C). There are limits to discovery and Plaintiff's request seeks to gather additional information and impose considerable additional costs on the Embassy regarding minor issues that it has already worked hard to explain. And, it must be emphasized, these problems do not affect the content of the documents produced.

Third, intrusive requests for forensic imaging and analysis are unheard of in single-plaintiff employment cases and Plaintiff has not cited a single case like hers where such relief has been ordered. There's good reason for that. Forensic imaging and analysis are generally only ordered in high-stakes trade secret cases where there is

evidence of theft or destruction of evidence.  See, e.g., Ameriwood Indus., Inc. v. Liberman, 2006 WL 3825291, *5 (E.D. Mo. Dec. 27, 2006) (compelling images where computers used "to secrete and distribute [] confidential information. How and whether [the party] handled those documents and what [the party] did with the documents is certainly an issue."); Capitol Records, Inc. v. Alaujan, 2009 WL 1292977, *1 (D. Mass. May 6, 2009) (ordering imaging where information on computer was "at the heart of" the copyright infringement action and plainly relevant under Fed. R. Civ. P. 26(b)); Global Tech. Search, Inc. v. Jacobsen, 2008 WL 789929, *2 (S.D. Cal. Mar. 21, 2008) (granting forensic examination of laptop to confirm misappropriated information was deleted from employee's laptop).  These circumstances do not exist here.

Fourth, imaging and analyzing a computer or a phone can become expensive and burdensome, and is unnecessarily intrusive to the individual witnesses in this case. Schroeder Decl. ¶ 2; Gleason Aff. ¶ 13.

Fifth, the Embassy does not have the ability to force its employees or former employees to turn over their personal "cellular/smart or other phones, memory cards and tablets" for analysis.  Of the twelve witnesses identified by Plaintiff, seven are Norwegian citizens and six reside abroad (and one is a former Vice President of the United States).  Some are no longer employees of the MFA.  Plaintiff's request raises serious and complicated privacy concerns.  It is one thing to review and produce an employee's work email account; it is quite another to turn over personal devices for analysis and inspection.  For all these reasons, any of which is a sufficient basis to deny Plaintiff's request, the request should be denied.

29

## I. The Court Should Deny Plaintiff's Request for Text Messages.

Contained within Plaintiff's request for forensic imaging of mobile phones is a request that the Embassy be ordered to produce text messages responsive to Plaintiff's discovery requests. Because there was no indication from Plaintiff that text messages would be relevant to the claims and defenses in this case (either in March 2011 when Plaintiff sent her demand letter; in June 2012 when the parties held the 26(f) conference; or in late 2012 when the Embassy began reviewing and producing documents) and because the Embassy's counsel had no knowledge that text messages would be relevant to the claims and defenses in this case, the Embassy's counsel took no steps to collect or produce text messages in this matter. Schroeder Aff. ¶ 4. [20]

Plaintiff's request should be denied for reasons similar to Plaintiff's request for forensic imaging. See supra II.H. In addition, the Embassy's counsel has contacted each of the witnesses listed in Request No. 29 and none of the witnesses have in their possession any text messages related to Plaintiff. Somermeyer Aff. ¶ 6. [21]

---

[20]     Plaintiff claims the Carney Declaration shows the prevalence of text messages. Carney's methods are flawed. First, he claims there are 17,808 documents that include one of his "mobile search terms." Carney Decl. ¶ 37. The Embassy only produced 16,981 documents. Buntain Aff. ¶ 6. Second, Carney evidently searched documents in Plaintiff's database other than those produced by the Embassy. The Embassy did not produce a single document that contains the word "Droid"—yet Carney claims he found 17. Id. at 15; Carney Decl. ¶ 37. Finally, Carney apparently did not review his search results. Even a cursory review shows that approximately 90% of the references to "iPhone" within the Embassy's production are to *email* signatures (e.g., "sent from my iPhone."). Buntain Aff. ¶ 16. This is not evidence of texting.

[21]     Plaintiff also claims Elisabeth Wemberg testified that "phone texts are considered documents that are routinely entered in official archives." Pl's Mem. at 8-9. This is not true. The Embassy does not have an official manner of retaining text messages. Ms.

## III.   THE EMBASSY IS NOT REQUIRED TO DESIGNATE DOCUMENTS BECAUSE IT PRODUCED DOCUMENTS IN ACCORDANCE WITH THE PARTIES' STIPULATION AND FEDERAL RULES.

Plaintiff asks the Court to order the Embassy to organize and label its documents

to correspond to her document requests. Pl's Mem. at 12-15. The Embassy completed its

document production six months ago. All of the Embassy's documents were produced

consistent with the FOPA.[22] Plaintiff's claim that the Embassy must now engage in extra

make-work has no basis in the Federal Rules of Civil Procedure.

### A.   A Producing Party Is Not Required to Designate Documents Where the Parties have Otherwise Stipulated to the Form of Production.

Federal Rule of Civil Procedure 34(b)(2)(E) provides that the parties may stipulate

to the manner in which documents and ESI are produced:

> *Unless otherwise stipulated or ordered by the court*, these procedures apply to producing documents or electronically stored information:
>
> > (i)   A party must produce documents as they are kept in the usual course of business *or* must organize and label them to correspond to the categories in the request . . . .

(emphasis added). Under Rule 34, the option to select between producing documents in

the usual course of business or organizing and labeling the documents exists *only when*

---

Wemberg testified that there is "currently no system" for archiving text messages. Pl's Ex. GG, Wemberg Dep. 14:25-15:6. Ms. Wemberg is not aware of any instance in which a text message has been archived by the Norwegian government. Ex. 12.

[22]   Only after the Embassy substantially completed its document production (and months after she first received documents) did Plaintiff request the Embassy designate documents. See Pl's Ex. Q. The Embassy repeatedly declined because: (1) the parties agreed otherwise; (2) given the stage of the case, the request was unnecessary, expensive, and wasteful; and (3) the Embassy complied with Rule 34. Pl's Exs. R, T.

the parties have not "otherwise stipulated" to the manner of production.[23] See also

Advisory Comm. Notes 2006, Fed. R. Civ. P. 34(b) ("*If the form of production is not

specified by party agreement* or court order, the responding party must produce [ESI]

either in a form or forms in which it is ordinarily maintained *or* in a form or forms that

are reasonably usable.") (emphasis added).

Here, the parties agreed to produce all documents—both hard-copy and

electronic—in accordance with the terms of the FOPA drafted by Plaintiff. See Pl's Ex.

C; Somermeyer Aff. ¶ 4. Plaintiff does not claim the Embassy produced documents

contrary to the parties' agreement.[24] She cannot now—after the close of discovery and

over eight months after she first received documents—compel the Embassy to incur the

considerable expense of designating almost 89,000 pages of documents. See Agri Star

Meat & Poultry LLC v. Moriah Cap., L.P., 2011 WL 3471241 at *10 (N.D. Iowa Aug. 8,

2011) (denying motion to compel defendant to organize and label documents as

responsive to document requests where plaintiff did not dispute that parties stipulated

otherwise).

---

[23]    Even then, it is the producing party's option to choose whether to organize and
label its documents or produce them as they are kept in the usual course of business. 8A
Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2231 at p.
431-32 (2d Ed. 1994).

[24]    In her brief, Plaintiff appears to suggest that the Embassy produced documents "in
a form of its choice, without identifying that form in advance of the production" and
"convert[ed] electronically stored information to a different form that makes it more
difficult or burdensome for the requesting party to use…." Pl.'s Mem. 12-13. *Plaintiff*
decided how she wanted documents and ESI produced to her. The Embassy agreed to the
FOPA that *Plaintiff's attorneys* drafted. And the Embassy produced documents to
Plaintiff in precisely the form *she* requested. Somermeyer Aff. ¶ 4; Buntain Aff. ¶ 7.

32

### B.     Plaintiff Has the Tools To Search, Organize, and Sort the Embassy's Documents.

The Embassy provided existing metadata to Plaintiff for each document it produced. Buntain Aff. ¶ 10. The metadata include:

- The identity of the custodian of the document;
- The identity of the sender;
- The identities of any recipients;
- The identities of any persons copied;
- The identities of any persons blind copied;
- The subject;
- The date the document was sent;
- The time it was sent;
- The date it was received;
- The time it was received;
- The file path of the document;
- The title of the document;
- The date of the document;
- The size of the file; and
- The extension of the file.

The purpose of this information—and undoubtedly the reason Plaintiff requested it—is to enable her to search, categorize, sort, and otherwise organize the documents. With this information, Plaintiff should be able to, for example, sort the documents to review all those that were sent to a particular recipient. Buntain Aff. ¶ 11. She can sort the documents to review all documents sent on a certain day. Id. She can search for all documents that include a particular term. And she has done so. Carney Decl. ¶ 36 ("The Plaintiff searched the Defendant [sic] production using 24 mobile evidence search terms... ."). In short, Plaintiff can make the documents work to suit her purposes.

To the extent that Plaintiff has had trouble searching foreign language document, she has a fix available through the developer of her database product.

### C. The Embassy Also Satisfied Rule 34(b)(2)(E)(i).

Even if the parties had not stipulated to the form of production, the Embassy satisfied its obligations under Rule 34 by producing documents "as they are kept in the usual course of business." Fed. R. Civ. P. 34(b)(2)(E)(i). As courts have observed, emails are "not maintained in a file cabinet organized within a file folder under a particular heading . . . ." Pass & Seymour, Inc. v. Hubbell Inc., 255 F.R.D. 331, 337 (N.D.N.Y. 2008). A party satisfies its obligation to produce email in the usual course of business when the receiving party is provided "the heading, including information regarding the author, sender, and recipients." Id. at 337-338 (discussing Zakre v. Norddeutsche Landesbank Girozentrale, 2004 WL 764895, at *1 (S.D.N.Y. Apr. 9, 2004) (party producing 204,000 emails in text-searchable format met its obligation to produce documents in the usual course of business and was "not further obligated to organize and label them to correspond with [Plaintiff's] requests."). Here, Plaintiff received much more than was required under the Rules.

### D. Plaintiff's Reliance on Rule 33(d) Is Misplaced.

Plaintiff also asserts that the Embassy should categorize its document production as responsive to individual interrogatories. Pl's Mem. at 14. She claims that the Embassy has "objected to and refused to answer interrogatories, presumably relying on Rule 33(d). See pp. 4-7, *infra*." Pl.'s Mem. at 13. Pages 4-7 of Plaintiff's brief address Interrogatory Nos. 3 and 13. Id. at 4-7. The Embassy's objections to those interrogatories are explained in § II.A above. The Embassy did not answer these interrogatories by simply referring Plaintiff to documents. The Embassy provided

34

detailed, narrative answers to Plaintiff's non-objectionable interrogatories. E.g., Pl's Ex. G, Nos. 2, 7, 10, 12, 14-17. In certain answers, the Embassy referred to documents in addition to, but not in lieu of, its narrative answer. E.g., id. at Nos. 10, 12, 15. In one instance, the Embassy referred to specific documents within its forthcoming document production that were also in the possession of Plaintiff. Id. at No. 8.[25]

In no answer did the Embassy represent that it was answering an interrogatory, without objection, merely by referring to documents. Ironically, it was Plaintiff who answered interrogatories in the manner she now claims is improper. See Ex. 14 (answering Interrogatory No. 10 by stating "Plaintiff will produce non-privileged documents").

## E.   Plaintiff has Already Used the Embassy's Documents and Discovery is Now Over.

Plaintiff's claim that requiring the Embassy to designate documents as responsive to her discovery requests is "necessary" to make the Embassy's production "reasonably usable" is further belied by the fact that Plaintiff has *already used* the documents—including by marking 181 exhibits in nine depositions that span the Bates range of the Embassy's production. See e.g., Pl's Ex. W at 3. Discovery is now over. If the

---

[25]   When Plaintiff asked for "each and every document known to you in which you know or believe may contain facts or information related to the claims," the Embassy objected and referred to its document production because, in answering such an interrogatory, "the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as the party served." 8B Wright & Miller, Federal Practice and Procedure § 2178; Hilt, 170 F.R.D. at 186 (denying motion to compel answer to interrogatory that would require a "detailed account of [a party's] case-in-chief, together with identification of virtually all supporting evidence for each fact").

Embassy's designating documents was "necessary" for Plaintiff to proceed with this litigation, she would have brought this motion eight months ago.

## IV.  PLAINTIFF'S CHALLENGES TO THE EMBASSY'S PRIVILEGE AND WORK PRODUCT REDACTIONS ARE WITHOUT MERIT.

Plaintiff challenges certain documents that the Embassy has redacted on the basis of attorney-client privilege and/or the work product doctrine.  Plaintiff does not specifically state why she believes the redactions on each document are improper. Rather, she asserts general dogmas that she claims preclude any protection for the entire set.  Plaintiff fails to state with particularity the grounds for seeking removal of the challenged redactions and her request should be denied. See Fed. R. Civ. P. 7 (b)(1)(B).

### A.  Documents that Contain a Discussion of Legal Advice Among Employees are Privileged.

First, Plaintiff claims redacting portions of documents that include a discussion of legal advice is improper because "this is not sufficient to be protected by the attorney-client privilege." Pl's Mem. at 24.  She cites no authority.

It is axiomatic that employees within an organization must be allowed to relay legal advice sought and received without losing the privilege. See McCook Metals L.L.C. v. Alcoa Inc., 192 F.R.D. 242, 254 (N.D. Ill. 2000) ("Management should be able to discuss amongst themselves the legal advice given to them as agents of the corporation with an expectation of privilege."); see also In re Denture Cream Prods. Liab. Litig., 2012 WL 5057844, *13 (S.D. Fla. Oct. 18, 2012) ("[T]he undersigned declines to adopt the Plaintiffs' wholesale approach to concluding that certain documents . . . are not privileged

36

based solely upon the fact that the particular document did not reference an attorney, was authored by a non-attorney and/or was disseminated by two non-attorneys.").

The Embassy has redacted certain documents on these grounds. Plaintiff challenges the redaction to RNE 374. Pl's Ex. BB at RNE 374.[26] The redacted portion of this report follows a sentence in which Ms. Finborud, the Chairwoman of the Stakeholder Committee that funded Plaintiff's position, states that the "Steering Committee considers the hiring of Ewald to be an error." Id. at 5569. The redacted text states, in effect, that the Embassy has sought legal counsel regarding Plaintiff's allegations and proceeds to explain legal counsel's assessment and advice.[27] Such communications are undoubtedly privileged.

## B. Documents Need Not be Authored By or Sent to Legal Counsel to Be Protected.

Plaintiff also claims the Embassy's redactions are improper because certain documents on which they appear were not authored by or sent to legal counsel. Pl.'s Mem. at 24. There is no requirement that an attorney draft or receive a communication in order for it to be privileged. E.g., Long v. Anderson Univ., 204 F.R.D. 129, 134 (S.D. Ind. 2001) (email sent from human resources director to dean of students regarding

---

[26] A translation of this document can be found at Pl's Ex. BB at 5666-69. The redaction appears on RNE 5669.

[27] Plaintiff challenges this redaction several times as it appears in different email chains. See Pl's Ex. CC at 4 (RNE 5666-69; 63100-03). Other challenged redactions contain similarly-protected statements. E.g., RNE 363-64 (redacted portion states, in effect, that the Embassy sought legal advice from outside counsel, the issues presented to legal counsel, and legal counsel's recommendations).

37

advice of legal counsel was privileged communication); In re Denture Cream, 2012 WL
5057844, at *13. This is no basis to challenge the Embassy's redactions.

### C.    There Was No Waiver.

Next, Plaintiff asserts that the Embassy cannot claim privilege over documents
that were sent to "numerous persons" because dissemination waived any privilege Pl.'s
Mem. at 24, n. 6.

None of the communications Plaintiff challenges were shared with third persons or
distributed to employees without a need to know the information. Plaintiff cites RNE
370-371 as an example of waiver by distribution to "numerous persons." The recipients
of this report fall into three different groups within the hierarchy of the MFA in Oslo
regarding the management of the Honorary Consulate General in Minneapolis:

- The first group, consisting of Finborud and Slettevold, handled the interaction
between MFA in Oslo, the Embassy in Washington D.C., and the Steering Group
which Finborud headed.

- The second group, consisting of Thorsheim, Brøther and Berge, represents
Department level management at the MFA in Oslo. Thorsheim and Brøther
ran one of the Departments at the MFA, while Berge was one of the
MFA's Deputy Directors General.

- The third group, consisting of Larsen, Stokke and Gillesdal, represents the link to
high-level MFA officials, specifically to the Foreign Minister, Jonas Gahr Støre.

Somermeyer Aff. ¶ 7. None of the challenged communications were "disseminated

beyond those persons who, because of the corporate structure, need to know its contents."

Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 609 (8th Cir. 1977).[28]

## 4. The Basis for Plaintiff's Claim that the Embassy Made Improper Work-Product Redactions Cannot be Discerned from Her Brief.

Plaintiff claims that "any" of the documents the Embassy has redacted on work-product grounds were "created for the purposes of conducting business." Pl.'s Mem. at 25. The only specific document Plaintiff references is the report prepared by Ms. Finborud, discussed previously. Id.; see Pl's Ex. BB at RNE 370-75. The Embassy did not claim this document was protected by the work product doctrine. See Pl's Ex. DD at 4. Its redactions were made on the basis of attorney-client privilege. Id. Plaintiff failed to put forth any specific grounds for challenging the Embassy's work product redactions.[29] The Embassy's redactions should stand.

---

[28]    Plaintiff also claims waiver regarding RNE 63212 and RNE 63100-63103. Plaintiff claims the privilege was waived for RNE 63212 because it was sent to Tove Hatlo. Pl.'s Mem. at 24. Hatlo is an advisor at the Embassy in Washington D.C. whom, as Plaintiff knows quite well, was involved in issues regarding Plaintiff's travel and health insurance. Somermeyer Aff. ¶ 8. In regard to RNE 63100-03, this is another email chain in which Finborud's report is circulated within the MFA. In distributing the report, Morten Aasland, the MFA's North America Coordinator, writes "Please treat what has been circulated here confidentially...Not to be forwarded." Id. at ¶ 9. The information is sent from higher levels within the MFA to the department that deals with North America policy under which the Honorary Consulate General Minneapolis falls. Id.

[29]    Plaintiff also takes issue with redactions to RNE 5503-04 (though she failed to submit a copy to the Court). Ex. 15. After discussion between the parties, the Embassy proposed these redactions to Plaintiff and stated that it would produce a redacted copy consistent with its proposal unless she objected. Pl's Ex. KK. Plaintiff made no objection. Ex. 16. The Embassy produced a redacted version on April 23, 2013 and, again, Plaintiff said nothing. Schroeder Aff. ¶ 17.

## V.  **PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE IT VIOLATES THE PRINCIPLE OF PROPORTIONALITY.**

Legitimate discovery has limits. See Mancia v. Mayflower Textile Serves. Co., 253 F.R.D. 354, 362-63 (D. Md. 2008) ("[R]ules of procedure, ethics and even statutes make clear that there are limits to how the adversary system may operate during discovery."). As another federal court put it: "[t]he discovery rules are not a ticket...to an unlimited never-ending exploration of every conceivable matter that captures an attorney's interest." Sommerfield v. City of Chicago, 251 F.R.D. 353, 358 (N.D. Ill. 2008).

The Federal Rules require that proportionality, in light of the claims and defenses, be considered in resolving discovery disputes:

> [T]he court **must** limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in this action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C) (emphasis added).

The Rules' important limitations compel denial of Plaintiff's motion. First, Plaintiff has had ample opportunity to pursue the information sought by her motion, but failed to do so until far too late in the process. See, e.g., Kademani v. Mayo Clinic, 2012 WL 5845338, * 2 (D. Minn. Nov. 19, 2012) ("Rule 26(b)(2)(C)(ii) requires the Court to limit discovery when a party has had ample opportunity to obtain the information it

seeks[.]"). Second, the burden, expense and disruption of the additional discovery sought by Plaintiff far outweighs its benefit. See Kay Beer Distrib., Inc. v. Energy Brands, Inc., 2009 WL 1649592, *4 (E.D. Wis. June 10, 2009) ("The mere possibility of locating some needle in the haystack of ESI...does not warrant the expense [defendant] would incur in reviewing it."); Southern Capitol Enters., Inc. v. Conseco Servs., L.L.C., 2008 WL 4724427, *2 (M.D. La. Oct. 24, 2008) ("Perfection in document production is not required.... In these circumstances Rule 26(b)(2)(C)(ii) comes into play. At this point in the litigation, the likely benefit [of further discovery] is outweighed by the burden and expense of requiring the defendants to renew their attempts to retrieve the electronic data.").

Plaintiff's motion ignores the concept of proportionality and is inconsistent with the letter and spirit of the Federal Rules. See Fed. R. Civ. P. 1 ("These rules...should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."). As explained by Judge Bjorkman, Chair of the Minnesota Supreme Court's Civil Justice Reform Task Force: "it simply makes no sense to spend more money on discovery in a case than is in dispute between the parties!" Louise Dovre Bjorkman & David F. Herr, *Reducing Costs & Delay: Minnesota Courts Revise Civil Case Handling*, BENCH & BAR OF MINNESOTA (May/June 2013), available at http://mnbenchbar.com/2013/06/reducing_cost_delay/.

The costs of Plaintiff's discovery have already dwarfed any reasonable estimate of the amount at issue. This is an individual employment case where an unrebutted labor economist has calculated Plaintiff's potential damages to be $90,714 and where only

"garden variety" emotional-distress damages are being pursued. Ex. 1. Plaintiff's salary was $30,000 per year less than Davidson on an annual basis over the three year term of her contract, yet, by her own admission, she has spent "hundreds of thousands of dollars on the case" through the close of discovery. Ewald Decl. ¶ 3. And Plaintiff unreasonably requests to conduct yet more discovery, and impose yet more expense on the Embassy.

## VI.    **PLAINTIFF DID NOT COMPLY WITH LOCAL RULE 7.1(b)(1)**

Local Rule 7.1(b)(1) requires "*at least 14 days* before the date of a hearing on a nondispositive motion, the moving party must *simultaneously*" file its motion, memorandum of law, and other supporting documents. Plaintiff failed to comply with this rule when she filed her memorandum and supporting documents on July 30, 2013, thirteen days before the hearing. E.g., Doc. Nos. 109, 113, & 114. The Court may refuse to consider Plaintiff's motion on these grounds or take whatever other action it deems appropriate. D. Minn. L.R. 7.1(g).

## CONCLUSION

For the foregoing reasons, the Embassy respectfully requests that the Court deny Plaintiff's motion to compel.

Dated: August 5, 2013

FAEGRE BAKER DANIELS LLP

s/ Sean R. Somermeyer

Daniel G. Wilczek, MN Atty #131660
  dan.wilczek@FaegreBD.com
Joel P. Schroeder, MN Atty #339556
  joel.schroeder@FaegreBD.com
Sean R. Somermeyer, MN Atty #391544
  sean.somermeyer@FaegreBD.com

2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Phone: (612) 766-7000

Attorneys for Defendant
Royal Norwegian Embassy

dms.us.52565236.02