## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Ellen S. Ewald, | Civil No. 11-cv-02116 (SRN/SER) |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR** |
| vs. | **SUMMARY JUDGMENT** |
| Royal Norwegian Embassy, | |
| Defendants. | |

### INTRODUCTION

Defendant, Royal Norwegian Embassy ("Embassy" or "Defendant"), misrepresented a position to Plaintiff, Ellen S. Ewald ("Ewald"), and induced her to leave her home in Norway. When she discovered discriminatory pay and benefits, Embassy threatened her to keep her mouth shut and, when she didn't, retaliated against her. Embassy violated the laws of the U.S., Minnesota and Norway. Embassy's motion for summary judgment should be denied and this case set for trial on the merits.

### FACTUAL BACKGROUND

Ewald, a U.S. citizen, returned to Minnesota, after having lived in Norway more than twenty years. Ewald has extensive professional experience in both education and business, including teaching, research, and project and business management positions in both the U.S. and Norway. Ewald also possesses advanced educational degrees and speaks and writes Norwegian fluently. (Ex.1.)

1

In 2008, Norway's Ministry of Foreign Affairs (MFA) created a New Model

Consulate, with two new expert positions focused on Business and Education.  (Gandrud

37.)[1] (Strommen 32-34.)  Six Norwegian government entities, branches of the Norwegian

government ("Stakeholders") provided 1.5 million Norwegian Kroner ("NOK") for the

two positions for a three-year trial period with the possibility of ending or extending the

positions.[2]  (Johne 16-7, 53; Marshall/Aff./Ex.M; Gandrud 71-72.)[3]

On July 3, 2008, Jostein Mykletun, Counsel General-Houston and the architect of

the expert positions, posted the final announcement for the positions described as their

full-time officer-level positions: Higher Education and Research ("Education-Research"),

and Innovation and Business Development Officer ("Business-Development").  (Gandrud

40-1,118;Ex.2.)  Each required similar professional experience and qualifications and

noted the importance of effective Norwegian language communication skills.  (Ex.2.)

The Education-Research position required an advanced university-level degree, while the

Business-Development position required only a university-level degree.  (Ex.2.)  Both

positions had almost identical responsibilities and duties with the objective to strengthen

relations between the Midwest and Norway within a respective focus area: (1) higher

---

[1]  Deposition testimony is cited herein as "[deponent's last name] [page number(s)]."
     Deposition transcripts are attached as Exhibits A-L to the Affidavit of Thomas E.
     Marshall.
[2]  (Johne 53.)  Stakeholders were the Research Council of Norway; SINTEF and Higher
     Education, Education and Research, and Food and Agriculture.  (Finborud 18.)
[3]  "Ex.[#]" standing alone (as opposed to, e.g., "Marshall/Aff./ Ex.[Letter]") refers to the
     depositions exhibits in this matter, which the parties numbered sequentially.  All other
     document exhibits are contained within the Affidavit of Thomas Marshall and marked
     accordingly.  Where documents contain Norwegian, certified translations are included
     within the document.

education and research, on the one hand, and (2) innovation and business development,
on the other.  (Ex.11,16.)

On July 3, 2008, Mykletun forwarded the links and job descriptions of both
positions to colleagues, including Ewald. (Ex.2.)  Ewald responded to Mykletun, with
whom she previously worked on different initiatives. (Ewald 54, 58; Ex.2.)  On July 4,
2008, Ewald told Mykletun about her interest in the positions and asked to discuss it with
him. (Ewald 55.)  She considered both positions "exciting" and similar, but was most
interested in the Education-Research position. (Id.)  Mykletun invited Ewald to meet  at
his office in Oslo. (Ewald 56.)  He explained the focus was promoting Norwegian
interests in business and education with a close link between the two.  (Id.; Johne 38.)
Mykletun further explained the two positions were "parallel" and "equal." (Ewald 56.)
Mykletun said the budget of $1.5 NOK would be divided between the positions. (Ewald
56-57.)  Although Ewald considered herself qualified for both positions, she applied only
for the Education-Research position because that position piqued her interest more.
(Ewald 59.)

On July 7, 2008, Embassy employee, Jan Aage Larsen, referring to their
conversation the previous day, asked Gandrud "depending on qualifications and
experience, will $60,000-70,000 plus Social Security and health insurance be in the range
in your area for such a position?" (Ex.12.) (Gandrud 47-9.)  Gandrud replied that "your
salary range would be attractive and we should expect a good representative response."
(Ex.12; Gandrud 49.)

On July 9, 2008, Patricia Manalo, Faegre Director of Human Resources, provided

Gandrud salary range information from a general query of the Salary.com website for two

business and two education positions entitled, "Business Development Manager Jobs,"

"Business Development Director Jobs by US Region," "Institutional Research Director

Jobs by US Region" and a "Researcher III-Academic" job. (Doc.135-1, Ex.A.)[4]

(Gandrud 97-8,100.) Manalo reported the compensation for the research position "ranges

from 70K to 79K and the business development positions, from \$93[K] to \$118[K]." Id.

Gandrud never shared this information with anyone evaluating candidates for the position

nor did he do any analysis for the actual Officer positions. (Gandrud 58,120; Johne 71;

Mondale 27.) The Officer positions advertised had nothing to do with the jobs Ms.

Manalo searched. (Ex.12.) The Education-Research position did not actually perform

research; it brought research institutions together. (Ex.2.) Likewise, the other position

managed no business itself, it also brought businesses together. (Davidson 89-99,236.)

On July 18, 2008, Ewald applied for the Education-Research position.

(Marshall/Aff./Q) The search committee included former Vice President Walter

Mondale, Honorary Consul General, Minneapolis; Berit Johne, Science Counselor,

Norwegian Embassy Washington DC; Elin Bergithe Rognlie, Minister Counselor for

Economic Affairs, Norwegian Embassy Washington DC; and Gandrud, Honorary Consul

selected Ewald for a personal interview. (Ex.25; Ewald 60; Gandrud 54, 59-61.)

---

[4] "Doc.____ Ex.____" refers to exhibits filed as exhibits to the Affidavit of Sean
Somermeyer.

During her interview, Gandrud told Ewald the salary range for the two positions was $40,000 to $70,000 USD and the salaries were "equal," and they will "work to get up to the top range[salary]" for both. (Ewald 69; Ex.45.) The Interview Committee also told her that these positions "were two parallel positions, and they were putting together a team," under the direction of the Mondale and Gandrud in Minneapolis. (Ewald 62; Gandrud 57-8,177; Johne 47.) This range is typical for other locally employed Embassy employees. (Vibe 53.) Most Embassy employees are female. (Vibe 56; Johne 45.) Ewald received a very positive referral from Mykletun. (Johne 44.)

Anders Davidson applied for the business position on July 25, 2008 and interviewed around the same time as Ewald. (Ex.15.) Davidson, unlike Ewald, did not speak or write Norwegian; in fact, had never even visited Norway. (Davidson 22-23.) Gandrud did not do any reference-checking himself. (Gandrud 107.) Davidson had never worked on issues dealing with Norwegian businesses except as they might concern 3M subsidiaries, where he worked. (Davidson 28.) When told of the salary range, Davidson made no negative comment. (Gandrud 187.) At the beginning of September, Gandrud called Davidson and offered him a salary of $60,000. (Davidson 52-53; Gandrud 88-90.) Davidson responded, "this would be a big pay cut for me, that we could not do it financially as a family." (Davidson 55; Mondale 35-36.) Davidson expressed interest in the job for $60,000 for a three-day work week. (Gandrud 88, 90.) Davidson said, "I was not under the impressions that the salary—the dollar amount was negotiable. I thought that that was,---I was kind of under the impression that it might have been a pretty fixed amount." (Davidson 56.)

5

On September 4, 2008, Gandrud requested Johne and Rognlie recommend Ewald

based on "clear and obvious consensus on the Education-Research position" to the

Stakeholders that day so the decision could be made, and Mondale could make the

announcement while in Oslo, Norway. (Ex.19.)  Johne responded to Gandrud and

Ambassador Wegger Strommen that the report on the selection and ranking of candidates

would be completed that day. (Ex.19.)  Johne directed, "if the Advisory Board approves

Friday, [9/10/08] then Mondale may announce the two names, IF THEY have been

informed" (Ex.19.)  In response, Gandrud stated:

> Anders Davison has been informed.  Ellen Ewald has also been informed.  Both
> are showing the same enthusiasm that they demonstrated to us in the interview.
>
> Davidson, after speaking with his wife, did express discomfort with the salary and
> told me that his base salary is currently $108,000.  While I told him that I do not
> intend to negotiate with him, I pointed out to him that we were sensitive the salary
> issue and intended to speak with him after he had discussed the matter with his
> family.  With young children, day care, etc., he has a legitimate concern.  HCG
> Mondale shares this concern as well.  Anders stated that the salary level would not
> diminish his desire for this position but it is his only concern.  (Ex.19;[5] Gandrud
> 111.)

Gandrud considered the family issues important to the position. (Gandrud 113.)

Johne is unaware of any other reason Davidson received more money. (Johne 73.)  On

September 5, 2008, Johne told the Stakeholders and many others, including Aasland,

Gandrud and Mondale, the hiring committee recommended Ewald and Davidson for the

two expert positions and respective compensation. (Ex.27.)  Johne herself made no

---

[5]  Ewald's salary at her prior employment also exceeded $100,000; she had two
daughters, and partner who retired from his former employment.  Gandrud made no
inquiry of her family situation or salary, other than to note that her partner would be of
use to the Honorary Consulate because of his extensive Norwegian contacts. (Gandrud
112-13,116,151-2; Vibe 83-84; Mondale 34,53.)

assessments regarding salary and relied on what she was told by Gandrud.  (Johne

51,57,59,64,71,86,130.)  In her report, Johne set forth "calculation examples . . . of what

such salaries translate to in NOK, and thus how they affect the total budget of 750,000

NOK **for each position**."  (Ex.27 (emphasis added); Johne 64-5.)  In her example, Johne

wrote:

> "Example a.) a gross salary of USD 68.000, plus health insurance per year USD
> 7.050, and pension insurance of USD 7.000, corresponds to a yearly cost of NOK
> 421.535,
> Example b.) a gross salary of USD 100.000, plus health insurance for a family
> with two small children USD 20.200, and pension insurance of USD 10.000,
> corresponds to a yearly cost of NOK 669.000."
> (Ex.27; Gandrud 124.)

Shortly thereafter, Gandrud copied Davidson on correspondence to Oslo but did

not copy Ewald.  (Gandrud 127-8.)  Although Davidson did not request it, Gandrud told

Davidson, "Embassy, Mondale and I joined in asking [the Stakeholders] that the salary be

more reflective of the market." (Ex.22) Gandrud would not label the communication

"negotiations."  (Gandrud 130, 242.)

On September 8, 2008, Gandrud forwarded Johne's email with salary calculations

again only to Davidson, noting: "FYI: Deeply confidential…you see our process . . . you

should note that the salary is 'in play.'"  (Ex.20.)  Davidson responded "Thanks for

keeping me abreast of the process.  I really appreciate the consideration of the salary."

(Ex.21.)

On September 10, 2008 Ewald's hiring was announced at a reception with

Mondale in Norway.  (Ex.26; Mondale 13-16,37,41.)  On the same day, the Stakeholders

met for the first time in Oslo.  (Ex.24.)  Finborud from the MFA was elected chair of the

group. (Ex.24.) Mondale reported they had found "two excellent candidates for the expert positions." (Ex.24.) Mondale praised Ewald's selection and spoke highly of her to Stakeholders. Finborud testified that Mondale informed the group they "would have to pay more to a more experienced person from a private business life." (Finborud 30.) In the minutes of the meeting, it was reported that:

> **"Some of the members of the board expressed their concern that the proposed pay level for the innovation and business development position would decrease the room of action for the higher education and research position.** In total, the Stakeholders will contribute NOK 750,000 **for each position** each year. If this is not sufficient to secure a high standard of the expert positions it was decided that the MFA will consider increasing this amount."
> (Ex.24.(emphasis added);. Johne 78; Strommen 52.) The funds were never split equally between Ewald and Davidson. (Vibe 50-1.)

On September 11, 2008, Aasland updated Gandrud on the steering group meeting. (Ex.27.) Aasland specifically stated, "[a]mong the Stakeholders the understanding is that the NOK 1.5 should be **divided equally** between the two officers/fields (i.e., for salary, travel, etc)." (Ex.27.(emphasis added); Gandrud 136; Johne 82.) Gandrud responded to Aasland that "both candidates have accepted our offer." (Ex.27.) Gandrud made no mention of the salaries for the two positions. (Ex.27.) Gandrud then told Davidson the Stakeholders were finalizing the budget and "you [Davidson] will be pleased with the salary adjustment." (Ex.21.)

On September 11, 2008, Ewald updated Gandrud on the reception and her meetings with Mondale and several Stakeholders. (Ex.26.) Gandrud told Ewald he received a "glowing report from the Foreign Ministry" and the Stakeholders were "very pleased with the process and [Ewald's] selection." (Ex.26; Gandrud 150.) Although he

did not mention her salary, Gandrud told Ewald "[t]he candidates made them re-think the economic package (salary, benefits and budget) and you will be pleased with their additional commitment." (Ex.26.) Gandrud updated Davidson on the budget process and told him, "expect to hear a report tomorrow." (Ex.21.)

On September 12, 2008, Gandrud called and offered Davidson the Business-Development position, which Davidson accepted. (Ex.94; Gandrud 137.) On the same day via email Gandrud "officially" offered Ewald the Education-Research position. (Ex.3, 14.) Gandrud advised Ewald he preferred to discuss the "economic details of the offer" in a phone call rather than by e-mail. (Id.) On September 13, 2008, Gandrud and Ewald discussed the terms of the employment offer. (Gandrud 137.) Ewald testified:

> I remember [Gandrud] saying you will be really pleased. That he worked–that they worked really hard. For both positions they were able to get the top range. And this was really positive for the consulate because they really wanted to get good people in. (Ewald 77.)

Gandrud also told Ewald "I'm happy to report or you will be pleased to know that we were able to get the highest possible salary." (Ewald 78.) Gandrud offered Ewald a salary of $70,000 and said there were health care and pension benefits and parking. (Ewald 79; Gandrud 137.) Ewald accepted the position. (Gandrud 68.) Strommen said he didn't ask how they came up with the numbers, he just signed off. (Strommen 45-6.)

On September 13, 2008, Gandrud reported to Johne that he had a "very long conversation today and [Ewald] accepts our offer, $70M+pension+health." (Ex.14.) Gandrud noted "now we have both on board!" (Ex.14.) Johne responded, "the embassy would issue contracts" as they "had a meeting the day before on details!" (Ex.14.) Johne

asked "Did you offer 100 + health + pension to Anderson?  And he accepted?"  (Ex.14.)

Gandrud responded, "Anders accepted" the day before.  (Ex.14; Gandrud 153-4.)

On September 16, 2008, Gandrud emailed Kathy Tunheim, a public relations

consultant and Norwegian-American who volunteered to do a press release for the

Consulate, to provide her information on the selection of the candidates.  (Gandrud 276;

Tunheim/Aff./Ex.A.)  Tunheim asked Gandrud if both positions are full-time and

Gandrud responded, "Both full time [off record $100,000+ positions]."  (Id.)  With his

salary, Davidson was the highest paid local employee at the Embassy.  (Wemberg 35;

Vibe 64.)

Earlier on September 16, 2008, Gandrud emailed Embassy the finalized salary and

benefit information for the two positions to finalize the contracts. (Ex 27.) On September

18, 2008, Gandrud advised Davidson that "Embassy is finalizing the Contract-I have

reviewed it-you will like it."  (Ex.28.)  Gandrud also requested the date of birth for

Davidson, his wife and children for insurance purposes but made no similar request for

Ewald. (Ex.28.)

Ewald executed an Employment Agreement on November 4, 2008 setting forth

her position description and title, salary of $70,000 USD, a pension of $7,000, plus

holidays, working hours, and other various terms.  (Ex.4.) Davidson received and

executed a similar employment agreement on October 14, 2008 with the only difference

being a salary of $100,000.00 and a pension of $10,000.00.  (Exs. 29,170.)

On about October 15, 2008, Ewald moved from Norway to Minneapolis with her

domestic partner, Terje Mikalsen. (Ewald 98.) On November 5, 2008 Ewald emailed the

Embassy inquiring how to add her children and partner to the health plan, noting she experienced difficulty adding them to the plan while Davidson had no difficulty at all. (Doc.133-1 Ex.L.) An Embassy benefits employee responded, "I have never received any information that they should be added to the plan." (Id.) Ewald questioned why her family was not covered when Davidson's wife and two small children were covered. (Gandrud 185.) (Id.) The employee explained Davidson's children were under the age of 18 and his wife was supported by him. (Id.) He also advised Ewald her partner was a Norwegian citizen so was not covered. (Doc.Ex.P.) Ewald complained that insurance laws required coverage for children under 25. (Doc.Ex.P.)

On November 6, 2008, Embassy changed its position, noting the Embassy would provide health care coverage for Mikalsen and Ewald's youngest daughter but only during her first year of college. (Marshall/Aff./Ex.R.) Embassy provided Ewald lesser benefits than her male peer.

On March 19, 2009, Embassy changed its position once again and Larsen notified Ms. Ewald via email that Mikalsen's health insurance had been cancelled and would expire. (Ex.36.) The reason stated for canceling Mikalsen's coverage was cancelled effective April 1, 2009, because Mikalsen allegedly had "independent income." (Id.) Though this determination was made on February 25, 2009, Ewald was not told until March 19, 2009. (Id.) Ewald again objected to the inequitable treatment because the spouse of Davidson was covered although she worked outside the home. (Marshall/Aff./Ex.T; Vibe 43.)

The Officer Positions' duties were set forth in the job postings. (Johne 43-44; Ex.2.) Stakeholders expected Ewald to develop a "strong institution network between Norway and U.S.A. on the education and research side." (Finborud 44.) Similarly, the Stakeholders expected Davidson to "also promote and get Norwegian business into the Midwest and connect the ties." (Finborud 44.) Both positions were accountable to the Stakeholders. (Finborud 45.)

The "positions work as a team and there is some overlapping institutions when it comes to research and technology." (Finborud 64.) Ewald's first priority, set by Stakeholders "was to network, to build--build up connections, cooperations between the various research institutions and to other academic institutions." (Finborud 54.) Davidson was to do the same for business. (Davidson 92,94,105.)

In early 2009, both Ewald and Davidson began working on vision statements for Stakeholders containing their respective goals, objectives and anticipated activities, as well as proposed budgets for the coming year. On February 18, 2009, Gandrud emailed Gary Smaby, an outside consultant, asking him to review Davidson's vision statement and "coach him." (Ex.33.)

During her interview and after, the Consuls encouraged Ewald to work on student mobility. (Gandrud 160,191; Mondale 90-1; Ewald 122-23; Exs. 4, 130.)

As requested by Stakeholders, Ewald redirected her focus more towards building relationships between the Norwegian and U.S. institutions, and less on student mobility. (Finborud 70.) The CeRTA project was "definitely" the "kind of model that

[Stakeholders] like where Norwegian and American institutions were cooperating, getting together on projects." (Finborud 70-71.)

On May 15, 2009 Gandrud sent Strommen and Mondale the vision statements (Ex.82.), stating, "it very important that changes and comments be directed to [he and Mondale] rather than directly to Ellen and Anders" ... "[w]e are in real danger of creating confusion and resentment should they hear from different and even competing 'supervisors'." (Ex.82.)  One stakeholder, Terje Emblem, wrote,

> "The most striking feature of the two documents submitted, is that they are very different in form and content. We have understood that the two positions should constitute a team, with closely related activities and businesses, and internally consistent priorities etc.  The documents do not bear witness to this." (Id.)

Rognlie provided Gandrud with a summary of Stakeholders' feedback regarding comments on the vision statements which included:

> -The two positions should work as a team.  A common vision should be reflected in the Statements. Their work is overlapping regarding research-based innovation and institutional contact.
> -The Stakeholders have contributed to the budget as a whole and not to one specific position. ... in working as a team the positions could overlap and should support each other.
> (Ex.37; Johne 94; Marshall/Aff./Ex.U)

Embassy directed these two positions were intended to work as a team, rather than interfacing with the Stakeholders individually.  (Ex.37.)

Gandrud met with the Stakeholders on June 29, 2009, to discuss the Minneapolis Consulate. (Ex.131.)  Stakeholders were positive about the work so far.  (Ex.131.) Although they agreed some student exchange is important, they stressed Ewald's priority should be on "research cooperation on a higher level," "more formal agreements between

institutions," and "collaboration between universities." (Ex.121-22,131; Johne 103-4,112.)

Gandrud communicated with Finborud about Ewald emphasizing too much on student mobility. (Ex.38.) Gandrud explained, "we may have overstated this fact in our discussions" with Ewald "when she was first hired for her present position" (Ex.38; Gandrud 192) and "you should know that student exchanges were not the major part of Ellen Ewald's duties this past year." (Ex.38.) Gandrud identified numerous examples where Ewald facilitated finding partners, established relationships and exchanges between institutions, and was involved in Nobel Peace Prize Forum. (Id.) She worked to develop relationships with not only educational institutions but with business entities as well. (Id.)

On August 5, 2009, having received no response regarding family health insurance coverage, Ewald requested a copy of the policy relied on to deny coverage, but nothing was provided. (Marshall/Aff./Ex.W.) Ewald also learned from analyzing an internal budget report that Embassy paid Davidson a six-figure salary, while she was paid $70,000 and discussed her unhappiness with Gandrud. (Gandrud 194-5, 98-9,207.) This information surprised Ewald because during the hiring process Embassy told her the salary and benefits for the two positions were the same--$70,000 in annual salary, plus benefits. In the email addressing insurance, Ewald asked Larsen to confirm the salary discrepancy between she and Davidson. (Marshall/Aff./Ex./X.) On August 7, 2009, Larsen confirmed the numbers were correct, and on health insurance stated "there is no

further reference (to clause 4.3.3 sent earlier).  (Marshall/Aff./Ex.Y.)  Ewald asked

Gandrud why Davidson's salary was so much greater than hers.  (Gandrud 198-200.)

After repeatedly asking questions and sending follow-up communications about

her health insurance without getting a specific response, Ewald wrote again to Larsen on

September 23, 2009 about the pay discrepancy (Marshall/Aff./Ex.Z.)  Larsen responded

that he had to consult others to answer her inquiries. (Marshall/Aff./Ex.41.)

At around the same time, Gandrud and Mondale had been working on a draft of a

letter to Strommen regarding the salary difference between the two positions.  (Gandrud

200-02; Mondale 102-07.)  On September 23, 2009, Gandrud emailed Mondale a draft

which was intended to address the following issues: (1) the budget shortfall, stating "they

agreed to $500 per month. but we have not seen it"; (2) Christina's salary, stating "both

performance based, expanded duties and clearing up the 35M–45M discrepancy"; and (3)

Ellen's salary, stating "her 70M and Anders 110M is too big a spread…" (Ex.40;Gandrud

205-06.)  The letter states:

> "there is too big a discrepancy between the salaries of Ellen and Anders Davidson.
> We recognize that there is a different job market demand between education and
> business and this is reflected in the differential. But that differential is too large
> ($70,000 compared to $110,000).  Once again, we understood that this would be
> addressed in the 2010 budget.  Norway is an acknowledged leader in gender equity
> and since these two people work closely and since both work hard with exemplary
> results and dedication, we find the differential unjust and embarrassing." (Ex.41.;
> Gandrud 209-10; Strommen 71; Mondale 110,115,128; Vibe 58-9.)

Gandrud handed the letter to Strommen.  (Gandrud 202.)  Strommen looked at it

and handed it right back without keeping it himself and said he considered it a "budget

issue." (Gandrud 203,211-12; Strommen 173-5.)  When Mondale learned this, his

comment was "bad." (Mondale 125.) The Embassy did nothing with the request.

(Gandrud 216-17.) Gandrud did not approach any stakeholder about the issue. (Gandrud

219.)

Receiving no further response from Larsen, Ewald requested a response on

October 23, 2009, November 4, 2009 and again on November 16, 2009, with a copy to

Strommen. (Marshall/Aff./Exs.BB,CC,DD.) Finally on November 18, 2009, Strommen

responded to Ewald addressing the salary difference and insurance coverage. (Ex.192.)

In his letter, Strommen wrote:

> The salary levels defined in last year's negotiations with you and
> your colleague, were based on what was, in consultation with the
> funders in Norway, considered necessary to recruit the right people
> to two very different jobs. I believe this was explained to you in the
> course of the negotiations… Your salary is competitive compared to
> other locally-employed staff at our Embassy. (Ex 192)

Ewald rebutted Strommen's response on December 30, 2009. (Ex.45.) Ewald

wrote that, contrary to Strommen's information, no one had explained during the hiring

process that her position was different than Davidson's position. Ewald stated the

explicit representations in the interview process included the two positions were parallel,

would work closely as a team, had similar responsibilities and objectives, shared the

same Stakeholders, and the experience and qualifications for the two positions were

similar. (Id.) Ewald also noted that knowledge of the Norwegian language and relevant

activities were required for both positions (Ewald has excellent Norwegian-language

skills and extensive and significant experience in Norway; Davidson did not) and, during

the hiring interview, she was told the salaries were both at $70,000–the top of the range.

(Id.) Ewald also stated Anderson's higher salary significantly impacted her pension, resulting in yet another inequity. In addition, Ewald reported the insurance coverage decision violated U.S. law and was discriminatory (coverage for Davidson's wife and children but no coverage for Ewald's partner and children). (Id.) Ewald also asked why she was denied coverage for travel expenses while Davidson had been fully reimbursed.[6] Accordingly, Ewald requested an explanation for the disparity between her salary, pension, health care and travel expenditures. (Ex.45.)

Shortly after Ewald sent her letter to Strommen, Johne called Ewald to discuss her concerns and Ewald asked whether Johne, as a woman, believed that such inequitable treatment was fair. (Ewald 88, 215.) Johne replied, "that is the way it is" and noted Ewald "should accept it." (Johne 139-40.) When Ewald asked why she was told the positions were paid the same, and why there had not been open communication about the pay and benefit difference, Johne said it was Gandrud's decision to pay Davidson so much more money than Ewald and that was not her responsibility. (Johne 134; Ewald 88-89, 215-16.)

On November 6, 2009, Finborud received a letter from Strommen, which she forwarded to the Stakeholders, subject line is "Request for extra funds for HCG Minneapolis" and references a letter attached from Embassy for additional funds needed

---

[6] On October 21, 2009 in an email exchange between Larsen and Gandrud, Larsen wrote (as translated by Christina Carleton): "The email below just states that and due to the exchange rate there was no money left over for travel expenses for Ellen and Anders. Everything was eaten up (direct translation) in their salaries." In response, Grandrud says to Carleton, "they cannot seriously tell us "no travel' for Ellen and Anders in 2010. Stakeholders would not stand for it. That are playing salary requests against travel – blaming it on the exchange rate which is bogus." (Ex.89.)

for the two positions in Minneapolis. (Marshall/Aff./Ex.EE.) Finborud reminded the

group of their 3/13/09 meeting with Ewald when they noted the dollar's reduced value

must not reduce the new employees' productivity, and Stakeholders would come up with

a solution. (Id.) Finborud noted some members of Stakeholders have covered some of

Ewald and Davidson's travel expenses and recommends the Stakeholders cover the

expenses as a whole, and come up with some ideas about how to handle expenses for

2010. (Id.) Svein Berg of Innovation Norway said he understood that the six partners are

being asked to cover their portion of the increased costs (prorated); Berg confirms that IN

will increase their contribution for 2010 by 25000 NOK. (Id.)

Once Ewald complained of discrimination, the Embassy began to question her

expenses. (Ex.43; Gandrud 226.) On November 17, 2009, Gandrud and Larsen

discussed Ewald's six requests for travel expenses dating back to January of 2009. (Id.)

In so doing Gandrud states, "I am afraid that we never set a 'rule' of prior approval," and

"I would just chalk that up to our sloppy procedures and pay the apportioned amount."

(Id.)] On November 18, Strommen wrote Ewald in response to her complaints about

salary and insurance discrimination stating no changes would be made. (Exs.142,192.)

An email exchange on December 3, 2009 between Gandrud and Ewald discussed a

prospective trip to Norway for Ewald. Gandrud stated, "HCG Mondale and I are in

agreement that we think that you should take this time for travel and that you have set up

worthwhile meetings. You do need to seek prior approval from either Embassy or one or

more of the steering committee (Stakeholders) for travel expense reimbursement. As you

know, we do not control that budget and those expenses need to be approved by them."
(Ex.44.;Gandrud 229-30.)

Ewald wrote a lengthy letter to Strommen describing the discrimination she had
experienced on December 30, 2009, including unequal pay, health insurance, travel
expenses and pension. (Ex.45.)

After seeing Ewald's December 30 communication to Strommen, Gandrud wrote
to Strommen and others criticizing Ewald, even stating the issues were not her
"business." (Ex.47.;Gandrud 240-2.) Strommen advised he "sleep on it."
(Ex.46.;Gandrud 235-9.) Strommen did not report this correspondence to his supervisors.
(Strommen 93.)

In January 2010, Gandrud invited Ewald to lunch. (Ewald 206; Gandrud 244-53.)
Gandrud said he knew of the letter Ewald sent to Strommen about unequal treatment.
(Id.) In stark contrast to the representations of Johne, Gandrud claimed he had nothing to
do with setting the salaries and "Embassy did that." (Id.) Gandrud attempted to explain
the disparity in pay by giving an example that the president of St. Thomas would not
have the same salary as an executive at Target. (Ewald 208;Gandrud 247,249.) He told
Ewald she should not expect to receive the same salary since she was "in education"
compared to "someone in business." (Id.)

During this lunch meeting, Gandrud asked whether Ewald got along with
Davidson. She stated she had no problems getting along with Davidson, (Gandrud 248)
noting the issue was "equal pay for equal work." (Ewald 207.) In response, Gandrud
also stated that she should "nip this in the bud" or otherwise there could be

"consequences." (Ewald 209; Gandrud 255.) Gandrud advised Ewald to send an email to Strommen saying she and Davidson worked well together. (Ewald 207; Gandrud 248,257-8.) As a result of Gandrud's statements, Ewald felt threatened, and asked Gandrud if his statements were a threat. (Ewald 209.) Gandrud responded "no", but she could not expect things to continue on as they were if she continued to raise issues, and someone would "likely have to go." (Ewald 209; Gandrud 256.) Ewald re-emphasized that the inequitable compensation package she received compared to Davidson was unfair and it was discrimination based on gender. (Ewald 211.) Gandrud responded angrily and pounded his fist on the table to stop Ewald from continuing the discussion. (Ewald 209; Gandrud 256-7.)

Gandrud emailed Strommen and noted "she (Ewald) sees no problem with Anders but says she wants answers....will not accept that the job market has different compensation levels for education and business...there were mixed messages on pension/health insurance." (Ex.48)

On January 4, 2010, Finborud advised Strommen and numerous others that Ewald complained to her about the salary difference and "discrimination." (Marshall/Aff./Ex.GG;Finborud 66-9.) Other than advise Ewald to tell the Embassy, and tell Stakeholders of Ewald's complaints, Finborud did nothing. (Finborud 69.)

On January 11, 2010, Vibe, Deputy Chief of Mission for Embassy, emailed the Foreign Ministry:

"For the Ministry's information find the submitted enclosed copy of a letter dated 18/Nov/09 the Ambassador's letter to Ellen Sue Ewald at the Honorary Consulate General in Minneapolis and her reply of 12/30/09. The Embassy and the Consulate

20

General's management have had frequent discussions about dealing with these personnel questions and Consul Gandrud had a conversation with Ellen Sue Ewald the 5th of this month (Jan)., where she toned down the dissatisfaction she expresses in his letter. The current regulations and salary policy do not permit meeting her wishes about health coverage for your family or significant increase in salary. (Ex.138.)

On January 12, 2010, Gandrud asked Ewald , "[a]re you traveling to Norway in February?  Did you send notice to Embassy and ask for approval of expenses? Prior approval is my understanding and we can avoid future issues by following this directive." (Ex.194.)

On January 21, 2010, Finborud informed Johne, Rognlie, Vibe, Strommen and others that Ewald would be in Norway and meet with the Stakeholders on February 2, 2010. (Marshall/Aff./Ex.5.) In the same communication, Finborud advised the Stakeholders of Ewald's gender discrimination complaints.

In January 26, 2010 Svein Berg asks, "Should we already begin thinking about evaluation, as the basis for creating a foundation for a possible decision about continuation?" (Marshall/Aff./Ex.HH.)

On February 12, 2010, Ewald asks Strommen to reply to her December 30, 2009 complaint letter. (Marshall/Aff./Ex.II.)  That same day Strommen emails others as follows: "We must send her asap, as we have talked about, the legal authorities, the legal clarifications for why it is as it is. . .Be sure that the substance of what we write is as MFA the body of law." (Ex.197.)

On January 28, 2010, Vibe, "has our *girlfriend* finally received an answer to her travel expenses (she asked for about 50% coverage on one of them.)"  (Ex.140;emphasis

added).  Johne also criticized Ewald's travel, stating HCG must set up a budget.
(Ex.209.)

On February 18, 2010, Ewald requested a reduced schedule to work on CeRTA

after being encouraged to do so by Vibe.  (Exs.135,143,201.)  CeRTA was a

collaboration for education and business, using Norway's vast biobank information for

medicine and research.  (Ewald 131.)  Ewald discussed CeRTA with Vibe, who

suggested she formally request a reduced schedule.  (Ewald 143.)  On February 25, 2010,

Vibe reported that Gandrud supported Ewald's request for reduced work schedule as an

opportunity to "show her the door" in a "nice way" and ended the email with a smiley

face. (Ex.144.)  Gandrud noted CeRTA get her "out sooner than 6-8 months."  (Ex.198.)

The Stakeholders made clear it had to approve any changes to Ewald's position.

(Ex.134.)  Thereafter, Vibe recommended denial of Ewald's request for a reduced work

schedule.  (Marshall/Aff./Ex.JJ.)[7]  Vibe's initial draft threatened that if Ewald wanted to

keep her Embassy job she had to resign from CeRTA "immediately" as well notify all

CeRTA participants of that fact.  (Ex.150; Johne 160;Vibe 170-1.)

On March 9, 2010, Vibe agrees that Embassy has to provide coverage for

Mikalsen:

> "[w]e will have to cover the health insurance. The current regulations were put
> into effect in 2007. I do not understand completely why there was a requirement of
> 'spousal support' when Ellen was hired, but it was most likely a routine grounded
> in the former guidelines." (Ex.145; Strommen 88-89; Vibe 44.)

---

[7] Of course, Davidson worked a second job throughout his tenure. (Ex.57.)

Vibe added, "[t]he Embassy (Embassy's budget) is not going to cover this with one cent." (Id.; Vibe 123.)

On March 11, 2010, Vibe responded to Ewald's December 30, 2009 correspondence to Strommen. (Ex.146.) Contrary to prior representations, Vibe wrote, "salaries for locally-employed staff" are set "according to the local salary levels for similar positions." He added that individual negotiations played a part in the salaries, and that someone with a "corporate background" should receive a higher salary, even though both positions were both "director" or "officer" level. (Ex.146) Initially, had she known Ewald may have applied for the Business-Development role since, as a former CEO of an international business, she had extensive business qualifications and experience qualifying her for that position. (Ex.62.)

April 19, 2010 Vibe wrote that Davidson's position will renew but Embassy will not renew Ewald's position as there have been personal problems. (Ex.148.)

On April 20, 2010, Finborud widely distributed her description of Ewald as a bad or faulty hire. (Ex.136.) (Johne 162-4.) She also stated it was "regrettable that the [Ewald and Davidson] have serious cooperation problems.") (Finborud 96-97;Ex.136; Vibe 163-4,166-7.) Although Stakeholders were supposed to do an evaluation of the positions before the expiration of the three-year period, they discussed not extending Ewald's contract. (Finborud 100-101; Ex.136.) Johne copied persons interested in CeRTA on emails suggesting that Ewald had missed deadlines (when, in fact, that was untrue). When corrected, the information was not passed on to those misled about Ewald. (Exs.

151, 152,156,212; Johne 165-6,171-7.) Ewald was criticized for desiring to correct falsehoods. (Exs. 120,152,154,156, 212.)

Similarly, in May 2010, Finborud widely distributed her report, labeling Ewald as a bad hire. (Ex.137; Finborud 103.) Prior to her complaints, the only criticism Ewald received was she spent too much time working with students. (Ewald 126.) She "happily" did what was requested and developed CeRTA, which was exactly what she was supposed to be doing. (Finborud 70-1.) She never received any criticism of her actual work, from the educational institution, or the programs she coordinated. (Milbury 71.;Gandrud 283-4.) As Gandrud testified, she "didn't have issues of performance, she had issues of happiness." (Gandrud 284.)

Davidson's performance, on the other hand, was thoroughly criticized by the businesses he was to support. (Ewald 192-93;Nash/Aff.;Mueller/Dec.;Sorensen/Dec.) Gandrud and Embassy received many complaints about poor service from Davidson and the refusal of many businesses to work with him. (Id.,Exs. 50,52-56,60-61,126,199; Gandrud 172,223,264-72, 280-2; Strommen 121-2; Vibe 128-34.) Davidson even acted as CEO of a business while working for Embassy, something expressly forbidden by his contract. (Gandrud 271-6, 279; Exs. 57, 59, 213.) Yet Davidson received extra travel benefits from the Stakeholders and Vibe even wanted to extend his position. (Davidson 212-16.)

After her continuing complaints about discrimination and Embassy failing to comply with insurance law, Ewald faced additional criticism. Information was kept from

her. (Ewald 176.) Ewald found herself ostracized from office issues, even the hiring of an assistant for Davidson or being included in an office lunch. (Exs. 75,159,176-79.)

Ewald personally talked to Strommen on or about June 23, 2010. (Ewald/Dec./¶19.) He said that he understood her frustration and implied that the situation would be rectified. (Id.) In contrast to the representations by Strommen, the inequitable pay and benefits continued and Ewald continued to suffer retaliation.

On June 24, 2010, Ewald responded to Larsen's previous correspondence and emailed Strommen again complaining about the inequitable compensation, and being "frozen out of virtually all communication lines," which was "harassment" and "bullying." (Exs. 62,200;Vibe 194-5.) Ewald requested the unfair treatment and retaliatory conduct stop, a written apology, and a solution to address inequitable treatment in the work environment, a policy which the Norwegian government has endorsed publicly. (Id.) Ewald never received a response to this email. (Id.)

In September 2010, Vibe, Elisabeth Wemberg and Lars Henie from Embassy interviewed Ewald. (Ewald 180; Wemberg 67-8,72-3; Vibe 196-7.) This meeting was not to investigate her complaints. (Wemberg 60-2,67; Vibe 198-203.) They led her to believe that various "solutions" were being considered. (Ewald 180; Wemberg 68-9.) For example, when Ewald said she had heard that her position was going to be cut, Wemberg confirmed that was being considered. (Id.) They also told Ewald the travel budget had been exhausted and there would be no more funding for travel, but suggested that Science Week would be funded. (Ewald 180.)

Ewald was not the only female with a salary differential -- as noted in the Consuls

September 23, 2009 letter, Christina Carleton, although promised a greater salary,

received ten thousand less than offered. (Gandrud 203-4; Milbury 75-77;Carleton 25,27-

30;Ex.41.;Wemberg 39-40.) Urd Milbury, locally-employed in Washington, DC, also

was promised a salary greater than she received when she signed a contract. (Milbury 7,

10, 14-16, 24-6, 109.) Milbury was paid thousands less than her male counterpart, who

like Davidson, did not speak or write Norwegian. (Milbury 36-7, 44-46,110-13,128-30.)

After five years and cost of living raises, Milbury was finally paid what her male

counterpart was making the day she began her employment. (Milbury 126.) Milbury

began a union for locally-employed Embassy workers and has received reports of similar

inequities throughout the Norwegian Foreign Service. (Milbury 16-20, 37-40,52-3,118-

19; Wemberg 35,37.) The Foreign Service refuses to bargain with the union. (Milbury

86.) Those who complain receive poor treatment in response. (Milbury 43-4, 50-1,60-1.)

On September 24, 2010 Embassy considered how to remodel the

Education/Research position to cut Ewald's position, but continue to employ Davidson.

(Marshall/Aff./Ex.KK.)

Following communications in early 2010 that Ewald was a bad hire, the

Stakeholders formally decided to end Ewald's position without an evaluation. (Finborud

112-13.) Other than a general feeling that Stakeholders "were not happy" with Ewald,

Finborud was not aware of any specific complaints about Ewald's performance.

(Finborud 116.) Stakeholders never held a meeting again. (Finborud 120.)

CASE 0:11-cv-02116-SRN-SER  Document 142  Filed 11/05/13  Page 27 of 57

The Embassy did not permit Ewald to participate in planning and organization of the 2010 Science Week, nor even asked for any meaningful suggestions. (Ewald 177,182.) Although she was instrumental in the success of the 2009 Science Week, she was denied travel expenses but attended Science Week at her own personal expense, although Davidson got funding to go (Ex.180-81.) When Ewald requested an explanation for denying travel funding for 2010 Science Week, she was told she had no "professional reason" to be at Science Week. (Ex.65.) Ewald's job description, however, specifically identifies Science Week as part of her job responsibilities, necessary to facilitate the meetings and communications, and contribute ideas about how collaborations between the Midwestern U.S. and Norway might work. (Ex.4.;Johne 183-4.)

Nonetheless, Ewald participated in the 2010 Science Week. Since a no-show would negatively impact her professional reputation and she had prepared and organized several meetings at the event. (Ewald/Dec./¶6.) Ewald facilitated meetings, including meetings between the leadership team from the Mayo Clinic Innovation Scholars program and the Universities of Tromsø, Bergen, KD and Oslo. (Id.) She assisted and accompanied the leadership of the UiT delegation to a meeting with key people at the University of North Dakota, University of Minnesota and Macalester College. (Id.) She received positive feedback and many thanks for her efforts and hard work related to these meetings. (Id.)

On October 11, 2010, Ewald objected to Wemberg about the denial of Science Week travel expenses noting, even though it is not part of his job duties, Davidson attended the 2010 Science Week and his expenses were reimbursed by one of

27

Stakeholders, Innovation Norway.  (Id.;Davidson 212.)  When Ms. Ewald pointed this

out, she was told that the Stakeholders paid for Mr. Davidson's travel, not Embassy.

(Ewald 182-82.)

On December 1, 2010, Innovation Norway was considering continuing Davidson

even though Stakeholders decided not to renew Ewald.  (Exs. 164,165,202; Vibe

148,153-4,223-4.)

Since she received no response to her October 11, 2010 request to Wemberg

regarding travel funding, Ewald sent another email outlining her situation on December

12, 2010.  (Ex.65)  In response, Vibe stated Ewald failed to follow travel request

procedures and her submission requesting reimbursement and reconsideration amounted

to "insubordination." (Ex.65.;Gandrud 290-2;Wemberg 105-06; Vibe 216-17.)  Vibe

further stated "Embassy has reviewed the other issues that [Ewald] has raised and while

we respectfully disagree with your position, we do not think that there is any value in

discussing them further." (Id.)

In early 2011, Gandrud visited Colleges to meet with university leadership and

students without Ewald's knowledge.  Ewald had previously developed relationships with

people at these institutions.  (Ewald 175.)  When she complained to Gandrud about his

exclusion of her, Gandrud bristled noting that he did not need to inform her and that it

was his job to make such visits.  (Ewald 175.)

The Embassy excluded Ewald from all meetings about invitations to various

events planned for the royal visit in the fall of 2011.  (Ewald 191.)  A significant part of

the royal visit included visiting three colleges in the Midwest where Ewald had

28

developed relationships with the colleges and their leadership.  (Gandrud 289;Id.;Vibe 218.)  Davidson continued getting his expenses paid by Embassy and Innovation Norway while Ewald's were denied.  (Exs.155,163,173,174,180,181,182,184,187,189; Vibe 50-51,184-5,193-4.)   Wemberg questioned Vibe about the appropriateness of granting Davidson's travel while denying Ewald.  (Wemberg 80-1,83,100,107,109; Ex.186.)

Ewald learned Mr. Davidson was operating a separate company, which is not allowed by Embassy's policies or Davidson's Employment Contract.  (Ewald 194.) When she discussed it with Mr. Gandrud, Mr. Gandrud said that it would be addressed. (Id.)  Throughout his employment at Embassy, Davidson continued to have significant involvement in this separate company.  (Ewald 194.)

The Embassy retaliated against Ewald in multiple ways and she directly complained directly to the Ambassador and Gandrud.  (Exs. 66,67,166.)  Ewald was officially notified that her job would not be renewed at the end of July 2011.  (Ex.188.)

The Embassy continued to criticize Ewald and her efforts to promote Norway even after her employment ended.  For example, it refused to support Norwegian interests in a brain science conference coordinated by Ewald after she left Embassy.  (Ex.167.)  It also inhibited the business interests of her company Tysvar.
(Ewald/Dec./¶14;Mikalsen/Dec./¶10.)

## **STANDARD**

Summary judgment may occur when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  F.R.Civ.P.56(a). Summary judgment "should seldom be utilized" in employment discrimination cases.

*Stidham v. Minnesota Mining & Mfg., Inc.*, 399 F.3d 935, 937 (8th Cir.2005); *see also,*

*Lynn v. Deaconess Med. Ctr.*, 160 F.3d at 484 (8th Cir.1998); *Landon v. Northwest*

*Airlines, Inc.*, 72 F.3d at 620 (8th Cir.1995). "The question of an employer's intent to

discriminate is a 'pure question of fact.'" *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*,

934 F.2d 1104, 1111 (9th Cir.1991) (*quoting Pullman-Standard v. Swint*, 456 U.S. 273,

287-88 (1982)). The Court may not consider the moving party's contradicted evidence.

See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).

     The moving party must show the material facts in the case are undisputed.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mems v. St. Paul Dep't of Fire &*

*Safety Servs.*, 224 F.3d 735, 738 (8th Cir.2000). The court may not weigh facts or

evaluate the credibility of affidavits and other evidence. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 249 (1986). Furthermore, the court must view the evidence, and the

inferences which may reasonably be drawn from it, in the light most favorable to the non-

moving party. *Mems v. St. Paul Dep't of Fire & Safety Servs.*, 224 F.3d at 738; *Graves v.*

*Arkansas Dep't of Fin. & Admin.*, 229 F.3d 721, 723 (8th Cir.2000).

     To survive summary judgment, a plaintiff need only "adduce enough admissible

evidence to raise genuine doubt as to the legitimacy of Defendant's motive, even if that

evidence does not directly contradict or disprove Defendant's articulated reasons for its

actions." *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 946 n.8 (8th

Cir.1994).

## LEGAL ARGUMENT

### I.   Ewald's Promissory Estoppel Claim is Viable.

To succeed on an estoppel claim, an employee must show: (1) the employer "made a promise;" (2) the employer "expected or should have reasonably expected the promise to induce substantial and definite action" by the employee; (3) the "promise did induce such action;" and (4) the "promise must be enforced to avoid injustice." *Rognlien v. Carter*, 443 N.W.2d 217, 220 (Minn.Ct.App.1989) (holding that appellant entitled to promissory estoppel as alternative claim because he relied on employer's oral representations regarding permanent employment when giving up previous job), *review denied* (Minn. Sept. 21, 1989); *See Cohen v. Cowles Media Co.*, 479 N.W.2d 387, 391 (Minn. 1992).

Embassy argues that because Ewald has a "contract," this claim fails. Embassy's simplified argument seeks to divert attention from the substance of Ewald's actual claim. During the interview process, Gandrud expressed a $40,000-70,000 salary range for both positions. (Gandrud 61.)  Ewald did not question the range because Gandrud told her "this was all they had to work with," and she knew of the rigid salary system in Norway. (Ewald 67.)   Gandrud's statement that the maximum salary was $70,000 was false and his promise that Ewald would be paid the same as Davidson was false.

Defendant argues since it provided Ewald a "salary range" with no specific salary that her claim fails. (Def.Mem.p. 44.)  Defendant misses the point.  Gandrud promised Ewald that both the Education-Research and Business-Development positions were going

to be *paid the same salary*.   (Ewald 69,77.)   Contrary to its reliance on *Martens*,[8] "comparable compensation" is not a clear and definite statement, the "same salary" is clear and definite sufficient to support Ewald's claim.   Moreover, the evidence contradicts Defendant's Stakeholders' declarations, and contemporaneous documentation shows the 1.5 NOK was to be divided equally for salary, expenses, and benefits for Ewald and Davidson.[9]   (Exs. 23,24,27.)   This evidence demonstrates a material fact issue.

When offering her the position, Gandrud told Ewald "she would be really pleased," and "they had worked really hard," and for "both positions they were able to get the top range."   (Ewald 77.)   Since Gandrud gave Ewald no other range, this statement means Davidson will be paid $70,000.   On that same day, Gandrud offered Davidson $100,000.   Gandrud's statement that both Ewald and Davidson would be paid top of the range was false, and intended to induce Ewald to accept the position.

Ewald reasonably relied on Gandrud's statements since she was specifically told by Mykletun that the $1.5 budget would be divided equally between the two officer positions.   (Ewald 56-57.)   The postings for the two positions showed her position required more education, so she would not believe her position would be paid less than the otherwise "equal" and "parallel" position.   Ewald relied, to her detriment, on

---

[8] *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W. 2d 732, 746 (Minn. 2000) (Def. Mem. p. 44.)
[9] The 1.5 NOK "should be divided equally between the two officers/fields (i.e., for salary, travel etc.," just as Gandrud told Ewald. (Exs. 23,27.) Instead of the NOK 750,000 earmarked for her position, Ewald actually received NOK 421,535 in salary, expenses and benefits according to the exchange rate at the time. (Ex.21.)

Gandrud's statement when she accepted the position. She moved from Norway to Minneapolis. (Ewald/Aff/¶3.)

Judge Kyle rebuffed Defendant's argument in *Jackson v. Navitaire, Inc.*, 2005WL61490,p.3 (D.Minn.2005). Judge Kyle noted the defendant's "argument that Plaintiff's...promissory estoppel claims must be dismissed because the signed agreements are valid and enforceable is rejected due to the alleged circumstances surrounding the execution of the signed agreements." (Id.) The promises made in that case included compensation (including options and bonuses), position, reporting structure, and health benefits, among other things. (Id.), p. 2. Judge Kyle observed that these promises "are distinguishable from those that have been found to lack clarity or definiteness." (Id,p.4.) [10] Here, Gandrud promised both officers would be paid equally, which is a definite statement.

## II.   Ewald's Minn. Stat §181.64 Claim Should be Tried.

Defendant made knowingly false statements to induce Ewald to take the HCG position and move to Minneapolis. Minn.Stat. §181.64, proscribes it as unlawful

> for any person, . . . or organization. . . to induce, influence, persuade, or engage any person to change from . . . any place in any . . . country to any place in this state, to work . . . through or by means of knowingly false representations, whether spoken, written, or advertised in printed form concerning the kind or character of such work, the compensation therefor. .

---

[10] *Vaidynathan v. Seagate U.S., L.L.C.*, 2010 WL 2925067 (D.Minn.2010), is similar to this case. Vaidynathan claimed Seagate made false statements in a job description, during interviews, and in a job offer. Id, p. 3. Judge Frank considered the claim an alternative to the employee's fraudulent inducement claim and that there were material facts at issue regarding a clear and definite promise about the nature of the position. *Id*, p. 4.

Defendant focuses only on the statements that the positions were to be "parallel," "equal," and "would work together," and completely ignores Gandrud's statement that the positions would be paid the same. (Def.Mem.pp.46-47.)

### A.    Gandrud Made Knowingly False Representations.

In *Vaidyanathan,* Judge Frank denied summary judgment under Minn.Stat. §181.64, finding genuine factual disputes about whether employer "made false representations regarding the position and, if so, whether the representations were known to be false." *Vaidyanathan,* 2010WL2925067 at p. 3.[11]  Judge Frank noted that knowingly false representations "involved factual issues that were properly submitted to the jury." *Vaidyanathan,* 2010WL2925067 at p. 3.

Ewald has ample evidence of knowingly false misrepresentations by Gandrud.  On the same day that Gandrud offered Ewald $70,000 noting she would be paid the same as Davidson, he offered Davidson $100,000.  Weeks later, Gandrud lied again telling a prominent member of the Norwegian-American community that both Davidson and Ewald were paid "$100,000+ in salary."  Embassy knew that it was supposed to pay Ewald and Davidson equally and provide equal benefits, obligations, and titles.  The 1.5 NOK budget was to be split equally between the two positions.

Gandrud testified he knew the salary range for Business-Development was "too low" based on a salary.com survey and information received by interested persons before interviewing applicants (Gandrud 103.)  Gandrud did not share this information with the

---

[11] On appeal of jury verdict, *Vaidynathan* was reversed and remanded for new trial on the Minn.Stat. §181 claim. *See* 691 F.3d 972 (8th Cir.2012). The Court held a "knowingly false representation" means made with knowledge of falsity. Id. at 978.

Stakeholders or hiring committee.[12]   Gandrud told Ewald both those accepting the positions would be paid the same--the maximum possible in the range--and each provided the same benefits, including health insurance and pension benefits.   These are not "general statements;" they are definite statements that the two employees would receive the same salary. *See Martens*, 616 N.W.2d at 747.   Gandrud made these statements knowing them to be false.[13]

### B.   Defendant Misrepresented the Compensation and Character of Work.

Defendant also represented that the two positions were "equal," "parallel" and would "work together as a team."   Contrary to Defendant's argument, these are false representations related to the "kind or character of such work" or "compensation."[14]

Defendant's knowingly false statements related to compensation and the kind or character of Ewald's claim under §181.64.   There is sufficient evidence these false statements induced her to accept the Education-Research position and raises numerous genuine issues of material fact such that summary judgment is inappropriate.

---

[12]  Had he shared the information collected by the Faegre staff person, the hiring committee undoubtedly would have pointed out the positions on salary.com did not match the "expert" positions for which Davidson and Ewald were hired.

[13]  Defendant relies on *Progressive Technologies, Inc. v. Shupe*, 2005WL832059 (Minn.App.2005) claiming future events are not actionable.  That Court found in favor of the defendant, in part, because the plaintiff "has not presented evidence indicating their falsity." *Id.*, p. 5.  Here, the evidence shows Gandrud's statements were false.

[14]  Defendant relies upon *Maida v. The Maxi-Switch Company*, 1989WL452*2 (Minn.App.1989), where "Maida's interpretation of the letter agreement is based only upon his assumptions."  Here, the record is replete with evidence the positions were to be equal and parallel in all respects--salary, benefits, duties and responsibilities.

III.   **Ewald Has Viable Reprisal And Retaliatory Harassment Claims.**

Ewald claims reprisal and retaliatory harassment under the Minnesota Human Rights Act (MHRA).[15]   (Doc#104/¶¶79-87,88-96).  Defendant contends Ewald's claims fail for lack of adverse employment actions. (Def.Mem.p.36-39.)  Defendant's argument should fail.

### 1.    Evidence Supports Reprisal.

A *prima facie* case of reprisal requires "(1) statutorily protected conduct by the employee; (2) adverse employment action by the employer; and, (3) a causal connection between the two." *Hoover v. Norwest Private Mortgage Banking*, 632 N.W.2d 534, 548 (Minn. 2001).  Under the MHRA, reprisal includes, but is not limited to, "any form of intimidation, retaliation, or harassment." *Id*; Minn.Stat. §363A.15.[16]  The MHRA's retaliation provision is broader than Title VII's, *Peltonen v. Branch No. 9*, 2006WL2827239*30 (D.Minn.2006); *Thorn v. Amalgamated Transit Union*, 305 F.3d 826,830-31 (8th Cir.2002).  must be construed liberally. Minn.Stat. §363A.04.  Here, Defendant's intimidating, retaliatory and harassing actions against Ewald constitute adverse action under the MHRA.[17]

---

[15]  Federal courts have recognized a claim of retaliatory harassment under Title VII. *Jensen v. Potter*, 435 F.3d 444 (3rd Cir.2006).  Plaintiff provided legal support for the retaliatory harassment claim in a previously-filed Memorandum. *See*/Doc.#132.

[16]  Defendant incorrectly argues Ewald must prove her protected activity was the "but for" cause of the retaliatory action. (Def.Mem.p.39 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nasser*, 133 S.Ct. 2517, 2533 (2013)).  Ewald's retaliation claims are under the MHRA, and Minnesota has not adopted the "but for" standard.

[17]  It is undisputed Ewald engaged in protected activity.

In December 2009, Ewald complained about discrimination to Finborud and Strommen. Finborud shared Ewald's discrimination complaints with Stakeholders who immediately raised issues about Ewald. When Stakeholders met on February 2, 2010, they discussed terminating her position at the end of the three-year term scheduled to end more than 1-1/2 years away. At that time, there was no discussion about not continuing Davidson's position-only Ewald's. Thereafter, Finborud also spread the word to others outside of Stakeholders that Ewald was a "bad hire." Finborud advised that although Ewald is a "bad hire" that did not mean the position needed to be abolished. (Exs. 136,137.)

Ewald was denied travel expenses to Science Week in 2010, which was an essential part of her job as referenced in her job description while her male counterpart had paid travel expenses to Science Week, which was not in his job description. Defendant told Ewald she had "no professional reason for going." (Ewald/Aff./Dec.¶6.) This is fantasy (and retaliation). Once there, Ewald organized several meetings with key U.S. institutions and Norwegian Universities, including Universities of Bergen, Tromsø, Trondheim together with the heads of the Mayo Innovation Scholar Program, and the Norwegian Minister of Research and Education. (Ewald/Aff.//¶6.) She received very positive feedback from the participants. *Id* Yet, she was reprimanded for being "insubordinate" for seeking an explanation about the denial of her travel expenses and requesting reconsideration. Ewald was not invited to significant events at Science Week. (Id.)

Defendant also denied Ewald's expenses for meetings with university representatives in the Midwest and Norway. Yet, Gandrud traveled and took over some of Ewald's responsibilities without telling her. (Ewald 175.) He visited universities and colleges meeting with Ewald's contacts, which embarrassed Ewald when she heard from those colleges about Gandrud's visits. (Ewald/Dec./¶15) Upon her inquiry, Gandrud said he didn't need to tell her what he was doing and he could "do anything he wants, that he didn't have to ask [Ewald] about whether he was visiting colleges or not." (Ewald 175.)

After Ewald complained, Defendant ignored her concerns for long periods of time and responded only after repeated follow-ups by her.[18] After Ewald complained of unequal pay and health benefits for her family, Defendant cancelled Mikalsen's health insurance.[19]

Ewald was also "frozen out of virtually all communication lines" relating to work events and operations. After Ewald complained, she received "cold receptions" from people and heard about references to the "Ellen problem."

## 2.    Evidence Supports Retaliatory Harassment.

The question here is whether retaliatory harassment is actionable under the MHRA, not the federal law in the Eighth Circuit. Since §363A.15 includes "harassment" in its definition of reprisal, it should be. Moreover, Ewald has previously cited federal

---

[18] Failing to conduct an investigation is an act of intimidation and deviation from policies (reprisal under Minn.Stat. §363A.15).

[19] Later reinstating Mikalsen's insurance does not allow Defendant to avoid liability. *See Burlington*, 548 U.S. at 54.

case law supporting this view. Per *Burlington,* a plaintiff must show the employer

conduct was such that "a reasonable employee would have found the challenged action

materially adverse, which . . . means it well might have 'dissuaded a reasonable worker

from making or supporting a charge of discrimination.'" 548 U.S.53,68 (2006.)

It is proper to consider the incidents cumulatively to show reprisal. *Giuliani v.

Stuart Corp.*, 512 N.W.2d 589 (Minn.Ct.App.1994). An employer can "effectively

retaliate against an employee by taking actions not directly related to his employment or

by causing him harm *outside* the workplace." *See Burlington*, 548 U.S. at 63.

A plaintiff does not need to be demoted, terminated, reassigned, suspended, or

suffer lost compensation or privileges to show she suffered adverse employment action

and retaliatory conduct may be "action less severe than outright discharge." *Kim v. Nash

Finch Co.*, 123 F.3d 1046, 1060 (8th Cir.1997). *Id* (citations omitted); *see Moore v. Kuka

Welding Systems & Robot Corp.*, 171 F.3d 1073, 1079-80 (6th Cir.1999). An adverse

action may be shown when the employer "systematically retaliates" against plaintiff.

*Kim*, 123 F.3d at 1060.

Ewald suffered much more than "mere inconvenience or an alteration of job

responsibilities or changes in duties." *Kim*, 123 F.3d at 1066. She experienced dissuasion

in the eye of a reasonable employee. To highlight: Gandrud "threatened" Ewald that if

she did not "nip it in the bud," there "would be consequences" and if she continued to

raise issues, someone would "likely have to go;" Johne advised Ewald to let the matter

drop, not complain about unequal treatment, and not talk about lawyers (Ewald 171); and

Johne "had all the information on research on Norway," but stopped communicating with

Ewald and "froze" her out of communications, interfering with the conditions of Ewald's job. (Ewald 174.)

### 3.   Defendant Continues Reprisal Post-Employment.

Ewald is protected from post employment reprisal. *See Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997). After Ewald's employment ended, the reprisal continued:  she, Mikalsen, and Tysvar were excluded from special events and conferences involving Norwegian dignitaries and business people, including:

- Dinner for Amb. Strommen  (Ewald/Dec./¶16)
- Reception sponsored by the Consulate for the Norwegian-American Chamber of Commerce (Ewald/Dec./¶17)
- Innovation Norway recommended a Tsyvar "client not to work with Minneapolis." (Ewald/Dec./¶10)

Members of the Norwegian-American business community report "some Norwegians have reported an inability to work with Tysvar due to Ms. Ewald's lawsuit." (Nash/Aff.¶15; Mueller/Dec./¶14.)

Defendant's conduct during Ewald's employment and thereafter, all of which adversely affected and undermined Ewald's position and reputation, constitute adverse actions under the MHRA.  Defendant's retaliatory conduct was much more significant than "mere inconvenience" or "alteration of job duties," and clearly amounts to intimidation and harassment designed to dissuade.

### IV.   Ewald's Whistleblower Act Claim Has Merit.

Under the MWA, an employer shall not:

"discharge, discipline, threaten, or otherwise discriminate against, or
penalize and employee regarding the employee's compensation, terms
conditions, or privileges because 'the employee. . . in good faith, reports a

violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer.'"

Minn.Stat. §181.932, subd. 1(1).

Ewald complained that her family legally should be covered under Defendant's health insurance. Defendant gave different responses to each complaint: Mikalsen was a Norwegian citizen and could not be covered; Mikalsen was not financially dependent on her; and her children were Norwegian citizens, and over 18. Upon Defendant's shifting reasons for denial, Ewald sought legal advice regarding coverage. She believed unmarried dependent children were eligible for insurance coverage if they were under 25 and full time students. (Ewald/Dec.¶4.) Ewald reported refusing coverage violated "insurance policy and US law." (Ex.45.) Ewald testified she understood "under U.S. law that children can be covered under the policy up until the age of 26." (Ewald 166.) Her additional claim, the denial of coverage, was discriminatory does not change her report of a violation of law.

Recent amendments[20] define "good faith" as "conduct that does not violate §181.932, subd. 3." §181.931, subd. 4. As long as the employee does not "make statements or disclosures knowing that they are false or that they are in reckless disregard of the truth," she makes her report "in good faith." §181.932, subd. 3. Based on the

---

[20] The legislative history shows the new definition of "good faith" clarified existing law. *See House Floor Session of May 16, 2013, pt. 2*, 2013 Leg., 88th Sess. (Minn. 2013), *available at* *http://tinyurl.com/k2rwvqu* (statement of Rep. Loeffler); *Hearing on S.F. 443 Before the S. Comm. on Judiciary*, 2013 Leg., 88th Sess. (Minn. 2013), *available at* *http://tinyurl.com/moup6sy*. Therefore, the clarification applies to pending litigation and future litigation. *See Braylock v. Jesson*, 819 N.W.2d 585, 588 (Minn. 2012).

amendment, the "public policy" requirement, as asserted by Defendant, no longer

applies. *See Anderson-Johanningmeier v. Mid-Minnesota Women's Ctr., Inc.*, 637

N.W.2d 270, 275 (Minn. 2002)(public policy requirement abolished). Moreover, Ewald

reported the violation of insurance laws for the benefit of Mikalsen and her children.

**V.     Defendant Violated the Equal Pay Act.**

The Equal Pay Act ("EPA") requires employers to pay men and women equally

for substantially equal work. 29 U.S.C. §206. For her *prima facie* case under the EPA,

Ewald must show Embassy paid her less than similarly-situated male employees for equal

work in jobs that required equal skill, effort, and responsibility and performed under

similar working conditions. 29 U.S.C. §206(d)(1); *Taylor v. White*, 321 F.3d 710, 715

(8th Cir.2003). Minnesota has its own Local Government Pay Equity Act which well

describes what a responsible public employer should do. *See* Minn.Stat. §§471.991-995.

This Act requires political subdivisions to establish equitable compensation relationships

between female-dominated, male-dominated, and balanced classes of employees in order

to eliminate sex-based wage disparities in public employment. Minn.Stat. §471.992,

Subd.1. It makes "[a] primary consideration in negotiating, establishing, recommending,

and approving compensation is comparable work value in relationship to other employee

positions within the political subdivision." Id. This requires the political subdivision to

assure:

> 1) compensation for positions in the classified civil service, unclassified civil
> service, and management bear reasonable relationship to one another;
>
> (2) compensation for positions bear reasonable relationship to similar positions
> outside of that particular political subdivision's employment; and

(3) compensation for positions within the employer's work force bear reasonable relationship among related job classes and among various levels within the same occupational group.

Minn.Stat. §471.993, Subd.1.

"Reasonable relationship" means:

(1) the compensation for positions which require comparable skill, effort, responsibility, working conditions, and other relevant work-related criteria is comparable; and

(2) the compensation for positions which require differing skill, effort, responsibility, working conditions, and other relevant work-related criteria is proportional to the skill, effort, responsibility, working conditions, and other relevant work-related criteria required.

Minn.Stat. §471.993, Subd.2.

The Minnesota law draws a stark contrast to what Embassy did to assure gender-neutrality:  nothing.

Embassy must show the pay differential was based on a factor other than gender.

_Id_ at 716; 29 U.S.C. §206(d)(1).  Embassy paid Ewald's similarly-situated male peer who performed substantially the same duties significantly more than she was paid.[21]

---

[21] With the exception of the focus area, Defendant's descriptions for the two positions outlined almost identical responsibilities, including but not limited to:

- Work with the counterpart at Embassy in Washington D.C., other key staff at the Consulate, and relevant Stakeholders in Norway, towards the goals of advancing Norway's strategies for the respective focus area within the Upper Midwestern U.S..

- Develop contacts between Norwegian and US partners.

- Proactively engage in targeted networking with relevant colleagues and partners in the respective focus area.

43

1.   **Ewald Was Paid Significantly Less Than Davidson.**

In addition to inferior insurance, Ewald made $30,000 less than Davidson in salary and $3,000 in pension annually.  Ewald established a *prima facie* case that she was paid less than her male counterpart, Davidson.

2.   **A Genuine Issue of Material Fact Exists Whether Ewald's Duties were Substantially The Same as her Male Counterpart, Davidson.**

Ewald need only identify a male employee who was paid more for equal work in jobs that required equal skill, effort, and responsibility and that were performed under similar working conditions. *Taylor*, 321 F.3d at 715. Davidson's position need not be identical to be considered equal under the EPA, contrary to the position taken by Embassy. *Grover v. Smarte Carte, Inc.*, 836 F.Supp.2d 860, 866 (D. Minn. 2011); *Krenik v. County of Le Sueur*, 47 F.3d 953, 961 (8th Cir.1995). As this Court wrote in *Grover*, "…job titles and classifications are not dispositive; it is the actual requirements of the jobs that control." *Id*; *Tenkku v. Normandy Bank*, 348 F.3d 737, 741 (8th Cir.2003). Whether the compared jobs are "substantially equal requires a practical judgment on the basis of all the facts and circumstances of a particular case, including factors such as level of experience, training, education, ability, effort, and responsibility." *Id*, *citing Renstrom v. Nash Finch Co.*, 787 F.Supp.2d 961, 967 (D. Minn. 2011) (*quoting Lawrence v. CNF Transp., Inc.*, 340 F.3d 486, 492 (8th Cir.2003)). "Insubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of

---

- Facilitate and plan visits to the Midwest by involved and interested Norwegian partners, as well as facilitate workshops and seminars of common interest.

jobs will not render the equal pay standard inapplicable." *Id* (citing 29 C.F.R. §1620.14(a)).

According to the job descriptions, Ewald and Davidson were expected to initiate and develop relationships between U.S., especially Midwest, and Norwegian entities. Each networked, promoted and developed relationships to work towards Norway's goals and strategies. Each worked to advance relations between U.S. and Norwegian entities. Each performed proactive, targeted networking; facilitating and planning of visits to the Midwest by Norwegian entities and facilitate workshops; and initiating U.S.-Norway collaborative agreements. (Exs. 2, 4, 29.) The fact that Ewald's focus area was Educational-Research, while Davidson's was Business-Development does not change that they had the same core duties that required the same skills.

This Court considered a similar claim in *Grover v. Smarte Carte, Inc.*, 836 F.Supp.2d 860 (D. Minn. 2011), in denying summary judgment. This Court noted that three comparators, despite holding differing job descriptions, titles, and responsibilities, were sufficiently similar to show they occupied similar roles within the business. Like Ewald and Davidson, none were in a position of authority over the other. The Court stated, "They held distinct positions, but a jury may well deem those positions to be equivalent for compensation purposes." *Id* at 867.

Defendant argues Davidson's position differed from Ewald's position. (Def. Mem. pp. 23-25.) But the evidence reveals that both were employed in similar capacities as a team, at the same "Officer" grade level with the same responsibility. They were similar to the comparators in *Grover*, "[t]hey were both vice presidents (albeit of different

business units), they both reported to [CEO], and they had similar job responsibilities. Indeed, their employment agreements contain nearly identical job descriptions." 836 F.Supp.2d 868.   Here, both Ewald and Davidson were:   considered "experts" with specialized skills, held "officer" titles, reported to Gandrud and Mondale, and received direction on priorities and work expectations from Stakeholders.

Defendant makes light of the fact that Ewald asserts she and Davidson's jobs were "parallel," "worked as a team," and "reported to the same people."[22]   (Def.Mem.p.25.) Yet, Stakeholders and Embassy repeatedly emphasized that "the positions work as a team" especially working with entities when it comes to research and technology such as renewable energy, environmental technology as well as medical technology.

Gandrud directed Ewald to revise her vision statement in 2009 and follow Davidson's narration of how they work together:

> A key success factor for this role is working closely with the Higher Education and Research Director position, particularly in the areas of academic research and innovation. The commercialization of research from universities is an extremely important source of innovation and business opportunities.   Combining the academic research and business talents Norway and the U.S. may yield significant results.   To facilitate the synergy of the two roles, the Directors will meet on a regular basis to discuss.   In addition, when appropriate, both Directors will attend meetings, teleconferences and conferences together.   Science Week is a great example of how the two positions can work together to advance the interests and opportunities for academic and private research, innovation and commercialization.

(Marshall/Aff./Ex.P.)

---

[22] In relying on *Tenkku v. Normandy Bank* (Def.Mem.p.25), Defendant makes an absurd comparison between a surgeon and nurse, and paralegal and lawyer, because they work as a team.  Similar to the court in *Tenkku,* along with the other cases cited by Defendant, Ewald bases her claim on the actual job requirements.

Also:

> As mentioned earlier, Science Week is a good example of where the two
> Directors are working very closely in order to achieve mutual objectives.

(Id.)

Ewald's actual job tasks were substantially similar to Davidson's duties. Ewald

has shown a genuine issue of fact exists.

### 3.  Defendant Cannot Show a Factor Other Than Gender.

Defendant argues the pay differential between Davidson's and Ewald's salaries

was based on a factor other than sex, namely the market value of Davidson's skills. (Def.

Mem. pp. 26-27.) A defendant must prove the "other than gender" affirmative defense

"so clearly that no rational jury could have found to the contrary." *EEOC v. Del. Dep't of

Health & Soc. Servs.*, 865 F.2d 1408, 1414   (3d Cir.1989). *Stanziale v. Jargowsky,* 200

F.3d 101, 108 (3d Cir.2000).  To use the marketplace value defense, the employer must

also rationally explain the use of market information.  *Dubowsky v. Stern*, 922 F.Supp.

985, 993 (D.N.J.1996).

Defendant relies on Gandrud asking a third party, the Faegre Human Resources

manager, to spend a few minutes on the internet generally collecting data on university

research assistants and professional business development managers and labeling this as

"market research."  Frankly, it is rank inadmissible hearsay. *See* FRE 801.  The

proponent of the expert testimony must prove its admissibility by a preponderance of the

evidence. *Lauzon v. Senco. Prods., Inc.*, 270 F.3d 681, 686 (8th Cir.2003).

In performing its duty as a "gatekeeper," the Court has considerable authority and

must exclude expert witness testimony that is inherently unreliable.  Fed. R. Evid. 702

"Where opinion evidence is connected to existing data only by the ipse dixit of the expert, a district court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Smith v. Cangieter*, 462 F.3d 920, 924 (8th Cir.2006) (quoting *Gen. Elec. Co. v. Joiner*, 552 U.S. 136, 146 (1997)). Embassy's "expert" testimony attempts to legitimize obviously faulty "market research" and should not be considered.

Reliance on the salary.com survey as its "market research" is flawed for a number of reasons. Gandrud admitted it was a "general market" survey on the Salary.com website. The "research" positions surveyed were positions within educational institutions, not government positions. Similarly, the Business-Development positions surveyed were in the private sector, not governmental jobs. Moreover, a review of the positions surveyed shows were not like Embassy "experts" jobs. There is no dispute that Embassy, or in other words, the Norwegian Government, was the employer. Ewald did not do "research" in an educational setting any more than Davidson managed any Business-Development. Both were promoters of Norway--Ewald in education and research, and Davidson in business. As noted above, Ewald initiated contacts, and promoted and facilitated relationships for the purpose of establishing collaborative agreements between institutions. Davidson was to do the same for business. The surveyed positions did not correspond to the position and duties of Ewald or Davidson, and therefore, the salary ranges do not apply.

The EEOC, in Section 10 of its Compliance Manual, discusses appropriate considerations for looking at salary disparity issues for market reasons:

Employers have sometimes asserted that they must pay more to a male employee than a female employee performing the same job because of the male employee's market value. Of course, payment of lower wages to women based on an assumption that women are available for employment at lower compensation rates does not qualify as a factor other than sex that would justify unequal compensation for substantially equal work. As one court stated, "the argument that supply and demand dictates that women *qua* women may be paid less is exactly the kind of evil that the [EPA] was designed to eliminate, and has been rejected." <u>Market value qualifies as a factor other than sex only if the employer proves that it assessed the marketplace value of the particular individual's job-related qualifications, and that any compensation disparity is not based on sex.</u>

Prior salary cannot, by itself, justify a compensation disparity. This is because prior salaries of job candidates can reflect sex-based compensation discrimination. Thus, permitting prior salary alone as a justification for a compensation disparity "would swallow up the rule and inequality in compensation among genders would be perpetuated." However, if the employer can prove that sex was not a factor in its consideration of prior salary, and that other factors were also considered, then the justification can succeed. The employer could, for example, show that it: (1) determined that the prior salary accurately reflected the employee's ability based on his or her job-related qualifications; and (2) considered the prior salary, but did not rely solely on it in setting the employee's current salary.

If the employer did not bargain with the higher-paid comparator it will cast doubt on the employer's argument that it had to offer a higher salary to compete for him/her. And even if there was bargaining, the investigator should consider whether the employer bargains differently with men than with women (e.g., responds more favorably to men's demands than to women's demands).

EEOC Compliance Manual Sec. 10-IV(F)(2)(g) (emphasis added); (citation

references omitted).

Here, Defendant undertakes exactly what the EPA was intended to prevent, a

justification of a higher salary merely because one employee is male and made a greater

salary elsewhere.  It is worse; however.  First, it did not even negotiate with Davidson.

Second, with other female employees, Defendant even paid them less than what they

were offered when they began employment, and far less than their male counterparts.

49

Third, Defendant attempts to justify Davidson's salary based on his prior salary of $108,000 at 3M, a private corporation. (Def.Mem.p. 27.) But, Defendant never asked Ewald what her prior salary was in order to determine her market value. (Gandrud 116.) Ewald earned between $170,000-190,000 working as a Director of Business Development prior to accepting the Officer position and she had worked as a CEO of an international telephone business as well. (Marshall/Aff./Ex. NN). It is ludicrous to suggest the market required paying Davidson more; he lacked the language requirements for the position and had never even visited Norway prior to his hiring!

Finally, Defendant first offered Davidson $60,000, significantly less than the salary.com range of $93,000-118,000, which demonstrates that Defendant did not initially use the salary.com survey in determining his salary. Defendant offered Ewald $70,000, more than Davidson, showing that it valued Ewald's qualifications, experience and background more than Davidson's.[23] Defendant only offered Davidson a higher salary after he talked with his wife, and explained that he had a family to support, including child care costs.[24] Treating Davidson as the male breadwinner for the family only enforces the stereotypical treatment to the advantage of male. Ewald also had a family, with two children in college. No such questions were asked of her.

---

[23] Ewald's position required an advanced university degree and Davidson's did not; she was fluent in Norwegian, had lived in Norway and had networks in both Norway and the U.S.

[24] Defendant never asked Ewald about her family expenses. In fact, Defendant at one time denied health insurance benefits for Ewald's partner because they assumed he was not dependent on her, whereas Davidson allegedly supported a wife and family. This is classic sexist thinking.

CASE 0:11-cv-02116-SRN-SER   Document 142   Filed 11/05/13   Page 51 of 57


Defendant cannot prove as a matter of law that the pay differential between Ewald's and Davidson's salaries was due to a factor other than sex.

## VI.     Pay Discrimination Under the MHRA.

Ewald alleges that Royal Norwegian Embassy's failure to pay her the same amount as her male counterpart also establishes a violation of the MHRA. The MHRA is similar if not identical to the same claim under Title VII. The Eighth Circuit has long held that "[w]here a claim is for unequal pay for equal work based upon sex, the standards of the Equal Pay Act apply whether the suit alleges a violation of the Equal Pay Act or of Title VII." *McKee v. Bi–State Dev. Agency*, 801 F.2d 1014, 1019 (8th Cir.1986); *see also Drum v. Leeson Elec. Corp.*, 565 F.3d 1071, 1072 (8th Cir.2009.)

For the same reasons Ewald's EPA claim may not be dismissed, the MHRA discrimination claim also survives. However, Ewald is entitled to different damages under the MHRA. Ewald is not limited to the remedies of one of the two statutes, exclusively, for the damages due to disparate pay. Under the MHRA, she can recover mental anguish, in addition to lost pay. This Court may allocate remedies between the two statutes, depending on the remedies available thereunder. *Luu v. Seagate Technologies, Inc.*, 2001WL920013*5 (D.Minn.2001) (The plaintiff-employee successfully brought claims for retaliation under both Title VII and the MHRA and the court held that it "may allocate damages, where applicable, between the two statutes," and awarded punitive damages under Title VII and compensatory damages under the MHRA.) *See, also, Lawrence v. CNF Transportation*, Inc.,340 F.3d 486 (8th Cir.2003)

(the lower court awarded plaintiff damages under the EPA (compensatory) and Title VII (punitive), but the Eighth Circuit reversed the punitive damages award on other grounds).

## VII.   **Ewald Suffered Gender Discrimination.**

Ewald also seeks relief for gender discrimination relating to disparate treatment. The MHRA prohibits employers from discriminating on the terms, conditions, or privileges of employment because of sex.  Ewald must show:  (1) she is a member of a protected class; (2) she was qualified for the position, (3) despite this, she was subject to an adverse employment action from which similarly-situated males were exempt. *Sigurdson*, 386 N.W.2d at 720.  For wage discrimination claims, the plaintiff must show the employer paid different wages to employees of opposite sexes for equal work on jobs requiring equal skills, effort and responsibility. *Kolstad v. Fairway Foods, Inc.*, 457 N.W.2d 728, 734 (Minn. Ct. App.1990).

It is undisputed that Ewald is a member of a protected class because she is a woman, and that she was qualified for her position.  There is ample evidence of discrimination in wages, benefits, and job conditions.  She suffered disparate treatment, from the beginning of her employment compared to her similarly-situated male colleague.   Right away, Gandrud shared confidential information with Davidson (including information about Ewald's pay), but did not include her in key-communications or share confidences.[25]

---

[25] There is also evidence of gender-based animus.  Gandrud made sexist comments ranging from discussing a sexy model being used for advertising to allowing Carleton to attend a male-oriented event because she was carrying a "male" fetus. (Gandrud 296-7.)  Gandrud said invitations "need a woman's touch." (Carleton 96.)

Ewald met all the educational and professional qualifications for her position. Ewald received high praise for her performance in developing and growing relationships between Norway and the U.S. in the areas of research and education. (Ewald/Dec./¶7-10; Mueller/Dec./¶5; Nash/Aff./¶14; Kullman/Dec./¶3.) Davidson did not perform. <u>Id</u>. But Vibe slated Davidson's contract for renewal, not Ewald's.   And Defendant paid Ewald materially less.

Ewald received unequal pay, unequal health benefits, unequal travel expense reimbursement and less support to perform her job duties.   She was called insubordinate while Gandrud made excuses for Davidson. (Mueller/Dec./¶10.)   In addition, Ewald's male peer worked in another private sector position, in violation of his contract (Ex.29), while she was chastised for minute infractions (e.g., requesting reimbursement for attending a conference listed on her job description.) (Ex.4.)

Ewald has properly stated a claim under the MHRA.   This Court held, in *Ewald v. Royal Norwegian Embassy*, 902 F. Supp. 2d 1208 (D. Minn. 2012), held that if what Ewald pled was true, she had demonstrated a claim of adverse employment action.   The Court wrote:

> Defendant contends that Ewald experienced none of the adverse actions that are typically considered actionable—she served the entire term of her employment, experienced no reduction in salary or demotion, nor was she subject to any disciplinary action. Plaintiff, however, contends that she experienced adverse employment actions as a result of her complaints. She alleges that she "opposed Defendant['s] practices of discrimination and retaliation against her by her multiple complaints" regarding her treatment. (Doc.#104-¶ 81.) Ewald contends that Defendant retaliated against her by making significant efforts to renew Mr. Davidson's contract, while making no such efforts with regard to her contract. ( Id.

¶ 84.) She also incorporates into her reprisal and retaliatory harassment counts the numerous factual allegations in the Complaint relating to her offer of employment, the alleged representations about the parallel position ultimately offered to Mr. Davidson, the differences in health insurance benefits, administrative support, travel expenses, and salary, and eventual lack of inclusion in professional events. (Id. ¶¶ 1–78.)

Accepting Plaintiff's allegations as true for purposes of a motion to dismiss, the Court finds that she has stated plausible claims for reprisal, retaliatory harassment and whistleblower claims. While a plaintiff must demonstrate a material, adverse action to state a claim for reprisal and retaliatory harassment, the Eight Circuit has observed that it is "proper to consider the cumulative effect of an employer's alleged retaliatory conduct." *Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1083–84 (8th Cir.2010) (citing *Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 787–88 (8th Cir.2007)).

Ewald has now certainly demonstrated that, in fact, these events occurred. She has certainly raised an issue of material fact precluding summary judgment.

Embassy takes the position that the Stakeholders are somehow unrelated to it. This is untrue. The Stakeholders and Embassy are one and the same and all part of the Norwegian government. Embassy took the position, when refusing to respond to Ewald's inquiries under Norway's Freedom of Information Act and Administration Act that the Stakeholders' Steering Committee was its agent! (Haugen, Lium Dec. Ex.A.) Johne described it as a branch of the government and even Innovation Norway, on its own website, labeled itself as a branch of Norwegian government "closely affiliated with the Norwegian embassies and consulates." (Marshall/Aff./ Ex.LL.)

## VIII.  Defendant Violated the Norway Working Environment Act

Ewald seeks relief under Norway's Working Environment Act (WEA).   In Paragraph 20 of Ewald's Employment Contract (Ex.4) notes "Instructions to the Foreign

54

Service" concerning foreign service employees also apply to Ewald. As stated in a December 20, 2007 letter from the Foreign Ministry, the Instructions provide "[t]he Working Environment Act shall only apply to personnel locally-employed at foreign service stations provided that the provisions are not in conflict with the rules that apply to the place of service." (italics in original) (See Doc.#59, Ex.A.)

As described on page 7 in the guide from the Norwegian Labour Inspection Authority on Norway's WEA:

The Working Environment within Norwegian territory.

The Working Environment Act applies to all undertakings in Norway with one or more employees. The Act applies not only to employees who are Norwegian nationals; it applies to all employees in paid employment.

(Doc.Ex.Q)

Section 1-1(a) of the WEA requires a healthy and meaningful working situation for employees, affording full safety from harmful physical and mental influences. Section 1-1(b) of the WEA includes, as its purpose, ensuring for employees sound conditions of employment and equality of treatment at work. (Id.) Section 1-1(e) of the WEA includes as its purpose, fostering inclusive working conditions for employees. Here, Defendant failed in meeting all of these purposes of the WEA.

Accordingly, WEA Section 4-3 contains an anti-bullying provision, stating that employees shall not be subjected to harassment or other conduct and shall be protected against violence, threats and undesirable strain as a result of contact with other persons. This section gives Ewald the ability to secure redress for her treatment by Defendant.

Defendant does not challenge the underlying facts supporting Ewald's WEA claim. Instead, it challenges her right to bring a claim at all, arguing the WEA does not allow for a private right of action. It offers the testimony of Stein Evju, a previously undisclosed professor of law in Oslo. Mr. Evju, from his review of the law, claims that no private cause of action is allowed. Mr. Evju apparently did not look beyond the two sections of the law Ms. Ewald cited in her Amended Complaint. His opinion contains no research, only his imprimatur as a law professor, and his statement he read two sections of the statute. This argument would have been more appropriate at the time Ewald sought to amend her Complaint, rather than at summary judgment.

Ewald, in response, has turned to lawyers who have actually litigated claims under Norwegian law. Not only are private causes of action allowed under the WEA, Norway's Supreme Court, its highest court, has sanctioned such claims.[26] (Haugen- Lium Dec.) Even Mr. Evju has written that the WEA, like other employment protection legislation, are mandatory and cannot be undone by contractual agreements. *See* Stein Evju, The Relationship between State Law, Collective Agreement, and Individual Contract, Sec. VI.I. (Marshall/Aff./Ex.MM.) Defendant's argument has no merit whatsoever.

The WEA is similar but much broader than retaliation laws in the U.S. as it prohibits bullying, in the form of threats or "undue strain." Ewald has suffered several significant harms, from Gandrud's specific threats against her employment in early January 2010, her being slandered to Stakeholders and others, restrictions on her travel, prohibitions from attending events. This conduct even continues today.

---

[26] The WEA itself, in Chapters 17 and 18 provides that "the Courts of Justice Act and the Dispute Act shall apply in addition to the special provisions in this chapter." *See* WEA Section 17-1(1).

## CONCLUSION

This Court should deny Embassy's motion for summary judgment and should proceed to trial.

Dated: November 5, 2013.                **ENGELMEIER & UMANAH, P.A.**


By:    s/Sheila Engelmeier
    Sheila Engelmeier (#175250)
    Thomas E. Marshall (#155597)
    Susanne J. Fischer (#285353)
    12 South Sixth Street, Suite 1230
    Minneapolis, MN  55402
    Telephone:  (612) 455-7720
    Facsimile:  (612) 455-7740
    E-Mail:  sheilae@e-ulaw.com;
    tomm@e-ulaw.com; suef@e-ulaw.com

    **ATTORNEYS FOR EWALD**