## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Ellen S. Ewald, | Civil No. 11-CV-2116 (SRN/SER) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Royal Norwegian Embassy, | |
| Defendant. | |

Thomas E. Marshall, Sheila A. Engelmeier, and Susanne J. Fischer, Engelmeier & Umanah, P.A., 12 South Sixth Street, Suite 1230, Minneapolis, Minnesota 55402, for Plaintiff.

Daniel G. Wilczek, Joel P. Schroeder, and Sean R. Somermeyer, Faegre Baker Daniels LLP, 90 South Seventh Street, Suite 2200, Minneapolis, Minnesota 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter is before the Court on Defendant Royal Norwegian Embassy's Motion for Summary Judgment [Doc. No. 130]. Defendant submitted a supporting memorandum [Doc. No. 132], three affidavits [Doc. Nos. 133–135], and seven declarations [Doc. Nos. 136–37]. Plaintiff submitted an opposition memorandum [Doc. No. 142], seven declarations [Doc. Nos. 143–49], and an affidavit [Doc. No. 151]. And, Defendants filed a reply brief [Doc. No. 160]. The matter was heard on November 26, 2013. For the reasons stated below, the Court grants in part, and denies in part, Defendant's motion.

## II.      BACKGROUND

### A.      The Parties and Claims

Plaintiff Ellen Ewald ("Plaintiff" or "Ewald") is a U.S. citizen and former employee of Defendant Royal Norwegian Embassy ("Defendant" or the "Embassy").  Ewald brought this lawsuit against the Embassy in July 2011.  In her Amended Complaint [Doc. No. 104], she asserts eight claims against the Embassy:  promissory estoppel, false representation, gender discrimination, reprisal, retaliatory harassment, violation of the Equal Pay Act, violation of the Minnesota Whistleblower Act, and violation of the Norway Working Environment Act.

### B.      The New Model Consulate and the Hiring Process

Norway's Ministry of Foreign Affairs created a New Model Consulate (the "Consulate") in Minneapolis in 2008.  (Marshall Decl., Ex. I (Strommen Dep. 32–34).)  The Consulate was to include two new expert positions—one focused on business and the other on education.  (Id.)  The Embassy in Washington, D.C., headed by Ambassador Wegger Strommen, was the employer for the two positions.  (Id. at 17–21, 41.)  However, six Norwegian institutions (the "Stakeholders") provided 1.5 million kroner per year in funding for the positions for a three-year trial period.  (Id. at 37–38, 57; Index to Stakeholder Decls. ¶¶ 1–2.)  At the end of the trial period, the Stakeholders could end or extend funding. (Index to Stakeholder Decls. ¶¶ 1–2.)  The Stakeholders created an advisory committee made up of one representative from each entity, and the committee was chaired by Liv Morch Finborud.  (Somermeyer Aff., Ex. X (Finborud Dep. 15–19).)

On July 3, 2008, Jostein Mykletun, Consul General in Houston, posted the announcement for the two positions:  Innovation and Business Development Officer (the "Business Position") and Higher Education and Research Officer (the "Education Position").  (Dep. Ex. 2.)  According to the job descriptions, the purpose of the former was to "strengthen commercial relations between the Midwest and Norway within innovation, business development and commerce . . . in team with Innovation Norway," while the purpose of the latter was to "strengthen exchange and networks between the United States and Norway within research and higher education . . . in team with the Science Counselor at the Norwegian Embassy."  (Id.)  Tasks for the Business Position were to include developing contacts between Norwegian and U.S. businesses, exploring business opportunities, preparing market analyses, facilitating technological exchange, networking, planning visits to the United States by Norwegian partners, and facilitating workshops.  (Id.)  Tasks for the Education Position were to include working on Science Week, initiating collaborative agreements, keeping an overview of funding opportunities and exchange programs, networking, planning visits to the Midwest for Norwegian colleges, facilitating workshops, and increasing mobility of students and faculty between Norway and the United States. (Id.)  The Education Position required an advanced university-level degree, whereas the Business Position required only a university-level degree.  (Id.)  Both positions reported to the Honorary Consul General (Vice President Walter Mondale) and the Honorary Consul (Gary Gandrud), who served on a volunteer basis.  (Id.; Sommermeyer Aff., Ex. Y (Gandrud Dep. 26–28).)

These positions were brought to Ewald's attention by an email from Mykletun. (Somermeyer Aff., Ex. W (Ewald Dep. 54).)  Ewald expressed interest in the Education Position, and she met with Mykletun to further discuss the positions.  (Id. at 55–56; Dep. Ex. 2.)  Mykletun explained that the two positions were "parallel" and "equal." (Somermeyer Aff., Ex. W (Ewald Dep. 56).)  Mykletun said there was a 1.5 million kroner budget that would be divided between the two positions.  (Id. at 57.)

Plaintiff applied for the Education Position on July 17, 2008.  (Marshall Aff., Ex. Q.)  Plaintiff has a Master's Degree in political science from MIT, as well as professional experience in higher education and teaching.  (Dep. Ex. 1.)  Ewald was selected for an interview with the Hiring Committee, which consisted of Mondale, Gandrud, and two counselors from the Embassy, Elin Rognlie and Berit Johne.  (Marshall Aff., Ex. I (Strommen Dep. 35).)  During Ewald's interview, Gandrud said the salary range for the two positions was $40,000 to $70,000, that the Hiring Committee would try to get to the top of the range for both, and that the positions were "equal" and "parallel" and would "work together."  (Somermeyer Aff., Ex. W (Ewald Dep. 64, 69, 82).)

Around this same time, Anders Davidson applied for the Business Position.  (Dep. Ex. 15.)  He has an MBA from the Carlson School of Management and was the Planning and Business Development Manager for 3M's International Operations.  (Id.)  Unlike Plaintiff, Davidson did not speak or write Norwegian and had never been to Norway. (Somermeyer Aff., Ex. V (Davidson Dep. 22–23).)

The Hiring Committee determined that Plaintiff and Davidson were the best candidates for the Officer Positions.  (Id., Ex. Y (Gandrud Dep. 61, 78).)  When Gandrud

told Davidson the salary would be $60,000, Davidson responded that he could not work

full time for that amount but that he could work three days per week.  (Id. at 88–90; id.,

Ex. V (Davidson Dep. 55–56).)  He explained that he was earning $108,000 at 3M and

that his family could not make such a big pay cut work.  (Id., Ex. V (Davidson Dep. 55–

58).)  Gandrud passed these concerns along to the Hiring Committee.  (Dep. Ex. 19.)  In

doing so, he referenced the research he had compiled, prior to the interviews, regarding

salaries.  (Id.)  That research consisted of the opinion of the Director of Human

Resources at Faegre & Benson LLP, based on the results of a Salary.com survey, that the

salary for the Education Position should range from $70,000 to $79,000 and that the

salary for the Business Position should range from $93,000 to $118,000.  (Gandrud Aff.

¶ 6 & Ex. A.)

On September 5, 2008, the Hiring Committee recommended Plaintiff and

Davidson for the positions.  (Dep. Ex. 20.)  In its email to the Stakeholders, the Hiring

Committee stated:

> During the interviews it became clear that a salary level as suggested
> between 60-70 000 USD may be within the right range for the higher
> education and research officer.  However, it became equally clear that to be
> able to hire the right person for the innovation and business development
> officer a salary level within reach of 100 000 USD has to be considered.
>
> The Embassy and the Honorary General Consulate recommend that the
> [Stakeholders] give very serious consideration to the importance of hiring
> the right person for the business development position.  It is of great
> importance for the success of the new HCG that a high quality team is
> employed.

(Id.)  The Stakeholders accepted the Hiring Committee's recommendations.  (Index to

Stakeholder Decls. ¶ 7.)

## C.    The Employment Contracts

On September 12, 2008, Gandrud officially offered Plaintiff the Education

Position and Davidson the Business Position.  (Dep. Exs. 3, 94.)  Plaintiff testified that

Gandrud called her to discuss the details and stated that her salary would be $70,000.

(Somermeyer Aff., Ex. W (Ewald Dep. 78–79).)  She also testified that he said that "[f]or

both positions they were able to get the top range."  (Id. at 77.)  Davidson, however, was

offered a salary of $100,000.  (Marshall Aff., Ex. B (Gandrud Dep. 137).)

Ewald entered into an employment contract on November 4, 2008, for a three-year

term set to expire on September 30, 2011.  (Dep. Ex. 4.)  The contract contained her

position description and title, annual salary of $70,000 plus health insurance and pension

benefit, working hours, holidays, and other various terms.  (Id.)  Ewald alleges that she

received a pension of $7,000.  (Pl.'s Opp. to Def.'s Mot. for Summ. J. [Doc. No. 142]

("Pl.'s Opp.") at 10.)[1]  There is no mention in the employment contract that the

Education Position and the Business Position would receive the same salary or benefits.

(Dep. Ex. 4.)  Plaintiff moved from Norway to Minneapolis in October 2008.

(Somermeyer Aff., Ex. W (Ewald Dep. 98).)

Davidson executed a similar employment agreement on October 14, 2008, with

the only difference being a salary of $100,000 and a pension of $10,000.  (Dep. Ex. 29.)

Like Plaintiff's contract, Davidson's contract did not include details regarding health

---

[1]    The employment contract stated that the health insurance and pension benefit
would be provided in an addendum; however, there is no health insurance and pension
addendum attached to the contract.  (Dep. Ex. 4.)

benefits.  (Id.)   However, unlike with Plaintiff, Gandrud requested the date of birth for

Davidson, his wife, and his children.  (Dep. Ex. 28.)

### D.     Plaintiff's Complaints About Health Insurance and Salary

On November 5, 2008, Ewald first emailed the Embassy inquiring how to add her

children and partner to her health plan.  (Somermeyer Aff., Ex. L.)  She stated that she

assumed her family would be registered, just like Davidson's family.  (Id.)  The Embassy

explained that Davidson's spouse was covered because she was supported by Davidson

and that his children were covered because they were under eighteen years of age.  (Id.)

On November 6, 2008, the Embassy informed Ewald that it would provide health

care coverage for Ewald's partner and Ewald's youngest daughter (who was eighteen)

during her first year of college.  (Marshall Aff., Ex. R.)  However, on March 19, 2009,

the Embassy notified Ewald that Mikalsen's health insurance had been cancelled because

he had "independent income."  (Dep. Ex. 36.)  Ewald objected to the differential

treatment because Davidson's spouse was covered.  (Id.)  Over the next several months,

Ewald continued to inquire as to health benefits for her family.  (See Marshall Aff., Exs.

W, X, Z.)  She also discovered that Davidson was receiving a higher salary and asked for

an explanation regarding the difference.  (Id., Ex. Z.)

In regard to the salary differential, Gandrud explained that Ewald and Davidson

had different jobs, but that he would see what he could do.  (Somermeyer Aff., Ex. Y

(Gandrud Dep. 199); id., Ex. W (Ewald Dep. 213).)  In September 2009, Gandrud drafted

a letter to Ambassador Strommen on behalf of himself and Mondale that requested

additional funds for several purposes.  (Dep. Ex. 41.)  The letter stated:

7

> In Ellen Ewald's case, there is too big a discrepancy between the salaries of Ellen and Anders Davidson. We recognized that there is a different job market demand between education and business and this is reflected in the differential. But that differential is too large ($70,000 compared to $110,000).[2] Once again, we understood that this would be addressed in the 2010 budget. Norway is an acknowledged leader in gender equality and since these two people work closely and since both work hard with exemplary results and dedication, we find the differential unjust and embarrassing. . . .

(Id.) Mondale testified that they chose "charged language" in order to get results.

(Somermeyer Aff., Ex. BB (Mondale Dep. 115).) The Ambassador reviewed the letter

and said he considered it to be a "budgetary matter." (Id., Ex. CC (Strommen Dep. 74–

75).)

In response to Ewald's multiple inquiries to the Embassy, the Ambassador wrote a

letter to Ewald on November 18, 2009, in which he explained:

> . . . The salary levels defined in last year's negotiations with you and your colleague, were based on what was, in consultation with the funders in Norway, considered necessary to recruit the right people to two very different jobs. I believe this was explained to you in the course of the negotiations. The salary agreed in your contract gives little room for major changes, like that of others working for the Norwegian Government. Your salary is competitive compared to other locally employed staff at our Embassy.

(Dep. Ex. 192; see Somermeyer Aff., Ex. CC (Strommen Dep. 85).) Ewald responded to

the Ambassador's letter on December 30, 2009:

> . . . I have been told both verbally and in writing that our jobs are closely related, that we have parallel positions and therefore we needed to work closely together. This is also apparent from the text in the job descriptions adverti[s]ed for the positions. Not to mention the fact that we share the same stakeholders. I had understood that the salary range

---

[2]   As discussed above, Davidson's salary was actually $100,000 per year, not $110,000.

for the two positions was between 40,000 USD and 70,000 USD and I was told that we received the absolute maximum possible which obviously led me to believe that was also the case for my coworker. Hence, I did not negotiate for my salary; I had assumed it was determined by typical UD "lonnstrinn" /salary levels within the aforementioned range.

. . . .

As concerns my health insurance, I am asking for an adjustment.  I have consulted a local law firm who specializes in employee and insurance rights. . . . Their conclusion based on the information I gave them (email exchanges, the actual UHC Insurance policy and my account of events) is that I seem to have been unfairly treated vis-à-vis my coworker with regard to coverage for my partner (samboer).

Here are a few points:

a.  On November 6th, 2008, Larsen had given me written confirmation that my "samboer" would be covered. . . . . On March 19, 2009 I received an email from Larsen . . . that my partner's insurance was cancelled. . . . I find this treatment extremely unreasonable and I asked for a copy of the employee rights which I never received.  I could not risk my family be [sic] left without insurance and I felt forced to accept to pay for my partner's coverage.

b.  My coworker's spouse (and children) continues to receive full coverage and I was informed that the difference in treatment was due to certain Norwegian regulations regarding coverage of relatives.  When I eventually received a copy of the applied rules, I discovered that the guidelines were related to family of Norwegians taking up positions abroad and could not be applied to me as a US citizen.  Subsequently the explanation from Mr. Larsen was changed to stating that "it is . . . not your status as a US citizen that is the deciding fact but your partner's citizenship and income in Norway." . . . Please forward the regulation that you are referring to.  My local lawyer informs me that according to the Insurance policy and to US law, insurance companies cannot discriminate based on nationality, gender or class.  And since the job description states that I am employed on local terms, I assume that US laws are relevant which means that my partner's Norwegian citizenship is not a factor.

Thus the same rules should apply to me (a US citizen) that apply to my American coworker.  My coworker's spouse is fully covered despite the fact that she has a job with separate income.  It has been indicated that it is a

question of whether or not the spouse is dependant [sic] or not.  <u>If there is a specific cut off level, please send copy [sic] of the regulations and also explain why such a level should apply in my case since I am employed on local terms.</u>

. . . .

In short:

<u>I am asking for an explanation for the inequalities related to salary, healthcare, travels and pension and for copies of applicable regulations.</u>  Quite specifically I am asking for compensation retroactively for healthcare expenses and coverage of travels on equal terms.

. . . .

(Dep. Ex. 45 (emphases added).)  Ewald also discussed these concerns with Johne.  When Ewald asked for advice, Johne told her not to talk about hiring legal counsel.  (Somermeyer Aff., Ex. W (Ewald Dep. 215).)

On March 11, 2010, the Embassy provided further explanation to Ewald regarding the salary issue:

Salaries for locally employed staff are, according to said regulations, set "according to the local salary levels for similar positions".  Since salary levels vary greatly from country to country, the Ministry has <u>not</u> established a fixed salary level system ("lonnstrinn") for locally employed staff.  Based on information about the local labour market, the Embassy sets a salary level when new employees are recruited.  Contract-negotiations are carried out on an individual basis and will also reflect the salary levels in the labor market segment we wish to recruit from. For one of the positions at the Consulate General in Minneapolis it was essential to recruit someone with a corporate background, and through the negotiations it became clear that such a candidate required a higher salary than initially offered.

(Dep. Ex. 146.)  In addition, the Embassy explained that it was mistaken about the "support" exception in the health insurance policy.  (<u>Id.</u>)  The Embassy apologized for its

mistake and told Ewald that she would be reimbursed for the money that had been

deducted from her salary.  (Id.)

### E.    Other Instances of Alleged Discrimination and Reprisal

Plaintiff describes several allegedly harassing and retaliatory actions that were

taken against her after she complained of discrimination.  For example, on December 3,

2009, Gandrud told Ewald that she would need to seek prior approval for travel expense

reimbursement for an upcoming trip to Norway.  (Ex. 44.)  And, after Gandrud read

Ewald's December 30, 2009, letter to Strommen, Gandrud wrote to Strommen and

criticized Ewald.  (Ex. 47.)  Then, in January 2010, Gandrud invited Ewald to lunch and

discussed her concerns about unequal treatment.  (Somermeyer Aff., Ex. W (Ewald Dep.

206–08); Marshall Aff., Ex. B (Gandrud Dep. 245–46).)  When Gandrud asked whether

Ewald got along with Davidson, she responded that the only issue was "equal pay for

equal work."  (Somermeyer Aff., Ex. W (Ewald Dep. 207).)  Gandrud pounded his fist on

the table and told her that she needed to "nip this in the bud" or that there could be

"consequences" and "[s]omeone will have to go."  (Id. at 209.)  Ewald asked whether

Gandrud's statements were a threat, and he said they were not.  (Id.)

In Spring 2010, there were several communications related to Ewald's

performance and the continuance of her position.  For example, on April 19, 2010, Johan

Vibe suggested that Davidson's position would be renewed but that Ewald's position

would not be renewed.  (Dep. Ex. 148.)  On April 20, Finborud emailed several

individuals and described Ewald as a bad hire.  (Dep. Ex. 136.)[3]  Around that time, the

Stakeholders also contemplated not extending Ewald's contract.  (Marshall Aff., Ex. E

(Finborud Dep. 100–01).)  In addition, Johne indicated to others that Plaintiff had missed

deadlines when she had not.  (See Dep. Exs. 151, 152.)

Ewald also describes several instances of being "ostracized from office issues."

(Pl.'s Opp. at 25.)  She was excluded from communications (Dep. Ex. 62), was not

allowed to participate in planning Science Week 2010 (Somermeyer Aff., Ex. W (Ewald

Dep. 176–77, 182)), and was denied travel expenses for Science Week (Dep. Ex. 180).

When Ewald asked why Davidson received funding for travel, she was told that the

Stakeholders—and not the Embassy—had paid for it.  (Somermeyer Aff., Ex. W (Ewald

Dep. 181–82).)  When Ewald requested reconsideration of her request for travel funding,

Vibe told her that she failed to follow proper procedures and that her request for

reconsideration amounted to "insubordination."  (Id.; Dep. Ex. 65.)  In addition, Gandrud

met with the leadership and students of several universities without Ewald's knowledge.

(Somermeyer Aff., Ex. W (Ewald Dep. 174–75).)  Finally, Ewald was not invited to

events planned for the royal visit in Fall 2011 or to several events with individuals from

the Norwegian community that took place in 2013 (id. at 191; Ewald Decl. ¶¶ 15–17), and

_____

[3]      This exhibit, like several others, is in Norwegian.  No translation was submitted to
the Court.  However, a translator read a portion of the document on the record during the
deposition of Finborud.  (Marshall Aff., Ex. E (Finborud Dep. 96–98).)  Counsel for
Defendant noted an objection.  (Id. at 98–99.)  However, the witness confirmed that she
had referred to Ewald as a "faulty hire."  (Id. at 100.)

Innovation Norway recommended a Tysvar client "not to work with Minneapolis" (Ewald Decl. ¶ 14).

### F.    Feedback From the Stakeholders

In 2009, Plaintiff and Davidson drafted statements that described the actual activities that they were undertaking.  For example, Plaintiff stated that she assisted with Science Week 2009, initiated projects with the University of Oslo, initiated a law student exchange, advised students on international study, and visited Norway to meet with various entities. (See Somermeyer Aff., Ex. EE (Dep. Ex. 5).)  Davidson stated that he attended Science Week, traveled to Norway to meet with individuals about opportunities for collaboration and to network, and planned events to educate local and Norwegian business leaders about business opportunities.  (See Gandrud Aff., Ex. C.)

In March 2009, Plaintiff met with the Stakeholders.  (Somermeyer Aff., Ex. W (Ewald Dep. 121).)  The Stakeholders told Plaintiff that their goals for her position should not be focused on undergraduate student exchange, but rather on building networks between research institutions.  (Id. at 121, 125.)  Thereafter, Ewald redirected her focus to the CeRTA project, which was a pre-study on research collaboration between the United States and Norway regarding Norwegian bio-banks.  (Somermeyer Aff., Ex. W (Ewald Dep. 131, 144–45); id., Ex. EE (Dep. Exs., 8, 9).)  Ewald chose Tysvar to provide business analysis to CeRTA.  (Id., Ex. W (Ewald Dep. 135).)  Tysvar is a private company where Ewald's partner was the CEO.  (Id. at 130.)  When Ewald met with Stakeholders in February 2010, she proposed reducing her position at the Consulate to ten percent so she could work the rest of the time at CeRTA, as was encouraged by Vibe.  (Id. at 140–43; id., Ex. D.)  However,

the Stakeholders wanted Ewald to end her involvement with CeRTA and to focus on other collaborations.  (Somermeyer Aff., Ex. W (Ewald Dep. 151–52); Index to Stakeholder Decls. ¶¶ 13–15.)  Vibe then recommended denying her request.  (Marshall Aff., Ex. JJ.)

On March 22, 2010, Gandrud told Ewald that the Stakeholders wanted her to cease her involvement with CeRTA.  (Somermeyer Aff., Ex. F.)  Johne also reiterated the instruction in April 2010.  (Dep. Ex. 212.)  In response, Ewald stated:

> CeRTA is certainly not "beyond the initiation/facilitation phase" as you state and in my assessment it is therefore necessary for me to continue to participate and facilitate in the CeRTA project.  I consider this to be in full agreement with the job I was hired to do.

(Id.)  Ewald continued her work with CeRTA until June 2010.  (Somermeyer Aff., Ex. G.)

On October 6, 2010, the Stakeholders met and voted unanimously to cease funding for both the Education Position and the Business Position as of the end of the initial three-year term.  (Index to Stakeholder Decls. ¶ 17; Somermeyer Aff., Ex. X (Finborud Dep. 112–13).)  Therefore, Ewald's and Davidson's employment ended on September 30, 2011.  (Dep. Ex. 4; Somermeyer Aff., Ex. V (Davidson Dep. 213–15).)

## III.  DISCUSSION

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to

14

judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322–23;

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986).  The party moving for

summary judgment bears the burden of showing that the material facts in the case are

undisputed.  Celotex Corp., 477 U.S. at 323.  However, "a party opposing a properly

supported motion for summary judgment may not rest upon mere allegation or denials of

his pleading, but must set forth specific facts showing that there is a genuine issue for

trial."  Anderson, 477 U.S. at 256.  "Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary

judgment."  Id. at 248.  Moreover, summary judgment is properly entered "against a party

who fails to make a showing sufficient to establish the existence of an element essential

to that party's case, and on which that party will bear the burden of proof at trial."

Celotex Corp., 477 U.S. at 322.  Defendant seeks summary judgment on each of

Plaintiff's claims.

### A.    Promissory Estoppel (Count I)

In Count I of her Amended Complaint, Plaintiff asserts a claim for promissory

estoppel.  Under Minnesota law, "[p]romissory estoppel is an equitable doctrine that

impl[ies] a contract in law where none exists in fact."  Martens v. Minn. Mining & Mfg.

Co., 616 N.W.2d 732, 746 (Minn. 2000) (citation and internal quotation marks omitted).  In

order to prevail, a party must prove that:  "1) a clear and definite promise was made, 2) the

promisor intended to induce reliance and the promisee in fact relied to his or her detriment,

and 3) the promise must be enforced to prevent injustice."  Id. (citation omitted).  However,

the doctrine only applies if no contract exists, and it cannot be used to alter a contract

through use of evidence that is otherwise barred by the parol evidence rule.  <u>Banbury v. Omnitrition Int'l, Inc.</u>, 533 N.W.2d 876, 881 (Minn. Ct. App. 1995) (citations omitted).  For example, in <u>Banbury v. Omnitrition Int'l, Inc.</u>, the plaintiffs claimed that the defendant's statements and conduct led them to believe that they could only be terminated for cause.  <u>Id.</u> at 880–81.  However, the parties had entered into a distributorship agreement that contained an at-will termination clause.  <u>Id.</u> at 880.  Because there was a contract, the Minnesota Court of Appeals affirmed the district court's dismissal of the plaintiffs' promissory estoppel claim on summary judgment.  <u>Id.</u> at 881.

Defendant argues that Plaintiff's promissory estoppel claim must fail because Plaintiff had a written employment contract with Defendant.  (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. [Doc. No. 132] ("Def.'s Mem.") at 45.)  Plaintiff, on the other hand, argues that summary judgment is inappropriate because Gandrud falsely stated that the salary range for the Education Position and the Business Position would be the same— $40,000 to $70,000—and that he had attained the top range for both.  (Pl.'s Opp. at 31–32.)  Plaintiff also argues that the evidence shows that the 1.5 million kroner was to be divided equally among the two positions.  (<u>Id.</u> at 32.)  She states that she relied on these representations when she accepted the position and moved to Minneapolis from Norway.  (<u>Id.</u> at 32–33.)

Plaintiff's claim fails as a matter of law.  Plaintiff entered into an employment contract with Defendant with a stated salary of $70,000.  That salary is consistent with the number that was stated during her interview, and the contract does not provide that the Education Position and Business Position would receive the same salary.  Plaintiff does not

dispute the enforceability of the contract.  Therefore, like the plaintiffs in <u>Banbury</u>, Plaintiff here cannot invoke the doctrine of promissory estoppel in the face of her undisputed employment contract or use the doctrine to alter the contract's terms.  The cases cited by Plaintiff, which allow a party to proceed with a promissory estoppel claim where there is no valid contract or where the validity of the contract is contested, are inapposite.  <u>See</u> <u>Rognlien v. Carter</u>, 443 N.W.2d 217, 220 (Minn. Ct. App. 1989) (finding that the plaintiff was entitled to present his promissory estoppel claim as "an alternative" to his unilateral contract claim); <u>Jackson v. Navitaire, Inc.</u>, No. Civ. 04-1557 RHK/AJB, 2005 WL 61490, at *3 (D. Minn. Jan. 11, 2005) (denying the defendant's motion to dismiss the plaintiffs' promissory estoppel claim because the court could not determine that the signed agreements were valid and enforceable).  Accordingly, Defendant's motion for summary judgment is granted as to Count I.

### B.      Minn. Stat. § 181.64 (Count II)

In Count II of her Amended Complaint, Plaintiff states a claim for violation of Minnesota Statutes § 181.64.  Under that provision:

> It shall be unlawful for any person . . . or organization of any kind, doing business in [Minnesota], directly or through any agent or attorney, to induce, influence, persuade, or engage any person . . . to change from any place in any . . . country to any place in [Minnesota], to work in any branch of labor through or by means of knowingly false representations, whether spoken, written, or advertised in printed form, concerning the kind or character of such work [or] the compensation therefor . . . .

Minn. Stat. § 181.64.  "[T]he phrase 'kind or character' covers the work to be performed . . . ."  <u>Kanner v. Fairmont Foods of Minn., Inc.</u>, No. C1-99-568, 2000 WL 31790, at *2 (Minn. Ct. App. Jan. 18, 2000).  And, in order for a party to be liable under this

statute, the party must know that the representation is false; it is not enough that the party

made the representation without knowing whether the representation was true or false.

Vaidyanathan v. Seagate US LLC, 691 F.3d 972, 976–78 (8th Cir. 2012).

The representations at issue are the statements that the Education Position and the

Business Position were "parallel," "equal," and "would work together," as well as

Gandrud's statement to Plaintiff that he had obtained the highest end of the salary range for

both positions.  (See Pl.'s Opp. at 34–35.)  Defendant argues that it is entitled to summary

judgment because the representations were either true or too general to be considered

representations of fact.  (See Def.'s Mem. at 46–47; Def.'s Reply Mem. in Supp. of Its Mot.

for Summ. J. [Doc. No. 160] ("Def.'s Reply") at 3–4.)

The Court finds that the facts do not support Plaintiff's claim that Defendant made

knowingly false representations about the "kind or character" of the work to be performed.

Only the first set of alleged misrepresentations (i.e., that the two positions were to be

"parallel," "equal," and "work together") could plausibly support that claim, and as

Defendant points out, Plaintiff relies on the veracity of these statements in support of her

Equal Pay Act and discrimination claims.  Moreover, Plaintiff points to no evidence in the

record to demonstrate the falsity of those statements.  Therefore, there is no genuine issue

for trial regarding whether Plaintiff was induced to move to Minnesota by Defendant's

statements regarding the "kind or character" of the work to be performed.[4]

---

[4]     Because this portion of the claim is dismissed on this basis, the Court declines to
address Defendant's alternative argument that the statements at issue were too general to
be considered representations of fact.

There is, however, a genuine issue of material fact regarding the statements that Gandrud made to Plaintiff regarding her compensation. Plaintiff has testified that Gandrud told her during her interview that the salary range for both the Education Position and the Business Position was $40,000 to $70,000. The evidence shows that, on September 12, 2008, Gandrud officially offered Plaintiff the Education Position and Davidson the Business Position. Plaintiff testified that Gandrud called her the following day to discuss the details and, at that point, he stated that her salary would be $70,000. She also testified that he said that "[f]or both positions they were able to get the top range." However, Davidson was offered a salary of $100,000. Therefore, the Court finds that there is a genuine issue for trial regarding whether Defendant made knowingly false representations concerning Plaintiff's compensation that induced her to move to Minnesota. Defendant's motion for summary judgment on Count II is denied.

### C.    Equal Pay Act (Count VI)

Plaintiff asserts a claim against Defendant under the Equal Pay Act ("EPA") in Count VI of the Amended Complaint. Under the EPA:

> No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

29 U.S.C. § 206(d)(1). Thus, to establish a prima facie claim under the EPA, a female plaintiff must show that she was paid less than a male worker for equal work in jobs that

required equal skill, effort, and responsibility, and which were performed under similar

conditions.  Taylor v. White, 321 F.3d 710, 715 (8th Cir. 2003) (citing Buettner v. Arch

Coal Sales Co., 216 F.3d 707, 719 (8th Cir. 2000)).  If the plaintiff makes this showing, then

the burden shifts to the defendant to prove one of the enumerated affirmative defenses.  Id.

Here, Defendant argues that Plaintiff cannot establish a prima facie case, and that even if

she could, Defendant paid Davidson a higher salary for reasons other than gender.  (Def.'s

Mem. at 23.)

### 1.     Plaintiff's prima face case

Defendant argues that Plaintiff cannot establish a prima facie case under the EPA

because "she and Davidson held different jobs with different duties requiring different

skills."  (Def.'s Mem. at 23.)  According to the Eighth Circuit, "jobs need not be identical to

be considered 'equal' under the EPA; they need only be substantially equal."  Hunt v. Neb.

Pub. Power Dist., 282 F.3d 1021, 1029 (8th Cir. 2002) (citation omitted).  Thus, "neither job

classifications nor titles are dispositive for determining whether jobs are equal."  Id. (citation

omitted).  Rather, "[w]hether two jobs are substantially equal 'requires a practical judgment

on the basis of all the facts and circumstances of a particular case,' including factors such as

level of experience, training, education, ability, effort, and responsibility.'"  Id. at 1030

(quoting Buettner, 216 F.3d at 719).  In fact, "[t]wo jobs could require '[i]nsubstantial or

minor differences in the degree or amount of skill, or effort, or responsibility' and still be

substantially equal."  Id. (quoting 29 C.F.R. 1620.14(a)).

In support of its motion, Defendant likens this case to a handful of cases in which

summary judgment was granted on an EPA claim because the court found that the

plaintiff's comparator position was not substantially equal.  For example, in <u>Horn v.</u>

<u>University of Minnesota</u>, a male assistant coach of a women's hockey team alleged that the

university paid him less than it paid a similarly-situated female assistant coach.  362 F.3d

1042, 1043–44 (8th Cir. 2004).  The female coach's duties included recruiting and public

relations that were bolstered by her communication skills and experience as a college

hockey player.  <u>Id.</u> at 1045–46.  In addition, she performed administrative duties that

"placed a unique degree of responsibility" on her.  <u>Id.</u> at 1046.  The plaintiff's

responsibilities, on the other hand, included identifying recruits, analyzing game tape, and

coordinating with other staff.  <u>Id.</u>  Based on these facts, the Eighth Circuit determined that

the jobs "required different types and degrees of skill and responsibility" and affirmed

summary judgment.  <u>Id.</u>  Similarly, in <u>Buettner v. Arch Coal Sales Co.</u>, a female attorney

claimed that she was paid less than a similarly-situated male attorney.  216 F.3d 707, 713

(8th Cir. 2000).  They had graduated from law school in the same year, but the male

attorney had worked with the company longer than the plaintiff, had greater industry

experience than the plaintiff, had primary responsibility for the company's litigation, and

had supervisory responsibilities that the plaintiff did not have.  <u>Id.</u> at 713, 719.  The Eighth

Circuit found that the individuals did not have "similar responsibilities, seniority, or

background" and affirmed summary judgment.  <u>Id.</u> at 719.

Unlike the parties in those cases, the parties here have submitted conflicting material

evidence regarding whether Plaintiff and Davidson were similarly situated that is sufficient

to create a genuine issue for trial.  According to the job descriptions for the Education

Position and the Business Position, the purpose of the former was to strengthen exchange

and networks within research and higher education in conjunction with the Science

Counselor, while the purpose of the latter was to strengthen commercial relations within

innovation, business development, and commerce in conjunction with Innovation Norway.

Tasks for the Education Position were to include initiation of collaborative agreements,

keeping an overview of funding opportunities and exchange programs, networking,

planning visits for Norwegian colleges, facilitating workshops, and increasing mobility of

students and faculty between Norway and the United States.  Tasks for the Business

Position were to include developing contacts between Norwegian and U.S. businesses,

exploring business opportunities, preparing market analyses, facilitating technological

exchange, networking, planning visits by Norwegian partners, and facilitating workshops.

Thus, while both positions were "Officers" that reported to the Honorary Consul General

and the Honorary Consul, and while there seem to be some similarities between these job

descriptions, the area of expertise differs (research and education versus business), as well

as the required qualifications (an advanced university-level degree versus a university-level

degree).

Likewise, Plaintiff's and Davidson's descriptions of the actual activities that they

completed contain similarities and differences.  For example, Plaintiff assisted with Science

Week 2009, initiated projects with the University of Oslo, created a law student exchange,

advised students on international study, and visited Norway.  On the other hand, Davidson

attended Science Week, traveled to Norway, and planned events to educate local and

Norwegian business leaders about business opportunities.  Moreover, while Plaintiff speaks

Norwegian, Davidson does not and, in fact, had never been to Norway prior to accepting the Business Position.

Finally, while Defendant claims that the positions did not work as a team, Plaintiff points to several communications in which Defendant indicated the opposite.  For example, Plaintiff testified that Mykletun explained that the positions were "parallel" and "equal," and that the Hiring Committee told her that the positions were "parallel," "equal," and would "work together."  Based on this evidence, there are genuine issues of material fact regarding whether Plaintiff's and Davidson's jobs were substantially equal, thus precluding summary judgment on the issue of whether Plaintiff was paid equal pay for equal work when compared to Davidson.

### 2.     Defendant's affirmative defense

Defendant argues that, even if the jobs were equal, Davidson's higher salary was based on a factor other than gender—namely, "the higher market value of the background, skills, and experience required for the Business Position."  (Def.'s Mem. at 26.)  "A differential that is based on education or experience is a factor other than sex recognized by the [EPA]."  Hutchins v. Int'l Bhd. of Teamsters, 177 F.3d 1076, 1081 (8th Cir. 1999) (citation omitted).  Defendant points to the fact that Davidson was earning $108,000 at 3M and that Davidson stated that he could only work part-time at $60,000.  (Def.'s Mem. at 27.) Defendant also points to the market research that Gandrud asked the Director of Human Resources at his law firm to compile prior to the interviews, which indicated that the salary for the Education Position should range from $70,000 to $79,000, and that the salary range

for the Business Position should range from \$93,000 to \$118,000.[5]  (Id.)  Finally, Defendant

argues that the letter from Gandrud and Mondale confirms that the salaries were reflective

of different job markets.  (Id.)

In opposition, Plaintiff argues that the Salary.com survey was "flawed" because the

research positions and the business development positions that were a part of the survey

were within educational institutions and the private sector, respectively, rather than the

government.  (Pl.'s Opp. at 48.)  Plaintiff asserts that "[she] did not do 'research' in an

educational setting any more than Davidson managed any [b]usiness-[d]evelopment," but

rather that "[b]oth were promoters of Norway."  (Id.)  Plaintiff also argues that Davidson's

prior salary cannot be used to justify the disparity, especially because she was never asked

about her prior salary and because Davidson lacked the required language qualifications.

(Id. at 50.)  Finally, Plaintiff argues that Defendant only offered Davidson a higher salary

after he explained that he had a family to support, thereby enforcing stereotypical treatment

of men as the breadwinners for their families.  (Id.)  On the contrary, no consideration was

made for Plaintiff's family situation.  (Id.)

---

[5]     Defendant also relies on an expert report created for purposes of this litigation, in
which its expert opines that the two positions "required substantially different skills,
education, and experience" and that Plaintiff and Davidson "were engaged in different
job duties and had substantially different goals and objectives."  (Sommermeyer Aff. ¶ 18
& Ex. Q at 19–20.)  The expert concludes that individuals in the Education and Business
Positions should have expected to have been paid in line with what those positions were
actually paid.  (Id., Ex. Q at 20.)  Plaintiff claims that this expert report is unreliable and
should not be considered.  (Pl.'s Opp. at 47–48.)  Because there is no formal motion to
strike, the Court will not address the issue.

Based on these facts, as well as the facts regarding Plaintiff's and Davidson's educational and professional backgrounds discussed above, the Court finds that there is a genuine issue for trial regarding whether Defendant paid Davidson a higher salary than it paid Plaintiff for reasons other than gender. Accordingly, Defendant's motion for summary judgment on Count VI is denied.

### D.   Minnesota Human Rights Act (Counts III, IV, and V)

Count III of Plaintiff's Amended Complaint alleges gender discrimination under the Minnesota Human Rights Act ("MHRA").[6] Counts IV and V allege reprisal and retaliatory harassment, respectively, under the MHRA. Under the MHRA, an employer may not "discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of that person's sex. Minn. Stat. § 363A.08, subd. 2. Likewise, the MHRA makes it illegal for an employer to engage in any reprisal against an employee who opposes an unlawful employment practice. Id. § 363A.15. "A reprisal includes, but is not limited to, any form of intimidation, retaliation, or harassment." Id. Because "reprisal" includes "harassment" within its definition, the Court will analyze Plaintiff's claims under Counts IV and V together.

---

[6]     In her opposition to Defendant's motion for summary judgment, Plaintiff argues that she has valid claims for both "pay discrimination" and "gender discrimination" under the MHRA. (Pl.'s Opp. at 51–54.) To the extent that Plaintiff's MHRA claim is based on not receiving "equal pay for equal work" when compared to Davidson, that claim survives for the reasons set forth in Part III.C. See Price v. NSP Co., 664 F.3d 1186, 1191 (8th Cir. 2011) (stating that "unequal pay for equal work" claims under the MHRA are governed by the same standards as EPA claims). However, to the extent that Plaintiff alleges that she was otherwise discriminated against based upon her gender, that claim fails as discussed herein.

Both sex discrimination and reprisal claims brought pursuant to the MHRA are analyzed under the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).[7]  <u>See</u> <u>Hervey v. Cnty. of Koochiching</u>, 527 F.3d 711, 719 (8th Cir. 2008) (sex discrimination); <u>Chivers v. Wal-Mart Stores, Inc.</u>, 641 F.3d 927, 932 (8th Cir. 2011) (reprisal).  Under that framework, a plaintiff must first establish her prima facie case.  For purposes of a sex discrimination claim, a plaintiff must show that she "(1) is a member of a protected class; (2) was qualified to perform her job; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated persons of the opposite sex."  <u>LaCroix v. Sears, Roebuck, and Co.</u>, 240 F.3d 688, 693 (8th Cir. 2001).  To establish a prima facie case of reprisal, the plaintiff must show:  (1) a statutorily protected activity, (2) an adverse employment action, and (3) a causal connection between the two.  <u>Chivers</u>, 641 F.3d at 932.  Once a prima facie case is established, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory or non-retaliatory reason for its action.  <u>Muor v. U.S. Bank Nat'l Ass'n</u>, 716 F.3d 1072, 1076 (8th Cir. 2013).  If such

---

[7]      These claims may be established through direct or circumstantial evidence.  <u>See</u> <u>Tenge v. Phillips Modern Ag Co.</u>, 446 F.3d 903, 907 (8th Cir. 2006) (discrimination); <u>Pye v. Nu Aire, Inc.</u>, 641 F.3d 1011, 1020 (8th Cir. 2011) (retaliation).  In the absence of direct evidence, a plaintiff may rely on the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>.  <u>See</u> <u>Tenge</u>, 446 F.3d at 907; <u>Pye</u>, 641 F.3d at 1020.  Plaintiff does not argue in her opposition memorandum that there is direct evidence of discrimination or retaliation, (<u>see</u> Pl.'s Opp. at 52–54), but Plaintiff's counsel argued during the hearing on this matter that there is direct evidence of retaliation, (<u>see</u> Tr. of Hr'g on Def.'s Mot. for Summ. J., dated Nov. 26, 2013, at 33–37 [Doc. No. 164]).  However, even "[i]n a 'direct evidence' case, [the plaintiff] must still establish that she has suffered a materially adverse employment action."  <u>See</u> <u>Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.</u>, 728 F.3d 800, 804 n.4 (8th Cir. 2013) (citation omitted) (analyzing a retaliation claim under Title VII).  Therefore, the Court need not address Plaintiff's "direct evidence" theory because her retaliation claims fail for lack of an adverse employment action, as discussed herein.

reason is offered, then the plaintiff must show that the employer's articulated reason was pretext.  Id.

In regard to Plaintiff's sex discrimination claim, Defendant argues that Plaintiff cannot establish a prima facie case because she did not suffer an adverse employment action and because she was not treated differently than similarly-situated males.  (See Def.'s Mem. at 30–35.)  As for Plaintiff's reprisal claims, Defendant argues that Plaintiff cannot establish a prima facie case because she cannot demonstrate the existence of any adverse employment action and that, even if she could, Defendant had a legitimate reason for the actions Plaintiff challenges.  (See id. at 35–42.)  Because the Court agrees that Plaintiff cannot demonstrate any adverse employment action sufficient to satisfy the statute, it need not address the other issues.

> For purposes of the MHRA:
>
> An adverse employment action must include some tangible change in duties or working conditions.  Burchett v. Target Corp., 340 F.3d 510, 518 (8th Cir. 2003).  There must be some material employment disadvantage; minor changes in working conditions are insufficient.  Brannum v. Mo. Dep't of Corr., 518 F.3d 542, 549 (8th Cir. 2008) . . . . "Not everything that makes an employee unhappy is an actionable adverse employment action."  LaCroix v. Sears, Roebuck, & Co., 240 F.3d 688, 691 (8th Cir. 2001).

Bahr v. Capella Univ., 788 N.W.2d 76, 83 (Minn. 2010).[8]  In regard to a MHRA retaliation claim, in particular, "[a]n employee suffers a materially adverse employment action . . .

---

[8]      The Minnesota Supreme Court has stated that, "'[i]n construing the MHRA, [it] appl[ies] law developed in federal cases arising under Title VII of the 1964 Civil Rights Act.'"  Bahr, 788 N.W.2d at 83 (quoting Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101 (Minn. 1999)); see LaCroix, 240 F.3d at 691 (applying the same standards to MHRA and Title VII retaliation claims).

when the employer engages in conduct that would dissuade a reasonable employee from

making a discrimination claim." Quinn v. St. Louis Cnty., 653 F.3d 745, 751 (8th Cir.

2011) (citing Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 787–89 (8th Cir. 2007),

abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031, 1042–43,

1058 (8th Cir. 2011) (en banc)).

Examples of "a material employment disadvantage" include "a change in salary,

benefits, or responsibilities," LaCroix, 240 F.3d at 691, as well as "[t]ermination . . . and

changes that affect an employee's future career prospects," Higgins v. Gonzales, 481 F.3d

578, 584 (8th Cir. 2007) (citation and internal quotation marks omitted), abrogated on other

grounds by Torgerson, 643 F.3d at 1042–43, 1058. On the other hand, "[m]inor changes in

duties or working conditions, even unpalatable or unwelcome ones, which cause no

materially significant disadvantage do not satisfy the prong." Id. (citation omitted).

Therefore, "personality conflicts, bad manners, or petty slights and snubs" are insufficient to

support a claim. Id. at 591. Even a "negative [performance] review is actionable only

where the employer subsequently uses the evaluation as a basis to detrimentally alter the

terms or conditions of the recipient's employment." LaCroix, 240 F.3d at 692 (citation

omitted).

While it is true, as Plaintiff notes, that actions may be examined cumulatively to

determine whether they materially affected her employment, the conduct must still be

"extreme, systemic retaliatory conduct resulting in serious employment consequences."

Devin, 491 F.3d at 788. For example, the Eighth Circuit held, as a matter of law, that

"reduction of duties, disciplinary action and negative personnel reports, as well as required

remedial training, constituted adverse employment action" when considered cumulatively. Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997).

Plaintiff claims that the following conduct constituted adverse employment actions by Defendant:  (1) Stakeholders discussed terminating Plaintiff's contract at the end of her three-year term; (2) Finborud told people that Plaintiff was a bad hire; (3) Plaintiff was denied reimbursement for travel expenses to Science Week in 2010; (4) Plaintiff was reprimanded for being "insubordinate" for requesting reimbursement; (5) Plaintiff was not invited to Science Week events in 2010; (6) Gandrud embarrassed Plaintiff by meeting with university representatives without her knowledge; (7) Gandrud only responded to Plaintiff's complaints after long periods of time had passed; (8) Defendant cancelled Plaintiff's partner's health insurance; (9) Plaintiff was left out of communications about work events and operations; (10) Plaintiff received "cold receptions" and heard references to the "Ellen problem"[9]; (11) Gandrud told Plaintiff to "nip it in the bud" or there could be "consequences" and that "someone would have to go" if she continued to raise issues; (12) Johne told Plaintiff to not talk about lawyers; (13) Defendant made efforts to renew Davidson's contract but did not make efforts to renew Plaintiff's contract; (14) Defendant paid Plaintiff less in salary and benefits than it paid Davidson; (15) Plaintiff was excluded from a dinner and a reception after her employment ended; and (16) Innovation Norway recommended a Tysvar client to not work with Minneapolis.  (Pl.'s Opp. at 37–40, 52–54.)

---

[9]     Plaintiff points to no evidence in the record to support this claim, so the Court will disregard it.

The closest Plaintiff has come to alleging a material employment disadvantage in the form of termination or a change in salary, benefits, or job responsibilities, are her arguments that stakeholders discussed terminating her contract at the end of its term, Defendant made no effort to renew Plaintiff's contract, Defendant paid Plaintiff less in salary and benefits than it paid to Davidson, and Defendant cancelled her partner's health insurance. As for the non-renewal of Plaintiff's contract, the contract specifically stated that it was for a three-year term. There was no provision for renewal. Therefore, non-renewal of that contract does not constitute a material employment disadvantage. Although Plaintiff has demonstrated that she was paid less than Davidson, she has not demonstrated that there was a change in her salary or benefits after she started her employment that could constitute an adverse action. And, although Defendant at first denied coverage of Plaintiff's partner's health benefits, it later reimbursed Plaintiff for those expenses. In light of this corrective action, Plaintiff has not suffered an adverse employment action. See Fair v. Norris, 480 F.3d 865, 870 (8th Cir. 2007) (finding that the plaintiff failed to present a prima facie case of discrimination where the employer discovered that it had erroneously rejected the plaintiff for a promotion and then offered her the promotion with retroactive pay and benefits). Therefore, there has been no obviously material adverse employment disadvantage.

Likewise, the remainder of the adverse actions described by Plaintiff are not sufficiently material to support a discrimination or reprisal claim. These actions can be grouped into five categories: (1) denial of reimbursement for travel expenses, (2) reprimands, (3) perceived threats, (4) exclusion from work-related events and

communications, and (5) comments alluding to Plaintiff's performance.  First, Plaintiff has presented no evidence that she was entitled to unfettered travel.  The fact that she was denied reimbursement, therefore, was not a material adverse action.  Second, a reprimand is only actionable if it leads to a material change in employment status, and Plaintiff has not presented any facts to that effect.  Third, neither Gandrud's nor Johne's statements to Plaintiff would dissuade a reasonable person from making a complaint.  Gandrud explicitly stated that he was not threatening Plaintiff, and Johne's statements were solicited by Plaintiff.  Moreover, Plaintiff was not dissuaded from complaining.  Fourth, while Plaintiff states that she was "embarrassed" by her exclusion from certain events (Ewald Decl. ¶¶ 15, 17), she has not put forth facts to show that her employment status or future career prospects were affected.  Similarly, Plaintiff has put forth no facts to show that her employment status or future career prospects were affected by the comments made about her performance or her exclusion from communications.  Even when viewed cumulatively, these actions do not amount to "extreme, systemic retaliatory conduct resulting in serious employment consequences."  Rather, they are more akin to "personality conflicts, bad manners, [and] petty slights and snubs" insufficient to support a claim under the MHRA.

Thus, the Court finds that the conduct upon which Plaintiff relies to demonstrate an adverse employment action is insufficient to support her prima facie case of gender discrimination and reprisal under the MHRA.  Therefore, Defendant's motion for summary judgment on Counts III, IV, and V is granted, except as detailed in footnote 6.

### E.    Minnesota Whistleblower Act (Count VII)

In Count VII of the Amended Complaint, Plaintiff brings a claim against Defendant under the Minnesota Whistleblower Act ("MWA"). Under the MWA:

> An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> (1)    the employee, or a person acting on behalf of an employee, in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official . . . .

Minn. Stat. § 181.932, subd. 1(1). Plaintiff's claim is based on her alleged "report[] in her December 30, 2009 letter to Ambassador Strommen that she believed that denying her health insurance for her family violated 'the insurance policy and US law.'" (Am. Compl. ¶ 104; see Pl.'s Opp. at 41.) Plaintiff argues that she "complained that her family legally should be covered under Defendant's health insurance," that Defendant provided several different reasons for its denial of coverage, and that she sought legal advice and "reported refusing coverage violated 'insurance policy and US law.'" (Pl.'s Opp. at 41.) Defendant argues that summary judgment is appropriate on this claim because the alleged whistleblowing was only a statement about a "personal concern" and not made "for the 'purpose of exposing an illegality'" or to protect the public.[10] (Def.'s Mem. at 43.)

---

[10]    Defendant also argues that Plaintiff's MWA claim is barred by the MHRA's exclusivity provision because the relief she seeks under both statutes is based on the same allegations of gender discrimination in terms of healthcare coverage. (Def.'s Mem. at 42–43.) The MHRA contains an exclusivity provision which states that "as to acts declared unfair by sections 363A.08 to 363A.19, and 363A.28, subdivision 10, the procedure herein provided shall, while pending, be exclusive." Minn. Stat. § 363A.04. In Williams v. St.

Plaintiff's only response to these arguments appears to be that recent amendments to the MWA indicate that a report need not be made for the benefit of the public.  (Pl.'s Opp. at 41–42.)

The Court agrees with Defendant.  "Whether an employee made a report in 'good faith' is a question of fact, but the court may determine as a matter of law that certain conduct does not constitute a report for purposes of the Whistleblower Act."  Cokley v. City of Otsego, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001) (citation omitted).  To determine whether a report is made in good faith, the court "must look not only at the content of the report, but also at the reporter's purpose in making the report.  The central question is whether the reports were made for the purpose of blowing the whistle, i.e., to expose an illegality."  Obst v. Microtron, Inc., 614 N.W.2d 196, 202 (Minn. 2000) (citation omitted).  "Reporting conduct for purposes other than exposing an illegality . . . is not sufficient to satisfy the good faith requirement under Minnesota law."  Chial v. Sprint/United Mgmt. Co., 569 F.3d 850, 855 (8th Cir. 2009) (citing Obst, 614 N.W.2d at 202).  Thus, the court "look[s] at the reporter's purpose at the time the report is made . . . to ensure that the report that is claimed to constitute whistle-blowing was in fact a report made for the purpose of

---

Paul Ramsey Medical Center, Inc., the Minnesota Supreme Court found that a plaintiff could not simultaneously maintain an action for reprisal under the MHRA and an action for retaliation under the MWA when both claims were based on the plaintiff's allegations that her employment was terminated because she filed a sexual harassment claim against her co-worker.  551 N.W.2d 483, 484–86 (Minn. 1996).  Thus, Plaintiff's MWA claim is barred to the extent that she is claiming retaliation under the MWA based on her complaint of gender discrimination in terms of her healthcare benefits, as she alleged in her MHRA claim.  To the extent that Plaintiff's claim is broader than that, the claim still fails, as detailed herein.

exposing an illegality and not a vehicle, identified after the fact, to support a belated whistle-blowing claim." Obst, 614 N.W.2d at 202.

The evidence shows that Plaintiff's purpose in writing the letter to Ambassador Strommen was to obtain an explanation of her healthcare benefits and retroactive compensation, not to expose an illegality. First, the full statement upon which Plaintiff bases her claim refers not to any alleged illegal conduct by Defendant, but rather to her lawyer's opinion that "insurance companies cannot discriminate on the basis of nationality, gender or class." Second, rather than assert that Defendant's conduct violated any laws, Plaintiff made multiple requests for copies of "regulations" and explanations as to how those regulations applied to her and her family. Plaintiff's after-the-fact attempt to characterize this letter as a report that refusal of coverage violated the law is not sufficient to create a genuine issue for trial. Therefore, Plaintiff's MWA claim fails as a matter of law, and Defendant's motion for summary judgment is granted as to Count VII.

### F.    Norway's Working Environment Act (Count VIII)

Finally, in Count VIII of Plaintiff's Amended Complaint, Plaintiff seeks damages for Defendant's alleged violation of Norway's Working Environment Act ("WEA"). Plaintiff cites to Section 1-1 of the WEA, which describes the purpose of the Act as ensuring "a healthy and meaningful working situation, that affords full safety from harmful physical and mental influences," "ensur[ing] sound conditions of employment and equality of treatment at work," and "foster[ing] inclusive working conditions." Working Environment Act (Act.

No. 62/2005) § 1-1(a), (b), (e), as amended (Act No. 80/2012) (Nor.).[11]   She also references

two provisions of Section 4-3:

> . . .
>
> (3)   Employees shall not be subjected to harassment or other improper
> conduct.
>
> (4)   Employees shall, as far as possible, be protected against violence,
> threats and undesirable strain as a result of contact with other persons.
>
> . . . .

Id. § 4-3(3), (4).

In support of its motion for summary judgment, Defendant argues that Plaintiff's

claim fails because there is no private cause of action available under Section 4-3.  (Def.'s

Mem. at 47–48.)  Defendant points to the Declaration of Professor Stein Evju, a Professor of

Labor Law at the University of Oslo, who states that Section 4-3 is a public law provision as

evidenced by the provision of the WEA vesting Norway's Labor Inspection Authority with

enforcement of that provision, the availability of criminal penalties upon a finding of a

violation of that provision, and legislative history indicating that an individual may only

base a lawsuit on the WEA's provision that protects against unfair dismissals.  (Evju Decl.

¶¶ 1, 10–16 [Doc. No. 136].)  Thus, Professor Evju concludes, "an individual cannot assert

in the Norwegian courts a viable stand-alone claim under the Act for a violation of Section

4-3."  (Id. ¶ 17.)

---

[11]   Defendant submitted the Declaration of Professor Stein Evju in support of its
motion for summary judgment.  Prof. Evju attached a copy of the English Translation of
Norway's Working Environment Act to his declaration.  (Evju Decl., Ex. A.)  Plaintiff
does not contest the validity of the translation.  Therefore, the Court will cite to this

In opposition, Plaintiff relies on the Declaration of Ola Haugen and Simen Smeby Lium, attorneys with the law firm of Wikborg, Rein & Co. in Oslo who practice in the areas of dispute resolution and employment law, respectively.  (Haugen & Lium Decl. ¶¶ 1–3 [Doc. No. 146].)  Mr. Haugen and Mr. Lium state that a claim for damages based on an employer's breach of Section 4-3 of the WEA "is viable and has been sanctioned by the Norwegian Supreme Court."  (Id. ¶ 9.)  Specifically, they state that:

> Under Norwegian law, an individual must—in order to be entitled to damages—prove the existence of three main criteria:  (i) basis for liability, (ii) a financial loss, and (iii) an adequate causal connection between (i) and (ii).  If an employer . . . has acted negligently and thus caused damage to an employee, these criteria may be fulfilled and the employee may claim damages.  In the assessment of whether the employer has acted negligently, possible breaches of its obligations under the Act will be of high importance.
>
> There are several examples from Norwegian case law where individuals have claimed damages due to e.g. harassment and bullying from their employers, and where the legal grounds for the damage claim has referred to breach of provisions regarding the working environment etc., such as Section 4-3 of the Act.

(Id. ¶¶ 10–11 (emphases added).)  Mr. Haugen and Mr. Lium point to two Norwegian Supreme Court cases, Rt-1997-1506 and Rt-2004-1844,[12] in support of their position.

It appears to the Court from its review of these expert and foreign materials that Section 4-3 of the WEA does not provide a stand-alone cause of action.  First, Chapter 4 of the WEA, unlike, e.g., Chapter 15 governing unfair dismissals, does not expressly provide

---

version of the law for purposes of this motion.

[12]    Plaintiff, through the Haugen and Lium Declaration, only provided translated excerpts from these cases.  (See Haugen & Lium Decl. ¶¶ 12–13.)  Defendant, however, provided translated versions of the entirety of each case.  (See Def.'s Reply, Exs. A–B.) Again, Plaintiff does not object to these translations.  Therefore, the Court will cite to them for purposes of this motion.

that an individual may seek compensation for an employer's violation.  Rather, Chapter 4 is

only expressly governed by Chapter 18 of the WEA, which gives monitoring and

enforcement authority to the Labor Inspection Authority.  Second, as was acknowledged by

Plaintiff's experts, in neither Rt-1997-1506 nor Rt-2004-1844 was Section 4-3 a stand-alone

cause of action.  Rather, in Rt-1997-1506, the court looked to the WEA's provisions only as

guidelines in analyzing the employee's contract law claim.  Similarly, the court in Rt-2004-

1844 described the WEA's provisions—particularly, the "harassment or other improper

conduct" provision—as norms that could be helpful in determining an employer's liability

under Norway's Damages Act.  Therefore, this Court concludes that, as a matter of law,

Plaintiff does not have a viable stand-alone claim for damages based on Defendant's alleged

breach of Section 4-3 of the WEA, and Defendant's motion for summary judgment on

Count VIII is granted.

### THEREFORE, IT IS HEREBY ORDERED THAT:

1. Defendant Royal Norwegian Embassy's Motion for Summary Judgment
   [Doc. No. 130] is **GRANTED IN PART** and **DENIED IN PART**,
   consistent with this Order.


Dated:  March 6, 2014                    s/Susan Richard Nelson
                                         SUSAN RICHARD NELSON
                                         United States District Judge