# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Ellen S. Ewald,                    Civil No. 11-CV-2116 (SRN/SER)

         **Plaintiff,**                  **FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND
ORDER FOR JUDGMENT**

v.

**Royal Norwegian Embassy,**

         **Defendant**.

_____

Thomas E. Marshall, Sheila A. Engelmeier, and Susanne J. Fischer, Engelmeier & Umanah, P.A., 12 South Sixth Street, Suite 1230, Minneapolis, Minnesota 55402, for Plaintiff

Daniel G. Wilczek, Joel P. Schroeder, and Sean Somermeyer, Faegre Baker Daniels LLP, 90 South Seventh Street, Suite 2200, Minneapolis, Minnesota 55402, for Defendant
_____

SUSAN RICHARD NELSON, United States District Court Judge

This case arises out of a dispute concerning Plaintiff Ellen S. Ewald's employment with Defendant Royal Norwegian Embassy (the "Embassy"). Plaintiff alleges pay discrimination, claiming that the Embassy violated the Equal Pay Act (the "EPA"), 29 U.S.C. § 206(d)(1), and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.08, Subd. 2. (Am. Compl. Counts III and VI [Doc. No. 104].) She also alleges that the Embassy violated Minn. Stat. § 181.64 by fraudulently inducing her to enter

employment.  (Am. Compl. Count II [Doc. No. 104].)

As an initial matter, the Court notes that the EPA is a strict liability statute, under which an employer's discriminatory intent, or lack of such intent, is irrelevant.  Bauer v. Curators of the Univ. of Mo., 680 F.3d 1043, 1045 (8th Cir. 2012).  The relevant inquiry under the law is whether the jobs in question are substantially equal    that is, whether they require equal skill, effort, and responsibility.  29 U.S.C. § 207(d)(1); Hunt v. Neb. Pub. Power Dist., 282 F.3d 1021, 1029 (8th Cir. 2002).

This matter was tried before the undersigned Judge of the District Court on April 21-24, 2014; April 28-May 2, 2014; May 13, 2014; and May 16, 2014.  Subsequently, on July 31, 2014, the parties submitted Proposed Findings of Fact and Conclusions of Law [Doc. Nos. 327 & 328].  Based on the evidence presented at trial and all of the files, records, and proceedings in this matter, the Court makes the following Findings of Fact and Conclusions of Law, and enters the following Order for Judgment.

## FINDINGS OF FACT

1.    Plaintiff Ellen S. Ewald is a female United States citizen who resided in Norway for more than twenty years.  (Ewald 57-83, 141.)[1]  She relocated to the Twin

---

[1]  References to trial testimony are indicated by the name of the witness whose testimony supports the finding and the transcript page.  Other citations refer to trial exhibits ("P" refers to Plaintiff's Exhibits; "D" to Defendant's Exhibits; and "J" to Joint Exhibits) or deposition testimony admitted at trial or submitted in lieu of live testimony. To the extent that certain exhibits contain translations of Norwegian documents, the parties neither objected to the accuracy of the translations at trial, nor in their Proposed Findings of Fact and Conclusions of Law.

Cities when she accepted a job working for the Embassy, and continued to live in Minneapolis, Minnesota, through the time of trial.  (Id.)

2.      At all times relevant to this matter, the Embassy had a presence in the State of Minnesota at the Honorary Norwegian Consulate, 901 Marquette Avenue South, Suite 2750, Minneapolis, MN 55402.  The Embassy has consented to the jurisdiction of this Court pursuant to Plaintiff's Employment Agreement (the "Agreement") (J-12-0001) and Defendant's representations to this Court.  (Tr. of 11/26/12 Hearing at 16-18 [Doc. No. 330].)  According to the Agreement, Plaintiff's employment relationship is "governed by the laws [where] the Employee is employed."  (J-12-0001.)

### Background and Framework for the "New Model Consulate"

3.     In 2007, Norway announced that it was closing its Career Consulate in Minneapolis, Minnesota, largely for budgetary reasons.  (Strømmen 829; Vibe Dep. 37.) Norway's career consulates are staffed with diplomatic personnel from the country's diplomatic corps.  (Strømmen 827.)  In contrast, Norway's honorary consulates in the United States are led by American citizens.  (Id.)  Prior to announcing the closure of its Career Consulate, Norway had maintained an official diplomatic presence in Minnesota for over a century.  (Mueller 1119; see also Gandrud 496; Strømmen 829-30.)

4.      Announcement of the closing was met with substantial disappointment and opposition   in the Midwest and Norway.  (Mondale 604-05; Strømmen 830.)  Those opposed to the closing believed that closing the Career Consulate would diminish the

longstanding ties between Norway and the Midwest.  (Strømmen 829-31.)

5.     Several people within the Norwegian Ministry of Foreign Affairs ("MFA")

began crafting an alternative solution that would allow for Norway to maintain a strong,

sustainable foothold in the Midwest.  (Mykletun 1575-83; Hansen 1079.)  Dr. Jostein

Mykletun, then serving in the MFA as Deputy Director General in the areas of trade,

innovation, business promotion, and research, was particularly involved in this process.

(Mykletun 1563-64.)

6.     Mykletun, along with persons in the Norwegian Ministry of Education and

Research, had been previously involved in developing a 2005 document entitled "Strategy

for Norway's Scientific and Technological Cooperation with North America" (the

"Strategy").  (Mykletun 1581; P161.)

7.     The purpose of the Strategy was to strengthen Norway's scientific and

technological cooperation with the United States and Canada.  (P161-0005.)  In so doing,

the Norwegian government hoped to raise Norway's aggregate spending on research and

development ("R&D") and to improve the quality of Norwegian research.  (Id.)  The

authors of the Strategy identified three primary objectives:

> 1.     The Strategy will contribute to the long-term escalation of
> R&D collaboration with the United States and Canada.
>
> A. More Norwegian researchers and research recruits will
> spend time in the U.S. or Canada, and more researchers and
> research recruits from these countries will have comparable
> stays in Norway.

B.  Norway's trans-Atlantic collaborations on R&D projects will expand, bilaterally or through projects involving parties from several countries.

C.  Norwegian research and Norwegian business and industry will receive more and faster access to research results, knowledge, and expertise from the U.S. and Canada.

2.     The Strategy will help enhance the quality of Norwegian research.

A.  More collaboration with North America will stimulate the revitalization of Norwegian research, improving the quality and efficiency of researcher training.

B.  Priority will be given to fields of research and groups that maintain high quality standards.

3.     More R&D collaboration with the United States and Canada will contribute to more knowledge-based economic development in Norway.

A.  More partnerships will develop for the purpose of innovation and R&D-based economic development.

B.  More people from Norwegian research, industry, the authorities, and others will become familiarized with relevant groups for research and economic development in North America, with a view to augmenting entrepreneurship in Norway.

(Id. at P161-0006.)

8.     Because of Mykletun's previous involvement in developing the Strategy, he was invited to participate in the effort to chart an alternative course for Norway's Consulate in Minnesota.  (Mykletun 1576.)  Mykletun, who had attended Macalester College in St. Paul many years earlier, had close connections with Minnesota as well as

5

with his employer, the MFA.  (Mueller 1124.)  Jeffrey Mueller, then the President of the

Norwegian-American Chamber of Commerce ("NACC") in Minneapolis, credited

Mykletun with shepherding the Norwegian-American community in the Midwest through

the process of understanding and supporting an alternative Consulate.  (Mueller 1126-27.)

9.     Mykletun met with members of the Norwegian-American community who

were opposed to the closing of the Career Consulate and discussed an alternative

approach to the Consulate that would maintain Norway's significant presence in the

Midwest.  (Mueller 1127.)  In terms of funding, Mykletun suggested that collaborative

funding among different Norwegian government ministries would demonstrate

widespread "buy-in," and would show that the Norwegian government remained

committed to the Midwest, even though it had decided to close the Career Consulate.

(Mueller 1127-28.)

10.     As a result of this effort, a "new model" for an honorary consulate was

developed for Minneapolis (the "Honorary Consulate" or the "New Model

Consulate").  (Mondale 606-07; Strømmen 831-35; Gandrud 969-70.)  The New Model

Consulate was designed to build upon and strengthen the relationship between the

Midwest and Norway through focused efforts to increase collaboration in two key

strategic areas: (1) business and innovation; and (2) education and research.  (Gandrud

503, 1006; Mondale 605-06; Mykletun 1576-79, 1581-83.)  The New Model Consulate

was an outgrowth of the Strategy, as well as an outgrowth of a bilateral agreement on

research and technology between Norway and the United States.  (Ewald at 86, 90; P-161; see also Mykletun 1617-18.)

11.    Two expert positions in the New Model Consulate were developed to drive collaboration in these two strategic areas: (1) an Innovation and Business Development Officer (the "Innovation and Business Position"); and (2) a Higher Education and Research Officer (the "Higher Education and Research Position").  (Mykletun 1590-91.)

12.    Mykletun discussed his vision of the New Model Consulate with members of the Norwegian-American business community in Minnesota, including Lois Quam and Marius Hansen.  (Hansen 1078, 1102.)  Quam and Hansen were colleagues who were actively involved in the Norwegian-American community.  (Hansen 1076.)  Hansen also had served as a board member of the NACC.  (Hansen 1077.)  In the course of their meetings and conversations about the New Model Consulate, Mykletun indicated that the two expert positions would collaborate in certain areas.  (Hansen 1081.)  Hansen explained that the two positions represented "intersecting circles" of education and business, which both included the commercialization of research.  (Id.)  Based on Hansen's recollection of these conversations with Mykletun, he understood that the two positions were parallel and equal.  (Id.)  Hansen held this belief because the intention behind the two positions was the same    to foster relationships between the Midwest and Norway.  (Hansen 1081, 1101.)  At trial, Mykletun testified that the two positions were

equally important.  (Mykletun 1589.)  The Higher Education and Research Officer was

tasked with fostering relationships between universities in the two regions, while the

Innovation and Business Development Officer was tasked with fostering relationships

between businesses in the two regions.  (Id.)

13.    Norway's then-Minister of Foreign Affairs, Jonas Gahr Støre, announced the

concept of the New Model Consulate in a March 2008 speech at the Humphrey Institute

in Minneapolis.  (Mykletun 1576; Nash 533.)  During Støre's speech, he addressed many

of the concerns of those opposed to the decision to close the Career Consulate.  (Nash

534.)  The Foreign Minister emphasized that the New Model Consulate would provide

potential collaborations between business and education, in Norway and Minnesota.

(Nash 534.)  Based on Støre's remarks and the remarks of other high-level Norwegian

government ministers who visited Minnesota in the spring of 2008, it was understood

among members of the Norwegian-American community that encouraging research-

based innovation would be one of the most important tasks of the New Model Consulate.

(Mueller 1114-15.)

14.    Because of budget constraints, the MFA sought the funds needed to

finance the two expert positions from other institutions in Norway.  (Strømmen 834-35;

Mykletun 1576-77, 1583, 1590-91.)  The MFA solicited various Norwegian institutions

and government agencies with existing or potential interests in the Midwest to make an

investment in funding the positions.  (Mykletun 1583-84.)  The MFA explained that the

positions could support the goals of the respective institutions with little financial risk.

(Id.)

15.    Ultimately, six Norwegian institutions (the "Stakeholders") participated in

the funding of the expert positions at the New Model Consulate, each agreeing to provide

250,000 Norwegian Kroner ("NOK") per year (a total of 1.5 Million NOK per year).

(Berg 1239; Mykletun 1586-87, 1599; Johne Dep. 53-54.)  The Stakeholders were: (1)

the Ministry of Education and Research; (2) the Research Council of Norway; (3) the

Norwegian Association of Higher Education Institutions; (4) the Ministry of Agriculture;

(5) SINTEF, an independent, commercial research and development institute; and (6)

Innovation Norway, an institution that provides consulting, market analysis, and

risk-mitigation services to small- and medium-sized businesses in Norway.  (J-6-0001;

Mykletun 1586-87; Finborud Dep. 18-20; Johne Dep. 53-54; Ewald 88; Berg 1234-37.)

Innovation Norway, which has offices throughout the world, evolved out of the

combined efforts of several Norwegian government ministries to create private-public

partnerships aimed at, among other things, assisting Norwegian-based businesses to

expand abroad.  (Nash 532.)

16.    The Stakeholders also were charged with (1) guiding the two experts by

way of an advisory committee, or "Steering Committee" (Berg 1245, 1304-1305;

P-11-0001); and (2) "inform[ing] [the two expert officers] about their priorities."

(Finborud Dep. 26-27.)  Each Stakeholder appointed a representative to serve on the

Steering Committee.  (Berg 1306-07; P-11-0001; Finborud Dep. 16-20, 26-27.)  Liv

Mørch Finborud, a senior MFA advisor, was appointed Chair of the Steering Committee.

(Berg 1251-52; Finborud Dep. 15-16.)

17.     The New Model Consulate project required Stakeholders to deposit their

financial contributions with the Embassy in Washington, D.C.  (Strømmen 836.)  The

Embassy was tasked with administering the Stakeholders' financial contributions because

the persons hired for the two expert positions would be the Embassy's employees.  (Id.)

Although the interests of a specific Stakeholder could be more closely aligned with one

expert position, the Stakeholders contributed to the project as a whole.  (Berg 1245,

1320-21; J-23-0002.)  This funding covered the salaries, travel expenses, and benefits for

the two expert positions.  (Finborud Dep. 21-22.)  Although the Stakeholders' role with

respect to the expert officers was important, Norway's Ambassador to the United States

at the time, Wegger Strømmen, had ultimate responsibility for employment decisions

regarding the two officers.  (Strømmen 839.)

18.     Because the New Model Consulate presented a novel and untested structure

and concept, the Stakeholders' financial commitment was limited to an initial three-year

trial term, with the possibility of either ending or extending the terms of the expert

positions after three years.  (Strømmen 841; Berg 1245-46; P-11-0001; Finborud Dep.

20-21; Ewald 313, 485.)  Funding beyond the trial term depended upon whether the

Stakeholders believed that the benefits from the work of the expert officers justified

further investment.  (Berg 1366-67.)

19.   In addition to the two expert positions, the New Model Consulate required the appointment of an Honorary Consul General, the selection of whom was critically important. (Strømmen 831.)  Following the announcement of the selection of Vice President Walter Mondale as the Honorary Consul General, opposition surrounding the decision to convert the Career Consulate to an Honorary Consulate subsided.  (Id.)

20.   In addition to Honorary Consul General Mondale, Gary Gandrud was appointed to serve as Honorary Consul for the Consulate beginning in August 2008. (Gandrud 495, 500.)  In his role as Honorary Consul General, Vice President Mondale functioned as the Consulate's public face, while Gandrud handled the operational details. (Mondale 603.)  When Vice President Mondale later resigned as Honorary Consul General, effective January 2010, Gandrud became Honorary Consul General.  (Gandrud 964-65.)  Both Vice President Mondale and Gandrud were volunteers who were not paid for their work at the Honorary Consulate.  (Gandrud 780, 965-66.)

21.   Ambassador Strømmen testified that his role in the New Model Consulate involved: (1) raising money for the New Model Consulate's budget; (2) supporting the Honorary Consul General; and (3) keeping the Stakeholders happy.  (Strømmen 835, 841, 843.)  The Embassy's Chief Deputy at the time, Aud Kolberg, asked Embassy staff Elin Rognlie, then the Minister Counselor for Economic Affairs, and Dr. Berit Johne, Counselor for Science at the Embassy, to assist with launching the New Model

Consulate.  (Rognlie 1398.)

### Job Postings and Hiring Committee

22.     In consultation with the Stakeholders, the MFA developed job descriptions,

which described the goals and expectations for the two expert positions.  (J-2-0002-03;

Gandrud 970; Mykletun 1583-88; Johne Dep. 33-36.)  Mykletun's involvement in

developing the New Model Consulate had also included working on "pitch documents"

and "keywords" for the job postings, as well as funding for the positions.  (Mykletun

1576-77; D-2-0017-30; D-4-0003.)  On July 3, 2008, Mykletun posted the final

announcement for the Minneapolis New Model Consulate's expert positions.

(J-2-0001-04; Mykletun 1638.)  The postings described both the Higher Education and

Research Position and the Innovation and Business Position as full-time, officer-level

positions.  (J-2-0002-4.)   Mykletun did not consider one expert position more important

than the other.  (Mykletun 1588-89.)

23.     Each expert position required similar professional experience and

qualifications, and required either the ability to speak Norwegian, or a willingness to

acquire a basic understanding of the language.  (J-2-0002-03.)  The Higher Education

and Research Position required an advanced university-level degree, and the Innovation

and Business Position required a university-level degree.  (Id.)  Both expert positions had

almost identical responsibilities and duties and shared the important objective of

strengthening relations between the Midwest and Norway within higher education and

research, on the one hand, and innovation and business development, on the other.  (J-1-0001-03; J-1-0016.)  Each job description specifically referenced the "key Norwegian institutions with which the expert would have regular contact": for the Innovation and Business Position, Innovation Norway and SINTEF; for the Higher Education and Research Position, the Norwegian Association of Higher Education Institutions and the Ministry of Higher Education and Research.  (Id. at 0002-03.)  Perhaps most importantly, both positions had precisely the same goal    to focus on opportunities for collaborative research and innovation, in order to develop commercial opportunities to justify the investment of the Stakeholders and ultimately benefit Norway.  (P-161-0005; P-161-0042; Mykletun 1581-83; Nash 548, 552-53; Gandrud 580-81, 756; Mondale 609-10; D-24-0004; D-24-0009.)

24.    Kermit Nash, a corporate attorney in Minneapolis with strong ties to the Norwegian-American business community and a member of the NACC, testified that the role of both positions was to serve the interests of Norwegians coming to the United Sates, and in order to best accomplish that, the two positions were "inextricably linked." (Nash 552.)  During his testimony, Nash further discussed the inextricable link between business and education in Norway, in the context of innovation and collaboration.  (Nash 551.)  Nash was familiar with the Norwegian government's objectives concerning expansion into the United States business market through his attendance at NACC-sponsored events in the Midwest and Norway, and through his professional experience in

assisting Norwegian research-based innovation companies to enter the United States
market.  (Nash 529-31.)  Nash's Norwegian corporate clients include academically well-
credentialed business people who develop various technologies for commercial use.
(Nash 535.)  Nash explained that unlike American entrepreneurs, Norwegian
entrepreneurs are largely drawn from university settings.  (Nash 534.)   The Norwegian
government supports the commercialization efforts of research-based innovation by
funding early-stage companies either with equity, or through research grants.  (Nash 535-
36.)  Nash testified that not surprisingly, research and innovation business facilities in
Norway house state-funded research projects.  (Nash 534.)

25.    With the exception of the specific focus area, Defendant's postings for the
two expert positions outlined almost identical responsibilities, including but not limited
to:

A.    Working with a counterpart at the Embassy in Washington
D.C., other key staff at the Consulate and relevant
Stakeholders in Norway, towards the goals of advancing
Norway's strategies for the respective focus area within the
Upper Midwestern United States.

B.    Developing contacts between Norwegian and United States
partners.

C.    Proactively engaging in targeted networking with relevant
colleagues and partners in the respective focus area.

D.    Facilitating and planning visits to the Midwest by involved
and interested Norwegian partners, as well as facilitating
workshops and seminars of common interest.

(J-2-0002-03.)

26.   The job postings did not include information regarding salary.
(J-1-0001-02, 14-15.)  Rather, the postings stated that the expert positions were limited to
a three-year term, with the possibility of renewal.  (J-2-0002-03; Ewald 383.)  The
postings included the names of contacts for each position.  (J-2-0002-03.)  The
Innovation and Business Position contacts were Rognlie and Gandrud. (J-2-0002.)  The
Higher Education and Research Position contacts were Johne and Gandrud.  (J-2-0003.)

27.   Hiring the right person for each expert position was believed to be critical
to the success of the New Model Consulate.  (Mondale 689, 693; Rognlie 1424.)  The
experts needed to have knowledge and expertise of their respective subject areas, be able
to work full-time, and have enthusiasm for achieving the goals of the Stakeholders.
(Mondale 617-18; Mykletun 1590-91.)  The experts would also need to be able to work
effectively without close supervision.  (Gandrud 1003; Berg 1304.)  Neither the
Honorary Consul General nor the Honorary Consul were physically present at the
Consulate full-time, nor were they experts in the fields of business and research-based
innovation or higher education and research.  (Gandrud 780, 965-66, 1003; Carleton
1052.)

28.   A committee (the "Hiring Committee") was established to review
applications, select finalists who would be interviewed, and make a hiring
recommendation.  (Rognlie 1400-01.)  The members of the Hiring Committee were: (1)

Johne, (2) Rognlie, (3) Vice President Mondale, and (4) Gandrud.  (Mondale 609-10;

Strømmen 837-38; J-17-004.)  Consistent with the job descriptions, Rognlie took the lead

in screening the Innovation and Business Position applicants, and Johne took the lead in

screening the Higher Education and Research Position applicants.  (Rognlie 1399; Johne

Dep. 56.)

     29.    In the process of planning the New Model Consulate, Gandrud contacted

business people in Minnesota who were connected to the Norwegian-American

community, including Marius Hansen and Lois Quam.  (Hansen 1081-82.)  Gandrud

solicited input on the attributes and skills that the Hiring Committee should look for

among the applicants, as well as the type of questions to ask the interviewees.  (Id.)

Hansen did not view the two expert positions as distinctly different.  Rather, he testified

that the Hiring Committee was looking for "the same kind of person [for both positions],

a person who can deal with people at a senior level, who can reach out, make

connections, and find areas of potential collaboration here and in Norway."  (Hansen

1082.)  In the course of these conversations, Gandrud also indicated to Hansen that the

two positions were equal and would pay approximately $70,000 each.  (Hansen 1089.)

Gandrud also told NACC President Mueller that the positions were significant and would

pay $70,000, which piqued Mueller's interest in applying for the Innovation and

Business Position.  (Mueller 1137-38.)

     30.    NACC Member Kermit Nash also testified to his understanding that the two

expert positions were equal    an understanding that stemmed, in part, from his

conversations with Gandrud, and, in part, from his conversations with applicants for the

positions. (Nash 553-54.) Over coffee, Gandrud had described to Nash the similarities

between the general roles of the two expert positions. (Nash 554.) And, applicants had

informed Nash that they had applied for both expert positions because they understood

that the jobs commanded equal pay and work in the Consulate. (Id.) Nash testified that

everyone in the Norwegian-American community familiar with the New Model

Consulate understood that the two positions were equal, and that the experts would

provide the same number of hours of service. (Nash 555.) In fact, NACC President

Mueller testified that the focus of both positions was on building stronger collaborations

between organizations in Norway and the Midwest. (Mueller 1137.)

31.    In connection with advertising any local employment positions at

Norwegian foreign service stations, selecting employees, and setting the salaries, the

MFA provided guidance in a document entitled "Guidance for Model Employment

Contracts for Local Employees" (the "Guidance"). (P-148.) "Local employees" are

employees hired by the Norwegian Embassy within a host country, as distinguished from

Norwegian employees and diplomatic staff who are sent from Norway to work abroad.

(Strømmen 827.) Persons charged with the responsibility of hiring local employees, such

as at the Minneapolis Consulate, were to follow the procedures set forth in the Guidance.

(P-148-00022; Strømmen 860-63.) Accordingly, the Hiring Committee was expected to

17

follow the Guidance. (Strømmen 861.) Moreover, the Guidance explicitly provides that the top leaders in the MFA, including ambassadors, have the responsibility to ensure compliance with the Guidance. (P-148-0043.) Ambassador Strømmen and Rognlie, as leaders in the MFA, agreed that they were obliged to ensure compliance with the Guidance. (Strømmen 887; Rognlie 1490,1492.)

32.     The Guidance provides that when hiring new staff, every foreign service station is to conduct an evaluation that includes a comprehensive consideration of each applicant's education, work experience, and personal attributes in order to find the single applicant who is best qualified for the particular position. (P-148-0023.) The Guidance also requires that the selected individual be well qualified for the announced position, not just generally well qualified. (Id.) Ambassador Strømmen agreed that the Embassy sought to hire the person who was the best fit for each expert position, not someone who had general qualifications for the job. (Strømmen 863.)

33.     The Guidance also provides that foreign service stations, like the Honorary Consulate, are expected to be mindful of the Norwegian anti-discrimination laws during the application and hiring process. (P-148-0024-28; Strømmen 864.)

34.     As to the determination of salary, the Guidance provides as follows:

The salary shall be appropriate to the salary levels of the regional labor market for comparable positions. In order to find comparable market salaries, the station must collect salary data from relevant sources. For example, international companies, recruitment companies, public salary standards, public statistics, industry statistics and job announcements. The station's established salary levels may be misleading for this purpose. In

establishing salary where the individual resides for tax purposes, marital
status and number of dependents shall not be taken into account.

(P-148-0033.)  In addition, the Guidance provides that "local public salary regulations"

are also a factor for determining an employee's salary.  (P-148-0034.)  Ambassador

Strømmen expected the Hiring Committee to follow these salary establishment

guidelines.  (Strømmen 867-68.)

35.  Ambassador Strømmen also testified that he expected that members of the

Hiring Committee were aware of and had considered Minnesota's pay equity law in the

New Model Consulate hiring process.  (Strømmen 878.)  However, no evidence was

presented demonstrating that the Hiring Committee had in fact considered Minnesota's

pay equity law in setting the salaries for the expert positions.

36.  As noted, the job postings did not include information regarding salary.

(J-1-0001-02, 14-15.)  Gandrud testified that prior to the interviews, he had received

inquiries from several persons about the Innovation and Business Position.  (Gandrud

575, 972-73.)  Gandrud further stated that when these persons were told the salary range

for the Innovation and Business Position, they indicated that it was too low.  (Id.)

Gandrud could not identify who had made such inquiries, referring to the callers as

"Tom, Dick, and Harry."  (Gandrud 575-76.)  Rognlie, the other contact for the

Innovation and Business Position, reported receiving no such calls.  (Rognlie 1449-50.)

The Court considers any references to comments regarding the Innovation and Business

Position salary made by unidentified callers to be unreliable hearsay.

19

37.    Before the jobs were posted, the Embassy's Counselor for Administrative and Consular Services, Jan Aage Larsen, asked, in a July 3, 2008 email, whether a proposed salary range of $60,000 to $70,000 would be acceptable for both expert positions.  (P-6-0001-03; Gandrud 523, 971; Mondale 610; Rognlie 1449.)  In a July 7, 2008 response email, Gandrud replied that that salary range would "be attractive" and would garner a "good representative response" for both positions because of the difficult state of the economy.  (P-6-0001; Gandrud 523, 971-72.)

38.    On July 9, 2008, Gandrud asked the Human Resources Manager at his law firm, Patricia Manalo, to briefly research the salary market for both expert positions.  (Gandrud 576-77, 973; Manalo 252.)  Gandrud told Manalo that he wanted an idea of the salary requirements for the two positions.  (Manalo 255.)  Gandrud gave Manalo copies of the job postings for the Higher Education and Research Position and the Innovation and Business Position.  (Manalo at 255-56; Gandrud 582.)  Manalo does not recall whether she reviewed any of the underlying information regarding the positions, including the Strategy or a bilateral agreement on research and technology between Norway and the United States.  (Manalo 258-59.)

39.    Gandrud did not provide Manalo with any information about the candidates or their then-current salaries, but Manalo concedes that if she were conducting this research as the official HR person in charge of hiring the two expert officers, she would have necessarily considered the candidates' (1) prior experience; (2) prior education; (3)

20

and prior salaries and/or the salary requirements, which she did not do. (Manalo 270-271, 274.)

40.     Manalo used a website called salary.com to conduct her research. (J-3-0004-15; Manalo 276-77.)  This website provides information regarding salaries for a large number of professions.  (See Manalo 276-77; J-3.)  Because Manalo did not find any listed positions that matched the job descriptions that Gandrud had provided, Manalo looked for positions that appeared most similar.  (Manalo 268, 276-77.)  Manalo had previously used this method when looking for salary information for positions that did not squarely match a position for which salary data was available.  (Manalo 257, 276.)  Manalo testified that she is aware that the pay levels for expert positions within the Minnesota Department of Commerce and the Minnesota Department of Education are publicly available.   (Manalo 257, 259, 262, 279.)  However, Manalo did not look for this information when she conducted the research in question.  (Id.)  She also did not review the salaries of other consulates' experts, or the salaries of other positions with foreign governments.  (Id.)  In total, Manalo spent approximately one hour on the salary search. (Manalo 256.)

41.     Manalo provided Gandrud the results of her nominal research on July 10, 2008.  (J-3-0001; Manalo 259.)  Manalo gave Gandrud salary range information from a general query on the salary.com website for business and education positions entitled "Business Development Manager Jobs," "Business Development Director Jobs by U.S.

Region," "Institutional Research Director Jobs by U.S. Region" and a "Researcher III-Academic" job. (J-3-0001-15; Manalo 276, 262-63.) This research incorrectly assumed that the two expert positions were for business people and academic researchers, respectively. Gandrud did not ask Manalo to search for salaries of similar employees in other embassies or consulates. (Gandrud 584.) Manalo believes that she printed out for Gandrud all of the documents that she reviewed in her search. (Manalo 259, 263.) Manalo conceded that the positions she pulled from salary.com were quite different from the job descriptions given to her by Gandrud. (Manalo 262, 267.) She also admitted that none of the search results were positions in the Midwest. (Id.) She considered her search to be an informal, "quick look at what [she] could find." (Manalo 272.) While Manalo did what she was asked to do, this scattershot research provided no insight into the appropriate market salaries for the two expert positions.

42.     Manalo concluded that the salary market range was from $70,000 to $79,000 for the Higher Education and Research Position and from $93,000 to $118,000 for the Innovation and Business Position. (J-3-0001; Gandrud 577-78.) Manalo testified that her research was objective and not influenced by the gender of the applicants. (Manalo 270, 276.) In fact, she testified that when she conducted her research, she did not know who had applied for the positions. (Id.)

43.     In Manalo's trial testimony, after comparing the actual job postings for the expert positions against the salary.com positions, Manalo conceded that they were quite

different.  (Manalo 260-67.)  The Higher Education and Research Position did not

actually perform research; it brought research institutions and businesses together.

(Manalo 264-266; 273; J-2.)  Likewise, the Innovation and Business Position was not

designed to generate business for a corporate entity; instead, it also brought businesses

together.  (Manalo 259-62; Davidson 2015-17.)  Manalo admitted that if she were

involved in hiring the two individuals, she would have conducted more research before

settling on a salary.  (Manalo 269-270.)

44.    Gandrud also admitted that the Consular expert positions were quite

different from the positions that Manalo had found on salary.com.  (Gandrud 578.)

Nonetheless, Gandrud believed that the information gleaned from Manalo's one-hour

search "was as close as he needed."  (Id.)  Gandrud did not ever look to the most relevant

market research    what other embassies or other state governments or federal entities

were paying similar employees in the Twin Cities    when setting the salaries for the

Consular positions.  (Gandrud 584.)

45.    Gandrud did not share the information that he received from Manalo with

the Stakeholders, the Hiring Committee, or anyone else at the Embassy.  (Gandrud 584;

Strømmen 902; Mondale 618; Rognlie 1481.)  Thus, while Vice President Mondale was

aware that some type of market survey or analysis had been performed, he did not see it

at any point during the hiring process, or during his tenure as the Honorary Consul

General.  (Mondale 618, 649-50.)  Similarly, Ambassador Strømmen had no knowledge

of what was done to find comparable market salaries and had no knowledge of the standards or statistics that were relied upon to set the salaries for the two Consular experts. (Strømmen 868-69.)

### Ellen Ewald

46.     On July 3, 2008, Mykletun forwarded the job descriptions for both expert positions to his colleagues, including Ellen Ewald, for distribution to their professional networks. (J-2-0001; Ewald 76, 78, 83-84.)  Ewald and Mykletun had been friends since 2002. (Mykletun 1566-67.)  Mykletun was not soliciting Ewald to apply and was not otherwise involved in recruiting, screening, or hiring for the positions. (Mykletun 1566-67, 1593-95.)

47.     Ellen Ewald is a Minnesota native who holds a Masters Degree in Political Science from the Massachusetts Institute of Technology, and a degree in Comparative Politics ("Hovedfag") from the University of Bergen in Norway, as well as a Bachelor's Degree in International Relations & Scandinavian Studies and Foreign Studies from the University of Minnesota (graduating *summa cum laude*). (J-4-0003.)  Ewald is fluent in the Norwegian language, both spoken and written. (J-4-0004.)  She has extensive professional experience in both education and business, and has held board positions in the United States and in Norway. (J-4-0003-04; Ewald 62-83.)

48.     Ewald has received awards for her achievements, including recognition as one of "Norway's Top 10 Most Successful International Women" in 2004.  (J-4-0003; Ewald 79-80.)

49.     Ewald was the founder and former president of the MIT Club of Norway, a business networking club comprised of business leaders and alumni of MIT with a specific interest in the area of government and industry collaboration.  (Ewald 70-72.) She was also a co-founder, along with Mykletun and Finn Kristian Aamodt, of the University of Minnesota Alumni Club of Norway.  (Ewald 81-83.)  Her involvement with the MIT Club and the University of Minnesota Alumni Club expanded Ewald's network in Norway and in the United States.  (Ewald 83-84.)

50.     Ewald had a successful private business career in Norway spanning more than a decade.  (J-4-0004; Ewald 67, 73.)  She worked as an executive for various corporations, and much of that experience was in the area of business evaluation and marketing, including network development.  (Id.)

51.     At the time that Ewald applied for the Higher Education and Research Position, she was the Chairperson and Marketing and Research Director of UnoPhone AS/UnoPhone Uganda, Ltd., where she had worked for five years.  (J-4-0004; Ewald 74.) UnoPhone AS was part of TM Holding AS/Venturos AD.  (Ewald 74.)  At the time that Ewald was contemplating whether to come to the United States and take the expert position with the Embassy, there were approximately four or five companies held by TM

Holding, to which Ewald could have transitioned, in roles similar to that which she held at UnoPhone, and at the same compensation. (Ewald 77-79; 476; Mikalsen 1195-96.)

52. Prior to UnoPhone, Ewald worked as the Manager of Business Network Development for TM Holding, as the International Project Coordinator and Manager for Norwegian Investor Forum/IT Fornebu, and as the Account Manager of Business Alliances and Project Management for Oracle. (J-4-0004; Ewald 73-79.)

53. Except for IT Fornebu, all of Ewald's former employers were private, non-government companies. (Ewald 68-69, 79.) In contrast, IT Fornebu was a 50/50 government/private industry business endeavor aimed at stimulating growth in Norwegian businesses and the economy, including initiatives in research-based innovation. (Id.) TM Holding/Venturos AS was a private equity group that invested in the IT Fornebu project. (Ewald 72-73.) Ewald's role in TM Holding/Venturos AS was primarily in the area of business network development. (Ewald 73.)

54. Ewald's total compensation at TM Holding/Venturos where she worked from 2000, through her acceptance of the Higher Education and Research Position with the Embassy was approximately 950,000 Norwegian Kroner ("NOK"). (Ewald 76-77, 475; Mikalsen 1197.) Depending on the exchange rate, 950,000 NOK is the equivalent of approximately $170,000 to $190,000. (Ewald 76; D-60-0010; see also, P-167-0001 (charting Ewald's overall compensation during 2007 and the first nine months of 2008,

prior to Ewald's move to the United States and demonstrating that Ewald earned an

overall compensation package worth approximately $190,000, annualized, in 2008).)

55. Ewald reviewed Mykletun's July 3, 2008 email about the two positions at

the New Model Consulate in Minneapolis. (Ewald 89-90; J-2-0001.) She considered

both expert positions "exciting" and "two sides of the same coin." (Ewald 89.)

Although she believed that she was qualified for both expert positions, she was

particularly interested in the Higher Education and Research Position, because it

represented a change from her work in business development for the preceding 15 years.

(Ewald 105.) She also believed that the focus on research-based innovation was exciting

and would put her at the cutting edge of technology, potentially spawning additional

business opportunities for Norway. (Ewald 105.)

56. Prior to receiving the job descriptions for the two expert positions from

Mykletun, Ewald was not looking for a new job because she was happy with her position

as Chairperson for UnoPhone. (Ewald 77-78.) Neither Ewald, nor her then-domestic

partner, now-husband, Terje Mikalsen, had any intention of leaving Norway to move to

the United States. (Ewald 77-78; Mikalsen 1200.) They were well-established in

Norway. Not only had they recently purchased and remodeled a home in Norway, but

their family members also lived there, including Mikalsen's eight grandchildren. (Ewald

77-78, 80, 83; Mikalsen 1200.)

57. Intrigued by the postings, however, Ewald showed them to Mikalsen.

(Ewald 80-81; Mikalsen 1198-1201.)  Although Mikalsen was struck by the similarity between the two expert positions, he believed that the Higher Education and Research Position was practically tailored for Ewald.  (Id.)  Mikalsen told Ewald, "wow . . . if you apply, you'll get it."  (Ewald 81; Mikalsen 1198-1199.)  Although Mikalsen was excited for Ewald, he was unsettled by the prospect that Ewald might be offered the job, precipitating a move to Minnesota.  (Ewald 80-81; Mikalsen 1200.)

58.    Ultimately, however, Mikalsen supported Ewald's interest in the position. Mikalsen viewed the expert position as an opportunity for Ewald's career to take priority in their relationship (Mikalsen 1200), even if it meant that the couple would have to uproot themselves from Norway and move to the United States.  (Ewald 96.)  Mikalsen believed that Ewald could use her connections in Norway and in the United States to help further important research collaboration both in education and business.  (Mikalsen 1200.)

59.    On July 4, 2008, Ewald expressed her interest in the expert positions to Mykletun and asked to speak with him further.  (J-2-0001; Ewald 89-90.)  Mykletun invited Ewald to his office at the MFA in Oslo to talk about the expert positions.  (Ewald 90.)  Mykletun never informed Ewald that he was talking to her as a friend only, and not as a representative of the MFA.  (Ewald 95.)  During the meeting, Mykletun indicated that the two expert positions were very substantive, focused positions.  (Ewald 90-92.) Mykletun advised that the expert positions were for three-to-five-year terms. (Mykletun

1636-37.)  The job descriptions, as well as the postings, also indicated a three-year

commitment with a possible extension.  (J-2-0002-3.)  Although Mykletun explained to

Ewald that the positions were limited-term appointments, he also expressed his hope that

the New Model Consulate would ultimately succeed and that the expert positions would

become permanent, as opposed to limited-term.  (Mykletun 1636-37.)  Accordingly,

Ewald was under the impression that the positions involved a long-term commitment.

(Ewald 90-92.)

      60.    Although Mykletun did not discuss the salary range for the positions

(Mykletun 1598), he did inform Ewald that the positions would be equal and parallel

(Ewald 91) and that the budget of 1.5 million NOK would be divided evenly to cover

salary and travel.  (Id.; Mykletun 1598-99.)  These representations are consistent with

what Mykletun told others in the Norwegian-American community.  (Hansen 1081.)

Mykletun also notified Ewald that the two expert positions should work as a team to

achieve the ultimate objective of increasing research-based innovation.  (Ewald 91.)

Mykletun explained to Ewald that the purpose of the expert positions was to network and

promote research-based innovation on behalf of Norway, because it was important for

Norway to be connected and collaborate with research and business in the Midwest.

(Ewald 93.)

      61.    During their meeting, Mykletun sensed that Ewald was excited about the

prospect of moving back to Minnesota.  (Mykletun 1605, 1617).  Ewald's parents and

other family members live in the Minneapolis area, Ewald's younger daughter was

beginning college at the University of Minnesota, and her older daughter was also

attending college in the United States.  (Ewald 141, 385; Ex. P-23-0006.)

62.     After speaking with Mykletun, Ewald spoke by telephone with Gandrud,

because he was one of the two contacts for the Higher Education and Research Position.

(Ewald 96-97.)  Ewald told Gandrud about her business background, as well as her

experience with the MIT Club of Norway and the University of Minnesota Alumni Club

in Norway.  (Ewald 97-98.)  Ewald also discussed her background in research-based

innovation and her enthusiasm for the Higher Education and Research Position.  (Ewald

98.)

63.     On July 17, 2008, Ewald applied for the Higher Education and Research

Position.  (J-4-0001-4.)  Ewald received a very positive reference from Mykletun.  (Johne

Dep. 44.)  Although both Ewald and Mykletun considered Ewald qualified for both

expert positions, and although Mykletun encouraged her to apply for both, Ewald applied

only for the Higher Education and Research Position because she thought it would be

more interesting and enjoyable.  (Ewald 95 105; Mikalsen 1201.)  As Ewald later wrote

to Ambassador Strømmen, had she known of the better salary and terms that

accompanied the Innovation and Business Position, she would have likely applied for it,

as she possessed the necessary experience.  (P-100-0001.)

**Interviews**

64.    On September 2 and 3, 2008, the Hiring Committee interviewed

approximately 11 applicants for both positions in Minneapolis.  (Mondale 610.)  During

Ewald's interview, the Hiring Committee and Ewald discussed Ewald's background, as

well as the objectives of the expert positions as being "equal" and "parallel," and

explained that the experts would function as a team, because both research and

commercialization were important to achieve Norway's goals.  (Ewald 107-110; see also

Johne Dep. 37-38, 49, 94 (stating that the positions were meant to be parallel and operate

as a team).)  Ewald's recollection about the expert positions being equal, parallel, and

working together as a team (albeit in different focus areas) is consistent with what

Gandrud told others in the Norwegian-American community.  (Hansen 1100-01; Nash

553-555; Mueller 1137.)

65.    During Ewald's interview, the Hiring Committee discussed the fact that

capitalizing on the intersection of research, business, and innovation is an important

policy objective for Norway; and the Committee discussed the importance of the

internationalization of students and business.  (Ewald 108.)  The Committee members

further addressed the commercialization of research, noting that collaboration between

the two expert positions would help Norway develop research opportunities.  (Ewald

109.)  Additionally, the Hiring Committee members explained that the expert officers

would engage with Science Week, an annual conference aimed at fostering connections

in science and research between Norway and the United States.  (Id.)  The Hiring

Committee members also addressed the importance of student exchanges.  (Ewald

109-110.)

66.    At the time of the interviews, the salaries for the two positions had not been

determined.  (Mondale 673-75.)  During Ewald's interview, members of the Hiring

Committee discussed a general salary range of $40,000 to $70,000 for both expert

positions.  (Ewald 110-11; Gandrud 710. )  This range was typical for other

locally-employed Embassy officer-level employees and other consular officers of

Norway in the United States at that time.  (Vibe Dep. 56; Berg 1282.)  Gandrud had

commented on this general $40,000 to $70,000 pay range to others in the Norwegian-

American community.  (Hanson 1100-01; Nash 553-55; Mueller 1137.)

67.    Ewald was not dissuaded by the salary range and remained enthusiastic

about the Higher Education and Research Position, feeling "so sure that this was a good

job for [her]."  (Ewald 390; 108-09.)  Gandrud recalled that Ewald "had the highest

interest . . . of any of the applicants for either job[ ]. . . .[H]er enthusiasm was infectious

and she made the same impression on all" of the Hiring Committee members.  (Gandrud

977.)

68.    The Hiring Committee members did not ask the interviewees about their

salary history.  (Id.)  There was no discussion of health insurance or other benefits at the

interviews.  (Gandrud 792-93.)  Ewald recalled that Gandrud seemed apologetic about

the salary, but told her that "they," presumably the Embassy, would try to compensate both experts at the top of the salary range. (Ewald 110-111.)

69.     Ewald was familiar with the salary and compensation system for Norwegian public employees. (Ewald 62-63.) Her understanding was that employees of the Norwegian government are compensated through a ladder system called "Lønnstrinn," in which employees are placed at a specific level of compensation appropriate for their level of employment. (Ewald 111-112; Strømmen 828.) Ewald believed that the Lønnstrinn system would apply to the expert positions. (Ewald 111-12.) That, coupled with the statements by Gandrud regarding the salary range, led her to believe that neither the salary, nor salary range, were negotiable. (Ewald 111-12.) In actuality, while the Lønnstrinn applies to most Norwegian government employees, the Embassy does not follow the Lønnstrinn for locally-employed employees, such as the expert officers. (Strømmen 828.)

70.     After Ewald's interview, Gandrud contacted her, telling her that the Hiring Committee was enthusiastic about her and that she was one of the top candidates. (Ewald 113.) Vice President Mondale considered Ewald "a rare find." (Mondale 612.) The Hiring Committee had been particularly impressed with Ewald's passion for the job, along with her connections, knowledge, and experience. (Rognlie 1410.) Gandrud believed that Ewald would readily accept the Higher Education and Research Position, if it was offered to her. (Gandrud 740.)

71.   Anders Davidson learned of the Innovation and Business Position through a job posting in his St. Olaf College alumni newsletter.  (Davidson 1911.)  At the time, Davidson was employed as a Business Development Manager in International Operations at 3M and was not looking for another job.  (Davidson 1903.)  His position at 3M required a great deal of travel.  (Davidson 1905.)  Davidson was attracted to the expert position because he believed it would provide a lifestyle change, allowing him to spend more time with his young children and shorten his work commute.  (Davidson 1908-09; 1924.)  While Davidson possessed Norwegian ancestry and an affinity for Norway (Davidson 1908), Davidson did not speak or write Norwegian; in fact, he had never visited Norway.  (Davidson 1987.)  Davidson was also unfamiliar with the Strategy and had never seen the document until it was presented to him as an exhibit at trial. (Davidson 2010.)

72.   Davidson received an MBA from the University of Minnesota. (Davidson 1884-85; J-5-0002.)  Prior to working at 3M, he had also worked at Microsoft. (Davidson 1885-86.)  Based on his experience at 3M and in business school, Davidson had experience in analyzing and assessing companies and business plans.  (Davidson 1898-1902; 1907.)

73.   Davidson applied for the Innovation and Business Position "at the last minute" on July 25, 2008.  (Davidson 1910; J-50001.)  The Hiring Committee selected Davidson as a candidate to interview based on his business background and experience,

34

particularly his international work at 3M.  (Rognlie 1404-06.)

74.     Davidson interviewed with the same Hiring Committee members as Ewald:
Vice President Mondale, Gandrud, Johne, and Rognlie.  (Davidson 1911.)  Davidson
recalls that the interviewers stated that the salary range was $40,000 to $60,000 or
$70,000.  (Davidson 1913.)  When told of the salary range, Davidson made no negative
comment, although he testified that he felt that the salary was "unrealistically low."
(Davidson 1913.)

75.     During Davidson's interview, he did not volunteer information about his day
care concerns for his daughter.  (Gandrud 722-23; Davidson 1913.)  Nonetheless,
Gandrud believes that during the interview there was "a sign" that Davidson was
concerned about child care.  (Gandrud 722-23.)  While Davidson does not believe that he
ever specifically referred to "day care" in subsequent conversations with Gandrud, he
admitted that after the interview he did discuss working three days per week, in order to
personally provide child care for his daughter two days per week. (Davidson 1996-98.)
The Hiring Committee made no inquiry of Ewald's prior salary or her family situation.
(Vibe Dep. 83-84; Rognlie 1463-64; Mondale 626-27.)

76.     Based on the interview, Gandrud gave Davidson positive marks, indicating
in his interview notes that Davidson was "fresh," "eager" and "lower $."  (D-5-0006.)
Vice President Mondale testified that Davidson was "young and strong."  (Mondale 612.)
Following the interview, Davidson remained interested in the position, but was privately

concerned about the suggested salary range.  (Davidson 1914.)

77.     After the interviews, the Hiring Committee concluded that Davidson was

the top candidate for the Innovation and Business Position.  (J-6-0002; Mondale 612,

629-30, 687-89; Gandrud 978; Rognlie 1404-06.)  Although Gandrud had not discussed

compensation directly with Davidson, Gandrud was concerned that the salary range for

the Innovation and Business Position might be too low and that it might affect

Davidson's willingness to accept the position.  (Gandrud 575-76; 972-73; 981-82; D-5-

0006, D-5-0008.)

### Communications on September 4, 2008

78.     On the morning of September 4, 2008   the day after the interviews were

completed     at approximately 9:20 a.m., Gandrud emailed Rognlie and Johne, copying

Ambassador Strømmen, regarding Ewald.  (D-6-0001.)  Referring to the Hiring

Committee's "clear and obvious consensus" that Ewald was their choice for the Higher

Education and Research Position, Gandrud "urgently request[ed]" that Rognlie and Johne

recommend Ewald to the Stakeholders for approval.  (Id.)  Gandrud sought a quick

response so that Vice President Mondale, who was in Oslo at the time, could introduce

Ewald as the new Higher Education and Research Officer at an upcoming meeting with

the Stakeholders.  (Id.)  In addition, if Ewald could be announced quickly, her name and

new title could be prominently featured in materials for an upcoming United States-

Norway forum.  (P-7-0004.)

79.     Shortly after receiving the email, Ambassador Strømmen telephoned Gandrud to discuss the fortuitous coincidence that Vice President Mondale was in Oslo and might be able to announce the hiring of Ewald during his visit.  (Id.)  Ambassador Strømmen followed up with an email to Rognlie, Johne, and others, asking, "Is it possible to get this done so fast?"  (P-7-0007.)  The Ambassador stated, "We can at least come with an offer in any case . . . ."  (Id.)  He also inquired, "Who must be notified in Norway?  Who makes the formal decision?  Is it not the Embassy?"  (Id.)

80.     In an email sent at 10:07 a.m. that same day, Johne responded to Gandrud and Ambassador Strømmen.  (P-7-0001-2.)  Johne indicated that she and Rognlie had created a draft document, ranking the candidates, focusing on the number one candidates for both positions.  (Id.)  She stated that the report on the selection and ranking of candidates would be completed within two hours and would be sent to Gandrud.  (Id.)  Johne indicated that once she received Gandrud's feedback, the document would be transmitted to Norway later that same day in order to give the Stakeholders an opportunity to review it.  (Id.)  Johne directed, "if the Advisory Board approves Friday [9/5/08], then [Vice President] Mondale may announce the two names, IF THEY have been informed."  (P-7-0002.)  She further advised that Gandrud should contact the two candidates, informing them that they were the top choices, subject to final approval.  (Id.)  She also indicated that "the embassy will check salary and benefits in more details [sic] today, for Gary to inform when you contact them."  (Id.)

37

81.    That same morning, Gandrud telephoned both Ewald and Davidson. (Gandrud 719-20.)  In his conversation with Davidson, Gandrud indicated that Davidson was the top candidate for the Innovation and Business Position, and asked him what he thought about a salary of $60,000.  (Gandrud 720, 722; Davidson 1915.)  Gandrud did not have authority to make an official salary offer at the time and told Davidson as much. (Gandrud 720-21, 984).  Davidson did not interpret the $60,000 figure as a formal offer. (Davidson 1992).  Rather, Davidson felt that Gandrud was "sort of [a] courier" and that he was expressing an initial level of interest in Davidson and "checking in about the salary." (Id. at 1992-93).  At trial, Gandrud deduced, by process of elimination, that he must have unilaterally made the decision to suggest the $60,000 figure to Davidson. (Gandrud 720, 722; Strømmen 872.)  In fact, some members of the Hiring Committee were not aware that Gandrud had initially suggested a salary of $60,000 to Davidson. (Rognlie 1447.)

82.    In response to Gandrud's question about salary, Davidson, who believed that the salary range was limited, did not demand a higher salary.  (Davidson 1918.) Rather, Davidson asked whether it would be possible to work on a part-time basis, three days per week, for $60,000.  (Davidson 1916.)  Davidson told Gandrud that his base salary at 3M was $108,000.  (Gandrud 721, 986; Davidson 1916-18; P-7-0001.)  Based on his then-current salary at 3M, Davidson believed that if he were able to work three days a week for $60,000, his wife could work while Davidson stayed home two days a

week with their youngest child.  (Davidson 1917.)  Davidson testified, "my response to them was not, I'm not going to work for 60, you have to pay me at least 100, I said, let's work within the 60 budget, can we do something else[?]"  (Davidson 1921.)  Gandrud responded that he would take Davidson's proposal back to the decision-makers, but that the three-day-a-week arrangement would not work.  (Davidson 1917; Gandrud 721.)  A part-time arrangement was not considered an option because both expert positions were intended as full-time positions.  (Gandrud 721-22; Mondale 627, 689; Davidson 1918-19.)

83.     Although Gandrud asked that Davidson's salary reflect the salary market rate for a similar position, Gandrud conceded at trial that Davidson was not applying for employment in the business community.  (Gandrud 736.)  Gandrud also conceded that Davidson did not request that Gandrud adjust his salary to reflect market rates.  (Gandrud 735-736.)  And, Davidson could not recall whether Gandrud asked him about his salary at 3M, or whether, unprompted, he shared his then-current salary of $108,000. (Davidson 1918.)  Therefore, Gandrud decided to follow-up about child care during his telephone conversation with Davidson. (Gandrud 722-23.)

84.     At approximately 11:30 a.m. that same morning, Gandrud emailed Johne, Rognlie, Ambassador Strømmen, and others, raising the issue of salary for Davidson:

> Anders Davidson has been informed.  Ellen Ewald has also been informed.  Both are showing the same enthusiasm that they demonstrated to us in the interview.  Davidson, after speaking with his wife, did express discomfort with the salary and told me that his

> base salary is currently $108,000.  While I told him that I do not
> intend to negotiate with him, I pointed out to him that we were
> sensitive [sic] the salary issue and intended to speak with him after
> he had discussed the matter with his family.  With young children,
> day care, etc., he has a legitimate concern.  [Honorary Consul
> General] Mondale shares this concern as well.  Anders stated that the
> salary level would not diminish his desire for this position but it is
> his only concern.
>
> As you know, our market research here at Faegre concluded that the
> Education and Research position was hitting the general market for
> that position.  They concluded that the Innovation and Business
> Development position was below the low end of the market for
> similar skills.  While not wanting to complicate this any further, I
> want this part of your consideration.  We will not negotiate with him
> but we should be fair to him, the position and to ourselves.

(P-7-0001.)  The "market research" referenced in the email referred to the one-hour

search performed by Manalo.  (Gandrud 724.)  Although Gandrud testified that he did

not refer to young children and day care to suggest that Davidson be paid more, but was

merely explaining why Davidson suggested working three days per week for $60,000

(Gandrud 722-25; 728), Gandrud's September 4 email sent at 11:30, quoted above,

speaks for itself.  (P-7-0001.)  The email makes no mention of Davidson's suggestion of

working part-time for $60,000.  (Id.)  Moreover, in the email, Gandrud expressly

disclaims that he and Davidson had engaged in any salary negotiations.  (Id.)  Rather, the

email only refers to Davidson's then-salary of $108,000, identifying Davidson's young

children and day care needs, as well as the so-called market research conducted by

Manalo, as factors to consider in setting Davidson's salary.  (Id.)  Likewise, Gandrud

testified that he provided the following information to the Hiring Committee with respect

to the recommendation to offer Davidson $100,000: Davidson's day care situation, his

prior salary, his willingness to work three days a week, and the so-called market research

conducted by Manalo.  (Gandrud 725, 728-729; P-7-0001.)

     85.    Beyond the information contained in Gandrud's September 4, 2008 email

(above), Defendant's witnesses were surprisingly unclear about the factors that were

considered in the ultimate decision to pay Davidson $40,000 more than was originally

offered to him:

    A.    Steering Committee member Berg testified, "that we need[ed] to
pay him more to get him on board because he ha[d] a higher salary
[when he interviewed for the position], and to have him accept the
job, we need[ed] to pay him $100,000."  (Berg 1253, 1284-85.)

    B.    Steering Committee Chair Finborud testified in her deposition that
they "would have to pay more to a more experienced person from a
private business life."  (Finborud Dep. 30, 37.)

    C.    Ambassador Strømmen testified that he does not know what factors
were considered in setting the compensation packages for the two
expert positions.  (Strømmen 876-77.)

    D.    Johne testified that she was aware of three reasons that justified
Davidson receiving a higher salary than Ewald: (1) the so-called
market research about salaries; (2) Davidson's prior salary; and (3)

Davidson's child care needs.  (Johne Dep. 73.)

E.     Vice President Mondale testified that the $100,000 salary was "what

at least one big company determined his market value to be."

(Mondale 626.)  He relied on the information that Gandrud had

provided to him, and was unaware of how poorly the market

research was conducted.

F.     Rognlie believes that Davidson was offered more money because

the market demanded a higher salary for business-related positions,

as opposed to education-related positions, and because Davidson

had a higher salary from his previous job.  (Rognlie 1478.)

86.    The Embassy did not consider any of these factors in determining the salary

offered to Ewald.  Rather:

A.     Ambassador Strømmen testified that, much like having tax debts or

wanting to buy a big boat, a need for day care was not a legitimate

basis for a higher salary, and, for all the Embassy knew, "Ewald

could be needing day care" costs to be covered as well.  (Strømmen

877.)

B.     Vice President Mondale conceded that the Embassy did not

consider Ewald's 15 years of prior business experience in making

the salary decision.  (Mondale 700.)

   C. The Hiring Committee did not determine Ewald's prior salary, but

     they knew Davidson's prior salary.  (Rognlie 1463-64.)

 87. When faced with the reality that there was no tangible reason to pay

Davidson more than Ewald, and despite the fact that neither expert position was in the

business sector nor the education sector, but rather, in the Embassy, all the Embassy

could say at trial was that "common sense" dictates that a person "in business" should be

paid more than a person "in education."  (Rognlie 1480, 1510.)

 88. Ambassador Strømmen testified that, while recruiting for the expert

positions, he was concerned that too much money would be spent on salaries.

(Strømmen 842.)  When he initially saw the proposed salaries, which reflected that a

woman would be paid less than a man, Ambassador Strømmen asked questions of

Gandrud, Vice President Mondale, and others about the salary differential.  (Strømmen

839-40.)  The feedback that he received left him with the impression that as long as the

jobs were different, a salary differential was acceptable.  (Strømmen 840.)

 89. Ambassador Strømmen concedes that individuals involved in hiring the two

experts at the Consulate should have used the Guidance.  (Strømmen 861.)   Members of

the Hiring Committee admit that they did not follow the Guidance in the hiring process

for the two expert positions, as Rognlie took no specific steps to protect against

discrimination in the selection process, nor did anything to ensure that Ewald received

equal pay for equal work.  (Rognlie 1495-9896.)  Once Rognlie learned of Ewald's

concern about discriminating pay, Rognlie did nothing to investigate whether Ewald was receiving equal pay for equal work, even though she was obligated to ensure compliance with the Guidance as a leader in the MFA.  (Rognlie 1490, 1492, 1498.)

### Hiring of Ewald and Davidson

90.     On September 5, 2008, Johne emailed the Stakeholders, Rognlie, Gandrud, Vice President Mondale, and numerous other Norwegian government employees, recommending that Ewald and Davidson be approved for the two expert positions and stating that "both [were] clear first choice candidates, who would constitute an excellent team."  (P-17-0011-12.)  Johne informed the recipients of the email that, while a salary of $60,000 - $70,000 was appropriate for the Higher Education and Research position,

> it became equally clear that to be able to hire the right person for the innovation and business development officer a salary level within reach of [$100,000] has to be considered.  The Embassy and the Honorary General consulate recommend that the Advisory board give very serious consideration to the importance of hiring the right person for the business development position.

(Id.)  Johne performed no assessments herself regarding salary, and she, like Rognlie, relied on what Gandrud had told her about setting Davidson's salary.  (Johne Dep. 59-60; Rognlie 1448-49.)  In her email, Johne provided "calculation examples . . . of what such salaries translate to in NOK, and thus how they affect the total budget of 750,000 NOK for each position."  (P-17-0012.)  In her examples, Johne wrote:

> example a.) a gross salary of USD 68.000   plus health insurance per year USD 7.050, and pension insurance of USD 7.000    corresponds to a yearly cost of NOK 421.535.

> example b.) a gross salary of USD 100.000    plus health
> insurance for a family with two small children USD 20.200
> and pension insurance of USD 10.000    corresponds to a
> yearly cost of NOK 669.000.

(P-17-0012-13.)  Ewald testified that when she subsequently learned of the wide

dissemination of this email    with its references to her lower salary    she felt

embarrassed that while so many people knew of the significant pay difference between

her and Davidson, she did not.  (Ewald 314.)

91.    Later on September 5, 2008, Gandrud sent Davidson an email notifying him

that the Embassy was working on his behalf to increase his salary.  (J-7-0001.)  Gandrud

noted that although Davidson did not request a higher salary, "[the] Embassy, Mondale

and I joined in asking [the Stakeholders] that the salary be more reflective of the

market."  (J-7-0001.)  Gandrud would not label the communication between himself,

Davidson, and the Embassy, as "negotiations."  (Gandrud 725-27; P-7-0001.)

92.    Also on September 5, 2008, Johne confidentially notified Ewald that she

was "strongly recommended as the no. 1 candidate," but had to pass the "formalities of

the stakeholder meeting on Wednesday [September 10, 2008]."  (Ewald 113, 391;

D-7-0017.)  Johne told Ewald of the intent to have Vice President Mondale announce her

hiring at the reception following the Steering Committee's meeting on September 10,

2008.  (D-7-0017.)  The same day, Gandrud sent Ewald materials related to the United

States-Norway Forum, at which Ewald was expected to give remarks as part of her work

for the Honorary Consulate.  (Ewald 115; D-10.)

45

93.     On September 8, 2008, Gandrud forwarded Johne's widely-disseminated email with salary calculations to Davidson   but not to Ewald   stating, "FYI:  Deeply confidential . . . you see our process . . . you should note that the salary is 'in play.'" (P-8-0001; J-8-0001.)  Davidson responded, "Thanks for keeping me abreast of the process.  I really appreciate the consideration of the salary."  (J-8-0001.)  Prior to receiving the September 8 email from Gandrud, Davidson did not know that the Hiring Committee had sought the Steering Committee's approval for a higher salary for the Innovation and Business Position.  (Davidson 2001-02; P-8.)  Gandrud conceded that while he provided Ewald's private and confidential proposed salary information to Davidson prior to Ewald's hire, he did not provide Davidson's salary information to Ewald.  (Gandrud 739-740.)  Gandrud testified that he did not know whether Ewald would have taken the job had she known that Davidson's salary was higher than hers. (Gandrud 740-741.)  Gandrud also testified that he never considered that it might be humiliating for Ewald to have so many people see that her work was valued less than the work of her male coworker.  (Gandrud 741.)

94.     On September 10, 2008, Ewald attended the Oslo reception at which Vice President Mondale announced her selection for the Higher Education and Research Position in Minneapolis.  (Mondale 680-682; J-9-0004-5.)  Former U.S. Ambassador to Norway Benson K. Whitney congratulated Gandrud on Ewald's selection, describing her as "bright, energetic, language-capable and charming."  (P-10-0001.)  Ambassador

Whitney went on to say, "I am very excited about the position and consider it one of the MOST important ways to build 21st century connections with Norway." (P-10-0001.) Although Ewald was announced as the Higher Education and Research hire, she had not been formally offered the expert position and salary had not been discussed. (Ewald 116, 396.) Vice President Mondale was not aware that Ewald had not yet been offered a specific salary at the time of the Oslo reception. (Mondale 622.) Ewald knew prior to attending the reception that Vice President Mondale planned to announce that she had been selected as the Higher Education and Research Officer. (D-7-0017.) However, she testified that she would not have attended the reception in Oslo, nor would she have accepted the expert position, had she known that Davidson would be paid a higher salary. (Ewald 478-479.)

95.    Prior to the reception on September 10, 2008, the Stakeholders met for the first time in Oslo (P-11-0001) and created the Steering Committee. (Berg 1245.) Again, the Steering Committee was tasked with ensuring that the topics and projects undertaken by the two expert positions were of interest to the Stakeholders. (Berg 1245.) The Steering Committee members included Chair Finborud of the MFA, Berg of Innovation Norway, Reidar Bye of SINTEF, Sten Anders Berge of the MFA, Ragnhild Skålid of the Norwegian Ministry of Education and Research, Olav Stave of the Norwegian Association of Higher Education Institutions, Gaute Lenvik of the Norwegian Ministry of Agriculture and Food, Morten Aasland of the MFA, and a representative of the

Research Council of Norway.  (See P-11-0001.)  Steering Committee Member Berg

testified about the Steering Committee's obligation, stating, "I was very clear [that] this

has to be a steering committee.  I wouldn't spend time if this was just an advisory board

coming up with suggestions that nobody needed to listen to."  (Berg 1251.)  The Steering

Committee also required the Honorary Consul General in Minneapolis, the Embassy in

Washington, as well as the MFA section for Economic and Commercial Affairs, to keep

the Steering Committee members informed of the work and developments of the two

expert positions.  (P-11-0001.)  During this meeting, Vice President Mondale reported to

the Steering Committee that the Hiring Committee had found "two excellent candidates

for the expert positions."  (P-11-0002.)

     96.    After the Stakeholders' meeting and reception, Gandrud updated Davidson

on the budget process and told him, "expect to hear a report tomorrow."  (J-8-0001.)

The Steering Committee, however, was not actually required to approve the selection of

or the compensation for the two candidates.  (Finborud Dep. 24; Berg 1288; P-17-0003.)

In the minutes of the September 10 Stakeholders' meeting, it was reported that:

> [s]ome of the members of the board expressed their concern that the
> proposed pay level for the innovation and business development position
> would decrease the room of action for the higher education and research
> position.  In total, the Stakeholders will contribute NOK 750,000 for each
> position each year.  If this is not sufficient to secure a high standard of the
> expert positions it was decided that the MFA will consider increasing this
> amount.

(P-11-0002.)  On September 11, 2008, Steering Committee Member Aasland, the

Norwegian Minister of North America, updated Gandrud on the Steering Committee meeting, which Aasland had attended.  (P-17-0003.)  Aasland recounted, "[a]mong the Stakeholders the understanding is that the NOK 1.5 should be divided equally between the two officers/fields (i.e., for salary, travel, etc)."  (P-17-0003; P-14-0002; Ewald 313.)  In fact, however, the funds were never split equally between Ewald and Davidson.  (Vibe Dep. 50.)

97.     Also on September 11, 2008, Gandrud was in contact via email with both Davidson and Ewald.  (J-8-0001; J-9-0004-5.)  He told Davidson that the Stakeholders were finalizing the budget and that "you [Davidson] will be pleased with the salary adjustment."  (J-8-0001.)  Also that morning, Ewald updated Gandrud on the Oslo reception and her meetings with Vice President Mondale and several Stakeholders.  (J-9-0004-5.)  Gandrud responded to Ewald's email, noting that he had received a "glowing report from the Foreign Ministry" about the Oslo reception, and the Stakeholders were "very pleased with the process and [Ewald's] selection."  (J-9-00004.)  Although he did not mention her salary, ironically, Gandrud told Ewald "[t]he candidates made them re-think the economic package (salary, benefits and budget) and you will be pleased with their additional commitment."  (J-9-0004.)

98.     On September 12, 2008, Gandrud sent Ewald an email stating, "after shaking a few trees, talking to [Honorary Counsel General] Mondale and the Embassy, I have a better focus on some of the administrative details.  I want to officially offer you

the position of education research officer."  (P-12-0002; see also Ewald 118-119.)

Gandrud advised Ewald that he preferred to discuss the "economic details of the offer"

by phone rather than by e-mail.  (P-12-0002.)  Gandrud further noted, "[a]s for your

specific duties, goals, obligations and expectations for the expert position, I would first

assure you that while we are starting from ground zero, we do have a very good idea of

what we need to accomplish, what constituencies we wish to serve and how to go about

it."  (P-12-0002.)  Gandrud stated that he was impatient for Ewald to begin, but knew she

had "to think about relocating as well."  (P-12-0003.)

99.     Also on September 12, 2008, Gandrud called and offered Davidson the

Innovation and Business Position, which Davidson accepted.  (Gandrud 744; Davidson

1922; P-9-0001.)  Although Gandrud had refused to discuss the "economic details" of

Ewald's offer via email, during his phone call with Davidson, he offered Davidson a

salary of $100,000.  (Id.)  With an annual salary of $100,000, Davidson was the highest-

paid local employee of the Embassy in the entire United States.  (Wemberg Dep. 35; Log

1877.)  In fact, the Embassy paid Davidson a higher salary than two of Davidson's

superiors, including the Embassy's Minister Counselor for Economic Affairs, Rognlie, to

whom he reported (Rognlie 1518-20; J-171-0002), and the Embassy's Counselor for

Science, Johne, to whom Ewald reported. (J-171-0007.)

100.     On September 13, 2008, Ewald discussed her salary with Gandrud on the

phone.  (Ewald 120-21; Gandrud 716.)  Despite the fact that Gandrud had already

offered Davidson $100,000, Gandrud misrepresented the truth to Ewald.  Gandrud told

Ewald that he had worked very hard and was able to get the top of the range for both

positions   $70,000.  (Ewald 120-21.)  Gandrud then formally offered Ewald the expert

position with a salary of $70,000 and informed her that a pension and parking were

included in her employment package as well.  (Ewald 121.)  When Gandrud told Ewald

that both experts were offered salaries at the top of the fixed range, she did not question

his statement.  (Ewald 120-22; 388-390.)  Nor did Ewald attempt to further negotiate her

salary because she believed that $70,000 was the highest salary that the Embassy could

offer.  (Id.)  Ewald believed that the salary range was rigid and that the Lønnstrinn

system applied to both expert positions.  (Ewald 390.)  Gandrud conceded that Ewald

was entitled to believe him when he said that she was offered the top of the range.

(Gandrud 752-53.)  Ewald testified that had Gandrud informed her of the actual

difference in pay between her salary and Davidson's, she would never have accepted the

position.  (Ewald 479.)

　　　　101.　　The September 13, 2008 conversation was the first time Gandrud provided

Ewald with specific salary information.  (Gandrud 748.)  Before that time, Gandrud did

not believe that the economic portion of Ewald's offer was relevant.  (Gandrud 752.)

Gandrud remarkably believed that Ewald would have taken the expert position

regardless of the salary.  (Id.)

　　　　102.　　On September 13, 2008, Gandrud reported to Johne that he had a "very

long conversation today and [Ewald] accepts our offer, $70M+pension+health."
(P-12-0001.)  Gandrud noted "now we have both on board!"  (P-12-0002.)  Johne
responded, "the embassy would issue contracts" as they "had a meeting the day before
on details!"  (P-12-0001.)  Johne asked, "Did you offer 100 + health + pension to
Anderson? [sic]  And he accepted?"  (P-12-0001.)  Gandrud responded affirmatively.
(P-12-0001.)

103.    Also on September 13, 2008, Gandrud replied to Steering Committee
Member Aasland's September 11, 2008 email, in which Aasland had reiterated the
Steering Committee's understanding that funding was to be equally split for the two
expert positions.  (P-17-0002.)  Although Gandrud informed Aasland that "both
candidates have accepted our offer," he did not mention the candidates' salaries.
(P-17-0002.)  Moreover, Gandrud did not address the fact that the Steering Committee's
belief that both candidates would be offered identical salaries, differed from the actual
salaries offered to the candidates.  (Id.)

104.    On September 16, 2008, Gandrud emailed Kathy Tunheim, a public
relations consultant in Minnesota and a Norwegian-American, asking her to draft a press
release for the Consulate, in order to: (1) explain the New Model Consulate; and (2)
introduce the two officers to the community.  (Tunheim 202-203, 208-09, 219-221;
P-16-0001.)  In an effort to understand the nature of the two expert positions, Tunheim
asked whether the expert positions were both full-time positions.  (Tunheim 214-15;

P-16-0001.)  Though Tunheim did not request salary information, Gandrud was again

untruthful and volunteered that "[b]oth [were] full time [off record $100,000+

positions]," and offered positive descriptions of both Ewald and Davidson.  (Tunheim

214-15; Gandrud 768; P-16-0001.)  While Tunheim had no intention of using the salary

information in the press release, she understood Gandrud's reference to salary to mean

that "they were senior positions that were worthy of our putting out a press release to

suggest these were going to be go-to people in the community," and to convey the

significant commitment made by Norway.  (Tunheim 214-15, 217.)  Gandrud never

expressed to Tunheim that one expert position was better or more important than the

other, which led Tunheim to assume that they were comparable positions.  (Tunheim

211; P-16-0001.)  Tunheim assumed that the information provided by Gandrud was

accurate and truthful.  (Tunheim 216.)

105.    While drafting the press release, Tunheim asked Gandrud for additional

information about the experts' duties.  (J-10-0010-12.)  Gandrud asked Ewald and

Davidson to respond to Tunheim's request.  (J-10-0009.)  In her email response, Ewald

pasted a copy of the job posting for her position and noted that although Davidson's

position was "different from mine, there are some general comments that might be made

which could apply to both of our jobs."  (J-10-0004.)  She observed that in the New

Model Consulate, the two positions were:

> dedicated and focused positions aimed at supporting specific strategic
> goals of the Norwegian government and the participating ministries and

institutions.  Moreover, these goals have an overriding objective of promoting positive relations and building bridges between US (in particular the mid-west) and Norway in the areas of education, research, business and innovations . . .  Our duties will be based and measured on supporting these goals.

(Id.)

106.    Also on September 16, 2008, Gandrud emailed the Embassy noting that Davidson's offer was for a salary of $100,000, along with pension benefits, and health insurance for a family of four, while Ewald's offer was for a salary of $70,000, pension benefits, and health insurance.  (P-17-0001.)  Gandrud did not specify the number of persons that Ewald's health insurance was intended to cover.  (Id.)

107.    On September 18, 2008, Gandrud advised Davidson that "The Embassy is finalizing the Contract   I have reviewed it   you will like it."  (P-18-0001.)  Gandrud asked Davidson for additional information regarding his family for the purpose of finalizing Davidson's benefits package.  (Gandrud 769-70; P-18-0001.)  However, Gandrud did not ask Ewald for information about her family.  (Id.)

108.    Ewald executed her Employment Agreement on November 4, 2008.  (J-12-0001-5.)  The Agreement set forth her job description and title, salary of $70,000, pension contribution, holidays, working hours, and various other terms.  (Id.)  Although her salary was set at $70,000 in the Agreement, in actuality, her annual base compensation was $75,355.  (Trial Transcript Stipulation 920-21; Davidson 2007-08.)  The Embassy paid Ewald the additional $5,355 in order to account for payroll taxes.

54

(Id.)  Additionally, Ewald received a pension contribution that comprised ten percent of the $70,000 salary outlined in the Agreement    $7,000 per year.  (J-12-0001-4.)  Therefore, during the course of her employment, Ewald received $75,355 in base compensation, plus $7,000 in pension.  (Trial Transcript Stipulation 920-21.)

109.   Davidson received and executed a similar Employment Agreement on October 14, 2008.  (Trial Transcript Stipulation 920-21; J-11-0001-0005.)  However, unlike Ewald, Davidson's annual salary was $100,000.  (Id.)  Davidson did not receive an additional payment to account for payroll taxes, to which he did not object, because he knew that he was earning more than Ewald.  (Davidson 2008.)  During the course of his employment, Davidson also received a pension contribution that comprised ten percent his base salary    $10,000 each year.  (Id.; Davidson 2006.)  Additionally, Davidson received uninterrupted health benefits for himself, his spouse, and his two children throughout his employment.  (Davidson 2006.)  The salaries, pension amounts, and benefits outlined in Davidson's and Ewald's Employment Agreements were also stipulated to at trial.  (Trial Transcript Stipulation 102.)

110.   Davidson's and Ewald's Employment Agreements stated, without further elaboration, that "health insurance" was to be provided as part of their compensation packages.  (J-11-0002 at ¶ 8; J-12-0002 at ¶ 8.)  The Administration Department at the Embassy, under Deputy Kolberg's direction, was responsible for the Employment Agreements.  (Rognlie 1493.)

111.    In terms of which individual or sub-entity actually set the specific salaries

for Davidson and Ewald, Defendant had no clear answer.  Although Gandrud told Ewald

that the Embassy had set her salary, he later testified that he did not know who set the

salaries.  (Gandrud 729; Ewald 328-29.)  Ambassador Strømmen testified that he had no

role in setting the salaries for the two expert positions, although he approved the

recommended salaries.  (Strømmen 838-39.)  Johne, a leader at the Embassy and one of

Ewald's bosses, testified that she had nothing to do with setting the two experts'

salaries.  (Johne Dep. 59-63; Ewald 317, 329.)  According to Steering Committee Chair

Finborud, the Stakeholders did not set the salaries.  (Finborud Dep. 37.)  Rognlie also did

not set the salaries; she testified that "[she] didn't take part in the discussions about

salary.  That was taken care of in Minneapolis."  (Rognlie 1446, 1448, 1472-73.)

## Ewald Commences Employment

112.    Ewald moved from Norway to Minneapolis because she accepted the

position at the Honorary Consulate.  (Ewald 96, 123; Mikalsen 1200.)   Her domestic

partner, Terje Mikalsen, required legal assistance concerning his immigration status in

order to relocate to Minnesota with Ewald.  (Ewald 131-133; Mikalsen 1658-59.)  At

Gandrud's suggestion, Ewald and Mikalsen hired Elaine Kumpula of the Faegre &

Benson law firm to help Mikalsen obtain a green card.  (Id.)  Ewald and Mikalsen paid

Faegre & Benson $18,664.91 for their work.  (Trial Transcript Stipulation 131-33.)

113.    Ewald officially started her work for the Honorary Consulate on October

1, 2008.  (Ewald 123.)  Ewald and Davidson were told that they reported to Vice

President Mondale and Gandrud.  (Ewald 194.)  Ewald stated, "[w]e were told very

clearly that . . . our directives were to come from Vice President Mondale and Consul

Gary Gandrud."  (Ewald 175.)  Ewald and Davidson were also accountable to the

Stakeholders.  (Finborud Dep. 44-45; Ewald 194.)  The Stakeholders expected Ewald

and Davidson to complete the work outlined in their job descriptions and to "follow the

signals given to them."  (Finborud Dep. 43.)  The Stakeholders' directives were to come

from the Steering Committee, which was charged with steering the two expert positions.

(Berg 1245, 1304-1305.)  Although the organization's hierarchy and reporting system

was outlined in advance, as a practical matter, correspondence between the Honorary

Consulate, the Embassy, and the Stakeholders reflected the parties' confusion about who

was responsible for decision-making.  (See e.g., P-26-0001-02 (an email string between

Gandrud and Vice President Mondale in which they discuss "a bit of a pattern" of the

"Embassy not following through on their commitments," causing Gandrud to state that it

was due to a "lack of communication on their end."); P-38-0005 (an email from

Finborud to numerous others, summarizing a 3/13/09 Steering Committee meeting, and

noting that "some lack of clarity emerged re: the Steering Committee's role.").)  Gandrud

explicitly addressed the lack of clarity in communication and decision-making in a

March 15, 2009 email, which contained Davidson's and Ewald's draft vision statements:

> Both [Honorary Counsel General] Mondale and I feel it very important that
> changes and comments be directed to us rather than directly to Ellen and

Anders.  They have to be responsive to the wishes of the Stakeholders as
well as the Embassy.  At the same time, we are in real danger of creating
confusion and resentment should they hear from different and even
competing "supervisors."  Mondale and I will be responsible for making
them conform to the wishes of the Stakeholders and the Embassy.

(P-41-0006.)   Stakeholder Terje Emblem, representing the Research Council of Norway,

stated that the Steering Committee's role was a bit amorphous: "The two employees

cannot constructively follow many and eventually dissimilar control signals from the

Consulate (Gandrud), the Embassy/MFA and the Steering Committee.  The Steering

Committee's Mandate is unclear on this point."  (P-41-0008.)

114.    Ewald's and Davidson's job duties were set forth in the job postings.

(Johne Dep. 91-92; J-2-0002-3.)  The Steering Committee set priorities and expected

Ewald to develop a "strong institution network between Norway and U.S.A. on the

education and research side."  (Finborud Dep. 43-44.)  Similarly, the Stakeholders

expected Davidson to "also promote and get Norwegian business into the Midwest and

connect the ties."  (Finborud Dep. 44.)

115.    Finborud testified that the two experts were expected to work as a team.

(Finborud Dep. 64.)  In fact, Finborud explained that the experts were responsible for

some overlapping work with institutions concerning research and technology.  (Id.)

Finborud also testified that research and innovation are "two sides of the same coin."

(Finborud Dep. 88; Ewald 30-31.)  Ewald's first priority was to "network, to build . . . up

connections, cooperations between the various research institutions and other academic

institutions." (Finborud Dep. 54.) Davidson was also expected to similarly network in order to facilitate connections between businesses. (Davidson 2014-2015.)

116. In early 2009, both Ewald and Davidson began working on vision statements containing their respective goals, objectives, and anticipated activities, as well as proposed budgets, for the coming year. (Ewald 359-360; J-22-001.) The Stakeholders wanted to evaluate these vision statements. (Id.) On February 18, 2009, Gandrud emailed Gary Smaby, an outside consultant, asking him to review Davidson's vision statement and "coach him." (P-76-0001.)

117. On May 15, 2009, Gandrud sent the draft vision statements to Ambassador Strømmen, Vice President Mondale, and others, soliciting feedback. (P-41-0010.) Responding to the two drafts, Stakeholder Emblem, of the Research Council of Norway, found that the two vision statements were "very dissimilar in form and content." (P-41-0009-10.) Emblem found that this contradicted the Steering Committee's understanding "that the two positions would constitute a team, with more related activities and operations, and mutually consistent priorities, etc." (P-41-0007.) Rognlie recommended that the vision statements make clear "that the positions work as a team with somewhat overlapping institutions in relation to research and technology. An example here is renewable energy and environmental technology, as well as medical technology." (P-41-0009-10.)

118. Emblem's organization also found that Davidson's draft vision statement

did not sufficiently address research-based innovation.  (P-44-0003-4.)  The Research

Council advised that Davidson have a "clearer goal to develop relationships between

Norwegian and American actors in the Midwest within research based activities."

(P-44-0003-4.)  The Research Council also criticized Davidson's proposed vision

statement for its failure to reference any work performed in cooperation with the

Research Council, which has "the main responsibility for research based innovation [in

Norway]."  (P-44-0004.)

119.    In a subsequent June 8, 2009 email to Gandrud, Rognlie summarized the

Stakeholders' feedback concerning the vision statements:

   •    The two positions should work as a team.  A common vision should
        be reflected in the Statements.  Their work is overlapping regarding
        research-based innovation and institutional contact.

   •    The stakeholders have contributed to the budget as a whole and not
        to one specific position.  That means as an example that Anders also
        should have a dialogue with the Research Council on their work on
        innovation.  The job descriptions should be part of the Vision
        Statements, but in working as a team the positions could overlap
        and should support each other.

(J-23-0002-03.)

120.    Based on the feedback from the Stakeholders, Gandrud directed Davidson

and Ewald to revise their vision statements.  (Gandrud 794-797; J-23-0002-3.)   Gandrud

directed Ewald to use "almost the same verbiage" as Davidson, particularly with respect

to their collaborative work.  (D-20-0001.)

121.    Notably, Davidson stated in his vision statement:

A key success factor for this role is working closely with the Higher
Education and Research Director position, particularly in the areas of
academic research and innovation.  The commercialization of research
from universities is an extremely important source of innovation and
business opportunities.  Combining [their] academic research and business
talents[,] Norway and the U.S. may yield significant results.  To facilitate
the synergy of the two roles, the Directors will meet on a regular basis to
discuss.  In addition, when appropriate, both Directors will attend
meetings, teleconferences and conferences together.  Science Week is a
great example of how the two positions can work together to advance the
interests and opportunities for academic and private research, innovation
and commercialization.

(D-20-0002; D-24-0009.)

122.    Ewald's revised vision statement mirrored Davidson's description of how

the two expert positions overlapped and worked together.  (D-24-0004.)  Both Ewald and

Davidson also noted that along with Innovation Norway, they worked with the Research

Council.  (D-24-0005, D-24-0011-13.)  In addition, Ewald identified ways in which the

two positions would work together:

The Midwest is also home to more than thirty Fortune 500 companies and
leading corporations, including many companies recognized as the most
research-based innovative companies in the world, such as Cargill,
Medtronic, 3M and Ecolab, not to mention dozens of emerging ventures in
the areas of green technology/renewable energy, health care and
information technology.  These are all great potential partners for applied
research from Norway and this position will work with the Director of
Business Development and Innovation to identify and support efforts in
this area.

(D-24-0006).

123.    Gandrud met with the Stakeholders to discuss the Honorary Consulate on

June 26, 2009.  (P-43-0001.)  The Steering Committee was enthusiastic about the work

that had been performed.  (P-43-0001-2.)  Although they agreed that some student exchange was important, the Steering Committee stressed that Ewald's priority should be "research cooperation on a higher level," "more formal agreements … between institutions," and "collaboration between universities."  (P-43-0001.)

124.   During her interview and immediately afterward, Ewald was initially encouraged to work on student mobility issues and student exchanges.  (Gandrud 750; 756-58; 796-97; Mondale 606-607, 674, 681, 696, 702-703; Ewald 93-94, 108-110; P-52-0001, D-24-0016, J-23-0003.)  However, in March 2009, the Steering Committee first directed Ewald to re-prioritize her focus on "strategic cooperation between universities, institutions and research groups above student exchanges and student mobility."  (P-38-0005.)  The Steering Committee expected that undergraduate student exchanges should occupy no more than ten percent of Ewald's time.  (J-23-0003.)  From then on, Ewald focused more on building relationships between the Norwegian and United States institutions and less on student mobility.  (Ewald 175; D-24-0016; see also Finborud Dep. 52-53.)

125.  Gandrud communicated with Steering Committee Chair Finborud about de-emphasizing student mobility issues.  (P-52-0001.)  Gandrud explained, "[w]e may have overstated this fact in our discussions" with Ewald "when she was first hired for her present position" (Gandrud: 799-800; P-52-0001), and "you should know that student exchanges were not the major part of Ellen Ewald's duties this past year."  (P-52-0001.)

Gandrud identified numerous examples of work that Ewald had facilitated in finding partners, establishing relationships and exchanges between institutions, and participating in the Nobel Peace Prize Forum.  (P-52-0001-02.)

126.  Gandrud reported to the Steering Committee that Ewald worked to develop relationships not only with educational institutions, but with business entities as well. (P-52-0001-2.)  In fact, one reason that the positions were considered so similar was that business development was a significant aspect of both positions.  (Mueller 1137; see also Nash 551-52.)  For example, Gandrud indicated that Ewald had worked on facilitating cooperative interests between the Human Nutrition Center-Obesity at the University of North Dakota and SINTEF and St. Olav's Hospital in Trondheim, Norway.  (Id.) Gandrud also reported to the Steering Committee that Ewald had initiated and was involved in a joint entrepreneurial exchange with the University of Oslo, Oslo Renewable Energy and Environment Cluster, the Norwegian-American Clean Tech Alliance, and St. Thomas Opus College of Business.  (P-52-0002.)  Ewald also helped to facilitate connections between Twin Cities-based Cargill and Norwegian businesses (Ewald 188); connected MIT colleagues with representatives of Statoil, a Norwegian oil company (Ewald 192); arranged meetings between Oslo MedTech Group and local businesses interested in research (Ewald 176); and organized a brain science conference involving representatives from research, business, and public policy, including the former Prime Minister of Norway (Ewald 183).  Ewald also worked on the Cell Research

63

and Treatment Alliance Project ("CeRTA")   a collaboration for education and business, using Norway's biobanks containing information for medicine and research (Ewald 174; Hansen 1085-86)   for which Vice President Mondale praised Ewald's "gifted leadership." (P-72-0003.) Ewald's excellent work with the business communities in Minnesota and Norway led Nash and his business clients to turn to Ewald for assistance, rather than Davidson, if they needed help because "[Ewald] understood how business and academics would work together." (Nash 550-51.)

127.   Ewald and Davidson often interacted with overlapping entities and audiences. For instance, Ewald and Davidson both facilitated meetings of visiting Norwegian dignitaries and event attendees (Ewald 173; Hansen 1084-85); traveled to Norway (Ewald 189; Davidson 2024); gave presentations and represented the Honorary Consulate at community events (Davidson 2024-25; Ewald 180); planned Science Week 2009 together (Ewald 181-82; Davidson 1945-46); attended Science Week 2010 (Davidson 2034-35); performed work related to Midwest-Norway connections in the areas of environmental technology, renewable energy, and medical technology (Ewald 185); met with Norwegian and Midwestern business representatives (id.); and covered some of Consular Officer Carleton's administrative duties when she was out of the office (Ewald 193; Davidson 2025). As an additional example of how Ewald and Davidson worked with audiences in both education and business, regardless of their job titles, Davidson once gave a presentation at St. Olaf College (Davidson 2024-25; Ewald 180),

and Ewald gave a presentation at the NACC (Ewald 181).

128.     There is no factual evidence in the trial record that Davidson performed

duties that required greater skill, effort, or responsibility than Ewald.

### Differences in Health Insurance Benefits

129.     Ewald's enthusiasm for role at the Honorary Consulate began to diminish

when she attempted to register her family in the Embassy's healthcare policy.  (Ewald

135-36; Gandrud 770.)  On November 5, 2008, Ewald asked the Embassy how to add her

children and partner to the health plan, noting that while she had experienced difficulty

in this regard, Davidson had no difficulty at all in obtaining health care coverage for his

family.  (Ewald 137; P-22-0007-9.)  An Embassy benefits employee responded, "I have

never received any information that [Ewald's children and partner] should be added to

the plan."  (P-22-0008.)  The benefits employee contrasted Ewald's family situation from

Davidson's, by stating that Davidson supported his wife financially and that his children

were under eighteen years old.  (P-22-0007.)  Specifically, the employee explained, "As I

understand it, your partner is not dependent on your income, and so he is not covered

under your health insurance." (P-23-0005.)  In response, Ewald wrote,

> As concerns my partner, is it the case that I have to report to you on how I
> use my money and on whom?  I have never been asked nor have I ever told
> anyone in your department that my partner is not dependent upon me.  As
> concerns my children, they are both students here in the U.S. (at the
> University of Minnesota and Mount Holyoke College) 18 and 20 years old.

(Id.; see also Ewald 141.)

130.  On another occasion, Ewald was told that her partner, Mikalsen, would not be covered by the Embassy's health plan because he was a Norwegian Citizen; and thus, was already covered by Norway's national health care system. (Ewald 141.)  Norwegian citizens generally receive coverage through Norway's national health insurance system ("NAV"), and do not have the option of receiving private health insurance at the Embassy's expense. (Carleton 1069; Log 1859.)  In order to avoid double coverage, Ewald was told that Mikalsen could not be covered through the Embassy's health care plan.

131.  In an attempt to determine her health care entitlements, Ewald spoke with an attorney. (Ewald 145.)  Based on this conversation, Ewald understood that under Minnesota law, a parent-employee's health insurance must provide coverage for his or her children, who are full-time students and ages twenty-five or younger. (Id.)

132.  Ewald notified the Embassy that, under Minnesota law, children who are twenty-five or younger, and are full-time students, must be covered. (P-55-0001-2; Ewald 148.)  Instead of responding directly to Ewald's concerns regarding Minnesota's requirements for coverage, the Embassy argued that Ewald's daughters were not full-time students, and thus were not entitled to coverage. (Ewald 148-49.)  Ewald corrected the Embassy, informing them that both of her daughters were, in fact, full-time college students. (P-54-0002; Ewald 153-54, 164-65.)  However, even after Ewald repeatedly relayed this information to the Embassy, Ewald's children were not provided

coverage by the Embassy.  (Ewald 153-54; 164-65.)

133.    When Ewald asked Davidson how he had obtained health insurance for his family, Davidson responded that it had been arranged for him when he was hired. (Ewald 137.)

134.    On November 6, 2008, the Embassy somewhat changed its position with respect to Ewald's insurance coverage, noting that it would provide health care coverage for (1) Ewald's youngest daughter, but only during her first year of college, and (2) Ewald's partner, Mikalsen.  (Ewald 142.)  However, this change in position did not occur until several months after Ewald's initial start date.  (Ewald 156; Mikalsen 1659-61.)  Ewald's youngest daughter was eighteen years old when she obtained coverage. (Ewald 144.)  Although the Embassy contends that it has never provided coverage for a local employee's dependent over the age of eighteen (Log 1862-63), the facts of this case contradict this position.

135.    Although the Embassy agreed to provide coverage for Ewald's younger daughter for one year (J-24-0006), they refused to provide coverage for her older daughter.  (See P-54-0011.)  Ewald requested that her older daughter be placed on her insurance plan and she paid out-of-pocket to cover her daughter's premiums.  (P-55-0001; P-101-0001-30.)  After her younger daughter's first year of college was complete, Ewald also paid out-of-pocket to cover her younger daughter's premiums.  (P-101-0001-30.)

136.    On November 19, 2008, Steering Committee Chair Finborud formally advised the Steering Committee that Davidson was receiving higher pay and different benefits than Ewald.  (P-28-0008-9.)

137.    Although the Steering Committee was informed about the difference in pay and benefits, Ewald continued to experience disparate treatment.  In fact, although in November 2008, the Embassy agreed to cover Mikalsen, the Embassy retracted his coverage within a few months.  (Ewald 142.)  On March 19, 2009, Ewald received an email from Jan Aage Larsen, the Embassy's Counselor for Administrative and Consular Services, informing her that Mikalsen was about to lose his medical coverage in less than two weeks.  (Ewald 142; 154-56; P-37-0005, P-51-0010-11.)  Larsen stated, "In re: your conversation with Gary concerning the Norwegian rules for medical coverage of your partner, see below wherein his part of the medical insurance agreement is now cancelled with effect as of April 1st, 2009."  (P-37-0005.)  The process of canceling Mikalsen's coverage began on February 25, 2009, and the late notice gave Ewald very little time to find alternate insurance for her partner.  (P-37-0008; P-51-0009.)  The basis for denying Mikalsen's coverage was that he had "independent income."  (P-37-0008.)  In fact, other than his Norwegian pension, Mikalsen did not have independent income at the time.  (Ewald 157-58.)  Ewald objected to the Embassy's treatment, noting her understanding that Davidson's spouse was covered even though she worked outside the home.  (Ewald 158.)

138.    On March 20, 2009, in an email between Gandrud and Vice President

Mondale, Gandrud stated, "Terje [Mikalsen] apparently cannot be covered under the

final health policy since he has Norwegian citizen coverage." (J-20-0001.) This was a

different reason than the "independent income" reason provided to Ewald just one day

earlier. (P-37-0008; Ewald 161.)

139.    Ewald felt distressed and frightened at the prospect of Mikalsen losing

medical coverage. (Ewald 163.) At the time that the Embassy canceled Mikalsen's

coverage, he was experiencing health issues and had recently visited the Mayo Clinic.

(Ewald 155.)

140.    Concerned that Mikalsen would be without coverage while experiencing

health problems, Ewald issued a plea for Mikalsen to stay on the Embassy's policy at

Ewald's expense. (Ewald 159.) The Embassy granted that request. (Id.)

141.    Although the March 19 email notifying Ewald of the cancellation of

coverage referenced a conversation with Gandrud, neither Gandrud nor any other

representative of the Embassy had ever spoken to Ewald about cancelling Mikalsen's

coverage. (P-37-0001; Ewald 156-57.) Likewise, no one from the Embassy or the

Consulate had asked Ewald about Mikalsen's income. (Ewald 158.)

142.    Ewald understood that Davidson's spouse had independent income.

(Ewald 158.) However, when she sought an explanation for the Embassy for why

Davidson's spouse was allowed coverage while having an independent income, but

Mikalsen was not afforded coverage, no one from the Embassy ever responded.  (Ewald 158; 170.)

143.    In early August 2009, having received no response regarding family health insurance coverage, Ewald requested a copy of the policy that the Embassy relied on to deny coverage.  (P-50-0006; Ewald 295.)  Larsen referred Ewald to "an old book of rules for locally employed personnel," which was subsequently replaced by an electronic version.  (P-50-0001.)

144.    Ewald paid $15,368 for health insurance premiums for her daughters for the period from September 2009, to September 2011.  (Ewald 134; Trial Transcript Stipulation 920; P-101-0001-30.)  In contrast, Davidson's children were covered by the Embassy while he was employed at the New Model Consulate.  (Davidson 2006.)

145.    The lack of clarity surrounding Ewald's health insurance through the Embassy also resulted in Mikalsen not being covered for a period of approximately two months at the beginning of Ewald's employment at the New Model Consulate. (Mikalsen 1659.)  After Ewald requested that the Embassy's insurance cover Mikalsen at Ewald's expense, Ewald paid out of pocket for 12 months of insurance premiums amounting to $6,455 for her partner/husband (P-101-0001-30).  However, that amount was later reimbursed by Defendant.  (Trial Transcript Stipulation 920-21.)

**Ewald Learns of Difference in Salaries**

146.    On August 5, 2009, over ten months after she commenced employment

with the Embassy, Ewald reviewed an email that she had received from Johne, which included a budget document from the Embassy that listed the salary budget for the Consulate and she learned for the first time that she was paid less than Davidson. (Ewald 286-87; P-47-0004; P-48-0002; P-49-0001.) By looking at the budgeted salary, Ewald deducted her own salary to determine the approximate amount of Davidson's salary. (Ewald 286-87.) Ewald was surprised to learn of the salary difference and felt terrible that the Embassy financially valued her significantly less than Davidson. (Ewald 288.) The Embassy budget document also reflected that for a particular three-month period, Davidson received over twice as much of an allocation for travel than Ewald. (P-48-0002.) In Ewald's August 6, 2009 email to Larsen that primarily addressed health insurance issues, Ewald asked Larsen to confirm whether the salary discrepancy she observed between the two positions was accurate. (P-49-0001.) On August 7, 2009, Larsen confirmed that the salary numbers listed in the budget were correct. (P-50-0001.) As a result of this email exchange, Ewald asked Gandrud why Davidson's salary was so much greater than hers. (Ewald 316; Gandrud 801.)

147. Based on the budgeted salary allocations in Johne's email, Ewald applied the then-current exchange rate, calculating her salary to be $70,000, and Davidson's salary to be $110,000 (P-55-0002), amounting to a $40,000 difference in salary. (See P-55-0002.) Ewald's calculation of Davidson's compensation was likely a result of adding Davidson's base pay of $100,000 and his pension contribution of $10,000.

148.    Until Ewald learned about the salary differential, no one at the Embassy had told her that the two expert positions were materially different or unequal.  (Ewald 299.)  In fact, they consistently told her just the opposite    that the expert positions were "equal" and "parallel."  (Id.)

149.    On September 23, 2009, Ewald emailed Larsen again to confirm that her calculations of the numbers were correct.  (Ewald 293-94; P-55-0001-2.)  Larsen responded to the September 23, 2009 correspondence to confirm receipt of the email, but provided no substantive response.  (Ewald 294; P-55-0001.)  He indicated that "it might take a little while for us to answer your points."  (P-55-0001.)

150.    A month later, on October 23, 2009, Ewald sent a follow-up email to Larsen asking when she could expect to receive a response to her September 23, 2009 inquiry regarding pay discrimination.  (P-62-0001; Ewald 295.)  Ewald testified that the one-month delay in receiving any substantive response left her feeling dismissed, disregarded, undervalued, and, generally, bad about herself.  (Ewald 295-96.)

151.    Receiving no further response from Larsen, Ewald again requested a response on November 4, 2009 (P-63-0001), and again on November 16, 2009, copying Ambassador Strømmen.  (Ewald 296; P-65-0001.)

### September 23, 2009 Letter from Gandrud and Vice President Mondale to the Ambassador

152.    Ewald also asked Gandrud about the pay disparity between her and Davidson.  (Ewald 316; Gandrud 801.)  After Ewald inquired about the pay disparity,

Gandrud alerted Vice President Mondale about Ewald's unhappiness with the pay gap.

(Id.)  Gandrud and Vice President Mondale immediately began drafting a letter to

Ambassador Strømmen regarding the salary difference between the two expert positions.

(Gandrud 800-04; Mondale 635-38; P-56; P-57; P-58.)  To his great credit, Vice

President Mondale felt a sense of urgency to rectify the pay differential (Mondale 638),

and "tried to get it changed" right away.  (Mondale 651.)

153.    On September 23, 2009, Gandrud emailed Vice President Mondale the

draft letter, noting in Gandrud's transmittal email that the letter was intended to address

the following issues: (1) a budget shortfall of approximately $500 per month; (2) a

requested increase in the salary of the Honorary Consulate's Consular Officer, Christina

Carleton; and (3) a requested increase in Ewald's salary, indicating that "her 70M and

Anders 110M is too big a spread . . . ."  (P-58-0001; Gandrud 802-03.)   Regarding the

salary difference, the letter, in final form, states:

> [t]here is too big a discrepancy between the salaries of Ellen and Anders
> Davidson.  We recognize that there is a different job market demand
> between education and business and this is reflected in the differential.
> But that differential is too large ($70,000 compared to $110,000).  Once
> again, we understood that this would be addressed in the 2010 budget.
> Norway is an acknowledged leader in gender equity and since these two
> people work closely and since both work hard with exemplary results and
> dedication, we find the differential unjust and embarrassing.

(P-56-0002.)

154.    By writing the letter, Vice President Mondale hoped to reassure Ewald that

she was a valued employee and that her salary would be appropriately adjusted.

73

(Mondale 638.)  Vice President Mondale agreed that he 'stood behind the letter' and testified that he used charged language   which he described as "dynamite" in his deposition   in order to impress upon the Embassy the importance of rectifying the salary differential.  (Mondale 635, 638.)  Although, at this point, Vice President Mondale was still unaware that the so-called market research that Gandrud had provided him lacked credibility, the Vice President came to believe that regardless of the justification for the difference in pay, the disparity was so great that it was unjust.  (See P-56-0002.) Additionally, Vice President Mondale was concerned that the Embassy's failure to rethink the salaries could jeopardize the success of the entire New Model Consulate. (Mondale 638.)

155.    In contrast, when Gandrud was asked about the letter, he testified that the forceful language in the letter was mere "argument," and "[he] did not believe that [the pay differential between Davidson and Ewald constituted gender discrimination]." (Gandrud 492-93.)  Although Gandrud conceded his agreement with the statement in the letter that Norway is a leader in gender equity (Gandrud 493-94), he testified that he leveled accusations of gender discrimination against the Embassy in order to win his point, using the letter as "a means to an end" (Gandrud 804):

Q:    But this differential, whether it's 70,000 to 100[,000] or 70,000 to 110[,000], it was too large?

A:    That's what I said.

Q:    And you had added language that because Norway is an

acknowledged leader in gender equity, this might be something they
would be interested in.

A:      I was trying to make a forceful argument that they could not refuse.
        In that whole memo, I wanted my way and have these things put
        into the 2010 budget so our office could function better with the
        stakeholders and with the local community.

Q:      And there's no more forceful way to do that than to accuse your
        superiors of gender discrimination?

A:      I was trying to win my point.

(Gandrud 803-04.)  Gandrud admitted at trial that through the September 23, 2009 letter,

he and Vice President Mondale were telling the Embassy that the salary difference

between Ewald and Davidson was wrong.  (Gandrud 804.)

156.    Gandrud personally delivered the letter to Ambassador Strømmen at a

meeting in Washington, D.C.  (Gandrud 805-06.)  Ambassador Strømmen looked at the

strongly-worded letter from Gandrud and the former Vice President of the United States,

read it, and handed it back to Gandrud at the end of their meeting.  (Gandrud 805;

Strømmen 846.)  Ambassador Strømmen said that he was displeased and a bit surprised

about the letter, noting that only a year earlier, the Embassy had "blessed or endorsed"

the experts' salaries with the signing of their respective contracts.  (Strømmen 844.)   As

a result, Ambassador Strømmen found the situation "a bit awkward."  (Id.)   Moreover,

he testified that he was surprised because the letter presented the very issue about which

he had inquired a year earlier    the salary discrepancy:

        I pointed out the fact that here you are with this    a year after you hired and

> sent me the other recommendations, you come with this.  And you know
> that I don't have a general fund that I can then help you out with the money
> on this.  I have to raise them, you know, extraordinary, out of, you know,
> from somewhere else.  The budget was, what was my concern.

(Strømmen 845.)  Ambassador Strømmen told Gandrud that he would treat the request as

a budgetary matter and would try to obtain funding through annual adjustments or from

the Stakeholders.  (Id.)  However, neither Ambassador Strømmen, nor the Embassy,

responded to Gandrud about whether it could make an adjustment to Ewald's salary.

(Gandrud 936.)  Additionally, Ambassador Strømmen never evaluated the deeply-flawed

market research, referred to in the September 23, 2009 letter, upon which the salary

difference was allegedly partially based.  (Strømmen 870.)  Despite Ambassador

Strømmen's representation to Gandrud that he would approach the Stakeholders for

additional funds (Strømmen 914), Stakeholder Berg of Innovation Norway testified that

he did not recall receiving any such request to increase Ewald's salary.  (Berg 1296.)

Ambassador Strømmen testified that he was not able to increase the budget.  (Strømmen

914.)

157.    However, on November 6, 2009, Steering Committee Chair Finborud

received an October 28, 2009 letter from Ambassador Strømmen, which she forwarded

to the Stakeholders via an email entitled "Request for extra funds for HCG

Minneapolis."  (J-26.)  In the attached letter, Ambassador Strømmen requested additional

funding for both expert positions in Minneapolis due to additional expenses.  (J-26-

0016.)  The Ambassador explained that the request for additional funds was based on

"the high dollar exchange rate for the first months in 2009," and indicated that the extra funds would cover various activities, including travel for 2009.  (Id.)   Specifically, Ambassador Strømmen requested a combined sum of NOK 150,000 (id.), or approximately $26,000 at the time.  (See http://www.x-rates.com/historical?from NOK&amount 150,000&date 2009-10-28) (last visited Dec. 29, 2014.)  In Finborud's transmittal email, she reminded the Stakeholders of their March 13, 2009 meeting with Ewald, at which they agreed that the dollar's reduced value must not reduce the activities of the new hires, and that the Stakeholders would have to come up with a solution.  (J-26-0014.)  Finborud noted that certain Stakeholders had covered some of Ewald and Davidson's respective travel expenses and recommended that the Stakeholders cover the expenses as a whole, and consider how to handle expenses for 2010.  (Id.)   By November 10, 2009, the Stakeholders had each agreed to pay the requested amount    amounting to an additional NOK 25,000 (J-26-0013), or approximately $4,500, per stakeholder at the time.  (See http://www.x-rates.com/historical?from NOK&amount 25,000& date 2009-11-10) (last visited Dec. 29, 2014.)  Stakeholder Berg testified that this was the only instance in which the Embassy asked the Stakeholders for an additional contribution.  (Berg 1295-96.)

158.   Eight days later, on November 18, 2009, Ambassador Strømmen responded by letter to Ewald, addressing the salary and insurance coverage issues, and for the first time, without explanation, described the two expert positions as "very

different jobs." (J-28-0002-03.)  In his letter, Ambassador Strømmen wrote:

> The salary levels defined in last year's negotiations with you and your
> colleague were based on what was, in consultation with the funders in
> Norway, considered necessary to recruit the right people to two very
> different jobs.  I believe this was explained to you in the course of the
> negotiations . . . Your salary is competitive compared to other
> locally-employed staff at our Embassy.

(J-28-0002.)

159.    In his November 18, 2009 letter, Ambassador Strømmen also advised

Ewald that while her children and partner could remain on her health insurance plan,

Ewald would have to pay for their supplemental coverage because her partner was not

financially dependent on her, and coverage was only for children under eighteen years

old. (J-28-0002-3.)  Strømmen acknowledged that his letter did not contain the answers

that Ewald was hoping for, but "[p]ublic employment is very rigid." (J-28-0003.)

160.    Ewald believed that Ambassador Strømmen's November 18, 2009 letter

was inaccurate. (Ewald 301.)  Ewald testified that her salary was not negotiated, that no

one asked her about her prior salary, nor did anyone at the Embassy ever ask her whether

she had negotiated her salary. (Ewald 298, 302.)  In fact, she had told persons at the

Embassy that she had <u>not</u> negotiated the amount of her salary. (<u>Id.</u>)  Moreover, as to

Davidson, the trial testimony demonstrates that his salary was not negotiated either

both Gandrud and Davidson expressly disclaimed that Davidson's salary was ever

negotiated. (P-7-0001; Davidson 1917-18; Gandrud 725-27.)  Ewald testified that the

letter made her feel as though the Embassy was not interested in providing her truthful information concerning her salary "negotiations."  (Ewald 301.)

161.    On December 30, 2009, Ewald sent Ambassador Strømmen an email in response to his November 18, 2009 letter, addressing the salary difference and her problems with insurance coverage for her family.  (P-68-0001-4.)  As to the salary difference, Ewald disputed Strømmen's characterization of the facts:

> You state in your letter that the jobs, hence corresponding salaries, are very different and that you believe this was explained to me during the negotiations period.  I am sorry, but this was not the case and I would be interested to know who told you that.  On the contrary, I have been told both verbally and in writing that our jobs are closely related, that we have parallel positions and therefore we needed to work closely together.  This is also apparent from the text in the job descriptions advertised for the positions.  Not to mention the fact that we share the same stakeholders.  I had understood that the salary range for the two positions was between 40,000 USD and 70,000 USD and I was told that we received the absolute maximum possible which obviously led me to believe that was also the case for my coworker.  Hence, I did not negotiate for my salary; I had assumed it was determined by typical UD "lønnstrinn"/salary levels within the aforementioned range.
>
> If the business position was so much more important than the education and research position and therefore warranted a significantly higher salary, why was that not communicated openly?
>
> ***
>
> Moreover, knowledge of Norwegian language and relevant activities (business, education, etc., as the case may be) was pointed out as important for the two jobs.  While I have full command of both languages, master degrees and work experience from both countries, my coworker has next to no knowledge of the Norwegian language or relevant activities in Norway. I would expect, for example, that my Norwegian skills and network would serve to balance the fact that he has worked for two high profile US companies.

(P-68-0002.)  Ewald requested a valid explanation for the difference in compensation.

(Id.)

162.   With regard to health insurance, Ewald wrote:

> As concerns my health insurance, I am asking for an adjustment.  I have
> consulted a local law firm who specializes in employment insurance rights.
> They have reviewed the translated email correspondence between Jan
> Aage Larsen and myself and studied the United Health Care insurance
> policies.  Their conclusion, based on the information I gave them (e-mail
> exchanges, the actual UHC insurance policy and my account of events) is
> that I seem to have been unfairly treated vis-à-vis my coworker with regard
> to coverage for my partner.

(P-68-0002.)

163.   Ewald testified that when she wrote the December 30, 2009 email, she was

frustrated and feeling sad and dismissed, as well as stressed to receive no meaningful

responses to her questions.  (Ewald 305-06.)  As Ewald's partner, Mikalsen, succinctly

explained that Ewald was:

> trapped in a system where apparently there was nothing she could do, and
> everybody seemed just to say this is done by Washington or this is done in
> Oslo or this is in Minneapolis.  They were always kicking the
> responsibility back and forth.  And she felt nobody is really listening to
> [her] and she felt very disregarded and let down.

(Mikalsen 1668-69.)

164.   Ewald testified that she eventually believed that the Embassy was simply

providing excuses for denying coverage, as opposed to genuinely trying to determine her

health benefits.  (Ewald 171-72.)  Ambassador Strømmen testified that he worked very

hard to help Ewald obtain insurance coverage.  (Strømmen 852.)

165.    On February 9, 2010, Johan Vibe, Deputy Chief of Mission for the

Embassy, presented the Ambassador's chief deputy, Larsen, with a list of reasons that

purportedly justified denying Ewald's family coverage.  (J-36-0003.)  Ambassador

Strømmen was copied on the email.  (Id.)  Vibe noted that the Ambassador was

concerned that Ewald should receive "somewhat more specific answers" regarding the

Embassy's refusal to extend health care coverage to her family members because

"[Ewald] is still nagging about getting 'clear answers.'"  (J-36-0003.)  The Embassy

offered two justifications as "somewhat more specific answers" for the poor health care

coverage Ewald's family received.  First, Vibe explained that Ewald's children were not

covered because they were older than eighteen.  (Id.)  Second, Vibe stated that Ewald's

partner, Terje Mikalsen, was not financially supported by Ewald.  (Id.)  Ambassador

Strømmen responded, "Brilliant    let's stick with the answers about health insurance for

the time being."  (J-36-0003.)  Ambassador Strømmen further cautioned: "Be aware that

she married Terje Mikalsen on January 1.  Thus they probably have, in accordance with

the regulations regarding marriage, a bilateral support responsibility    but I assume, as

far as this is concerned, that one actually has to be supported, that is to say not covered."

(Id.)

166.    Almost as an afterthought at the very end of Vibe's February 9, 2010

email, Vibe addressed the issue of Ewald's salary concerns.  (Id.)  Vibe snidely

suggested that "we give her a minimal amount.  0.0% may be too provocative?  But she

will learn about this the usual way along with the other local employees." (Id.)  Again, Ambassador Strømmen's overall response to Vibe's email was that Vibe's suggestions were "brilliant." (Id.)  The Ambassador advised that they wait to address Ewald's salary concerns, replying, "salary is a separate matter    let's handle that later." (Id.)

### Effect of the Salary Difference and Insurance Coverage Dispute on Ewald

167.    During this time period in early 2010, Ewald continued to feel that the Embassy was creating new excuses for denying Ewald's family health coverage, as opposed to genuinely finding solutions. (Ewald 172.)  Ewald felt undervalued, that her family was unimportant compared to her male colleague's family, and that her concerns regarding pay and benefits discrimination were unimportant. (Id.)  She summarized her response to the unequal pay, stating, "I felt that I was just broken." (Ewald 338.)

168.    Throughout Ewald's entire employment with the Embassy, the issue of health coverage for Mikalsen and Ewald's children was a constant source of worry for her. (Ewald 163, 234.)  Particularly because of Mikalsen's health conditions, she was concerned that the Embassy would "find another excuse" as to why Mikalsen was not covered on the Embassy's plan. (Id.)

169.    The difference in pay between Ewald and Davidson was so upsetting to Ewald because she "knew that these positions were equal." (Ewald 312.)  The Embassy's actions, however, demonstrated to Ewald that she was not considered equal. (Id.)

170.    The entire situation relating to differential pay and benefits was so

upsetting to Ewald that she began obsessing about it   "it was starting to take over in my

head, and I would think about   think about it before I went to bed at night, think about it

in the morning, and it was painful." (Ewald 306.)  Ewald testified that feelings of

sadness and disbelief essentially "took over [her] life." (Ewald 337-38.)  Mikalsen also

testified that over the course of Ewald's employment with the Embassy, her concerns

with respect to pay discrimination became "almost like an obsession." (Mikalsen 1677.)

Ewald discussed with Mikalsen the situation regarding pay and benefits discrimination at

the Embassy hundreds of times. (Mikalsen 1678.)  Although Mikalsen attempted to

involve Ewald in other activities in an effort to distract her, he was sometimes

unsuccessful in doing so. (Mikalsen 1679.)

171.    Mikalsen described Ewald before she took the job as a "very open and fun

person to be around," who also possessed impressive self-confidence, which Mikalsen

had observed at professional seminars and events. (Mikalsen 1674-75.)  Mikalsen also

addressed the change that he observed in Ewald from when she first took the job with the

Consulate:

> To start with, she was even more excited than she had been before.  But
> then that started to    that eventually turned into sadness, disbelief.  I think
> first she was extremely surprised to find that there was a difference in pay
> or even before that, she was frustrated that we didn't get the health
> insurance organized in any good way . . . .  I think she believed for a long,
> long time that explaining the facts and putting it in front of them, this
> would be fixed, it was just sort of a bureaucratic mess that she got caught
> in.

But then came the pay differential on the table, and she was shocked and
surprised to start with.  And again, believed that, okay, I explained this to
them, . . . believing that somebody would do something.  And she got into
a correspondence of   with evasive answers, a long time before any[one]
responded, and then it started to get at her, started to change her.  She
started to, instead of in the beginning just say, oh, I'm going to fight back,
she started to disbelieve herself and be pointing more to herself, what have
I done wrong, why are they doing this to me, are they trying to prove that I
am of less value?  Is that just because they pay me less, and now they have
to prove that that's true?

(Mikalsen 1676-77.)

172.    The fact that Ambassador Strømmen was someone with whom Ewald and

her family had socialized, made his unresponsiveness to her concerns particularly

bothersome to Ewald.  (Ewald 307.)  Ewald testified to feeling a sense of betrayal and a

diminished sense of self-worth.  (Id.)

173.    Ewald also testified that she found Johne's September 5, 2008 email (P-

100-0003) extremely embarrassing because Johne highlighted the significant difference

in pay between Ewald and Davidson, and sent the email to many people    some of whom

Ewald knew    in addition to a number of general agency mailboxes.  (Ewald 314.)

174.    Ewald felt as though the Embassy was trying to dismiss her or was simply

hoping that the situation would go away.  (Ewald 307.)  The Embassy's nonchalant

response to Ewald's concerns was particularly disappointing because of how quickly the

Embassy responded to others' concerns.  For example, when Carleton and Gandrud

raised concerns to the Embassy about the working environment in the Honorary

Consulate    specifically, the working relationship between Ewald and Davidson

84

Embassy personnel, including Elisabeth Wemberg, Lars Petter Henie, and Vibe, promptly investigated.  (P-105-0004.)

175.    Ewald, not normally a person who cries often, recalls that, to her embarrassment, she cried in the presence of  Davidson and Carleton and expressed her feelings regarding the pay discrimination she experienced.  (Ewald 325.)  Carleton remembered that Ewald was often very upset about the pay difference and her health insurance difficulties.  (Carleton 1055.)  Davidson similarly recalled Ewald being emotional and upset at work regarding differential treatment for travel reimbursement (including at meetings, and in relation to Science Week 2010).  (Davidson 2033.)  Ewald testified that she also often cried privately in her office, finding her reactions uncontrollable.  (Ewald 325.)  Prior to working for the Embassy, Ewald was not a person who had cried at work.  (Ewald 326.)  Because Mikalsen lived with Ewald, he could tell from Ewald's face that she privately cried at home as well.  (Mikalsen 1680.)  Ewald not only cried because of the disparate treatment she received, but she also had difficulty making decisions and second-guessed herself.  (Id.)  Additionally, as a result of her experience with the Embassy, she often felt sick and nauseated and had difficulty sleeping.  (Ewald 306-07.)

**Ewald's Communications with Others Regarding Concerns of Discrimination**

176.    Shortly after Ewald sent her December 30, 2009 email to Ambassador Strømmen, Ewald also raised her concerns about unequal pay in a telephone call with

Johne.  (Ewald 317.)  In response to Ewald's question about who had made the salary

decision, Johne indicated that Gandrud had made the decision.  (Ewald 317.)  Ewald also

asked whether Johne, as a woman, believed that the salary difference was unfair, to

which Johne responded, "you just have to realize that this is the way that it is, and the

world is unfair."  (Id.)  When Ewald asked what she could do, Johne advised Ewald,

"don't talk to any lawyers," and to not make a big deal out of the situation, but to accept

it.  (Ewald 317-18.)

177.    After Gandrud reviewed Ewald's December 30, 2009 communication to

Ambassador Strømmen regarding Ewald's pay and benefits concerns, Gandrud sent an

email entitled "CONFIDENTIAL" to Ambassador Strømmen that same day, criticizing

Ewald.  (J-31-0001.)  Gandrud began his email, "First, my apologies that she, now,

covers these many issues when some have never been her 'business' . . . ."  (Id.)

Ambassador Strømmen forwarded the email to Larsen, Rognlie, and others, and

suggested a meeting "as soon as possible."  (J-31-0003.)

178.    In January 2010, Gandrud invited Ewald to lunch at the Dakota Bar & Grill

restaurant in Minneapolis, at which time he told Ewald that the December 30, 2009 email

she had sent to Ambassador Strømmen was like a bomb dropped on the Embassy.

(Ewald 326.)   When Ewald asked if he had read her email, Gandrud responded that he

had not read it in its entirety.  (Id.)  At the lunch, Gandrud represented that he had

nothing to do with the salaries and that the Embassy was responsible for the pay.  (Ewald

328-29.)  However, Ewald testified that the Embassy represented to her that it was Gandrud who had determined the salaries and pushed for Davidson's higher salary. (Ewald 321.)

179.   During the meeting, Gandrud attempted to justify Ewald and Davidson's pay differential by comparing the differences in salary between the President of St. Thomas University and that of a business executive at Target.  (Ewald 327.)  Ewald disagreed that Gandrud's analogy provided a fair or accurate comparison.  (Id.)

180.   At the meeting, Gandrud also stated that Ewald's email to Ambassador Strømmen gave the appearance that Ewald and Davidson were not working as a team, and further emphasized the importance of them working as a team.  (Ewald 327-28.) When Ewald clarified that the email was not about Davidson, per se, but about the pay difference, Gandrud told her, "you need to nip this situation in the bud because there could be consequences."  (Id.)  Gandrud instructed Ewald to write a letter to Ambassador Strømmen telling the Ambassador that she and Davidson were working as a team. (Ewald 328.)  Ewald testified that when she refused to do so because she was not comfortable writing such a letter, Gandrud got angry and pounded his fist on the table. (Id.)  Ewald felt that Gandrud was attempting to intimidate her, suggest that her concerns were invalid, and belittle her.  (Ewald 330.)

181.   Following the lunch meeting, Gandrud emailed Ambassador Strømmen, stating that Ewald "sees no problem with Anders but says she wants answers.  Thinks

salary reflects relative value and will not accept that the job market has different

compensation levels for education and business . . . .  High level of frustration with

mixed messages on pension/health insurance."  (P-69-0001.)

182.    Ewald also discussed the issue of pay discrimination with Steering

Committee Chair Finborud.  (Ewald 323-24.)  Finborud indicated that she and the other

Stakeholders did not have any detailed information and that Ewald would need to

address the pay discrimination issue with the Embassy.  (Id.)

183.    On January 6, 2010, Finborud advised Ambassador Strømmen, copying

several others, that Ewald had complained to her about the salary differential between

the two expert positions.  (P-70-0003; see also Finborud Dep. 65-67.)  According to

Finborud, Ewald complained of discrimination because of Davidson's "much better

compensation," and the "differential treatment of her family compared to Davidson's

[family]."  (P-70-0003.)  In addition to relaying the conversation to Ambassador

Strømmen, Finborud testified that she also informed the Steering Committee of Ewald's

pay and benefits discrimination complaints.  (Finborud Dep. 65-69.)  Other than relaying

the information, Finborud did nothing to assist Ewald, testifying that "the Steering Group

wouldn't   did not want to have anything to do with what they considered

responsibilities of the employee," because "it was not [the Steering Committee's] job."

(Finborud Dep. 68-70.)

184.    On January 11, 2010, Vibe emailed the HR section of the Foreign

Ministry:

> For the information of the Ministry is hereby enclosed a copy of the
> Ambassador's letter dated November 18, 2009 to Ellen Sue Ewald at the
> Honorary Consulate General in Minneapolis and her answer dated
> December 30, 2009.
>
> The Embassy and the Consulate General's management have had frequent
> discussions about the handling of these personnel issues, and Consul
> Gandrud had a conversation with Ellen Sue Ewald the fifth of this month
> where she toned down the discontent she expresses in her letter.  The
> current regulations and salary policies do not provide an opportunity to
> grant her request for health insurance coverage for her family or significant
> salary increase.

(J-32-0007.)

185.   On January 28, 2010, Vibe sent an email to Larsen and administrative staff

at the Embassy/MFA asking, "has our little friend received a final answer on her travel

expenses (she actually asked for 50% coverage on one of them).  It seems to me that

Gary considers this not to be totally cleared up (or maybe he just meant that Ellen would

appeal)."  (P-74-0003.)

186.   On February 12, 2010, Ewald emailed Ambassador Strømmen, asking

when she could expect a reply to her December 30, 2009 complaint letter.  (P-77-0001.)

That same day, Ambassador Strømmen forwarded Ewald's email to Vibe, Larsen, Johne,

and Rognlie, and, apparently for the first time, directed that the Embassy's substantive

response be consistent with the law:

> We must send [Ewald] ASAP, as we have talked about, the legal
> authorities, that is to say, the legal clarifications for why it is as it is.

I cannot have ongoing personal correspondence about employment terms for all local employees, it would be differential treatment if I do it with [just] one.  I wrote a letter   and that was fine   but now this must be handled according to the Admin. Division's normal procedures.  Be sure that the substance of what we write is as MFA understands the body of law.

(P-78-0001.)

187.   In February 2010, Ewald communicated her concerns to her friend Mykletun, both in person and via email.  (Ewald 333-37.)  In a February 1, 2010 email to Mykletun, she noted her concerns of pay discrimination (P-152-001-3)   concerns that she also raised again in person at a breakfast meeting on February 5, 2010.  (Ewald 334.) Ewald and Mykletun, along with Marius Hansen and Ewald's now-husband Mikalsen, were present for the meeting.  (Id.)  Mykletun seemed surprised and saddened by the salary discrepancy and told Ewald that during the development of the New Model Consulate, the intent was that the two expert positions were equal in stature, pay, and responsibilities.  (Hansen 1088; 1101.)  Mykletun further stated, in Norwegian, that if anyone told her anything differently, it was ridiculous.  (Ewald 336; Mikalsen 1669-70.)

188.   Although Ewald directly communicated her concerns about unequal pay to numerous persons in authority, as noted above, one person in authority with whom she did not raise the subject   and perhaps the only such person   was Vice President Mondale.  (Mondale 638; 665.)  As noted, shortly after learning of Ewald's unhappiness, and with only a few months remaining in his tenure as Honorary Consul General, Vice President Mondale tried to move rapidly to address Ewald's concerns.  (Mondale 643.)

90

He surmised that his September 23, 2009 letter was not a typical letter received by the

Embassy; moreover, had he received such a letter, he would have stood up and taken

notice of it.  (Mondale 637.)  The Vice President testified, "I did raise hell when I

thought it would make a difference.  I deeply regret how this has ended up where it has

here."  (Mondale 671.)  Asked whether he knew Ewald to be a person of strong

convictions, Vice President Mondale agreed that she is, adding, "we were friends before

this, and I hope to be friends afterwards."  (Mondale 643.)

**The Embassy Acknowledges Error in Denying Coverage for Ewald's Spouse**

189.   On March 9, 2010, Vibe conceded for the first time that he had been

mistaken and that the Embassy was in fact obliged to provide health insurance coverage

for Mikalsen    approximately 17 months after Ewald started working for the Embassy in

October 2008:

> We will have to cover the health insurance.  The current regulations were
> put into effect in 2007.  I do not understand completely why there was a
> requirement of 'spousal support' when Ellen was hired, but it was most
> likely a routine grounded in the former guidelines.

 (P-84-0001.)  Embassy staff indicated that the addition of Mikalsen to Ewald's plan

amounted to approximately $576 per month, and estimated that it owed Ewald

approximately $12,096 for a nine-month period of premium payments.  (P-84-0002.)

Vibe responded:

> This will become very expensive.  The prerequisite will have to be that
> these funds are taken from the NOK 1.5 million or alternatively the extra
> funding of NOK 150,000 that was approved by the leadership group in

2009 . . . The Embassy (Embassy's budget) is not going to cover this with one cent.  Worst case scenario is that we will have to drastically cut the travel budget for MN.  There is no reason that Ellen should travel to Norway as frequently as she does the way things are now.

(P-84-0001.)

190.    On March 11, 2010, Vibe informed Ewald that the Embassy had reversed its stance on health insurance for Mikalsen and that he would now be covered: "With regard to health insurance for your partner, we have consulted the Ministry again.  The regulations do not any longer specify a requirement that a spouse/partner should be financially dependent on the locally-employed staff member to get coverage."  (J-38-0002.)  Ewald received this communication over 18 months after initially asking how to register her family for health care benefits.  (Cf. id. with P-22-0009.)  The Embassy proposed refunding Ewald the premium costs that she had incurred for Mikalsen since May 2009.  (Id.)

191.    As for Ewald's daughters, the Embassy stated that "[c]hildren over age 18 are, however, not covered."  (Id.)  The Embassy allowed Ewald's daughters to maintain coverage under the Embassy's insurance policy, at Ewald's expense.  (Ewald 165-66.)  The parties have stipulated that the total amount paid by Ewald for health insurance for her daughters was $15,367.63.  (Trial Transcript Stipulation 134.)

**Salary Dispute Remains**

192.    In the same March 11, 2010 letter, Vibe also responded to Ewald's December 30, 2009 correspondence to Ambassador Strømmen, in which Ewald had

92

complained of the salary disparity. (J-38-0002-03.)  Contrary to prior representations,
Vibe wrote, "salaries for locally-employed staff" are set "according to the local salary
levels for similar positions."  (J-38-0002.)  He added that individual negotiations played
a part in the salaries, and that someone with a "corporate background" should receive a
higher salary.  (Id.)

193.    The Embassy's reference to contract negotiations as a reason for the pay
disparity, as reflected in Vibe's March 11, 2010 letter (id.), and in Ambassador
Strømmen's November 18, 2009 letter (J-28-0002-03), directly contradicts (1) Gandrud's
testimony that there were no contract negotiations concerning Davidson's salary amount
(Gandrud 725-27); and (2) Davidson's testimony, who, believing that it would not be
worthwhile to negotiate the salary amount, did not ever ask for a specific salary.
(Davidson 1917-18.)  Moreover, Vibe's rationale that a person with a corporate
background should command a higher salary, does little to explain why Ewald    who
possessed greater corporate experience than Davidson    failed to receive a higher salary.
(E.g., cf. J-4-0003-5 with J-5-0002-3.)

194.    On April 19, 2010, Vibe provided MFA staff with background
information about the Honorary Consulate in preparation for a telephone conversation to
be held the following day between Norway's Foreign Minister and Gandrud.  (P-92-
0003.)  In Vibe's memorandum, he stated, "[t]he director for Higher education and
research however is not functioning satisfactorily, and there have been some personnel

problems.  There is therefore reason to assume that the Steering Committee will not continue this position after 2011." (P-92-0004.)  To Ewald's knowledge, the only "personnel problem" was that she had complained of pay and benefits discrimination. (Ewald 348-49.)  No one in leadership in the MFA, the Embassy, or the Consulate, or any of the Stakeholders ever expressed to Ewald any concerns about her work performance. (Ewald 349.)  Despite the fact that Vibe requested "limited distribution" of the memorandum due to the sensitive, personal nature of its contents, Vibe himself sent the email to several high-ranking officials in the MFA (including Morten Aasland, Torgeir Larsen, Øyvin Stokke) and copied Ambassador Strømmen, Rognlie, Finborud, Larsen, as well as the general email box for the MFA.  (Id.)

195.   As one of the recipients of Vibe's April 19 "limited distribution" email, Steering Committee Chair Finborud forwarded Vibe's memorandum the next day to three additional email recipients, as well as to three of the original recipients. (P-93-0003-4; P-97-0006-8.)  In her April 20, 2010 transmittal email, Finborud also noted that "the general perception is that [Ewald] is a bad hire." (P-93-0003.)  In addition, Finborud stated that it was "regrettable that the two employees have serious problems working together." (P-93-0003.)  When Ewald later read this communication, she found the description of herself as a "bad hire" to this group of recipients very demeaning, humiliating, and embarrassing.  (Ewald 345-46.)

196.   Although the Stakeholders intended to perform an evaluation of the expert

positions near the expiration of the three-year contract terms, in her April 20 email to officials within the MFA, Finborud alerted them that Ewald's position might or might not be renewed, or could be advertised again upon the expiration of Ewald's contract. (P-93-0003-04.) In another email that Finborud sent that same day to Torgeir Larsen, Oyvind Stokke, and others, Finborud discussed the fact that the Embassy had considered terminating Ewald. (P-97-0008.) Finborud who again labeled Ewald as a "bad hire" indicated that the general consensus was to maintain the status quo, allowing Ewald to continue in her position until the expiration of her contract:

> By the Steering Committee's assessment Ewald is a bad hire. The Embassy has been in contact with the Legislative Division and privately with American lawyers (Gandrud's law firm) to get legal assessments of the issue. On the Embassy's side there are fears about going towards a termination when this would most likely result in a lawsuit. It is preferred therefore to tread water until the employment period runs out.

(Id.)

197. As to Ewald's actual performance on the job, Gandrud testified that Ewald "didn't have issues of performance, she had issues of happiness." (Gandrud 802.) As evidence of Ewald's excellent performance on the job, members of the Norwegian-American business community in Minnesota described Ewald as "very helpful" (Mueller 1136), and described working with her as "fantastic" (Nash 565).

198. As to Davidson's work performance, although Innovation Norway was apparently satisfied (P-110-0008), Davidson's work was otherwise roundly criticized by members of the United States-Norway business community. (Nash 560, 565; Mueller

1132-35; P-81-0001; P-82-0001; P-83-0001; P-85-0001; P-87-0001; P-88-0001;

P-95-0001; P-109-0001-3.)   For example:

A.    Marius Hansen testified that his experience working with Davidson
      on the Norwegian-American Clean Tech Alliance ("NACTA") was
      so negative that "we were not able to work with [Davidson]," and
      because of this poor experience, Hansen "just didn't find
      [Davidson] trustworthy anymore."  (Hansen 1098.)

B.    Attorney Nash provided "plenty of feedback to Gary [Gandrud] that
      the performance from the business development side of the
      consulate was less than stellar."  (Nash 557-58.)  In fact, Nash
      characterized Davidson as "a little bit of a liability" for the
      Honorary Consulate.  (Id. at 558.)  In May 2010, Nash sent Gandrud
      a lengthy confidential email, detailing his negative experiences with
      Davidson, as well as the negative experiences of Nash's clients,
      who asked to have no further contact with Davidson.  (P-95-0003.)
      Nash testified that when Gandrud met with him to discuss the
      concerns raised in Nash's email, Gandrud was visibly upset with
      Nash for criticizing Davidson's performance.  (Nash 558.)  Nash
      testified that he eventually ceased making business referrals to
      Davidson, noting that none of his efforts at putting together events

with Davidson came to fruition.  (Nash 549.)  Likewise, Nash

ceased inviting Davidson to participate in projects or events,

observing that Davidson was either unlikely to attend, or that his

presence was not helpful.  (Nash 550.)  Instead, Nash turned to

Ewald when he sought the Consulate's assistance, finding her to be

particularly helpful "because she understood how business and

academics could work together" (Nash 551), whereas Davidson

essentially "ignor[ed] how the innovation side work[ed]."  (Id.)

Moreover, if Ewald was unable to help Nash, she found someone

who could.  (Id.)

C.   Another NACC member, Ivar Sorenson, emailed Gandrud with his

observations about Davidson, describing Davidson's manner of

communications in creating a meeting agenda as "amateurish and

unprofessional."  (P-81-0001.)

D.   Mikalsen testified that he wanted Davidson to succeed for many

reasons   Mikalsen supported the Consulate's efforts to serve

Norwegian relationships in the Midwest, he supported the

connection to business, and, because Davidson was Ewald's

colleague, Davidson's success would inure to the Consulate as a

whole.  (Mikalsen 1662.)  Although Gandrud had encouraged

Mikalsen to work with Davidson and Mikalsen offered to share his

business network with Davidson, Davidson never accepted

Mikalsen's offer.  (Mikalsen 1662-63.)

E.     Approximately one year into Davidson's term in the Innovation and

Business Position, NACC President Mueller became concerned

about Davidson's performance.  (Mueller 1133.)  Mueller found

Davidson unresponsive to his requests, and, in fact, testified that

Davidson would attempt to deflect certain requests to Mueller, who

responded:

> Well, but they're coming to you for help.  And he said: Well,
> there's nothing I can do, and . . . here's the information, give
> the guy a call.  So I thought that was kind of odd because,
> you know, we're looking to the Consulate for help and
> direction, and . . . instead they're sending . . . what they don't
> want to take care of or   to me.

(Mueller 1134.)  Moreover, Mueller testified that when Davidson

was unable to provide assistance, Davidson failed to offer an

alternative resource or contact   instead, Davidson's response was,

"I can't help you.  End of sentence."  (Id.)  Mueller relayed his

concerns about Davidson to Gandrud.  (Id.)

F.     In approximately April 2010, Carleton learned that Davidson's

LinkedIn page indicated that he was operating a separate company,

MobileOn, Inc. (P-147-0001; Carleton 1061-62.)  Such outside

employment interests were prohibited by Embassy policies and

Davidson's Employment Contract.  (Carleton 1063-64; J-11-0001.)

Davidson's LinkedIn page described his Embassy position as a

"consultant," suggesting that it was secondary to his work as CEO

of his other company.  (P-147-0001.)  Carleton forwarded the

LinkedIn information to Gandrud; Gandrud indicated that the

Embassy also wanted to see the LinkedIn page.  (P-89-0001.)

Gandrud instructed Davidson to stop his activities with MobileOn.

(Davidson 2037.)  Although Davidson was told to halt his

involvement with MobileOn, Davidson did not do so.  He testified

that his involvement in the company was minimal and that after

speaking with Gandrud, he lowered his profile further.  (Davidson

2037-38.)  Although he lowered his profile, Davidson did not

completely stop his involvement with this side business.  After

members of the Norwegian-American community voiced concerns

about Davidson's side business, Mueller broached the subject with

Gandrud.  (Mueller 1134.)  In response, Gandrud was very short

with Mueller, and told him that it was none of Mueller's business

and that the matter "had been taken care of."  (Id.)

199.   While Davidson was merely slapped on the wrist for his involvement in his

side business, the Embassy treated Ewald's side business interests very differently.  In

March 2010, Ewald requested permission to change her employment relationship with

the Embassy, so that she would work 90% for CeRTA and 10% for the Embassy.  (P-80-

0005.)  Gandrud recommended "that a solution be considered which makes it possible

for Ewald to go over to CeRTA as she herself wants."  (Id.)  Gandrud viewed Ewald's

proposed move to CeRTA as "the way out for all."  (P-79-0002; Gandrud 958-59.)  The

Embassy, however, did not support Ewald's request.  As Vibe stated, "The Embassy

things [sic] that difficult questions of loyalty and probably also questions of competency

would arise if Ewald were to combine two such positions."  (P-80-0005.)  Vibe also

recommended that Ewald be reminded that "local employees cannot have side jobs,

commitments or other paid obligations . . . at least not without written permission from

the station chief."  (Id.)  The Steering Committee also joined in the Embassy's

recommendation to deny Ewald's proposal, noting that it "seems wise to remind Ewald

that local employees cannot have side jobs etc. . . . without the station chief consenting."

(P-80-0004.)

200.    Despite numerous negative comments concerning Davidson, Gandrud

stated in his January 25, 2011 annual report to Ambassador Strømmen and the

Stakeholders that "[o]ur greater community has accepted the New Consulate without a

negative comment   to me, at least."  (J-40-0003.)  In addition, Davidson received extra

travel benefits from the Stakeholders, and Vibe even suggested that Davidson's work

continue, albeit perhaps with Davidson working directly for Innovation Norway. (Davidson 2028-30; P-110-0008; P-130; P-132; P-135.)  Davidson could not recall any work-related travel for which he was not reimbursed.  (Davidson 2030.)  Discussing Davidson's travel reimbursement with Vibe on May 27, 2011, Elisabeth Wemberg, Head of Administration at the Embassy, asked whether it was "[a] little unfortunate that this is coming at the same time when we are denying Ellen?"  (P-130-0004.)

201.    The criticism of Davidson underscored the fact that his skills, efforts, and abilities were inferior to Ewald's.  In fact, by his own admission, Davidson experienced little success in his position at the Consulate in 2010.  For example, in responding to criticism from prominent Norwegian-American Dr. Ivar Sorenson about Davidson's poor communication skills, Davidson conceded that he "never really developed the skills of writing polished communications."  (P-85-0002.)  In addition, in response to Davidson's 2010 Action Plan, some Steering Committee members suggested that "[h]e might have a stronger eye on research and facilitate contacts/co-operation between American and Norwegian Universities and institutions as mentioned in the Vision Statement.  This would benefit all Stakeholders."  (D-34-0009).  Yet, Davidson admitted that he failed to achieve a primary goal for 2010, which was "to organize an event . . . to showcase the modern Norwegian economy and innovation through a combination 'Impressions of Norway' cuisine event with business information and networking."  (J-40-0009.)  When contemporaneously discussing his work-related activities, Davidson reported that he

served in a "reactive" role in responding to inquiries, and needed to expand his

resources, as he had limited inquiries.  (J-40-0009; <u>see also</u> Davidson 1968-70.)

Davidson identified only the Moods of Norway retail store at the Mall of America as a

recipient of his assistance   even though his assistance took the form of advising the

store against opening a retail shop in Minnesota.  (<u>Id.</u>)

### Ewald Continues to Seek Resolution of Her Complaints

202.    On or about June 14, 2010, Ewald spoke with Ambassador Strømmen on

the phone about her pay and benefits concerns.  (Ewald 309-10.)  Ewald recalled that the

Ambassador understood her frustration and implied that he would rectify the situation.

(<u>Id.</u>)

203.    On June 24, 2010, Ewald emailed Ambassador Strømmen, following up on

their earlier phone conversation, which she described as "fruitful."  (P-100-0001.)

However, she also noted that since that conversation, she had inadvertently received an

email from Larsen, in which Larsen insinuated that Ewald was attempting to cheat the

tax authorities.  (Ewald 310-11.)  Larsen had mistakenly included Ewald as a recipient

and unsuccessfully attempted to recall the email message.  (<u>Id.</u>; P-100-0001.)   In

Ewald's June 24 letter to Ambassador Strømmen, she again complained about the salary

difference, as well as about consequential harassment and bullying.  (P-100-0001.)

Ewald requested an end to the unfair treatment, a written apology, and a solution to

address her situation.  (<u>Id.</u>)

204.    In September 2010, high-ranking Embassy staff including Vibe, Wemberg, and Lars Petter Henie came to Minneapolis and met with Ewald, Davidson, and Carleton to discuss the conditions at the Consulate.  (Wemberg Dep. 66; Vibe Dep. 196-97; Carleton 1057; P-103-0003.)  During their meeting with Ewald, she raised the issues of her pay and insurance coverage.  (Ewald 320.)

205.    As noted, the purpose of the September 2010 meeting was to investigate the general working environment    not to investigate Ewald's complaints regarding unequal treatment.  (Wemberg Dep. 68:-69; Vibe Dep. 197.)  The visiting Embassy staff indicated that they could not discuss the salary issue with Ewald, but they noted that various "solutions" were under consideration.  (Ewald 321-22; Wemberg Dep. 68-69.)  At the meeting, Ewald asked whether they were considering discontinuing her position, and Wemberg informed her that it was one of the options under consideration.  (Id.)  The visiting Embassy staff also told Ewald that the travel budget had been exhausted, but appeared to suggest that her travel in connection with Science Week that year would be funded.  (Ewald 321.)

206.    Ewald spoke to a number of individuals in the Embassy, the Consulate, and MFA leadership about the pay discrimination issue.  (Ewald 315.)  She talked to Gandrud a number of times about her concerns and feelings about pay discrimination.  (Ewald 316.)  She also spoke with Johne, Ambassador Strømmen, Vibe, Aasland, and Mykletun about the pay disparity.  (Ewald 316.)  In her conversation with Steering

Committee member and Norwegian Minister for North America Aasland, Ewald asked

whether she should take her complaints about pay discrimination to the LDO (a

Norwegian equivalent of the Equal Employment Opportunity Commission).  (Ewald

315-16; 322-23.)  Ewald recalled that Aasland advised Ewald not to report her concerns

outside of the Ministry.  (Id.)  Ewald showed Aasland a copy of his September 11, 2008

email in which he had recounted the Stakeholders' understanding that "the 1.5 million

NOK [for the expert positions] should be split equally between the two expert positions."

(Id.; P-17-0003.)  Aasland appeared to be uncomfortable with Ewald's questions

regarding the plan for an equal split of the funding and did not respond.  (Ewald 323.)

207.    Ultimately, midway through her employment with Defendant, Ewald raised

her concerns of unequal pay with the LDO.  (Ewald 315-18.)  However, the LDO did not

respond to Ewald's concerns until 2014, at which time the organization declined to

further investigate Ewald's claim because she had filed this lawsuit by then.  (Ewald

318-19.)

208.    Throughout the time that Ewald raised concerns regarding compensation,

no one ever spoke to Ewald about the prospect of changing her compensation.  (Ewald

307.)

### Different Treatment Beyond Pay and Health Insurance Benefits

209.    The Embassy did not permit Ewald to participate in planning and

organizing the 2010 Science Week despite her request to do so.  (Ewald 238-39.)  In

addition, although Ewald played an instrumental role in the 2009 Science Week, and even though Wemberg and Henie intimated that the Embassy would provide travel funding for Ewald to attend the 2010 Science Week, the Embassy denied her travel expenses (Ewald 238, 321; P-104-0014-22), finding that there was no "professional basis" for Ewald to attend the event.  (P-104-0022.)  Yet Ewald's job description, attached to her employment contract, specifically stated that work related to Science Week was part of her job responsibilities.  (J-12-0005.)  Even Embassy leaders acknowledged that participating in Science Week was an important part of Ewald's job (Johne Dep. 183-84), and that it would be "odd" for Ewald not to attend Science Week. (Wemberg Dep. 89.)

210.    Ultimately, Ewald paid out of pocket to attend the 2010 Science Week, incurring expenses in the amount of $2,362.  (P-149-0001.)  She testified that not appearing would negatively impact her professional reputation and that she had prepared and organized several meetings at the event.  (Ewald 238; P-104-0004.)  One such meeting was between the leadership team from the Mayo Clinic Innovation Scholars program and the Norwegian Universities of Tromsø, Bergen, KD, and Oslo. (P-104-0004; J-40-0011.)

211.    Although the Embassy also denied to pay for Davidson to attend 2010 Science Week, Davidson attended the conference because his expenses were covered by Stakeholder Innovation Norway.  (P-104-0014.)  Ewald protested the denial of her travel

expenses in an October 11, 2010 email to Wemberg.  (P-104-0018.)  After receiving no

response, Ewald sent another email on December 12, 2010, expressing her grievances

including claims of retaliatory treatment:

> Now, in spite of the claimed lack of funds, both Christina and Anders have
> been given a personal assistant to help them to do their jobs while at the
> same time I am being denied travel funds that I need to do my job.
>
> Discrimination and retaliation are serious complaints.  It continues to get
> worse, not better.  I am kept out of the loop on communications, have no
> travel budget when others are traveling (including Anders Davidson and
> Christina [Carleton]).  And my salary compensation and corresponding
> impact on my pension remain significantly lower than my male colleague.
>
> Recently, I have heard from several sources that there is an "Ellen
> problem."  Such comments clearly harm my professional and personal
> reputation.  I enjoy my job and the strategic goals, mission, and the work
> that we do on behalf of Norway.  I continue to perform my job duties, and
> receive positive feedback and compliments on my work from the
> Norwegian and US communities I serve, but it is very stressful and
> upsetting that I am being treated unfairly by my employers.  I cannot
> continue to be mistreated and retaliated against for raising these
> complaints.  I am asking for these issues to be addressed in a fair and
> reasonable answer.

(P-104-0017.)

212.    In response, Vibe replied that Ewald had failed to follow travel request

procedures.  (P-104-0014.)  Additionally, Vibe indicated that Ewald's subsequent

request for reconsideration and reimbursement amounted to "insubordination."

(P-104-0014; Vibe Dep. 216-17.)  Vibe also expressly signaled the Embassy's

unwillingness to engage in any further communications with Ewald regarding her salary

or retaliation concerns, stating, "The Embassy has reviewed the other issues that you

have raised and while we respectfully disagree with your position, we do not think that

there is any value in discussing them further." (P-104-0014.) Thereafter, Davidson's

travel expenses continued to be paid by the Embassy and Innovation Norway, while

Ewald's expenses were denied. (Vibe Dep. 51; P-130-0004-6; P-132-0001; P-135-001.)

213.    Ewald's job security was further called into question when certain tasks,

which she initially completed herself, were taken on by others. For instance, in early

2011, without Ewald's knowledge, Gandrud visited colleges to meet with university

leadership and students. (Gandrud 962.) Ewald had previously developed relationships

with leaders at these institutions, because this was an integral part of her job. (Ewald

190, 366.)

## Post-Employment

214.    Ewald suffered humiliation and mental anguish as a result of the

Embassy's treatment of her, both during and after her employment. In particular, Ewald

was concerned that Embassy staff discussed her as "a problem," and that her reputation

was consequently damaged. (Ewald 324; P-104-0004-5; P-107-0017.) She described

her concerns and mental anguish as follows:

> I feel like my self-esteem has taken a real beating, and I    my self-worth is
> now what    that I gave everything    this was my    I gave my heart and soul
> to this job. It was so important and it was such a    I was so excited and I
> worked as hard as I could all    all the time, as much as I could. And I felt
> like at every turn I was being beaten down, and that feeling    it's affected
> my self-confidence.
>
> And these were people I trusted. These    I knew these people and I just    I

feel that it's hit me at my core.  And I feel a sense of dread now because I when I think about these emails that were sent around and people that I knew when I was living in Norway and if I meet them again, you know, now they know all this   all the   how   how bad I was I was a bad hire, I was this   I just   I have a sense of anxiety about   about that.

(Ewald 350; <u>see also</u> Ewald 341.)

215.    Nash testified that Ewald's concerns about her reputation are unfortunately well-grounded   her reputation has been damaged from her tenure at the Consulate.  (Nash 567-68.)   Referring to his business circles in both Minnesota and Norway, Nash indicated that this litigation is discussed, stating, "I think there's those who view the fact that this has turned into a litigation matter, the fact that it's gender discrimination, I think some people, right or wrong, have a negative reaction to [Ewald]."  (Nash at 568.)

216.    In addition, Nash has observed a general concern on the part of Norwegian-based companies to enter the United States market via Minneapolis because of this case.  (Nash 569-70.)  Specifically, they are concerned about whether to utilize the services of Tysvar, a company that helps Norwegian businesses enter the United States market, for which Mikalsen serves as CEO.  (Nash 570.)

217.    Some of the physical symptoms Ewald suffered as a result of the situation at the Consulate were nausea, headaches, anxiousness, tightness in her chest, sore neck, eye twitches, and an inability to concentrate.  (Ewald 339; Mikalsen 1680-83.)  Ewald observed that while she has experienced headaches or a sore neck in the past, she noticed

that these symptoms occurred with much greater frequency during her employment with the Embassy.  (Ewald 339-40.)  She also complained of an inability to sleep (Mikalsen 1682-83), but on weekends, she would stay in bed all day     behavior that she did not display prior to working for the Embassy.  (Mikalsen 1678.)

218.   Ewald testified that some of the physical symptoms of emotional distress have gone away, but at times, she has been reminded of her treatment by the Embassy and her sad feelings have returned, negatively impacting her self-esteem and self-confidence.  (Ewald 337-38.)  Ewald has also had difficulty with decision making and second-guesses herself when making decisions.  (Mikalsen 1689-90; Ewald 351.)  Her husband testified that Ewald's self-confidence began to decline in mid-2009 and has continued to decline since then.  (Mikalsen 1678-79.)  Mikalsen confirmed that Ewald questions her memory, even when her recollection is correct.  (Mikalsen 1679-80; Ewald 350.)  Through the time of trial, Ewald also continued to have a diminished ability to concentrate and focus.  (Ewald 350-51.)

### Mitigation

219.   After her employment with the Embassy ended in 2011, Ewald began working for Tysvar.  (Ewald 351.)  As noted, Tysvar helps Norwegian companies establish themselves in the Midwest.  (Id.)  Tysvar CEO Mikalsen testified that Ewald's transition into Tysvar was a good move for both Ewald and Tysvar because Ewald possessed a set of competencies and skills that Tysvar lacked prior to hiring Ewald.

(Mikalsen 1665.)

220.     Ewald is a partner in Tysvar, along with Mikalsen and Marius Hansen. (Ewald 351.)  Tysvar employs approximately six employees in addition to the three partners.  (Ewald 352.)  As of the time of trial, Ewald, as a partner, had not earned income from Tysvar since commencing her work for the company.  (Ewald 352.)  Tysvar had credited Ewald with an accumulated unpaid distribution in the amount of $20,184.36 for work that she performed over a three-month period in 2011.  (D-64-0002; Mikalsen 1656.)  Mikalsen explained that Ewald received this credit due to a liquidity problem in the company that caused Tysvar to pay only its employees, but not its partners. (Mikalsen 1656-57.)  However, Tysvar has paid for Ewald's personal health care and a dependent daughter who is in her twenties.  (Mikalsen 1670.)

221.     Ewald accepted the partnership position because she felt that she was respected and valued at Tysvar and that she could trust her colleagues.  (Ewald 352.) Mikalsen credits the safe working environment at Tysvar with Ewald's ability to provide competent expert management advice at Tysvar, despite the concentration and memory difficulties that Ewald experienced during and after her tenure at the Honorary Consulate.  (Mikalsen 1723.)  And, Nash described Tysvar as a place where Ewald can "exist meaningfully," noting that "whether her ability to go out and get work with someone with her qualifications is available, if it's impacted by this [litigation] or not I think is a general concern she has."  (Nash 568.)

110

222.    In an effort to salvage her reputation and to stay connected to Norwegian

society since her departure from the Consulate, Ewald has served as a board member on

a number of boards, including the Minnesota Peace Initiative, the University of

Minnesota Neuroscience Committee, and the Oslo Center for Peace and Human Rights.

(Ewald 352-53.)  She explained:

> I felt it was important to do those things to show that I am not as bad as . . .
> people say I am at the Embassy and the Consulate.  And it was a way of
> trying to pull things together again.  It was . . . a pretty devastating
> experience to . . . give everything into something that I was so passionate
> about and be hit down and pulled down at every turn.  And I    so I'm
> trying.

(Ewald 353.)

### Economic Damages

223.    The position that Ewald held while working at TM Holding before coming

to the United States in 2008 to work for Defendant, and the pay level that she received at

TM Holding in Norway, would have continued had she not taken the expert position

with the Embassy.  (Mikalsen 1197, 1215.)  Mikalsen testified that although Ewald could

have transitioned into various companies within TM Holding, an entity called

MobileAxept would have been the best fit.  (Mikalsen 1655-56.)  However, after Ewald

took the expert position at the Consulate in Minneapolis, TM Holding hired other

employees    who are still with the company today    to fill the position with

MobileAxept.  (Mikalsen 1656.)  This fact, combined with liquidity difficulties that TM

Holding was experiencing at the time, meant that Ewald could not return to TM Holding

at her pre-Embassy salary after her tenure at the Embassy had expired.  (Mikalsen 1664.)

## Substantially Equal Jobs

224.    The evidence presented during trial demonstrates that Davidson's and Ewald's jobs were substantially equal, as a factual matter.  The positions required the same levels of skill, effort, and responsibility and entailed similar duties within the Honorary Consulate.  The following evidence demonstrates precisely how substantially equal the positions were:

A.    First, the selection criteria for the two expert positions was nearly identical:

1.    Candidates for both expert positions were evaluated based on "how they would approach the job," "Norwegian network and language skills, network experience in both regions, as well as personal skills," and "teamwork abilities." (J-6-0009.)  Finalists for the Innovation and Business Position had MBA degrees and finalists for the Higher Education and Research Position similarly had advanced degrees.  (J-1-0013-21; D-56; J-1-0004-12.)

2.    Ewald was identified as a top candidate, in part, because of her "extensive experience both in Norway and the Midwest,"

112

"business management in an international setting,"
"Norwegian language skills and networks," and "personal
skills and networking capabilities."  (J-6-0009-10.)

3.    Similarly, Davidson was identified as a top candidate, in part,
because of his "long, broad experience from doing business
in the private sector," work "internationally for 3M," "good
collaborative skills," and "good skills about Norwegian
business and about the business in the region."
(J-6-0009-10.)

B.    Second, the job structure for the two positions was substantially
identical:

1.    The Higher Education and Research Position and the
Innovation and Business Position were considered expert
positions.  (J-6-00013.)

2.    The Stakeholders shared in contributions to both expert
positions.  (P-3-0001; J-23-0002.)

3.    The funds that the Stakeholders contributed were to be
divided equally between the expert positions.  (Ewald 31;
P-11-0001-2; P-17-0003.)

4.    The salary range for both expert positions was initially

determined by the Embassy to be $60,000-70,000.

(P-6-0001-3.)

5.      The same Hiring Committee members interviewed the candidates for both expert positions.  (P-17-0012.)

6.      Both experts were employed by the same entity, the Embassy.  (J-2-0002-3.)

7.      Both expert positions were at the same Officer/Director level.  (J-2-0002-3.)

8.      Both expert officers initially reported to the Consuls (J-2-0002-3), and later to the Economic Section of the Embassy in Washington, D.C.  (Ewald 235; P-74-0001-2.)

9.      Both expert officers were expected to serve all Stakeholders. (D-25-0002-3.)

10.     The Stakeholders guided both experts' priorities.  (Mondale 609; Strømmen 896; Berg 1267-68; P-74-0001-4.)

C.      Third, the abilities, skills, effort, duties and responsibilities of both positions were substantially the same:

1.      Both expert positions were primarily designed to strengthen exchanges, networks, and relations between the United States and Norway.  (J-1-0001; J-1-0016.)  As NACC President

Mueller testified, while one position focused on developing business relationships, and the other on developing educational relationships, the focus of both positions was on building stronger collaborations between organizations in Norway and the Midwest.  (Mueller 1137.)

2.      Both expert officers were also tasked with advancing Norway's strategies for higher education and research and innovation and business development within the Upper Midwest.  (J-1-0002-03; J-1-0016.)

3.      In addition, both expert officers were expected to work with a counterpart at the Embassy, other key staff at the Consulate, and the relevant Stakeholders in Norway.  (Id.)

4.      Both expert officers were expected to proactively engage in targeted networking with relevant colleagues and partners in the United States and Norway.  (Id.)

5.      Both expert positions were to help facilitate and plan visits by their respective Norwegian constituencies to the Midwest. (Id.)

6.      Both expert positions were to facilitate workshops and seminars.  (Id.)

7.      Members of the Norwegian-American community understood that the experts would provide the same number of hours of service.  (Nash 555.)

8.      The primary region in which both expert officers' work was to be focused was Minnesota, Illinois, Iowa, Michigan, Montana, Nebraska, Wisconsin, North Dakota, and South Dakota.  (Id.)

9.      Both expert officers would travel within the Midwest and to Norway as part of their job duties.  (Ewald 189; Davidson 2024.)

10.     Both expert officers were involved in planning and organizing Science Week 2009. (Ewald 181-82; Davidson 1977; P-151-0001; P-158.)

11.     Neither expert officer was in a position of authority over the other; rather, the positions were meant to be parallel and operate as a team.  (See Ewald 107-110; see also Johne Dep. 37-38, 49, 94.)

12.     Neither expert officer managed any other employees.  (See Gandrud 579, 581.)

D.      Fourth, the vision statements for the Higher Education and Research

116

Position and the Innovation and Business Position were substantially the same:

1.  Both expert officers were to improve relations between the Midwest and Norway by identifying and raising awareness of opportunities for collaboration, as well as actively supporting and facilitating collaboration.  (D-24-0004; D-24-0009.)

2.  Working closely with each other    particularly in the areas of academic research and innovation    was identified as "[a] key success factor" for both expert officers.  (D-24-0004; D-24-0009.)  As NACC member Nash testified, the two positions were "inextricably linked."  (Nash 552.)

3.  Both expert officers recognized that "the commercialization of research from universities is an extremely important source of innovation."  (D-24-0004; D-24-0009.)

4.  Both expert officers acknowledged that "combining the academic research and business talents of Norway and the United States may yield significant results."  (Id.)

5.  Both expert positions expected that "[t]o facilitate the synergy of the two roles," the officers would meet on a regular basis to discuss opportunities and collaboration.

(D-24-0004; D-24-0009; P-98: P-151-0001; P-157.)

6.　Both expert officers stated that, when appropriate, the two experts would attend meetings, teleconferences, and conferences together.　(D-24-0004; D-24-0009.)

7.　Science Week was specifically identified as an example of a project on which the two expert officers could work together to advance the interests and opportunities for academic and private research, innovation, and commercialization. (D-24-0008; D-24-0014.)

8.　Both expert officers stated that the scheduling of Science Week in Minneapolis in 2009 provided a "great stage to raise the awareness of the capabilities and opportunities between Norway and the Midwest."　(D-24-0008; D-24-0014.)

9.　In regards to Science Week, both expert positions sought "to highlight technologies, capabilities, and companies in Norway to bring them to the attention of potential American partners and begin a meaningful dialogue with a focus on business partnerships."　(D-24-0008; D-24-0014.)

E.　Fifth, the 2010 Annual Report, a May 2010 Activity Report, 2011 Objectives, and other related documents demonstrate that the expert

118

officers' work was, in practice, substantially the same:

1.      Both expert officers organized events.  (J-40-0011-13;

J-40-0009.)

2.      Both expert officers participated in meetings.  (J-40-0011-13;

J-40-0009.)

3.      Both expert officers facilitated possible connections between

the United States and Norway and networked with their

contacts (J-40-0011-13; J-40-0009; P-115; P-117; P-118;

P-120; P-123; P-155; P-156; D-42), including Norwegian

and Midwestern business representatives, particularly in the

areas of environmental technology, renewable energy, and

medical technology.  (Ewald 185.)   For example, through

Ewald's work with CeRTA, she connected businesses such

as Sanford Health with researchers and universities interested

in using Norway's biobanks to promote collaborative

research and business opportunities.  (Ewald 174, 176;

Hansen 1085-86.)

4.      Both expert officers coordinated and attended conferences

and seminars (J-40-0011-13; J-40-0009; D-46; P-154), in

overlapping areas, with Davidson attending events at the

University of Minnesota and St. Olaf College (Davidson 1977, 1948-49. 2024-25; Ewald 180-82), and Ewald working with numerous businesses to create business and research connections between Norway and the Midwest.  (Ewald 174, 176, 183, 188, 192.)

5.    Both expert officers participated in Science Week, with both attending Science Week in 2009 and 2010.  (D-24-0004; D-24-0009; Davidson 2034-35.)

6.    Both expert officers participated in speaking events. (Davidson 2024-25l; Ewald 179-80.)  These events occurred in overlapping interest areas    Davidson gave a presentation at St. Olaf College (Davidson 2024-25; Ewald 180), and Ewald gave a presentation at the NACC.  (Ewald 181.)

7.    Both expert officers participated on various boards.  (Ewald 364, 366; J-40-0011; P-35-0013.)

8.    Both expert officers were involved with organizations in order to develop relationships between Norway and the United States (e.g., CeRTA and NACTA).  (J-40-0011-13; P-35-0013.)

9.    Both expert officers attended various public engagements

such as breakfasts, lunches, and dinners and represented the Honorary Consulate at these community events.  (P-124; Ewald 179-80; Davidson 2024-25.)

10.  Both expert officers obtained financing and funding for their projects.  (Davidson 1938; D-42-0004-05; Ewald 171-75, 360-61.)

11.  Both expert officers tended to general Consulate administrative tasks, such as answering the telephone or covering some of Carleton's duties when she was out of the office.  (Davidson 2025.)

12.  With respect to objectives for 2011, both experts had similar goals of holding events to highlight Norwegian businesses or research collaborations.  (J-40-0010, J-40-0013.)  Davidson hoped to hold two small events, showcasing Norwegian businesses to a United States audience, and working with Innovation Norway to target and assist Norwegian life science companies to encourage expansion to the United States.  (J-40-0010.)  Similarly, Ewald wanted to continue work on a seminar on neuroscience and mental health to promote high quality research between Norway and the

United States; work with the Mayo Clinic to promote

innovation; and facilitate contacts and collaboration between

Norwegian entities and the United States.  (J-40-0013.)

225.   The Stakeholders' expectation for both expert officers was also the same:

Ewald was to establish a strong network of institutions between Norway and the

Midwest in the area of education and research, while Davidson was expected to "also

promote and get Norwegian business into the Midwest and connect the ties."  (Finborud

Dep. 43-44.)

### Gandrud Testimony and Evidence

226.   The Court finds that Gandrud gave inconsistent testimony, that he made

certain material misrepresentations, and that some of his testimony was not credible.  For

example, Gandrud:

> A.    Testified that he received several phone calls    from unknown
>
> persons he labeled "Tom, Dick and Harry"    letting him know that
>
> the salary for the Innovation and Business Position was too low,
>
> while others listed as contacts on the job postings received no such
>
> phone calls and no other evidence corroborates such a concern.
>
> (Gandrud 575-76; Rognlie 1449.)
>
> B.    Assured the Embassy that a "salary range [of $60,000-70,000]
>
> would be attractive and we should expect a good representative

response," yet requested that Manalo, the Human Resources

Manager at his law firm, conduct a market survey two days later.

(Manalo 252, 255; P-6-0001; P-6-0003.)

C.    Informed members of the Norwegian-American community in

Minnesota that the salary for the expert positions was $70,000.

(Hansen 1088; Mueller 1130-31, 1137, 1140; P-16.)

D.    Told Ewald that she and Davidson had received salaries at the "top

of the range" (Ewald 120-21), and that he "went for the max, 70

plus plus" (Gandrud 751; D-8-0001), even after Gandrud had

actually offered Davidson $100,000, which was $30,000 above the

range that he had relayed to Ewald.  (Gandrud 751, 753; Ewald 110-

11.)

E.    Maintained at trial that the expert positions were "different"

(Gandrud 946, 1002, 1011), yet told multiple people in the

Norwegian-American community in Minnesota that the expert

positions were equal, parallel, and were to work as a team.  (Hansen

1100-01; Nash 553-55; Mueller 1137.)

F.    Told Ewald that he did not set the salaries, but that the Embassy did.

(Ewald 328-29.)  Similarly, testified in his deposition that he did not

determine Davidson's initial salary offer of $60,000, but conceded

123

at trial that, by the process of elimination, he must have unilaterally decided to offer that figure.  (Gandrud 721-22.)

G.  Told public relations consultant Kathy Tunheim that both Davidson and Ewald were to be paid salaries of  "$100,000+" (P-16-0001), yet on the same day emailed the Embassy outlining a $100,000 salary for Davidson, and a $70,000 salary for Ewald.  (P-17-0001.)

H.  Told Ambassador Strømmen in the Honorary Consulate's annual report that the "greater community ha[d] accepted the New Model Consulate without a negative comment    to me, at least" (J-40-0003), yet had received multiple complaints about Davidson's performance from prominent members of that community, including Quam (P-87), Nash (P-95), Mikalsen (Mikalsen 1671; P-109), and Sorensen (P-81; P-82; P-83; P-85).

I.  From Ewald's initial complaint about the significant pay difference in 2009, to his trial testimony, denied setting the $100,000 salary for Davidson.  (Gandrud 729-30.)  However, Gandrud was the sole person who communicated and confirmed the details of the expert position offers to the Embassy.  (P-17-0001.)

J.  Appears to have told Larsen that he spoke to Mikalsen and Ewald about Mikalsen's insurance being canceled (P-37-0005) when he

had never spoken with either of them.  (Id.)

K.  Co-authored the September 23, 2009 letter that labeled Ewald's

salary differential "unjust and embarrassing" for Norway

(P-56-0002), but testified that he was only trying to win his point.

(Gandrud 803.)

L.  Testified that although he wrote in the September 23, 2009 letter

that Davidson and Ewald were "demonstrating exemplary results"

(P-56-0002), he was simply "painting a pretty picture" and he did

not really believe it.  (Gandrud 492-93.)

**Defense Expert Shippen's Reliability and Credibility**

227.  The Embassy's labor economics expert, Benjamin Shippen, Ph.D., testified

at trial.  Shippen is a principal in an accounting business in Florida, has written several

articles, and has lectured about wages in the apparel industry.  (Shippen 1741-42,

1746-47, 1749.)

228.  Shippen received $420/hour for the work on his opinion in this case,

charging a total of approximately $80,000 for his services.  (Shippen 1748, 1856.)

229.  The Embassy directed Shippen to "look at the positions that were being

created at the Embassy with respect to higher education and research and innovation, and

business development, and determine how those positions' salary [sic] fit with

similarly-situated positions in the Minneapolis labor market."  (Shippen 1749-50.)

230.     Shippen reviewed the original job classifications for the expert positions, and identified the former job responsibilities of those who interviewed for the two expert positions, as opposed to the two experts' present duties.  (Shippen 1750, 1754.)

231.     The Court finds that the testimony and opinion of Dr. Shippen is not reliable for the following reasons:

A.     Shippen considered the job duties that the interviewees had in previous jobs (Shippen 1762-63), essentially pricing what the interviewees for the expert positions used to do, rather than pricing the expert positions themselves.  (Shippen 1783-84.)

B.     Shippen did not consider the critical fact that both expert positions worked for the Norwegian government and were not in the private sector.  (Shippen 1763-66.)  Therefore, Shippen did not consider comparable jobs of networkers in the government employment sector.  (Shippen 1769.)

C.     In preparing his report and testimony, Shippen did not consider the testimony of Davidson, the recommendations of the Hiring Committee to hire Ewald and Davidson, Gandrud's interview notes, Norway's Strategy, the drafts of the job descriptions for the expert positions, the Guidance that the Embassy was required to follow in determining salary for local employees, or the so-called research

126

performed by Manalo.  (Shippen 1794-97, 1799, 1800, 1802,
1824,1827-28, 1831-33.)  He also did not consider particular drafts
of Ewald's and Davidson's vision statements, the Steering
Committee's responses to the vision statements, or the Embassy's
dialogue with Gandrud that the salary range for both expert
positions was $60,000-70,000.  (Id.)

D.   Shippen only considered the expert positions at the time of hire, and
not their subsequent evolution over time.  (Shippen 1795.)

E.   Shippen did not know and failed to determine what other diplomatic
missions in the United States   including missions and/or honorary
consulates for Denmark and the Netherlands located in the Twin
Cities   paid employees who had roles that were comparable to
Ewald's and Davidson's.  (Shippen 1800-01.)

F.   The positions that Shippen used for comparison did not require the
same duties as the expert positions required.  (Shippen 1803-05).
Moreover, a review of the Bureau of Labor statistics for public
sector positions demonstrates that   based on the requirements of
the expert positions   those public sector positions have more equal
salary expectations.  (Shippen 1800-01, 1806-11).

G.   Shippen agreed that Ewald's background more clearly mirrored the

127

background of the salary level that he had determined was

appropriate for the Innovation and Business Position.  (Shippen

1814.)

H.  None of the persons with stronger academic-background credentials

were hired for Ewald's expert position.  The Hiring Committee

hired Ewald, the person with the strongest business background, for

that position.  (Shippen 1816-17.)

I.  Shippen acknowledged that Ewald and Davidson were not recruited

for the expert positions; rather, Ewald and Davidson applied for the

positions.  (Shippen 1816-17, 1854.)

**Evidence Regarding Justification for Unequal Pay**

232.  The defense variously argued that the pay disparity was either justified to

"get the right person" for the Innovation and Business Position (focusing on the

candidates' prior work experience and salaries), or because the position itself was in

"business" (focusing on the content of the expert position at the Embassy).  In addition,

the Embassy argued that Davidson required a higher salary because the market required

it and because he had day care needs.  The facts at trial, however, do not provide any

support for these arguments, in part, because:

A.  Both Ewald and Davidson came from the business sector and both

possessed advanced degrees.  (J-4-0003; J-5-0002.)

B.    Ewald actually made more in her prior position than Davidson made in his prior position (D-60-0005; P-167-0001), but Ewald's prior salary was never considered in setting her salary at the Consulate. (Vibe Dep. 83-84; Rognlie 1463-64; Mondale 626-27.)

C.    In terms of qualifications for both expert positions, Davidson:

1.    had no relevant work history in the innovation, business development, and commercial and investment sectors in Norway and the United States (J-1);

2.    worked on business development less than Ewald during his tenure in the Embassy, as observed by individuals in the Norwegian-American community in regular contact with the Consulate (Nash 566);

3.    had no network in Oslo or with Norwegian businesses (Gandrud 1013; D-5-0006);

4.    conceded that he was a poor event organizer (J-40-0009);

5.    had no medical technology knowledge or experience (Nash 563-64);

6.    had no experience writing external correspondence (P-85-0002); and

7.    did not speak or write Norwegian. (Gandrud 1013).

D.    The so-called market research performed by Manalo, upon which the Hiring Committee allegedly relied in setting the salaries for the expert positions, was deeply flawed because:

1.    The job descriptions for the two expert positions were materially different than those referenced in Manalo's search (Manalo 262, 267) and incorrectly assumed that the two expert positions were for business people and academic researchers/educators, respectively (J-3-0001-15);

2.    Manalo did not consider comparable government positions, the salaries of other consulates' experts, or consult publicly available pay levels for expert positions within the Minnesota state government (Manalo 257, 259, 262, 279);

3.    None of Manalo's search results were for positions in the Midwest (Manalo 262, 267);

4.    Manalo did not consider the candidates' prior experience, prior education, and prior salaries or salary requirements    all of which she would have considered if she were conducting this research as the official HR person in charge of hiring the two expert officers (Manalo 270-71; 274); and

5.    Manalo's search results were not provided to any of the

members of the Hiring Committee, except Gandrud   who

testified that he did not set the salaries (Gandrud 584;

Mondale 618).

E.      While Davidson performed work for Innovation Norway, similar

networking/marketing employees who worked full-time for

Innovation Norway in New York during this time frame made

approximately $60,000 to $70,000.  (Berg 1282.)

F.      According to Ambassador Strømmen, a consideration of day care

expenses was not a legitimate basis for determining salary

(Strømmen 877), nor was it permitted under the Guidance.

((P-148-0033.)  Moreover, as the Ambassador testified, the Hiring

Committee was unaware of any day care needs that Ewald may have

had.  (Strømmen 877.)  Furthermore, despite Gandrud's testimony

and email on the subject, Davidson denied that he needed day care

for his children   he merely raised the issue of child care in the

context of inquiring about part-time work.  (Davidson 1916-17,

1996-98.)

**Evidence Regarding Unequal Pay**

233.    The letter to Ambassador Strømmen states:

[T]here is too big a discrepancy between the salaries of Ellen and Anders
Davidson.  We recognize that there is a different job market demand

131

between education and business and this is reflected in the differential. But that differential is too large ($70,000 compared to $110,000.) Once again, we understood that this would be addressed in the 2010 budget. Norway is an acknowledged leader in gender equity and since these two people work closely and since both work hard with exemplary results and dedication, we find the differential unjust and embarrassing.

(P-56-0002.) Vice President Mondale hoped that the letter would be "dynamite," noting that if he had received a letter such as this as Vice President, he would have stood up and taken notice. (Mondale 637-38.)

234. Testimony in this case demonstrates that, by the time this letter was sent to Ambassador Strømmen, the authors had plenty of time to observe the situation about which they wrote. They had been involved in the selection and oversight of the candidates from before the opening of the Consulate through nearly the first year of the two experts' employment, and the Embassy identifies Gandrud as relaying the Embassy's decision regarding the salaries for the two expert positions. Accordingly, all relevant information underlying the salary decision and expert positions (including all of the alleged reasons given as the basis for the salary differential    Davidson's MBA, Davidson's business background, Davidson's prior salary, Davidson's day care situation, and the market) would have been in Vice President Mondale and Gandrud's collective possession at the time they stated that the salary differential was "too large" and "unjust and embarrassing." (Rognlie 1446, 1448; Berg 1253, 1284-85; Finborud Dep. 30, 37.)

**Procedural History**

235. Ewald commenced this action by serving a Complaint dated July 1, 2011

against the Embassy and Gandrud.  (Comp. [Doc. No. 1-1].)  The Embassy removed the action to this Court.  (Notice of Removal [Doc. No. 1].)

236.    All claims against Gandrud were dismissed by the Court on January 26, 2012.  (Order of 1/26/12 [Doc. No. 18].)

237.    Ewald filed an Amended Complaint asserting eight counts against the Embassy: (1) promissory estoppel; (2) violation of Minn. Stat. § 181.64; (3) sex discrimination under the MHRA; (4) reprisal under the MHRA; (5) retaliatory harassment; (6) violation of the EPA; (7) violation of the Minnesota Whistleblower Act; and (8) violation of Norway's Working Environment Act.  (Am. Compl. [Doc. No. 104].)

238.    Following the Embassy's motion for summary judgment, the Court issued an order dismissing Ewald's claims for promissory estoppel, reprisal, retaliatory harassment, whistleblowing, and violation of the Norwegian Working Environment Act. (Order of 3/6/14 [Doc No. 201].)  The Court further ordered that Ewald's Minn. Stat. § 181.64 claim was limited to alleged representations regarding compensation and that her MHRA sex discrimination claim was limited to her claim of unequal pay for equal work. (Id. at 18-19, 25 fn. 6.)

239.    As noted, beginning on April 21, 2014, the Court held an eleven-day bench trial on Ewald's remaining claims of unequal pay and violation of Minn. Stat. § 181.64.

240.    Any conclusion of law which is deemed a finding of fact is incorporated

herein as such.

Based upon the above findings of fact, the Court now makes its:

## CONCLUSIONS OF LAW

### Equal Pay Act

1.    Plaintiff's claims of unequal pay for equal work are brought under both the

EPA and the MHRA.  (Am. Compl. Counts III and VI [Doc. No. 104].)

2.    The EPA prohibits workplace discrimination based on sex, providing:

> No employer . . . shall discriminate . . . between employees on the basis of
> sex by paying wages to employees . . . at a rate less than the rate at which
> he pays wages to employees of the opposite sex . . . for equal work on jobs
> the performance of which requires equal skill, effort, and responsibility,
> and which are performed under similar working conditions, except where
> such payment is made pursuant to (i) a seniority system; (ii) a merit system;
> (iii) a system which measures earnings by quantity or quality of
> production; or (iv) a differential which is based on any other factor other
> than sex . . . .

29 U.S.C. § 207(d)(1).

3.    Similarly, the MHRA declares it an unfair discriminatory practice for an

employer to discharge or otherwise discriminate against a person with respect to hiring,

tenure, compensation, terms, upgrading, conditions, facilities, or privileges of

employment based on their sex.  (Minn. Stat. § 363A.08, Subd. 2.)  Defendant Embassy

is an employer as defined by the MHRA, see Minn. Stat. 363A.03, Subd. 16, and Ewald

is an employee as defined by the MHRA, see Minn. Stat. 363A.03, Subd. 15.

4.    The standards and defenses of the EPA also apply to claims alleging unequal

pay for equal work brought under the MHRA, Price v. NSP Co., 664 F.3d 1186, 1191

(8th Cir. 2011), as well as Title VII, Taylor v. White, 321 F.3d 710, 715 (8th Cir. 2003);

EEOC v. Delight Wholesale Co., 973 F.2d 664, 669 (8th Cir. 1992) ("Where, as here, the

plaintiff raises a claim of unequal pay for equal work on the basis of sex, the standards

are the same whether the plaintiff proceeds under Title VII or the Equal Pay Act.").   The

Court therefore considers Plaintiff's unequal pay claims under the EPA and the MHRA

together.

5.    Importantly, the EPA is a strict liability statute.  Bauer v. Curators of the

Univ. of Mo., 680 F.3d 1043, 1045 (8th Cir. 2012).  As the Eighth Circuit has properly

observed, the EPA "does not require plaintiffs to prove that an employer acted with

discriminatory intent; plaintiffs need show only that an employer pays males more than

females." Id. (citation omitted).  There is no evidence in this case of discriminatory

intent.   There is, however, ample evidence of unequal pay for equal work on the basis of

sex.

**Prima Facie Case - Unequal Pay**

6.    To establish a prima facie case under the EPA and/or the MHRA, a female

plaintiff must show that she was paid less than a male employee for equal work in jobs

that required equal skill, effort, and responsibility and which were performed under

similar working conditions.  Taylor, 321 F.3d at 715 (citing Buettner v. Arch Coal Sales

135

Co., 216 F.3d 707, 718-19 (8th Cir. 2000)).  Federal courts do not serve as

"super-personnel department[s]," re-examining the business decisions of an employer.

Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 898 (8th Cir. 2002) (citation

omitted).  Nonetheless, an employer's business decisions must comport with the EPA.

 7. The law is clear that jobs "need not be identical to be considered 'equal'

under the EPA," but, must be "substantially equal," in order to establish a prima facie

case.  Hunt v. Neb. Pub. Power Dist., 282 F.3d 1021, 1029 (8th Cir. 2002).  "Whether

two jobs are substantially equal 'requires a practical judgment on the basis of all the facts

and circumstances of a particular case,' including factors such as level of experience,

training, education, ability, effort, and responsibility."  Id. at 1030 (quoting Buettner,

216 F.3d at 719).  In fact, "[t]wo jobs could require '[i]nsubstantial or minor differences

in the degree or amount of skill, or effort, or responsibility' and still be substantially

equal."  Id. (quoting 29 C.F.R. § 1620.14(a)).  "[N]either job classifications nor titles are

dispositive for determining whether jobs are equal."  Id. at 1029 (citing Orahood v. Bd.

of Trustees of Univ. of Ark., 645 F.2d 651, 654 (8th Cir. 1981)); see also Carey v. Foley

& Lardner, LLP, No. 11-10818, 2013 WL 4747825, at *5-6 (E.D. Mich. Sept. 4, 2013)

(noting that differing legal specialities within a law firm may or may not have

substantially equal job content, but finding that the plaintiff failed to provide sufficient

facts to show that all partners performed essentially the same duties).  Likewise, merely

because two jobs are in different departments is not determinative of a lack of substantial

equivalence, although in some instances it may indicate different job content.  See

Ebbert v. Nassau Cnty., No. 05-CV-5445 (FB) (AKT), 2009 WL 935812, at *3

(E.D.N.Y. Mar. 31, 2009) (stating, "No case stands for the proposition that a woman

performing the same job as a man cannot make a valid comparison simply because she

works in a different department.").

8.    It is the specific, day-to-day content of the jobs that determines substantial

equivalence.  Bearden v. Int'l Paper Co., 529 F.3d 828, 833 (8th Cir. 2008) ("whether

different employees are performing equal work . . . depend[s] . . . on the actual

requirements of the job"); Younts v. Fremont Cnty., Iowa, 370 F.3d 748, 752-53 (8th

Cir. 2004) (same).  "The focus on job content has been a constant in the context of the

EPA."  EEOC v. Port Auth. of N.Y. & N.J., 768 F.3d 247, 255 (2d Cir. 2014).   The

EEOC's own regulations demonstrate that "equal work" is based on actual job content

and performance, as opposed to job classifications or titles.  29 C.F.R. § 1620.13(e).[2]

The EEOC's Compliance Manual  points to an examination of whether the two jobs

share a "common core" of duties:

> In evaluating whether two jobs are substantially equal, an inquiry should
> first be made as to whether the jobs have the same "common core" of
> tasks, i.e., whether a significant portion of the tasks performed is the same.
> If the common core of tasks is not substantially the same, no further

---

[2]    While regulations interpreting the EPA are not binding, they should be given
great weight.  Herndon v. Wm. A. Straub, Inc., 17 F. Supp. 2d 1056, 1060 n.4 (E.D. Mo.
1998) (citing Hodgson v. Security Nat'l Bank of Sioux City, 460 F.2d 57, 59 (8th Cir.
1972)).

> examination is needed and "no cause" can be found on the EPA violation. If a significant portion of the tasks performed in the two jobs is the same, an inquiry should be made as to whether the comparators perform extra duties which make the work substantially different. Jobs with the same common core of tasks are equal, even though the comparators perform extra duties, if the extra duties are insubstantial.

EEOC Compliance Manual § 10-IV(E)(2); see also Port Auth. of N.Y., 768 F.3d at 255.

However, while the individual components of jobs are important, the Eighth Circuit has

directed courts to consider the jobs overall, stating, "[f]or purposes of the Equal Pay Act,

the fact finder must consider the overall job, not just the individual segments of the job,

when determining whether two employees performed substantially equal work."

Broadus v. O.K. Indus., Inc., 226 F.3d 937, 942 (8th Cir. 2000) (citing EEOC v.

Universal Underwriters Ins. Co., 653 F.2d 1243, 1248 (8th Cir. 1981)).

9.      There is no dispute that Ewald was paid less than Davidson.  (Trial

Transcript Stipulation 920-21.)  Courts have noted that "the size of the pay differential,

though not determinative . . . is highly relevant."  Sims-Fingers v. City of Indianapolis,

493 F.3d 768, 771 (7th Cir. 2007) (noting that a $100 pay gap, representing a 2% salary

differential, that favored men did not support an inference of sex discrimination).  Here,

the $30,000 difference in salary, representing a 42% differential, was a significant

difference, but the question is whether the two jobs were substantially equal.  Defendant

maintains that Davidson's position as the Innovation and Business Officer required

greater skill, effort, and responsibility than Ewald's position as the Higher Education and

Research Officer.  Plaintiff argues to the contrary.

10.     From the very outset, the two expert positions at issue here were conceived as equal and parallel positions.  In the greater Norwegian-American community, it was understood that the overriding duty of both positions was identical    to build relationships between the Midwest and Norway, with an emphasis on research and innovation.  (Hansen 1081, 1101; Mueller 1137.)   One reason that the positions were considered so similar was that business development was a significant aspect of both positions.  (Mueller 1137; see also Nash 551-52.)   In the course of meetings and discussions about the New Model Consulate, Mykletun, who had developed the concept, indicated that the two expert positions were equal and parallel and that funding for the two positions would be divided equally.  (Hansen 1081; Ewald 91; Mykletun 1598-99.)  Similarly, in part from conversations with Gandrud, others in the Norwegian-American community understood that the two positions were equal, parallel, and would work together as a team.  (Hansen 1100-01; Nash 553-555; Mueller 1137.)   Moreover, the Stakeholders understood that funding for the two positions would be equally divided to cover travel and salary.  (P-17-0003; P-14-0002; Ewald 313.)

11.     This understanding of equal positions is reflected in the actual work of the two expert positions.  The Innovation and Business Position and the Higher Education and Research Position involved a common core of responsibilities.  The job postings, which were also used as the experts' job descriptions (Johne Dep. 91-92), reflect almost identical duties, including but not limited to:

139

    A.      Working with a counterpart at the Embassy in Washington D.C., other key staff at the Consulate and relevant Stakeholders in Norway, towards the goals of advancing Norway's strategies for the respective focus area within the Upper Midwestern United States.

    B.      Developing contacts between Norwegian and United States partners.

    C.      Proactively engaging in targeted networking with relevant colleagues and partners in the respective focus area.

    D.      Facilitating and planning visits to the Midwest by involved and interested Norwegian partners, as well as facilitating workshops and seminars of common interest.

(J-2-0002-3.)

12.    In Ewald's interview, the Hiring Committee members noted that collaboration between the two expert positions would help Norway develop the commercialization of research.  (Ewald 109.)  Specifically, the Committee Members indicated that the expert officers would both be involved with Science Week.  (Id.)

13.    The Steering Committee expected Ewald to develop a "strong institution network between Norway and U.S.A. on the education and research side." (Finborud Dep. 43-44.)  Similarly, the Stakeholders expected Davidson to "also promote and get Norwegian business into the Midwest and connect the ties." (Finborud Dep. 44.) Steering Committee Chair Finborud agreed that the two expert positions were to work as a team, with some overlapping work with institutions concerning research and technology. (Finborud Dep. 64.)  Finborud also testified that research and innovation

are "two sides of the same coin."  (Finborud Dep. 88; Ewald 30-31.)  According to

Finborud, Ewald's first priority was to "network, to build . . . up connections,

cooperations between the various research institutions and other academic institutions."

(Finborud Dep. 54.)   Davidson was to similarly network in order to facilitate

connections between businesses.  (Davidson 2014-2015.)

14.    While Ewald was initially encouraged to work on student mobility issues

and student exchanges (Gandrud 750; 756-58; 796-97; Mondale 606-607, 674, 681, 696,

702-703; Ewald 93-94, 108-110; P-52-0001; D-24-0016; J-23-0003), in March 2009, the

Steering Committee redirected Ewald to prioritize her focus on "strategic cooperation

between universities, institutions and research groups above student exchanges and

student mobility."  (P-38-0005.)   The Steering Committee expected that undergraduate

student exchanges should occupy no more than 10% of her time.  (J-23-0003.)   From

then on, Ewald focused on building relationships between the Norwegian and United

States institutions and less on student mobility.  (Ewald 175; D-24-0016; <u>see also</u>

Finborud Dep. 52-53.)   With this re-prioritization, early in the experts' tenure with the

Honorary Consulate, Ewald's and Davidson's duties were even more similar.  In fact,

Rognlie communicated to Gandrud in June 2009 that the two positions "should work as a

team. . . .  Their work is overlapping regarding research-based innovation and

institutional contact."  (J-23-0002-03.)

15.    The two experts' 2009 vision statements, in which they described their

work, highlight the overlapping nature of the two positions.   Gandrud directed Ewald to

use "almost the same verbiage" as Davidson, particularly with respect to their

collaborative work.  (D-20-0001.)  Davidson's 2009 vision statement emphasized this

collaboration:

> A key success factor for this role is working closely with the Higher
> Education and Research Director position, particularly in the areas of
> academic research and innovation.  The commercialization of research
> from universities is an extremely important source of innovation and
> business opportunities.  Combining [their] academic research and business
> talents[,] Norway and the U.S. may yield significant results.  To facilitate
> the synergy of the two roles, the Directors will meet on a regular basis to
> discuss.  In addition, when appropriate, both Directors will attend
> meetings, teleconferences and conferences together.  Science Week is a
> great example of how the two positions can work together to advance the
> interests and opportunities for academic and private research, innovation
> and commercialization.

(D-20-0002; D-24-0009.)  Ewald's vision statement mirrored Davidson's description of

how the two expert positions overlapped and worked together (D-24-0004), and also

identified future opportunities for collaboration:

> The Midwest is also home to more than thirty Fortune 500 companies and
> leading corporations, including many companies recognized as the most
> research-based innovative companies in the world, such as Cargill,
> Medtronic, 3M and Ecolab, not to mention dozens of emerging ventures in
> the areas of green technology/renewable energy, health care and
> information technology.  These are all great potential partners for applied
> research from Norway and this position will work with the Director of
> Business Development and Innovation to identify and support efforts in
> this area.

(D-24-0006).  In addition, both Ewald and Davidson also noted that along with

Innovation Norway, they worked with the Research Council.  (D-24-0005;

D-24-0011-13.)

16.    The trial testimony of Ewald and Davidson also demonstrates a common

core of duties between the two expert positions:  Ewald and Davidson facilitated

meetings of visiting Norwegian dignitaries and event attendees (Ewald 173; Hansen

1084-85); traveled to Norway (Ewald 189; Davidson 2024); gave presentations and

represented the Honorary Consulate at community events (Davidson 2024-25; Ewald

180); planned Science Week 2009 together (Ewald 181-82; Davidson 1945-46); attended

Science Week 2010 (Davidson 2034-35); performed work related to Midwest-Norway

connections in the areas of environmental technology, renewable energy, and medical

technology (Ewald 185); met with Norwegian and Midwestern business representatives

(id.); and covered some of Carleton's administrative duties when she was out of the

office.  (Ewald 193; Davidson 2025.)   The entities and audiences with which the two

experts interacted overlapped as well; as just one example, Davidson gave a presentation

at St. Olaf College (Davidson 2024-25; Ewald 180), and Ewald gave a presentation at

the NACC. (Ewald 181.)

17.    Moreover, Gandrud communicated with Steering Committee Chair

Finborud about Ewald's work on developing relationships not only with educational

institutions, but also with business entities.  (P-52-0001-02.)   The specific business

fields with which Ewald worked included environmental technologies, renewable

energy, medicine, and medical technology.  (Ewald 174.)   For example, Ewald helped

facilitate connections between Twin Cities-based Cargill and Norwegian businesses (Ewald 188); connected MIT colleagues with representatives of Statoil, a Norwegian oil company (Ewald 192); arranged meetings between the Oslo MedTech Group and local businesses interested in research (Ewald 176); organized a brain science conference involving representatives from research, business, and public policy, including the former Prime Minister of Norway (Ewald 183); and through her work with CeRTA, connected businesses such as Sanford Health with researchers and universities interested in using data in Norway's biobanks to promote collaborative research and business opportunities. (Ewald 174, 176; Hansen 1085-86.)   Moreover, Nash testified that he and his business clients ultimately turned to Ewald for assistance, instead of Davidson, because "[Ewald] understood how business and academics would work together."  (Nash 550-01.)

18.    Based on the foregoing, it is evident that the two expert positions were meant to be   and were understood to be   equal and parallel.  However, superficial similarities or a broad comparison of jobs from a "bird's eye view" are not determinative of equal jobs.  See Wheatley v. Wicomico Cnty., Md., 390 F.3d 328 (4th Cir. 2004). Rather, jobs must be substantially equal with regard to each factor of skill, effort, and responsibility.  Renstrom v. Nash Finch Co., 787 F. Supp. 2d 961, 970 (D. Minn. 2011) (citing 29 C.F.R. § 1620.14 (2013) (skill, effort, and responsibility "constitute separate tests, each of which must be met in order for the equal pay standard to apply")).  While

Plaintiff bears the burden of establishing that she and Davidson, the comparator

employee, were performing substantially equal work that required equal skill, effort, and

responsibility, 29 U.S.C. § 206(d)(1); Hunt, 282 F.3d at 1029, "'[i]nsubstantial or minor

differences in the degree or amount of skill, or effort, or responsibility required for the

performance of jobs will not render the equal pay standard inapplicable.'" Krenik v.

Cnty. of LeSueur, 47 F.3d 953, 961 (8th Cir. 1995) (quoting 29 C.F.R. § 1620.14(a)).

**Equal Skill**

19.    Skill   the first factor in determining whether two jobs are substantially

equal   includes the experience, training, education and ability necessary to perform the

jobs. Simpson v. Merchs. & Planters Bank, 441 F.3d 572, 578 (8th Cir. 2006).  "[A]

plaintiff does not have to show that the skills or qualifications of the actual male and

female employees holding the positions are . . . substantially equivalent," but rather, that

the jobs are substantially equal.  Grover v. Smarte Carte, Inc. , 836 F. Supp. 2d 860, 867

(D. Minn. 2011) (citing Arrington v. Cobb Cnty., 139 F.3d 865, 876 (11th Cir. 1998)).

Thus, "[t]he crucial question under the [EPA] is not whether one sex possesses

additional training or skills, but whether the nature of the duties actually performed

require or utilize those additional skills." Peltier v. City of Fargo, 533 F.2d 374, 377 (8th

Cir. 1976) (citation omitted).[3]

---

[3] While an employee's additional skills are inapplicable to a substantial
equivalence analysis of the skills factor, see Peltier, 533 F.2d at 377, those same
additional skills may, however, be relevant to an affirmative defense under the EPA, as

20.    Defendant contends that the Innovation and Business Position required skills unique to business    skills that Davidson gained through his MBA and business background    while the Higher Education and Research Position required skills unique to education.  (See id. ¶¶ 215-17.)   However, this argument misunderstands the two positions.   In these expert positions, Davidson was not a businessman, nor was Ewald an educator.   They were both networkers    serving primarily to create research-based business opportunities for Norway in the Midwest.  And the evidence show that the skills required to perform the substantive duties of the two jobs were substantially equal.

21.    First, the same interviewers for both positions looked for identical skills when evaluating candidates:  "how [the candidates] would approach the job," "Norwegian network and language skills, network experience in both regions, as well as personal skills," and "teamwork abilities."  (J-6-0009.)   As the Embassy itself observes, finalists for the Innovation and Business Position had MBA degrees, and the finalists for the Higher Education and Research Position similarly had advanced degrees.  (Def.'s Proposed Findings of Fact & Concl. of Law at ¶ 215 [Doc. No. 327]) (citing J-1-0013-21; D-56; J-1-0004-12).)

22.    Second, Ewald's expert position involved skills in developing relationships between Norwegian and Midwestern educational and research institutions and research-based businesses equal to the skills required of Davidson's expert position, which

discussed below.

involved skills in developing relationships between Norwegian and Midwestern businesses   particularly businesses involved in technology and research.  Both Davidson and Ewald utilized communication and networking skills when communicating with, and facilitating exchanges between, their respective Norwegian and Midwest constituents in business and education.  (Davidson 2026-27; J-1-0001; J-1-0016; Mueller 1137.)

23.   Third, the record reflects a significant overlap in duties   for instance, Davidson attended events at the University of Minnesota and St. Olaf and worked with Ewald on Science Week 2009 (Davidson 1977, 1948-49, 2024-25; Ewald 180-82), while Ewald worked with numerous businesses to create business and research connections between Norway and the Midwest.  (Ewald 174, 176, 183, 188, 192.)  The fact that on a given day, Ewald attended a particular meeting and Davidson did not, and vice versa, is insignificant.   There was little difference in the skills required for each employee to attend such functions and to network with the Norwegian and Midwest communities   to the extent that any different skills were required, they were minor.  See Hunt, 282 F.3d at 1030 (citing 29 C.F.R. § 1620.14(a)).  Davidson analyzed business plans as part of his efforts to increase exchanges (Davidson 1913, 2016), and Ewald similarly mapped student exchanges and fostered research collaborations as part of her efforts to fulfill the same task. (Ewald 360-61.)  The specific means deployed to accomplish this task, i.e., a business plan versus a plan for research collaboration, is a minor difference that does not

negate equivalence in the skills required for the two jobs.

24.    Fourth, in performing their duties, both Davidson and Ewald also used their skills in obtaining financing and funding for their projects    for instance, Davidson identified potential financing sources for Norwegian firms while attending an oil and gas conference, while Ewald worked on obtaining financing for the CeRTA research alliance.  (Davidson 1938; D-42-0004-05; Ewald 171-75, 360-61.)   That the funding or financing might be for different projects is again a minor distinction    the skills required to raise the funds were substantially equivalent.

25.    Finally, the "[p]ossession of a skill not needed to meet the requirements of the job cannot be considered in making a determination regarding equality of skill."  29 C.F.R. § 1620.15(a) (2013).   Because the possession of an MBA was not a requirement for the Innovation and Business Position (see J-2-0002.), Davidson's MBA is actually irrelevant to the skills analysis required for Plaintiff's prima facie case.  Likewise, a comparison between Ewald's fluency in Norwegian versus Davidson's lack of fluency is not relevant to "equal skill" because both positions required only speaking knowledge of Norwegian or the willingness to acquire a basic understanding of the language.  (Id.; J-2-0003.)

26.    The Court thus finds that the two jobs required substantially equal skills.

**Equal Effort**

27.    As to the second factor, "[e]ffort refers to the physical or mental exertion

148

necessary to the performance of a job." Simpson, 441 F.3d at 578.   It is uncontested that both Ewald and Davidson were required to apply the same effort in the course of performing their networking duties between Norwegian and Midwestern contacts.  In addition to the common core of duties, both positions required attendance at various civic and cultural events, at which the experts represented the Embassy (J-2-0002-03).  See Simpson, 441 F.3d at 578 (discussing attendance at after-hours events, in which both employees represented employer, in finding that the positions involved equal effort).  Davidson himself agreed that the jobs required a similar level of effort.  (Davidson 2043.)  And Nash, a member of the Norwegian-American community, testified that everyone in the community understood that the experts would provide the same number of hours of service.  (Nash 555.)  No evidence in the record suggests that the Innovation and Business Position required greater effort or additional duties than the Higher Education and Research Position.   The Court finds that the two positions required equal effort.

28.     Moreover, while the expert positions themselves required equal effort, the record reflects that Ewald actually expended greater effort than Davidson.  For example, Nash testified that he eventually ceased making business referrals to Davidson, noting that none of his efforts at putting together events with Davidson came to fruition.  (Nash 549.)  Likewise, Nash ceased inviting Davidson to participate in projects or events, observing that Davidson was either unlikely to attend, or that his presence was not

149

helpful.  (Nash 550.)  Instead, Nash turned to Ewald when he sought the Consulate's

assistance, finding her to be particularly helpful "because she understood how business

and academics could work together" (Nash 551), whereas Davidson essentially

"ignor[ed] how the innovation side work[ed]."  (Id.)  If Ewald was unable to help Nash

herself, she found someone who could.  (Id.)  In addition, Mikalsen testified that

Davidson never followed up on Mikalsen's invaluable offer to share his business

network with Davidson (Mikalsen 1662-63), and NACC President Mueller testified that

Davidson attempted to deflect certain requests for assistance to Mueller.  (Mueller 1134.)

 When Davidson was unable to provide assistance,  Davidson failed to offer an

alternative resource or contact.  (Id.)  In other words, Davidson's work was roundly

criticized by members of the United States-Norway business community.  (Nash 560,

565; Mueller 1132-35; P-81-0001; P-82-0001; P-83-0001; P-85-0001; P-87-0001;

P-88-0001; P-95-0001; P-109-0001-3.)

### Equal Responsibility

29.    Regarding the third factor, "[r]esponsibility concerns the degree of

accountability required in performing a job."  Simpson, 441 F.3d at 578.  The Eighth

Circuit Court of Appeals has observed that "[m]uch of the precedent regarding unequal

jobs involves comparing two jobs with a common core of duties, but with the

higher-paid job having additional duties."  Id. at 577 (citing Horn v. Univ. of Minn., 362

F.3d 1042, 1045-46 (8th Cir. 2004) (finding that jobs of two hockey coaches were not

equal where the female hockey coach served as a public representative to the hockey team, in addition to performing administrative duties in common with the male hockey coach); McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 513-14 (8th Cir. 1995) (finding two jobs not equal because the male employee performed additional tasks); Krenik, 47 F.3d at 961 (holding two maintenance employees' jobs not equal where the male maintenance engineer had additional supervisory duties in addition to the job functions that the female assistant performed)).  For example, in Conigliaro v. Horace Mann School, No. 95 Civ. 3555 CSH, 2000 WL 45439, at *5-6 (S.D.N.Y. Jan. 19, 2000), in which the court found that two jobs were not equal, the comparator employee was actually the plaintiff's supervisor.  Not only did the comparator supervise more employees than the plaintiff, the comparator's actual job duties involved work that the plaintiff did not perform: while the plaintiff kept the office running, the comparator engaged in high-level fund-raising meetings, speech-making, and presentations.  Id.

30.    Here, the Higher Education and Research Position and the Innovation and Business Position were both considered expert positions.  (J-6-00013.)  Both Ewald and Davidson were employed at the same "officer" level (id.), and both reported to Gandrud and Vice President Mondale (id.), and to the Economic Section of the Embassy in Washington, D.C.  (Ewald 235; P-74-0001-02.)  Both positions were expected to serve all Stakeholders.  (D-25-0002-03.)  Neither expert officer was in a position of authority over the other.  (See Ewald 107-110; see also Johne Dep. 37-38, 49, 94 (stating that the

positions were meant to be parallel and operate as a team).)   And, neither expert officer managed any other employees.  (See Gandrud 579, 581.)  These similarities are important markers of substantially equal responsibility.  Here, unlike in Horn, both Ewald and Davidson performed similarly outward-facing work.  (Nash 552 (testifying that externally, their work was the same).)  And, unlike in McLaughlin, Krenik, and Conigliaro, there is no evidence that the Innovation and Business Officer performed duties over and above those performed by the Higher Education and Research Officer.

31.    The Court finds that the two jobs at issue here required equal responsibility. Having found that the two jobs required equal skill, effort, and responsibility, the Court finds that Ewald has established a prima facie case of unequal pay.  Taylor, 321 F.3d 710 at 715.

### Affirmative Defenses

32.    Having found that Ewald has established a prima facie case, the burden of persuasion shifts to the Embassy to justify the pay disparity based on one of the EPA's four defenses:  "(1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; or (4) a disparity based on any other factor other than sex." Horn, 362 F.3d at 1045-46 (citing Price, 664 F.3d at 1191).   Under the EPA, a defendant "cannot escape liability merely by articulating a legitimate non-discriminatory reason for the employment action." Simpson, 441 F.3d at 572. Instead, the employer bears a heavy burden in establishing one of the four defenses, "because the statutory exemptions are narrowly

construed." <u>Ryduchowski v. Port Auth. of N.Y. & N.J.</u>, 203 F.3d 135, 143 (2d Cir. 2000)

(internal citations and quotation marks omitted).  As one legal treatise has noted,

> [t]o meet this burden, a defendant must identify the factor(s) justifying the
> difference in pay and also demonstrate that the sex of employees played no
> part in the wage differential. <u>Drum v. Leeson Elec. Corp.</u>, 565 F.3d 1071 (8th
> Cir. 2009). This requires the defendant to prove that the factor on which pay
> is based has been rationally and systematically applied to members of both
> sexes on an equal basis.  <u>Taylor v. White</u>, 321 F.3d 710 (8th Cir. 2003).  The
> employer also has the burden of explaining why the factor is used as the basis
> of establishing the pay of employees.

58 Causes of Action 2d § 17 (2013); <u>see also</u> <u>Hodgson</u>, 460 F.2d at 59 n.3 (quoting 29

C.F.R. § 800.142) (stating that for the requirements of an exemption to be met, any such

exempting factor "must be applied equally to men and women whose jobs require equal

skill, effort, and responsibility, and are performed under similar working conditions").

33.    Although the Embassy's primary argument at trial was that Ewald could not

establish a prima facie case of unequal pay, the Embassy also presented evidence in support

of its position that even if Ewald could make out a prima facie case, the Embassy's decision

to pay Davidson a higher salary was based on a "factor other than sex."   The "factor other

than sex" category is a broad catch-all, created "due to the impossibility of predicting and

listing each and every exception."    <u>Taylor</u>, 321 F.3d at 717-18.  At trial, the Embassy

presented evidence of several "other than sex" factors, recognized by courts, to justify

Davidson's higher salary:  (1) his particular marketplace value, <u>see</u> <u>Horner v. Mary Inst.</u>,

613 F.2d 706, 714 (8th Cir. 1980); (2) salary negotiations, <u>see, e.g.</u>, <u>Balmer v. HCA, Inc.</u>,

423 F.3d 606, 613 (6th Cir. 2005), <u>abrogated on other grounds</u>, <u>Fox v. Vice</u>, 131 S. Ct. 2205

(2011); (3) Davidson's prior salary, see Drum v. Leeson Elec. Corp., 565 F.3d 1071, 1073 (8th Cir. 2009); and (4) the Embassy's efforts to meet the demands of Davidson, who was the top candidate for the Innovation and Business Position, see, e.g., Horner, 613 F.2d at 714. (See Def.'s Proposed Findings of Fact & Concl. of Law ¶ 197 [Doc. No. 327].) To a lesser extent, the Embassy also presented evidence (P-7-0001) that suggested another justification based on Davidson's status as a breadwinner or "head of household." See EEOC v. J.C. Penney Co., 843 F.2d 249, 254 (6th Cir. 1988) (finding that the provision of insurance benefits conditioned upon "head of household" status was a valid "other than sex" factor, absent evidence of discriminatory reasons); EEOC v. Tree of Life Christian Schs., 751 F. Supp. 700, 709 (S.D. Ohio 1990) (finding that a "family allowance" available to men with dependents, but not women with dependents, violated the EPA).

### Marketplace Value

34.     It is not a defense under the EPA that a woman may be paid less than a man in the same position simply because the woman is willing to accept less pay. Courts have consistently rejected this type of "market forces" defense. Corning Glass Works v. Brennan, 417 U.S. 188, 205 (1974); Taylor, 321 F.3d at 716. However, an employer "may consider the market place value of the skills of a particular individual when determining his or her salary." Horner, 613 F.2d at 714. When a comparator's work experience is used to justify a pay differential, "it is the comparator's experience vis-á-vis the claimant that is salient." Dreves v. Hudson Grp. (HG) Retail, LLC, No. 2:11-cv-

4, 2013 WL 2634429, at *7 (D. Vt. June 12, 2013) (citing Byra-Grzegorczyk v. Bristol-

Myers Squibb Co., 572 F. Supp. 2d 233, 253 (D. Conn. Aug. 20, 2008); Virgona v.

Tufenkian Imp.-Exp. Ventures, Inc., No. 05-cv-10856, 2008 WL 4356219, at *10

(S.D.N.Y. Sept. 23, 2008)).  Such a differential "that is based on education or experience

is a factor other than sex recognized by the [EPA]."  Hutchins v. Int'l Bhd. of Teamsters,

177 F.3d 1076, 1081 (8th Cir. 1999).  Thus, in Horner, the court found that the plaintiff

not only failed to establish a prima facie case, but that the higher-paid comparator's

experience and ability made him the best person for the job and a higher salary was

necessary to hire him.  613 F.2d at 714.

       35.    The Embassy often referred to the different marketplace value of the two

expert positions in order to justify the pay differential, whether in Gandrud's September

4, 2008 email to the Stakeholders, suggesting a higher salary for Davidson (P-7-0001), or

the September 23, 2009 letter from Vice President Mondale and Gandrud to Ambassador

Strømmen (P-56-0002).  Also, Rognlie and Finborud recalled that Davidson was offered

a higher salary than Ewald because of the different job market (Rognlie 1478), and

because they "would have to pay more to a more experienced person from a private

business life."  (Finborud Dep. 30, 37.)   Incredibly, the basis for this marketplace

justification consisted of one hour's worth of research performed by Manalo.  (Gandrud

576-77, 973; Manalo 252.)   Importantly, this deeply-flawed research involved absolutely

no consideration of the relative skills of either Davidson or Ewald.  Manalo conducted

155

the research in early July 2010 (Manalo 259)    nearly two months prior to the September

interviews for the expert positions    and Manalo had no knowledge of who had applied

for the positions.  (Manalo 270, 276.)  Manalo could not find exact matches for the

expert positions, and instead provided Gandrud with salary range information for non-

relevant jobs such as "Business Development Manager Jobs," "Business Development

Director Jobs by U.S. Region," "Institutional Research Director Jobs by U.S. Region"

and "Researcher III-Academic."  (J-3-0001-15; Manalo 276, 262-63.)   This so-called

research incorrectly assumed that these positions were for business people and academic

researchers, respectively.  Gandrud did not ask Manalo to search for salaries of similar

employees in other embassies or consulates.  (Gandrud 584.)  Manalo testified that if she

had been asked to conduct this search as the Human Resources person in charge of the

two expert positions, she would have necessarily considered the candidates' (1) prior

experience; (2) prior education; and (3) prior salaries or salary requirements, which she

did not do.  (Manalo 270-71, 274.)

36.    Notably, there is no evidence that anyone involved in the hiring of the two

expert officers followed the Guidance    the MFA's guidance for hiring local employees

at Norwegian foreign service stations (P-148)    which they were required to do.  (P-148-

00022; Strømmen 860-63.)   The one-hour's worth of market research that the Embassy

relied upon failed to consider the numerous relevant sources listed in the Guidance for

determining local employees' salaries, including international companies, recruitment

companies, public salary standards, public statistics, industry statistics, and job announcements.  (P-148-0033.)   The Guidance also strictly forbade any consideration of a candidate's marital or family status in determining salary.  (Id.)

37.     Ironically, had the Embassy truly considered Ewald's and Davidson's skills to justify a difference in pay, such a consideration should have favored Ewald. See Dreves, 2013 WL 2634429, at *7 (concluding that a comparison of skills should have led to a higher salary for the plaintiff, not the comparator).  Ewald possessed more work experience, including work experience in both the United States and Norway, and fluency in Norwegian, versus Davidson's lack of work experience in Norway and lack of Norwegian language skills.  Yet the Embassy did not consider Ewald's 15 years of prior business experience in making the salary decision.  (Mondale 700.)  Gandrud's initial salary overture to each candidate provided a more accurate and honest measure of the marketplace value of their respective skills: he floated a $60,000 salary by Davidson, and a $70,000 salary by Ewald.  At no point did the Embassy explain how it arrived at those initial suggested salaries, much less how Davidson was ultimately offered the sum of $100,000.

38.     Moreover, the Embassy's broad statement that "common sense" dictated that a person "in business" should be paid more than a person "in education" (Rognlie 1480, 1510), not only overlooks that the positions were neither for a business person nor an educator, but also that both jobs were in the public sector.  In addition, the Embassy's

"common sense" runs afoul of the law.  Such a sweeping generalization bears striking similarity to "market forces" salary justifications, which are rejected under the law, Corning Glass Works, 417 U.S. at 205, in favor of an analysis of the marketplace value of a particular individual's skills.  Horner, 613 F.2d at 714.

39.     The Court finds that the Embassy failed to meet its burden of persuasion in establishing that the disparity between Ewald's and Davidson's pay was based on marketplace value and experience.

### Salary Negotiations and Specific Salary Demand

40.     The Eighth Circuit has found that negotiations leading to a comparator's higher salary, or a demand for a specific salary, may establish a valid "factor other than sex" defense to an unequal pay claim.  See, e.g., Horner, 613 F.2d at 714.  However, the facts of this case do not support the application of this defense.

41.     The evidence in this case demonstrates that, at various times, Defendant attempted to justify Davidson's higher pay with reference to the parties' respective salary "negotiations," stating that the $100,000 offer to Davidson was what it took to get the Embassy's top candidate to accept the job.  For example, in response to Ewald's multiple inquiries to the Embassy about the pay disparity, Ambassador Strømmen wrote to Ewald on November 18, 2009, explaining:

> ... The salary levels defined in last year's negotiations with you and your colleague, were based on what was, in consultation with the funders in Norway, considered necessary to recruit the right people to two very different jobs. I believe this was explained to you in the course of the

158

negotiations.

(J-28-0002.) On March 11, 2010, the Embassy provided further explanation to Ewald

regarding the salary issue:

> Contract-negotiations are carried out on an individual basis and will also
> reflect the salary levels in the labor market segment we wish to recruit
> from. For one of the positions at the Consulate General in Minneapolis it
> was essential to recruit someone with a corporate background, and through
> the negotiations it became clear that such a candidate required a higher
> salary than initially offered.

(J-38-0002.)

42. Despite these explanations, the facts here overwhelmingly demonstrate that

neither Ewald nor Davidson "negotiated" their salaries, as both thought that the salary

range was rigid, and therefore believed that negotiations for a higher salary would not be

fruitful. (Ewald 120-22, 388-390; Davidson 1918.) In response to Strømmen's

November 18, 2009 communication explaining that the salary differential was partly a

result of separate salary negotiations, Ewald replied,

> I had understood that the salary range for the two positions was between
> 40,000 USD and 70,000 USD and I was told that we received the absolute
> maximum possible which obviously led me to believe that was also the
> case for my coworker. Hence, I did not negotiate for my salary; I had
> assumed it was determined by typical UD "lønnstrinn"/ salary levels within
> the afore-mentioned range.

(P-68-0002.) Ewald's understanding is supported by the facts. Gandrud took pains to

disclaim that his initial $60,000 salary suggestion to Davidson, and Davidson's response,

constituted a negotiation. (Davidson 1917-18; Gandrud 725-27.) In fact, Gandrud

informed Davidson that he was not authorized to make an offer at that time. (Gandrud

720-21, 984.)  Davidson did not interpret the $60,000 figure as a formal offer, either.

(Davidson 1992.)  In later relaying the details of their conversation to Johne, Rognlie,

Ambassador Strømmen, and others, Gandrud commented, "I told him that I do not intend

to negotiate with him."  (P-7-0001.)

43.     In addition to Gandrud not negotiating the salary, Davidson did not demand

a particular salary.  (See Davidson 1921.)  Moreover, Davidson actively sought out the

Innovation and Business Position    the Embassy did not recruit him.  (Shippen 1854.)

Davidson inquired about the possibility of working three days per week at Gandrud's

suggested salary of $60,000.  (Davidson 1916.)   Davidson testified, "my response to

them was not, I'm not going to work for 60, you have to pay me at least 100, I said, let's

work within the 60 budget, can we do something else." (Davidson 1921.)   Defendant

has not demonstrated that the $100,000 figure was "what it took" to get Davidson to

accept the position on a full-time basis    no other figures or alternative part-time work

arrangements were ever formally considered or offered.

44.     Accordingly, the Court finds that the Embassy failed to meet its burden of

persuasion that either Davidson's salary negotiations or a salary demand justified the pay

differential.

**Prior Salary**

45.     Prior salary is often seen as an indicator of marketplace value.  When prior

salary is asserted as a defense to a claim of unequal pay, however, the Eighth Circuit has

cautioned that courts must "carefully examine[ ] the record to ensure that an employer

does not rely on the prohibited 'market force theory' to justify lower wages for female

employees simply because the market might bear such wages." Drum, 565 F.3d at 1073

(citing Taylor, 321 F.3d at 718.)  In examining the record, reference to the lower-paid

employee's education, experience, or other qualifications is necessary to determine

whether the reliance on prior salary for the higher-paid comparator is based on a factor

other than sex.  See id.; Lewis v. Smith, 255 F. Supp. 2d 1054, 1063 (D. Ariz. 2003)

(citations omitted) (merely relying on the prior salary of an employee, without analyzing

the market value of that employee's skills, is insufficient to establish an equal pay

defense).  Justifying the comparator's higher salary does not justify the plaintiff's lower

salary; it is the differential that must be explained.  Drum, 565 F.3d at 1073; Simpson,

441 F.3d at 579.  Thus, in Simpson, the Eighth Circuit affirmed a jury verdict finding an

employer liable under the EPA.  441 F.3d at 579.  The court rejected the employer's

argument that the pay differential at issue was based on factors other than sex, including

the fact that other employers had attempted to recruit the higher-paid comparator, stating,

"Exterior salary pressures have been rejected as reasons for pay differential by other

circuits, and the jury here was not unreasonable in doing so also."  Id. (citing Irby v.

Bittick, 44 F.3d 949, 955 (11th Cir. 1995) ("If prior salary alone were a justification, the

exception would swallow up the rule and inequality in pay among genders would be

perpetuated.")).

46.    Here, as discussed earlier, the Embassy failed to determine Davidson's marketplace value.  Even more importantly, it failed to determine Ewald's marketplace value.  Rather, Rognlie and Berg testified that one reason that Davidson was offered more money was that he had a higher salary from his previous job.  (Rognlie 1478; Berg 1253,1284-85.)   However, the evidence is undisputed that while the Hiring Committee was aware of Davidson's prior salary of $108,000 (P-7-0001), it did not determine Ewald's prior salary, which was approximately $190,000.  (Rognlie 1463-64; Ewald 76, D-60-0010; P-167-0001.)   The Embassy has failed to explain the differential, as required by Drum.  Accordingly, the Embassy's affirmative defense based on Davidson's prior salary fails.

**Breadwinner Status**

47.    In general, some courts have found that a pay disparity based on "head of household" or breadwinner status does not violate the EPA if it is equally applicable to men and women and was not implemented for the purpose of discriminating based on gender.  See J.C. Penney, 843 F.2d at 254; Tree of Life , 751 F. Supp. at 709.  The EEOC regulations caution, however, that "[s]ince a 'head of household' or 'head of family' status bears no relationship to the requirements of the job or to the individual's performance on the job, such a claimed defense to an alleged EPA violation will be closely scrutinized. . . ." 29 C.F.R. § 1620.21.  The Court is unaware of any Eighth

Circuit authority finding that head of household or breadwinner status is a valid "other than sex" affirmative defense under the EPA.

48.    After Gandrud's initial overture to Davidson, in which he suggested a $60,000 salary, Gandrud communicated with Johne, Ambassador Strømmen, and others. (P-7-0001.)  Gandrud relayed Davidson's "discomfort" with a $60,000 salary, and indicated that "market research" and Davidson's then-current salary of $108,000 might require a higher salary, commenting that "[w]ith young children, day care, etc., he has a legitimate concern."  (P-7-0001.)  Johne testified that she was unaware of any reason other than the issues that Gandrud identified in his email (P-7-0001) for Davidson to receive a higher salary than Ewald.  (Johne Dep. 73.)

49.    As noted, the Embassy's Guidance document that governed the hiring of local employees stated, "In establishing salary. . . , marital status and number of dependents shall not be taken into account."  (P-148-0033.)  Ambassador Strømmen expected the Hiring Committee to follow the Guidance (Strømmen 861), and found any consideration of how an employee might expend his or her salary     whether for day care, to pay a tax debit, or to buy a big boat     to be irrelevant to the determination of salary.  (Strømmen 877.)  He testified that Davidson's need for day care was not a legitimate basis for a higher salary, explaining that, for all the Embassy knew, Ewald might have had day care expenses as well.  (Id.)   Moreover, Davidson himself testified that he had no desire to find "day care" or non-parental child care for his children.

(Davidson 1916.)   He merely volunteered the information concerning his family

situation to explain his reason for seeking a part-time working arrangement.  (Davidson

1916-17.)

50.    The Court finds that Defendant's "head of household" defense fails as a

matter of fact and law.   Not only was consideration of family status either prohibited by

the Guidelines or irrelevant, even if it were a permissible or relevant factor, there is no

evidence in the record showing that the Embassy considered Ewald's family status in

determining her salary.  Since courts require a gender-neutral application of any such

consideration, see J.C. Penney, 843 F.2d at 254; Tree of Life , 751 F. Supp. at 709 (S.D.

Ohio 1990), this defense fails.

51.    For all of these reasons, and based on all of the evidence before the Court,

the Court finds that Plaintiff has proven by a preponderance of the evidence that

Defendant violated the EPA, 29 U.S.C. § 206(d)(1).  Likewise, Plaintiff has proven by a

preponderance of the evidence that Defendant violated the MHRA, Minn. Stat. 363A.08,

Subd. 2, for which the same liability standard applies.   Price, 664 F.3d at 1191.

### Minn. Stat. § 181.64

52.    Plaintiff asserts a claim for violation of Minnesota Statutes § 181.64. (Am.

Compl. Count II.)   Under that provision:

> It shall be unlawful for any person . . . or organization of any kind, doing
> business in [Minnesota], directly or through any agent or attorney, to
> induce, influence, persuade, or engage any person . . . to change from any
> place in any . . . country to any place in [Minnesota], to work in any branch

of labor through or by means of knowingly false representations, whether spoken, written, or advertised in printed form, concerning the kind or character of such work [or] the compensation therefor . . . .

Minn. Stat. § 181.64. "[T]he phrase 'kind or character' covers the work to be performed . . . ." Kanner v. Fairmont Foods of Minn., Inc., No. C1-99-568, 2000 WL 31790, at *2 (Minn. Ct. App. Jan. 18, 2000). "Compensation therefor" refers to the pay an employee receives in exchange for his or her work. See Lincoln v. Sears, Roebuck & Co., No. 02-CV-840 (DWF/SRN), 2002 WL 31108204, *5 (D. Minn. Sept. 17, 2002) (finding that the statements at issue did not concern the plaintiff's compensation). And, from a plain reading of Minn. Stat. § 181.64, Christianson v. Henke, 831 N.W.2d 532, 536-37 (Minn. 2013) ("we will construe [a] statute's words and phrases according to their plain and ordinary meaning"), the statute applies to knowingly false representations concerning the plaintiff's own pay, but does not apply to false representations about another employee's compensation. In order for a party to be liable under this statute, the party must know that the representation is false; it is not enough that the party made the representation without knowing whether the representation was true or false. Vaidyanathan v. Seagate US LLC, 691 F.3d 972, 976-78 (8th Cir. 2012).

53.     Here, the statements at issue are Gandrud's statement to PR Consultant Tunheim that the two positions were being paid the same range of compensation: "$100,000+" (P-16-0001), and Gandrud's statement to Ewald that he was able to get the top of the range for both positions, in other words, $70,000. (Ewald 120-21.) Neither

165

statement is sufficient to create liability under Minn. Stat. § 181.64.

54.    First, Gandrud's statement to Tunheim that the two positions commanded a

salary of "$100,000+" fails to satisfy the requirements of Minn. Stat. § 181.64, as the

statement was not made to Ewald, with the intent to induce her to change her

employment.

55.    Second, as to Gandrud's "top of the range" statement to Ewald    Ewald,

Davidson, and Gandrud all testified that the pay range mentioned by the interviewers

was $40,000-70,000.  (Ewald 110-11; Davidson 1913; Gandrud 710.)  On September 10,

2008, Vice President Mondale announced Ewald's hiring at a reception in Oslo

(Mondale 680-82; J-9-0004-05), before the Embassy had made a formal offer with a

salary figure.  (Ewald 116, 396.)   On September 12, 2008, Gandrud offered Davidson

the Innovation and Business Position with a salary of $100,000.  (Gandrud 744;

Davidson 1922; P-9-0001.)  The following day, when Gandrud phoned to formally offer

Ewald the Higher Education and Research Position with a $70,000 salary, Gandrud told

her that he was able to get the top of the range for both positions    in other words,

$70,000.  (Ewald 120-21.)   While Gandrud's statement to Ewald was false as it

concerned Davidson's salary, it was not a "knowingly false statement" about Ewald's

salary.  Vaidyanathan, 691 F.3d at 978; Lincoln, 2002 WL 31108204, at *5.  It is

undisputed that before Ewald accepted the position, she was told that she would be paid

$70,000.  (Ewald 118-19.)  Ewald was paid no less than $70,000.  (Trial Transcript

Stipulation 920-21; J-12-0002.)  The fact that the Embassy paid Davidson a higher salary does not relate to what the Embassy paid Ewald for purposes of liability under Minn. Stat. § 181.64.

56.     No court has expanded the reach of Minn. Stat. § 181.64 to statements concerning compensation for a position that was not the plaintiff's position.  See, e.g., Vaidyanathan, 691 F.3d at 976-78 (describing a Section 181.64 claim based on statements regarding plaintiff's job duties); Ferris v. Bodycote Lindberg Corp., No. 01-CV-1689 (MJD/JGL), 2003 WL 21517363, at *5 (D. Minn. June 30, 2003) (finding no false representations about "the kind or character of the work at the job or its compensation") (emphasis added); Jackson v. Navitaire, Inc., No. 04-CV-1557 (RHK/AJB), 2005 WL 61490, at *3 (D. Minn. Jan. 11, 2005) ("Plaintiffs must show that Navitaire 'made a knowingly false representation about the kind or character of the work at [each] job or its compensation.'") (alteration in original, emphasis added) (quoting Ferris, 2003 WL 21517363, at *5).

57.     Moreover, the evidence does not show that the Embassy intended to induce Ewald to change her employment and accept the job at the Honorary Consulate by commenting that the salary for both positions was "the top of the range."  See Rognlien v. Carter, 443 N.W.2d 217, 220 (Minn. Ct. App. 1989) (noting that a required element of employer fraud is that the defendant "intended the plaintiff to act on his representation").  Again, by September 13, 2008, the date on which Gandrud made the "top of the range"

statement, Gandrud had been told by several persons    Vice President Mondale, the U.S. Ambassador to Norway Benson K. Whitney, and Ewald herself    that Ewald had already been announced as the Higher Education and Research Officer.  (J-9-0004-05; P-10-0001).  In addition, several witnesses testified to Ewald's enthusiasm and excitement about the Higher Education and Research Position.  (Gandrud 877; Ewald 98.)  Moreover, Gandrud testified to his belief that Ewald would have accepted the expert position regardless of the salary offered to her.  (Gandrud 752.)   Based on these facts, the Court finds that Gandrud's statement concerning the "top of the range" for both positions was not intended to induce Ewald to accept the Higher Education and Research Position.

58.     For all of these reasons, the Court finds that the Embassy is not liable for a violation of Minn. Stat. § 181.64.

### Damages

59.     "[T]he plaintiff has the burden of proving damages caused by the defendant by a fair preponderance of the evidence."  Can. by Landy v. McCarthy, 567 N.W.2d 496, 507 (Minn. 1997).  Damages are awarded only for "a proven injury or loss."  Ray v. Miller Meester Adver., Inc., 684 N.W.2d 404, 407 (Minn. 2004).  Damages must be proven with reasonable certainty and supported by record evidence.  See Carmody v. Kan. City Bd. of Police Comm'rs, 713 F.3d 401, 407 (8th Cir. 2013) ("unsupported estimations" insufficient to prove damages).  Where a plaintiff seeks damages under

different theories, she must prove separate damages to avoid double recovery.  Hanks v.

Hubbard Broad., Inc., 493 N.W.2d 302, 308 (Minn. Ct. App. 1992); Wiring v. Kinney

Shoe Corp., 461 N.W.2d 374, 379 (Minn. 1990) ("Although . . . parallel actions can be

maintained, we do not uphold double recovery for the same harm.").

    60.    Based on the Court's finding that Ewald has proven by a preponderance of

the evidence Defendant's liability for discrimination based on unequal pay under the

EPA and MHRA, Plaintiff is entitled to damages.   Under the EPA, a plaintiff may

recover lost wages, liquidated damages, and attorney's fees and costs.  29 U.S.C. §

216(b).  Pursuant to the MHRA, Minn. Stat. § 363A.33, Subd. 6, if a court or jury finds

that an employer has engaged in an unlawful discriminatory practice, relief shall be

determined as provided by Minn. Stat. § 363A.29, Subd. 3-6.  Under Minn. Stat.

363A.29, Subd. 4, courts are required to impose a civil penalty, payable to the State of

Minnesota, and the aggrieved plaintiff may recover compensatory damages in an amount

up to three times the actual damages sustained, damages for mental anguish or suffering,

reasonable attorney's fees, and punitive damages in an amount not more than $25,000.

**Lost Wages**

    61.    Because this Court finds that Ewald was paid less than her male comparator

for equal work, she is entitled to recover the additional amount that she would have

received had they been paid equally.  29 U.S.C. § 216(b); see also E.E.O.C. v. White &

Son Enter., 881 F.2d 1006, 1012 (11th Cir. 1989).  As for lost salary, Ewald received a

salary of $75,355, with a $7,000 pension, while Davidson received a salary of $100,000,

with a $10,000 pension.  (Trial Transcript Stipulation 920.)  This results in a salary

difference of $24,645 and a pension difference of $3,000 per year.  Multiplying those

figures over the three-year term of employment, and adding the salary and pension

difference together, results in a total of $82,935.

      62.    In addition, this Court previously determined that Ewald's non-reimbursed

travel expenses for attending Science Week 2010 constituted "wages" under the EPA,

and therefore permitted Ewald to present evidence of such expenses in support of her

damages claim under the EPA.  (Mot. in Limine Order at 7 [Doc. No. 276].)  However,

Defendant now argues that it did not pay for Davidson to attend Science Week 2010

rather, Innovation Norway paid those expenses.  (Davidson 2033-35.)

      63.    As the Court previously explained, under the EPA, the term "wages"

includes

> all forms of compensation . . . whether called wages, salary, profit sharing,
> expense account, monthly minimum, bonus, uniform cleaning allowance,
> hotel accommodations, use of company car, gasoline allowance, or some
> other name.  Fringe benefits are deemed to be remuneration for
> employment.

29 C.F.R. § 1620.10.  Not only does the language of the statute envision a broad reading

(using phrases such as "whether called," "or some other name," and "fringe benefits"),

the EEOC expressly defines the term "wages" to include "reimbursement for travel

expenses."  EEOC Compliance Manual, No. 915.003 § 10-IV(C) (Dec. 5, 2000); <u>see</u>

<u>Federal Express Corp. v. Holowecki</u>, 552 U.S. 389, 399 (2008) (noting that EEOC compliance manuals reflect "a body of experience and informed judgment to which courts and litigants may properly resort for guidance").

64.     Since Ewald's involvement in Science Week was a required part of her job duties (J-2-0003), the Embassy should have covered her expenses to attend the event in 2010.  Although Innovation Norway may have paid for Davidson to attend, the Stakeholders understood that the two expert positions were to be funded equally (P-17-0003; P-14-0002), and the Embassy facilitated Davidson's reimbursement of travel expenses on a number of occasions.  (P-132-0001; P-135-001.)  Wemberg, the Embassy's Head of Administration, even acknowledged the Embassy's different treatment of Ewald and Davidson in the reimbursement of travel expenses. (P-130-0004.)   When presented with a reimbursement request from Davidson in May 2011 (P-132-0002; P-130-0003), which the Embassy approved (P-132-0001), Wemberg stated, "A little unfortunate that this is coming at the same time when we are denying Ellen?" (P-130-0004.)  Ewald submitted a travel claim form in the amount of $2,362 in connection with her attendance at Science Week 2010. (P-149-001-02.)  Therefore, Ewald is entitled to an additional $2,362 (P-149-001-2) as part of her lost wages calculation, resulting in a lost wages total of $85,297.

65.     As for Ewald's claims for reimbursement of certain health insurance claims, the evidence in this case does not establish a link between the non-reimbursed

health insurance benefits at issue and Plaintiff's claims based on unequal pay.  The

evidence concerning the Embassy's handling of Ewald's health insurance shows that

while the Embassy was ultimately incorrect in its denial of coverage for Mikalsen, it

demonstrated that factors other than sex were behind the denial of coverage for Ewald's

adult children and for the denial of coverage for Mikalsen for the first few months of

Ewald's employment.  Specifically, the Embassy identified Norway's policy of not

extending health care benefits to children over age 18, Norway's former policy that only

financially-dependent spouses or partners could obtain coverage, and the belief that

Mikalsen, a Norwegian citizen, was covered under the Norwegian health care system.

Nor were the Embassy's decisions with respect to health insurance benefits necessarily

made by the same decision makers as those who determined the salaries for the expert

positions.  While Plaintiff may have had a claim for reimbursement for her out-of-pocket

expenses for her adult daughters' insurance under the Minnesota statute through which

she claimed entitlement to coverage, Minn. Stat. § 62A.048 (2008), she did not bring

such a claim.  Accordingly, Plaintiff is not entitled to lost wages damages related to

reimbursement for health insurance for the first few months of her employment as to

Mikalsen or for her adult daughters.

### Period of Back Pay/Front Pay

66.    While Plaintiff seeks back pay for the three-year term of her employment

with the Embassy (Pl.'s Proposed Concl. of Law ¶ 39B [Doc. No. 328])    which the

172

Court awards   she also seeks a back pay award from the end of her employment with the Embassy through the date of trial.  (Id. ¶ 39B.)  In addition, Plaintiff seeks future lost compensation, to account for what she lost when she left her job in Norway to take the job at the Embassy, and also because her former job was no longer available to her upon the expiration of her contract with the Embassy.  (Id. ¶ 39K.)   The Court finds both of these damages requests to be somewhat related and addresses them together.

67.    As to the scope of Plaintiff's back pay award, the EPA contemplates liability for such "legal or equitable relief as may be appropriate to effectuate the purposes of [the EPA], including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  In the employment discrimination context, where reinstatement is impractical due to the frayed relationship between employer and employee, courts may instead award employees front pay, under certain circumstances.  Mathieu v. Gopher News Co., 273 F.3d 769, 778 (8th Cir. 2001) (affirming award of front pay in lieu of reinstatement in MHRA case involving disability discrimination).  Regarding Plaintiff's future damages request, it is not entirely clear whether it is premised on Plaintiff's unsuccessful claim under Minn. Stat. § 181.64 or her unequal pay claim.  For purposes of analysis, the Court will assume that it is premised on her unequal pay claim.

68.    Plaintiff has previously represented to the Court that she does not seek

future damages under the EPA.  (Pl.'s Mem. in Opp'n to Def.'s Mot. in Limine to Exclude Evidence of Future Damages at 2 [Doc. No. 251].)   As the Court has previously ruled, front pay is compensable under the MHRA.  Minn. Stat. § 363A.29, subd. 5(1); Ray v. Miller Meester Adver., Inc., 684 N.W.2d 404, 407 (Minn. 2004).  However, recognizing that front pay awards are potentially speculative, such awards are limited by the plaintiff's duty to mitigate damages, as well as the evidence presented concerning the extent of the potential damages.  Ray, 684 N.W.2d at 406.  As the Eighth Circuit has observed, "[f]ront pay is an exceptional remedy and should only be awarded in lieu of reinstatement when extraordinary circumstances render reinstatement "'impractical or impossible.'"  Mathieu, 273 F.3d at 778 (quoting Newhouse v. McCormick & Co., Inc., 110 F.3d 635, 641 (8th Cir. 1997)).  For instance, in Mathieu, the court approved an award of front pay where the plaintiff was near retirement, had worked for the employer-defendant for most of his working career, and was disabled    all of which made it unlikely that the plaintiff would achieve his previous level of income and benefits in the future.  Id. at 779.

69.   The Court declines to award Plaintiff back pay beyond the three-year term of employment, and likewise declines to award future damages or front pay.  The wage disparity here occurred over a defined period of employment.  Ewald and Davidson accepted employment for a three-year term understanding that there was no guarantee of renewal.  Both Ewald and Davidson were employed for the entire term of their

174

employment contracts; neither Ewald's nor Davidson's term of employment was

renewed or extended.  The wage disparity does not extend beyond the period of

employment.

70.     The Court's decision, however, is based merely on the fact of the three-year

term of Ewald's employment.  It is not based on any failure to mitigate damages.  To the

contrary, the Court finds that Plaintiff has met her duty to mitigate damages.  This duty

requires a successful plaintiff to use reasonable diligence in finding suitable employment

and not refuse a position substantially equivalent to the one that was lost.  Denesha v.

Farmers Ins. Exch., 161 F.3d 491, 502 (8th Cir. 1998) (finding that damages for

employee in successful age discrimination suit were properly reduced for employee's

failure to mitigate).  The requirement to mitigate damages is not onerous and does not

require success.  Id.  The defendant bears the burden of showing that there were suitable

positions and that the plaintiff failed to use reasonable care in seeking them.  See Kehoe

v. Anheuser-Busch, Inc., 96 F.3d 1095, 1106 (8th Cir. 1996).

71.     Ewald used reasonable efforts to mitigate her damages by finding full-time

employment with Tysvar.  Ewald was concerned about her reputation, and needed to

work with people whom she trusted.  Defendant has not shown that there were other

suitable expert positions available to Ewald.  There is no evidence that Ewald could have

obtained a substantially equivalent expert position within or outside the Norwegian

government.  The widespread distribution of communications criticizing Ewald and

referring to her as a "bad hire" within various Norwegian agencies would have substantially hindered her efforts to find employment with such agencies.  Although Ewald's income with Tysvar has not been fully realized, it appears from the evidence at trial that this is due to some specific pressures that were faced by the company over a certain period of time, and that Ewald has been credited to receive future payments. (Ewald 352, D-64-0002, Mikalsen 1656-57.)

### Liquidated Damages

72.     An employer who violates the EPA may also be liable for liquidated damages.  29 U.S.C. § 216(b).  Liquidated damages are "a means of compensating employees for losses they might suffer by reason of not receiving their lawful wage at the time it was due."  Broadus, 226 F.3d at 943 (citation omitted).  Such damages are "expressly a matter for the trial court's discretion," and the trial court may "award no liquidated damages or limited liquidated damages if the employer shows that it acted in good faith and had reasonable grounds for believing its action did not violate the EPA." E.E.O.C. v. Cherry-Burrell Corp., 35 F.3d 356, 363, 365 (8th Cir. 1994); Brown v. Fred's Inc., 494 F.3d 736, 743 (8th Cir. 2007) (citing 29 U.S.C. § 260).  The question is whether reasonable grounds existed for the employer's belief, not whether the court later determines that that belief was inaccurate.  Clymore v. Far-Mar-Co., 709 F.2d 499, 505 (8th Cir. 1983).

73.     The Embassy showed that it had good faith, reasonable grounds for

believing that it was not in violation of the EPA. The evidence shows that Ambassador

Strømmen consulted with attorneys about the salary difference between Ewald and

Davidson at the time the salaries were recommended, and was told that the salary

differential was not in violation of the law because the two jobs were different.

(Strømmen 839-40.)   While the Embassy's subsequent actions with respect to the

handling of Ewald's inquiries were bungled, those actions do not undercut the essential

fact that, at the time the salary decisions were made, the Embassy held a good faith

belief, albeit legally incorrect, that it had reasonable grounds for awarding Davidson a

higher salary than Ewald.  On these facts, the Court declines to award liquidated

damages.

### Attorney's Fees

74.     The EPA also provides that where an employer is found to have violated

the Act, the Court shall allow reasonable attorney's fees and costs to be paid by the

employer.  29 U.S.C. § 216(b).  The Court directs Plaintiff to submit within 20 days of

this Order an affidavit and memorandum in support of reasonable attorney's fees and

costs related to the claims on which Plaintiff has established liability.  Defendant will

then have 20 days from the date of Plaintiff's filing in which to submit a response.

### Emotional Distress Damages

75.     Plaintiff seeks "garden variety" emotional distress damages.  (See Order of

4/15/15 at 12 [Doc. No. 276].)  Defendant argues that damages for emotional distress are

not available under the EPA.  (Def.'s Proposed Findings of Fact and Concl. of Law at 85

[Doc. No. 327] (citing 29 U.S.C. §§ 216-17; Hanlon v. Casino Queen, Inc., No.

10-453-GPM, 2011 Dist. LEXIS 20509, at *3 (S.D. Ill. Mar. 2, 2011); Hybki v.

Alexander & Alexander, Inc., 536 F. Supp. 483, 484 (W.D. Mo. 1982)).)  Defendant also

argues that Ewald's claims of emotional distress are undercut by the fact that she

attempted to remain a 10% employee of the Embassy when she proposed to work for

CeRTA for the majority of her time, and by the fact that she also inquired about other

positions at the Embassy when she learned that her expert position would not be

renewed.  (Def.'s Proposed Concl. of Law ¶ 246 [Doc. No. 327]) (citing Ewald 438-39;

P-1137-0001.)

76.    As an initial matter, it is not clear that emotional distress damages are

unavailable under the EPA in the Eighth Circuit.  While Defendant cites to our sister

court, the Western District of Missouri, in Hybki, 536 F. Supp. at 484, that court relied

on only one case in support of its position that the EPA has been consistently interpreted

to authorize damages only for unpaid wages and liquidated damages.  Id. (citing

Vazquez v. E. Air Lines, Inc., 579 F.2d 107, 109-10 (1st Cir. 1978)).  On the other hand,

in Broadus, while the Eighth Circuit did not expressly analyze the issue, it affirmed an

EPA jury award that appears to have included emotional distress damages.  238 F.3d at

992.  At least one district court has cited Broadus, along with decisions from the Sixth,

Seventh, and Ninth Circuit Courts of Appeals, for the proposition that the EPA's grant of

"legal or equitable relief" includes emotional distress damages.  Douglas v. Mission

Chevrolet, 757 F. Supp. 2d 637, 639 (W.D. Tex. 2010) (citing decisions approving an

award for emotional distress damages, but concluding that such damages have not been

recognized by the Fifth Circuit).

77.     In any event, regardless of the availability of such damages under the EPA,

such damages are expressly available under the MHRA.  Under Minn. Stat. § 363A.29,

Subd. 4, a court may order the employer to pay damages for mental anguish, in addition

to compensatory damages and other relief.  Damages for mental anguish may also

include compensation for personal humiliation and impairment of reputation.  See Kohn

v. City of Minneapolis Fire Dep't, 583 N.W.2d 7, 14 (Minn. Ct. App. 1998.)  The

mental anguish need not be severe, or accompanied by physical injury, to support an

award of damages.  See id.  Damages for mental anguish, including a diminished sense

of self worth, may be established solely through subjective testimony.  See Gillison v.

Dep't of Natural Resources, 492 N.W.2d 835, 842 (Minn. Ct. App. 1992).

78.     Plaintiff testified that she suffered substantial emotional distress and

humiliation related to her unequal pay (Ewald 172, 306, 312, 337-39, 350), and the

evidence adduced at trial overwhelmingly establishes the existence of such distress.  She

testified that the pay differential "took over [her] life" (Ewald 338), causing her to feel

sad, embarrassed (id.) and belittled.  (Ewald 306.)  She summarized her response to the

unequal pay, stating, "I felt that I was just broken."  (Ewald 338.)  Ewald and her

husband both testified to her difficulties with decision making, observing that she second-guessed herself when making decisions. (Mikalsen 1689-90; Ewald 351.) Mikalsen confirmed that Ewald also questioned her memory, even when her recollection is correct. (Mikalsen 1679-80; Ewald 350.) Mikalsen described the decline in his wife's emotional well-being over the course of her employment with the Embassy, from a fun, open person with great self-confidence, to a sad, self-doubting person with greatly diminished confidence. (Mikalsen 1674-75, 1677-79.) In addition, Honorary Consulate staff member Carleton recalled that Ewald was often very upset about the pay difference and insurance benefits difficulties. (Carleton 1055.) Ewald remembered that she cried in Carleton's presence at work when discussing the pay differential, which embarrassed Ewald. (Ewald 325.) Likewise, Davidson recalled Ewald being emotional and upset at work regarding differential treatment for travel reimbursement. (Davidson 2033.)

79. Through the time of trial, Ewald also continued to have a diminished ability to concentrate and focus. (Ewald 350-51.) During her testimony as a trial witness, the Court observed that Ewald sometimes displayed difficulty following questions, appeared defeated, distraught, and unsure of herself, and was occasionally tearful.

80. Ewald also experienced physical symptoms related to her emotional distress. In addition to her difficulties with concentration and memory, she experienced headaches, a stiff neck, trouble sleeping, tightness in her chest, nausea, and eye twitches. (Ewald 339; Mikalsen 1680-83.)

81.     Moreover, Plaintiff testified that she has continuing concerns about the damage to her reputation    a valid concern, as at least one member of the Norwegian-American community testified at trial that Ewald's reputation has been harmed.  (Nash 567-70.)  Other evidence at trial revealed harm to Ewald's reputation: widely-circulated email messages from Steering Committee Chair Finborud disparaged Ewald as a "bad hire" (P-93-0003; P-97-0008), Johne revealed Ewald's private and confidential salary information as compared to Davidson's to a wide audience of recipients (P-17-0012-13), Johan Vibe patronizingly referred to Ewald as "our little friend" (P-74-0003) and suggested that Ewald receive a 0.0% raise. (J-36-0003.)  Understandably, Ewald testified that she found these personal attacks and the divulging of salary information humiliating. (Ewald 314, 345-46.)

82.     Defendant argues that because Ewald sought to retain employment with the Embassy, this undercuts her claim of mental anguish and emotional distress.  The Court disagrees.  Ewald's attempt to work out a 90% work arrangement with CeRTA and a 10% arrangement with the Embassy was not an indication of her emotional happiness, but, rather, a survival strategy.  Gandrud described it as a "way out for everyone."  (P-79-0002; Gandrud 958-59.)

83.     Based on this evidence, the Court finds that Ewald has demonstrated emotional distress, for which an award of $100,000 for mental anguish and emotional distress under the MHRA is appropriate.  See Mathieu, 273 F.3d at 780 (affirming trial

court's enhancement of jury award of $165,000 for mental anguish under the MHRA);

Luu v. Seagate Tech., Inc., No. 99-CV-220 (JRT/FLN), 2001 WL 920013, at *9 (D.

Minn. July 5, 2001) (sustaining a jury award of $800,000 in emotional distress damages);

Kohn, 583 N.W.2d at 14-15 (affirming trial court's award of $100,000 in emotional

distress damages under the MHRA).

## Punitive Damages

84.    Plaintiff also seeks punitive damages under the MHRA.  Under the MHRA,

punitive damages of not more than $25,000 may be awarded. Minn. Stat. § 363A.29,

Subd. 4.  In order to recover such damages, Plaintiff must establish "upon clear and

convincing evidence that the acts of the defendant show deliberate disregard for the

rights or safety of others."  Minn. Stat. § 549.20, Subd. 1(a)(b); Minn. Stat. § 363A.29,

Subd. 4 (stating that punitive damages under the MHRA "shall be awarded pursuant to

section 549.20").

85.    The Embassy's decision to award Davidson a higher salary than Ewald does

not rise to the level of deliberate disregard for Ewald's rights warranting punitive

damages.  Accordingly, for many of the same reasons set forth in the Court's denial of

liquidated damages, the Court declines to award punitive damages.

## Enhanced Damages

86.    The MHRA also provides that compensatory damages may be enhanced by

up to three times the amount of actual damages sustained when the defendant has

engaged in an unfair discriminatory practice.  Minn. Stat. § 363A.29, Subd. 4.

Application of the MHRA multiplier is entirely within the trial court's discretion and

there are "no guidelines as to when or under what circumstances a trial court may

multiply damages." Phelps v. Commonwealth Land Title Ins. Co., 537 N.W.2d 271, 274

(Minn. 1995).  Reflecting the wide degree of latitude under the statute, courts have

elected to treble or double compensatory damages, to award a different multiplier, or

have declined to apply a multiplied enhancement.  See, e.g., Mathieu, 273 F.3d at 780

(affirming trial court's enhancement of entire damages award by 1.5 pursuant to the

MHRA); Stavenger v. Jay Ryan Enter., Inc., No. 07-CV-3514 (ADM/RLE), 2008 WL

906794, at *3 (D. Minn. April 3, 2008) (doubling entire damages award under the

MHRA); Ryther v. KARE 11, 864 F. Supp. 1525, 1529 (D. Minn. 1994) (declining to

award enhanced compensatory damages under the MHRA); Gammon v. Precision Eng'g

Co., No. 4-85-1217 (JMR), 1987 WL 16127, at *9 (D. Minn. Aug. 27, 1987) (trebling

damages for back pay under the MHRA).

     87.    Although an enhanced award is entirely within the Court's discretion,

Phelps, 537 N.W.2d at 274, the Eighth Circuit has also observed that "encourag[ing]

private enforcement of the MHRA is a valid justification for application of the

multiplier." Mathieu, 273 F.3d at 780.   While "the trebling function in this statute has a

deterrent effect, it is primarily a compensatory measure which is made all the more clear

by the statute's explicit labeling of the treble damages as 'compensatory.'" Phelps, 537

N.W.2d at 277 (citing Evans v. Ford Motor Co., 768 F. Supp. 1318, 1327 (D. Minn.

1991)).  However, the application of the multiplier need not be expressly tied to

compensatory purposes.  Id. at 275 (stating, "after an initial finding of damages, a trial

court need not make an additional finding that uncompensated damages exist prior to

multiplying damages").

     88.    Here, the Court finds that an enhancement of Plaintiff's compensatory

damages is warranted, and orders that such damages be doubled.  As in Mathieu, the

Court finds that an enhancement of compensatory damages serves the purpose of

encouraging private enforcement of the MHRA.  Because enhanced damages are a fixed

multiple of compensatory damages, "the degree of culpability of the employer need not

be considered."  Convent of the Visitation Sch. v. Cont'l Cas. Co., 707 F. Supp. 412, 416

(D. Minn. 1989).  However, it appears that nothing precludes the Court from

considering the employer's conduct.  While the Embassy's conduct with respect to

Ewald's salary was not intentionally discriminatory, nor does it rise to the level of

deliberate disregard, the Court finds that the Embassy's handling of Ewald's complaints

and inquiries was offensive and demeaning.   In contrast to the prompt efforts of Vice

President Mondale and Gandrud to rectify Ewald's concerns about unequal pay on

September 23, 2009, the Embassy itself unnecessarily delayed its response to Ewald's

inquiries about health insurance benefits and the salary differential.   When Ambassador

Strømmen handed the September 23, 2009 letter back to Gandrud, the Ambassador said

that he would try to obtain funding (Strømmen 845), yet the Embassy did not respond to Gandrud about whether it could make an adjustment to Ewald's salary.  (Gandrud 936.)  While Ambassador Strømmen did not ask the Stakeholders for more funding to increase Ewald's salary (Berg 1296), within four weeks of receiving the letter from Vice President Mondale and Gandrud, the Ambassador asked the Stakeholders for more money for various other activities at the Consulate, including the experts' travel expenses.  (J-26-0016.)  Ironically, Ambassador Strømmen received 150,000 NOK, or approximately $26,000    an amount that would have bridged the pay gap between Ewald and Davidson, had it been applied for that purpose.  (J-26-0013.)

89.    Ewald herself fared no better than Gandrud and the former Vice President of the United States in obtaining a response from the Embassy.  On September 23, 2009, Ewald emailed Jan Age Larson with questions about her family's insurance coverage and the salary differential between her and Davidson.  (P-55-0001-2.)  While Larsen confirmed receipt of her email, he provided no substantive response.  (P-55-0001.)  One month later, on October 23, 2009, Ewald sent a follow-up email, requesting a response.  (P-62-0001.)  And she sent another such request on November 4, 2009 (P-63-0001), and another on November 16, 2009.  (P-65-0001.)

90.    Behind the scenes, when the Embassy discussed Ewald's concerns, it referred to Ewald both internally, and to a wide audience, in damaging, derogatory terms, labeling her a "bad hire" (P-93-0003; P-97-0008), revealing the private and confidential

salary differential to a large group of recipients (P-17-0012-13), calling her "our little

friend" (P-74-0003), and characterizing her inquiries as "nagging." (J-36-0003.)   In

response to Vibe's email in which he suggested that Ewald receive a 0.0% raise,

Ambassador Strømmen replied, "Brilliant."  (Id.)  In addition, when Ewald expressed her

concerns in person, she was told by Gandrud to "nip this situation in the bud because

there could be consequences" (Ewald 327-28), and Johne advised, "don't talk to any

lawyers," and to not make a big deal out of the situation, but to accept it.   (Ewald 317-

18.)  With the exception of the September 23, 2009 letter from Vice President Mondale

and Gandrud, there is no evidence showing that the Embassy, at any point, seriously

considered adjusting Ewald's salary.

    91.    Accordingly, the Court finds that an award doubling Plaintiff's

compensatory damages for lost wages is appropriate.[4]   As this Court awards $85,297 in

---

[4] Although the Eighth Circuit in Mathieu v. Gopher News Co. affirmed the trial
court's application of the MHRA multiplier to an award for emotional harm, the Eighth
Circuit noted that it was a "close question" that had not been expressly addressed by a
Minnesota court in a published opinion.  273 F.3d at 780.  Because it does "not sit as final
arbiter[] of questions of state law," the Eighth Circuit concluded that it "[could] not say
the magistrate judge abused his discretion by adopting one plausible interpretation of the
multiplier provision." Id. at 781.  However, since that opinion was issued, the Minnesota
Court of Appeals held - in a published opinion - that the MHRA "specifically does not
include emotional damages within the damages permitted to be trebled."  Ray, 664
N.W.2d at 370 (emphasis added), aff'd, 684 N.W.2d 404 (Minn. 2004).  Accordingly, this
Court declines to apply the MHRA multiplier to Ewald's award of emotional distress
damages.  But see Stavenger, 2008 WL 906794, at *3 (doubling an award of emotional
distress damages without addressing the Minnesota Court of Appeals' holding to the
contrary).

lost wages, the enhanced total award of such damages is $170,594.

**Civil Penalty**

92.     Plaintiff also seeks the imposition of a civil penalty against Defendant. (See Am. Compl. at p. 31 [Doc. No. 104].)  Pursuant to Minn. Stat. § 363A.29, Subd. 4, the Court is required to assess a civil penalty payable to the general fund of the State of Minnesota against any defendant found to have violated the MHRA. In making this assessment, the Court is to consider the "seriousness and extent of the violation, the public harm occasioned by the violation, whether the violation was intentional, and the financial resources of the respondent."  Minn. Stat. § 363A.29, Subd. 4.  Based on these factors, the Court assesses a civil penalty of $1,000 against the Embassy.  See, e.g., Peterson v. Ford Motor Co., 03-CV-5027 (DWF/AJB), 2006 WL 2375653, at *5 (D. Minn. Aug. 15, 2006) (imposing a $5,000 civil penalty against the defendant pursuant to the MHRA, in a case involving disability discrimination); Briel v. Chang O'Hara's Bistro, Inc., No. 03-CV-6549 (RHK/AJB), 2005 WL 827087, at *4 (D. Minn. April 8, 2005) (assessing a $1,000 civil penalty against defendant under the MHRA in a sexual harassment, constructive discharge, and retaliation suit).

**Prejudgment Interest**

93.     "Prejudgment interest serves at least two purposes: (1) it helps compensate plaintiffs for the true cost of money damages they have incurred, [and] (2) where liability and the amount of damages are fairly certain, it promotes settlement and deters an

187

attempt to benefit unfairly from an inherent delay of litigation." <u>EEOC v. Rath Packing Co.</u>, 787 F.2d 318, 333 (8th Cir. 1986) (citations omitted).  Courts have indicated that in actions brought under the Fair Labor Standards Act   of which the EPA is a part   the district court may "award interest on back pay from the date the claims accrued." <u>McClanahan v. Mathews</u>, 440 F.2d 320, 326 (6th Cir. 1971).  This Court has also previously observed that it is "well settled that plaintiffs are entitled to prejudgment interest if the back pay awarded was reasonably capable of being ascertained at the time of the discriminatory act." <u>Klask v. N.w. Airlines, Inc.</u>, No. 4-86-352 (DSD), 1991 WL 346371, at *2 (D. Minn. Aug. 12, 1991) (citation omitted).  In addition, under Minnesota law, interest may be awarded on judgments or awards for the recovery of money.  Minn. Stat. § 549.09.

94.    The Court directs Plaintiff to calculate prejudgment interest and to submit that calculation, along with any supporting authority, in her attorney's fees petition within 20 days from the date of the filing of this Order.  Defendant will have an opportunity to respond within 20 days of Plaintiff's filing.

## CONCLUSION

The New Model Norwegian Consulate in Minneapolis promised to be both an exciting and economically workable model consulate precisely because the Stakeholders who invested in the concept expected, long term, to realize a meaningful return on their investment - increasing opportunities to collaborate on research-based innovation and the

commercialization of research in technologies shared by both countries, including green technology, renewable energy, health care and other business development opportunities.

To further that end, it was clearly their expectation that these expert positions would be "two sides of the same coin" (Finborud Dep. 88), each side of which was to be of equal value - that is, expert networkers, with the capacity to bring together such collaborations in two strategic areas    higher education and research, on the one hand, and business and innovation, on the other.  The false premise that the jobs were somehow comparable to a private business person, on the one hand, and an educator, on the other, and should be paid accordingly is completely belied by the facts.  Although there were differences in the expert officers' daily activities, those differences were not material to the ultimate question presented to this Court    were the jobs substantially equal?  That analysis depends not on whether there were differences in the jobs but rather on whether the jobs required equal skill, effort, and responsibility.  There was no competent evidence presented at trial that one job required greater skill, effort, and responsibility than the other.  Rather, the evidence demonstrated that the jobs were substantially equal.

The EPA is a strict liability statute.  The plaintiff is not obligated to demonstrate that the employer acted with discriminatory intent.  Rather, the plaintiff need only show that she was paid unequally for substantially equal work.  There is no evidence in the record of real discriminatory intent.  There is, however, ample evidence of unequal pay

for equal work.

To his great credit, Vice President Mondale, along with Honorary Consul Gandrud, attempted to bring this issue to the attention of the Embassy in their letter of September 23, 2009 to the Ambassador describing the pay differential as "unjust and embarrassing."  It was also unlawful.  Unfortunately, the pay differential was never corrected and this lawsuit followed.

Based upon the above findings of fact and conclusions of law, the Court makes the following:

## ORDER

Ewald has successfully demonstrated a violation of the EPA and MHRA as to her unequal pay claim.  She has not demonstrated a violation of Minn. Stat. § 181.64, however.  Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Judgment on Count III of the Amended Complaint, for violation of the MHRA as to unequal pay, and Count VI for violation of the EPA, be entered in favor of Plaintiff;

2. Judgment on Count II, for violation of Minn. Stat. § 181.64, be entered in favor of Defendant.

3. Defendant shall pay Plaintiff $170,594 for lost wages, an amount which contains an enhancement of doubled compensatory damages pursuant to Minn. Stat. §

190

363A.29, Subd. 4;

4.  Defendant shall pay Plaintiff $100,000 for emotional distress damages;

5.  Defendant shall pay the sum of $1,000 to the general fund of the State of Minnesota for its violation of the MHRA pursuant to Minn. Stat. § 363A.29, Subd.4; and

6.  Plaintiff shall submit a detailed affidavit and memorandum to the Court itemizing attorney's fees and costs, as well as a calculation for prejudgment interest, as detailed herein, within 20 days, to which Defendant shall respond within 20 days of Plaintiff's filing.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   December 31, 2014

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Court Judge